1   KAROL K. DENNISTON (Bar No. CA 141667)
    karol.denniston@dlapiper.com
2   BRENDAN P. COLLINS (Bar No. CA 260260)
    brendan.collins@dlapiper.com
3   NATASHA L. JOHNSON (Bar No. CA 260562)
    natasha.johnson@dlapiper.com
4   **DLA PIPER LLP (US)**
    550 South Hope Street, Suite 2300
5   Los Angeles, CA  90071-2678
    Tel:  213.330.7700
6   Fax:  213.330.7701

7   [Proposed] Attorneys for Fili Enterprises, Inc., d/b/a
    Daphne's Greek Cafe, a California corporation,
8   Debtor and Debtor-in-Possession

9

            UNITED STATES BANKRUPTCY COURT
10
            SOUTHERN DISTRICT OF CALIFORNIA
11

12  In re:                              CASE NO.  10-bk-00324-PB

13  FILI ENTERPRISES, INC., d/b/a Daphne's    Chapter 11
    Greek Cafe, a California corporation,
14                                      **DECLARATION OF GEORGE
                Debtor.                 KATAKALIDIS IN SUPPORT OF FIRST
15                                      DAY MOTIONS**

16                                      Date:        TBD
                                        Time:        TBD
17                                      Place:       Room 328
                                        Judge:       The Hon. Peter W. Bowie
18

19

20

21

22

23

24

25

26

27

28

DLA Piper LLP (US)
Los Angeles

                                   -1-
WEST\21846895.4                          Case No. 10-bk-00324-PB
                                    **DECLARATION OF GEORGE KATAKALIDIS**

I, GEORGE KATAKALIDIS, declare as follows:

1.      I am the founder of Fili Enterprises, Incorporated, d/b/a Daphne's Greek Cafe ("Fili" or the "Debtor"). I serve as the Debtor's President, Chief Executive Officer and Chairman of the Board of Directors. In this capacity, I am generally familiar with the day-to-day operations, business and financial affairs of the Debtor. I submit this Declaration in support of the Debtor's chapter 11 petition and "first-day" relief that the Debtor has requested in the first day motions ("First Day Motions") identified below and to assist the Court and other interested parties to understand the circumstances that compelled the commencement of this Chapter 11 case (the "Case").

2.      Except as otherwise stated, all facts contained within this Declaration are based on my personal knowledge, my discussions with other members of the Debtor's management, my review of relevant documents, and/or my opinion, relying on my experience in the industry and knowledge of the Debtor's operations and finances. If I were called upon to testify, I could and would competently testify to the matters set forth herein. I am authorized to submit this Declaration on behalf of the Debtor.

3.      On January 11, 2010 (the "Petition Date"), the Debtor filed a voluntary petition ("Petition") for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"). The Debtor continues to operate its business and manage its affairs as a debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

4.      As President and Chief Executive Officer, I oversee and direct all of the Debtor's business operations, including, but not limited to, financial planning, financial reporting, and cash management activities, and I have been actively involved in developing and implementing the Debtor's business strategies. I have reviewed and worked extensively with the Debtor's books and records, including the Debtor's financial statements and projections, business plans, analyses, reports, insurance policies, leases, other legal documents, notes, correspondence, and the like. On a daily basis, I witness and/or participate in negotiations with lenders, vendors, and customers of the Debtor, and I work closely with personnel from all aspects of the Debtor's operations. Based upon all of the foregoing, I have developed an intimate familiarity with the Debtor's books and records, operational and financial details, business and

DLA PIPER LLP (US)
LOS ANGELES

WEST\21846895.4

financial history, and current business and financial situation, and with the restaurant industry generally.

5.    After the filing of the Petition, the Debtor filed (concurrently with this Declaration), the following Motions:

a.    First Day Motion By Debtor For Order Limiting Scope Of Notice;

b.    First Day Motion By Debtor For Order (A) Authorizing Continued Use Of Debtor's Cash Management System, (B) Authorizing Maintenance And Continued Use Of Debtor's Existing Bank Accounts, (C) Authorizing Continued Use Of Debtor's Business Forms, (D) Authorizing A Waiver Of Section 345(b) Deposit And Bond Requirements, And (E) Directing Banks And Financial Institutions To Honor And Process Prepetition Checks And Transfers;

c.    First Day Motion by Debtor for Order (A) Authorizing Interim Use of Cash Collateral, (B) Granting Adequate Protection for Use of Prepetition Collateral, and (C) Granting Related Relief;

d.    First Day Motion by Debtor for Order (A) Prohibiting Utility Providers from Altering, Refusing or Discontinuing Service, (B) Deeming Utility Companies Adequately Assured of Future Performance, and (C) Establishing Procedures for Determining Adequate Assurance of Payment;

e.    First Day Motion by Debtor for Order: (1) Authorizing, but not Requiring, Payment of Pre-Petition (A) Wages, Salaries and Other Compensation; (B) Employee Benefits; (C) Reimbursable Expenses; (D) Related Taxes; and (2) Authorizing and Directing Financial Institutions to Receive, Process, Honor, and Pay All Checks Presented for Payment;

f.    First Day Motion by Debtor for Order Pursuant to Sections 507(a)(2) and 503(b) Confirming Grant of Administrative Expense Status to Undisputed Obligations Arising from the Postpetition Delivery of Goods;

g.    First Day Motion By Debtor For Order Authorizing Debtor To Pay Interim Compensation To Insiders;

DLA PIPER LLP (US)
LOS ANGELES

WEST\21846895.4

Case No. 10-bk-00324-PB
**DECLARATION OF GEORGE KATAKALIDIS**

h.      First Day Motion by Debtor for Order (A) Authorizing the Debtor to Pay Prepetition Insurance Premiums, and (B) Directing Banks and Financial Institutions to Honor and Process Checks and Transfers Related to the Payment of These Obligations;

i.      First Day Motion by Debtor for Order Authorizing the Debtor to Honor Certain Prepetition Obligations to Customers and to Otherwise Continue Customer Programs and Practices; and

j.      Motion by Debtor for Entry of Final Order Pursuant to Sections 105, 361, 362, 364(c) and 364(d) (A) Authorizing the Debtor to Incur Postpetition Financing on a Secured Basis, (B) Granting Adequate Protection, and (C) Modifying the Automatic Stay. (This Motion shall be heard on regular notice).

6.      In addition, the Debtor plans to file shortly after the Petition Date applications to employ various professionals, including, but not limited to:  (a) an application employ DLA Piper LLP (US) as bankruptcy counsel *nunc pro tunc* as of the Petition Date; (b) an application to employ CRG Partners as financial advisors *nunc pro tunc* as of the Petition Date; (c) an application to employ North Point Advisors LLP as investment bankers *nunc pro tunc* as of the Petition Date; and (d) Retail Resource Group as leasing specialists.

7.      This Declaration is divided into three parts:  Part I of this Declaration provides an overview of the Debtor's business, organizational and liability structure; Part II provides a discussion of the Debtor's financial performance and the events that compelled the commencement of the Case, and the Debtor's restructuring goals; and Part III sets forth the relevant facts in support of the First Day Motions (and the DIP Financing Motion).

## I.      BACKGROUND OF THE DEBTOR'S BUSINESS

### A.      The Fili Business

8.      In 1988, I founded Fili, to produce affordable and great tasting Greek food in a fast casual environment.  I have been the Chief Executive Officer of Fili since its inception.  Prior to 1988, I was a professional soccer player with the New York Arrows, San Jose Earthquakes, and finally with the San Diego Sockers.  While I was playing professional soccer, I began researching

1    and developing ideas on the food business and realized that there was an opportunity for high

2    quality Greek cuisine at reasonable prices. When I was ultimately forced to retire from soccer due

3    to injury, I started Fili with one small unit in the Sorrento Valley area of San Diego County.

4          9.      Fili currently does business under the trade names of Daphne's Greek Express

5    and Daphne's Greek Café ("Daphne's").

6          10.     I am an active member of my industry, a recognized expert on the fast casual

7    segment, and a frequent contributor and speaker to various restaurant related conferences,

8    publications, and working groups throughout the United States. My extensive and successful

9    leadership skills make me uniquely suited to carry out my primary duties as the Debtor's

10    President and Chief Executive Officer.

11         11.     Currently, the Debtor designs, develops, builds, owns, and operates restaurant

12    facilities, in California, Arizona, Washington, and Colorado. Daphne's is the largest national

13    chain of Greek restaurants in the country. Daphne's appeals to those looking for a fresh healthy

14    dining experience by featuring fresh carved gyros, fresh grilled pita bread, grilled chicken and

15    steak kabobs and fresh roasted chicken. Daphne's was one of the first in its industry to feature a

16    completely zero trans fat menu. In addition, Daphne's caters to the budget conscious consumer

17    by offering a range of one dollar add-ons such as the Hummus & Grilled Pita Starter, roasted

18    Red Pepper Hummus & Grilled Pita Starter, Lemon Chicken Soup and Baklava.

19         12.     Over the last ten years, Daphne's has received numerous accolades from a

20    variety of industry and local publications. Daphne's has been named a "mover and shaker" in

21    our segment and "one to watch" in many restaurant publications. In addition, Daphne's has

22    achieved numerous, "Best Of…." titles in many of the communities in which we operate.

23         13.     The Debtor, headquartered in San Diego, California, employs 1,034 people. As

24    of the Petition Date, the Debtor is operating out of 67 leased locations with the largest

25    concentration of restaurants in Southern California. Additional information about the Debtor and

26    its history can be found at www.daphnesgreekcafe.com.

27      **B.**      **The Debtor's Management Team**

28         14.     As stated above, I am the President and Chief Executive Officer. Anne Geiling is

DLA PIPER LLP (US)
LOS ANGELES

WEST\21846895.4

Case No. 10-bk-00324-PB

**DECLARATION OF GEORGE KATAKALIDIS**

the Senior Director of Marketing, Greg Hernandez is Vice President of Operations and Ricardo Camberos is the Director of Accounting.

15.    In January, 2009, at the request of our senior secured lender, the Debtor retained the services of CRG Partners ("CRG"), a management consulting firm focused on advising and assisting financially and operationally troubled companies.  The firm consists of seasoned professionals with over 30 years of combined turnaround, restructuring, and crisis management experience.  Specifically, Gene Baldwin, a partner of CRG, who has been acting as the Debtor's primary financial advisor, is assisting the Debtor with (among other things) cash flow forecasting, identification and implementation of cost reduction initiatives, store closure analysis and in the management and completion of the reorganization process in the Case.  As set forth above, the Debtor is filing an application to employ CRG as its financial advisor.

**C.    Corporate Structure and Ownership**

16.    The Debtor is a privately held corporation.  I own 100% of the outstanding shares of stock.

**D.    The Debtor's Recent Financial History**

17.    The Debtor enjoyed uninterrupted revenue growth until the fourth quarter of 2007.  Over the past two years, sales have decreased 12% and the Debtor's net income from operations declined from -$165,000 to -$571,000.  Revenue has continued to decline throughout 2009.  The continuous and significant decline in revenue has made it impossible for the Debtor to meet it operational expenses, including its real property lease obligations.

**E.    Asset and Debt Structure**

**1.    Current Assets**

18.    The Debtor's revenue is generated primarily from its restaurant operations.  As of November 30, 2009, the Debtor had current assets with an estimated value of $2,899,273, including $1,296,867 of cash on hand.   As of November 30, 2009, Debtor's total assets have an estimated value of $17,080,780 which includes property, equipment and deposits.

**2.    Secured Debt**

19.    On or about February 1, 2005, the Debtor and Fleet National Bank, Bank of

DLA Piper LLP (US)
Los Angeles

WEST\21846895.4

Case No. 10-bk-00324-PB
**DECLARATION OF GEORGE KATAKALIDIS**

America's predecessor in interest, entered into a Credit Agreement (as amended from time to time, and together with all ancillary documents, the "Credit Agreement") pursuant to which the lender agreed to make certain loans and letter of credit extensions to the Debtor (the "Loan"). The Loan provided the Debtor with funds to build and operate multiple restaurants throughout the western United States.  The Loan is secured by a lien and security interest on substantially all of the Debtor's assets in favor of Bank of America.  As will be discussed in detail below, prior to the Debtor's default, the Debtor had a credit facility of $16,500,000 of which $3,500,000 was available.  As of November 30, 2009, the outstanding balance under the Loan was $12,881,240.18.

### 3.    Unsecured Debt

20.    As of the Petition Date, the Debtor has approximately $3.7 million of priority and general unsecured obligations that are held by approximately 1,240 creditors, including employees.

21.    The Debtor has paid employees wages and benefits through December 27, 2009. The Debtor's next payroll is due to its payroll service (as defined below) no later than January 14, 2010, and the Debtor, pursuant to the first day Wage Motion (defined below), is seeking authority to pay, in the ordinary course of business, its employees all wages earned but unpaid prior to the Petition Date, which amounts to approximately $550,000.  Further, through its Wage Motion, the Debtor is seeking the authority to honor all of its other employee benefit programs in the ordinary course of business.

22.    I believe that the Debtor's underlying business strategy is sound.  The advantages of our management team, infrastructure, core restaurants and network and distribution have allowed us to be a strong restaurant business that enables us to deliver the highest quality food products at reasonable prices.  I believe that once our debt structure is releveraged to address operating challenges caused by the current economic conditions, and we focus on our best operated and most profitable restaurants, we will be able to perform as a successful going concern.

## II.    RECENT FINANCIAL PERFORMANCE AND EVENTS LEADING TO THE CHAPTER 11 FILINGS

23.    Given the well known decline of the economy throughout 2008, sales of ethnic restaurants slumped.  This slump had and continues to have a severe impact on the Debtor's operating income.  Same store sales dipped from -8.25% in June 2008 to -13% in August 2008 and have remained negative through the Petition Date.  In addition, construction costs for the opening of 5 new stores in 2009 were accelerated to the first quarter of 2009 impacting cash flow by approximately $2,200,000.  We also had new leases signed for opening in 2008.  Nevertheless, out of the five signed leases in 2008, only one store opened.  In September of 2008, the Debtor communicated to Bank of America that the fixed charge covenant required for August 2008 had not been met.  Later, in the Fall of 2008, Bank of America denied the Debtor's request to draw $1,000,000 from its credit line (and reduced the credit facility to the actual outstanding debt, eliminating the entire $3.5 of available credit).  Consequently, on or about December 19, 2008, I funded a $400,000 loan to the Debtor so that it could make payroll.

24.    By letter dated February 9, 2009, Bank of America reserved all rights and declared events of default for the Debtor's failure to comply with its financial covenant obligations under the Credit Agreement.  On March 2 and March 30, 2009, Bank of America and Debtor entered into two forbearance agreements, the last of which period ended on July 31, 2009 ("Forbearance Agreements").  Nevertheless, from September 1, 2008 and until November 1, 2009, the Debtor continued to service its interest payments to Bank of America at the default rate of Prime plus 2 (400 punitive basis points were imposed).  As stated above, in connection with the Forbearance Agreements, Bank of America revoked the Debtor's access to its credit line which it had relied on to fund operating costs when the seasonal dips inherent in the restaurant business impacted cash flow.

25.    Prior to filing the Case, the Debtor, with the assistance of CRG, implemented an informal restructuring plan designed to eliminate some of its financial burden.  This pre-filing restructuring included renegotiating rents with certain landlords saving the Debtor in excess of $1,000,000; terminating 4 corporate level employees and generally reducing

overhead by more than $1,000,000, negotiating payment plans with contractors on restaurants under construction, and implementing a successful marketing plan.  In addition, in the weeks prior to the Petition Date, the Debtor closed 14 stores and terminated 87 employees.

26.    These  restructuring efforts have not been enough to facilitate an out of court restructuring with Bank of America, despite best efforts on everyone's part. [1]  The lack of access to a credit facility to fund operating costs caused by declining revenue and the continued decline of the economy has put extreme pressure on the Debtor's business making it necessary to seek protection under chapter 11 of the Bankruptcy Code.

27.    Bank of America and the Debtor have been negotiating regarding the Debtor's use of Bank of America's cash collateral.  As of the Petition Date, Bank of America has not consented to cash collateral use and as a result the Debtor is seeking this Court's approval of the use of cash collateral.  The Debtor will continue its efforts to reach a cash collateral stipulation with Bank of America.

28.    The Debtor believes that the bankruptcy filing is necessary to provide it the time it needs to continue implementing its prepetition restructuring strategy to reorganize its business around its strongest performing locations and eliminate burdensome and unprofitable locations. The Debtor intends to develop and implement a consensual plan of reorganization on an expedited basis.

29.    In anticipation of this case, and with the assistance of CRG, the Debtor has developed cash flow projections reflecting anticipated revenue and expenditures through the week ending April 25, 2010 as set forth in the proposed cash collateral and operating budget (the "Budget") attached hereto as Exhibit "A."  The projected cash inflow results primarily from operating income, while the outflows consist of payroll, costs of goods sold, rent, other overhead

---

[1] In addition to the Credit Agreement, Bank of America and the Debtor are parties to an ISDA Master Agreement and Schedule, dated March 8, 2007 ("Master Swap Agreement"), which gave rise to an Interest Rate Swap Transaction on March 14, 2007 ("Swap Transaction").  By letters dated December 22, 28, and 30, Bank of America declared the Debtor in default under the Master Swap Agreement for failure to make two payments totaling $62,966.33.  As a result of the Debtor's defaults, Bank of America terminated the Swap Transaction effective December 30, 2009.

expenses and certain reserves for professionals, among other expenses. The Budget takes into account the effect this bankruptcy filing may have on its business and Debtor's cost cutting measures identified above.

30. In addition to requiring the use of cash collateral, the Debtor believes it is necessary to obtain Court approval for postpetition financing to maintain the liquidity it needs to enable it to operate its business and permit it a sufficient opportunity to reorganize its affairs. This postpetition financing will be available to the Debtor on a revolving basis to cover cash shortfalls, if any. Subject to court approval, GPG Capital, LLC has agreed to provide the Debtor with a $1,000,000 revolving credit facility on a senior secured super-priority basis. The motion to approve postpetition financing has been filed concurrently with this Declaration and will be heard on regular notice.

## III.    **FIRST DAY MOTIONS**

31. As stated above, I believe the Motions will facilitate the Debtor's transition into the Case. The First Day Motions are discussed below.

32. ***First Day Motion by Debtor for Order Limited Scope of Notice:*** By this motion ("Motion to Limit Notice"), the Debtor seeks authority pursuant to Rules 1007(d), 2002 (i), 2002(m), 4001, 6004, 6006, 9006, 9007, 9013, 9014 and 9019 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), an order authorizing the Debtor to limit notice of the following Limited Notice Matters (as defined below) in this Case to the following parties: (1) the Office of the United States Trustee; (2) the creditors appearing on the list filed in accordance with Bankruptcy Rule 1007(d); (3) any creditors asserting secured claims; (4) parties that file with the Court and serve upon the Debtor request for notice of all matters in accordance with Bankruptcy Rule 2002; and (5) any party with a specific pecuniary interest in the particular Motion. If the relief requested in the Motion to Limit Notice is granted, the burden, complication, delay and cost to the Debtor's estate that is associated with administering this Case and providing notice of the proceedings in this Case to many thousands of parties would be dramatically reduced.

33. The Debtor's creditor matrix in this Case contains more than 4,200 creditors

DLA PIPER LLP (US)
LOS ANGELES

WEST\21846895.4

Case No. 10-bk-00324-PB
**DECLARATION OF GEORGE KATAKALIDIS**

and other interested parties. Further, the Debtor has approximately $284,770 of outstanding gift cards and has no knowledge of the names of the parties holding those cards nor ready means by which to obtain them.  The Debtor anticipates numerous creditors may make claims against the estate.  Requiring notice to and service upon all of these parties would substantially increase the cost of administering the estate without conferring any meaningful benefit on the estate.  The Debtor submits that the limited scope of notice proposed herein is necessary to avoid the administrative burdens and costs that serving notice of all pleadings in these parties would impose upon the Debtor while assuring that the interested parties in this Case receive proper and sufficient notice of all matters.

34.    The Debtor requests that the Court limit the scope of all notices, motions, or applications, including, but not limited to, the following matters (the "Limited Notice Matters"):

a)    any proposed use, sale or lease of property of the estate other than in the ordinary course of business pursuant to section 363 of the Bankruptcy Code and Bankruptcy Rules 2002(a)(2), 4001(b) and 6004;

b)    any proposed assumption, rejection or assumption and assignment of an executory contract or unexpired lease pursuant to section 365 of the Bankruptcy Code or Bankruptcy Rule 6006(a) or (c));

c)    any proposed extension of the Debtor's exclusive time to file a plan of reorganization and solicit acceptance thereof (including, without limitation, the time to file a disclosure statement) pursuant to section 1121 of the Bankruptcy Code or Bankruptcy Rule 3016;

d)    any proposed approval or compromise or settlement of a controversy pursuant to Bankruptcy Rules 2002(a)(3) and 9019;

e)    any proposed abandonment or disposition of property of the estate and the hearing, if any, thereon, pursuant to section 554 of the Bankruptcy Code or Bankruptcy Rule 6007(a) or (c);

f)    any proposed modification of the automatic stay pursuant to section 362 of the Bankruptcy Code or Bankruptcy Rules 4001(a) or 9014;

g)    any proposal to prohibit or condition the use, sale or lease of property pursuant to section 363 of the Bankruptcy Code or Bankruptcy Rule 4001 (a);

h)    any proposal to obtain credit on a secured basis or out of the ordinary course of business or grant a lien pursuant to section 364 of the Bankruptcy Code or Bankruptcy Rule 4001(b) or (c);

i)    any proposed agreement relating to relief from the automatic stay, prohibiting or conditioning the use, sale or lease of property, providing adequate protection, use of cash collateral and obtaining credit pursuant to

sections 361, 362, 363, or 364 of the Bankruptcy Code or Bankruptcy Rule 4001(d);

j)   any proposed application for employment of professionals pursuant to sections 327,1103, and/or 1104 of the Bankruptcy Code or Bankruptcy Rule 2014;

k)   any proposed application for compensation or reimbursement of expenses of professionals, pursuant to sections 328, 329, 330, or 331 of the Bankruptcy Code or Bankruptcy Rules 2002(a)(6), 2016, 2017 and 6005 and compensation to debtors' insiders pursuant to Local Bankruptcy Rule 4002-2;

l)   any verified statement filed by any entity or committee (other than those appointed pursuant to section 1102 and 1104 of the Bankruptcy Code) representing more than one creditor pursuant to Bankruptcy Rule 2019(a) and any motion filed in respect thereof pursuant to Bankruptcy Rule 2019(b);

m)   any proposed objections to claims pursuant to section 502 of the Bankruptcy Code or Bankruptcy Rule 3012;

n)   any proposed reconsideration of claims pursuant to Bankruptcy Rule 3008;

o)   any proposed valuation of security pursuant to section 506 of the Bankruptcy Code or Bankruptcy Rule 3012;

p)   any proposed redemption of property from lien or sale pursuant to Bankruptcy Rule 6008; and

q)   any hearing on any contested matter in this case that requires notice to creditors pursuant to the Bankruptcy Code, Bankruptcy Rule 9014 or the Local Rules.

35.     Notwithstanding the foregoing, the Debtor is prepared to provide notice to all creditors and interested parties of hearings on its proposed disclosure statement and plan of reorganization, and other actions requiring notice as described in Bankruptcy Rules 2002(a)(4), (5), (7), and (8).

36.     As set forth above, the Debtor's creditor matrix contains more than 4,200 creditors and interested parties.  The expense of serving duplicates of even the initial motions necessary in this case places a substantial burden upon the estate without conferring any substantial benefit. This Motion to Limit Notice seeks to fulfill the objectives of chapter 11: successfully rehabilitating the Debtor, and maximizing the value of the Debtor's estate.  Any undue delay could greatly impact the efficiency at which these objectives are accomplished, or stymie these objectives altogether. Based on this need for immediate approval, the Debtor respectfully submits that the relief requested

-12-

by the Motion to Limit Notice be granted on an emergency basis.

37. ***First Day Motion by Debtor for Order (A) Authorizing Continued Use Of Debtor's Cash Management System, (B) Authorizing Maintenance And Continued Use Of Debtor's Existing Bank Accounts, (C) Authorizing Continued Use Of Debtor's Business Forms, (D) Authorizing A Waiver Of Section 345(b) Deposit And Bond Requirements, And (E) Directing Banks And Financial Institutions To Honor And Process Prepetition Checks And Transfers:*** By this motion (the "Cash Management Motion"), the Debtor is seeking an order (a) authorizing continued use of Debtor's cash management system, (b) authorizing maintenance and continued use of Debtor's existing bank accounts, (c) authorizing continued use of Debtor's business forms, (d) authorizing a waiver of section 345(b) deposit and bond requirements, and (e) directing banks and financial institutions to honor and process prepetition checks and transfers**.**

38. <u>The Debtor's Existing Bank Accounts And Cash Management System</u>.  To maximize the estate's value and reorganize efficiently, the Debtor must continue to use its existing bank accounts and cash management system.  Maintaining the prepetition status of its cash management system allows the Debtor to continue the uninterrupted operation of its business.  Essentially, the Debtor maintains a centralized cash management system, involving established banking relationships and accounts, to manage and control receipts and disbursements.

39. <u>Bank Accounts</u>.  To efficiently consolidate its cash flow and fund its operations, the Debtor currently keeps three active bank accounts: its Depository Account, its Main Account, and its Disbursement Account (collectively, the "Accounts").  All of these Accounts are with US Bank.

40. <u>Cash Deposits</u>.  Restaurant sales occur either by cash or credit card – checks are not accepted.  At each restaurant, cash from sales is collected, stored in a safe at the restaurant, and deposited the following day into the Depository Account at the nearest US Bank branch location.  Cash deposits are made by restaurant managers Monday through Friday.  Each store's deposits are separately identified with the appropriate restaurant number and tracked by US Bank.  The Debtor's corporate managers monitor and reconcile the sales from each location to the

-13-

1  deposits and notify the Debtor's operations management of any discrepancies.  In addition, any

2  miscellaneous cash received at corporate headquarters is also deposited into the Depository

3  Account at the nearest US Bank branch location.  Because the Depository account is a zero-

4  balance account ("ZBA"), each night, US Bank automatically sweeps the funds out of the

5  Depository Account and transfers them to the Main Account.  The Main Account is not a ZBA.

6  In the ordinary course of business, the Main Account's balance may approach – and even exceed

7  – $1 million.

8          41.      Credit Card Deposits.  All credit card sales are processed by Elavon, Inc., as

9  merchant service provider, in accordance with that certain Payment Device Processing

10  Agreement by and between Elavon, Inc. and the Debtor.  With the exception of purchases made

11  with American Express credit cards, Elavon remits all credit card payments directly into the

12  Debtor's Main Account.  For purchases made with American Express credit cards, American

13  Express remits payments directly into the Debtor's Main Account.  Typically, credit card

14  payments are remitted to the Main Account within twenty-four hours, generally by direct

15  payment or by wire.  Like cash deposits, credit card deposits are separately identified with the

16  appropriate restaurant number and tracked by US Bank.

17          42.      Disbursements.  Each week, the Debtor pays its vendor and other creditor

18  obligations from the Disbursement Account.  Payroll is funded bi-weekly through a reverse wire.

19  Vendors and other creditors are paid by check (based on the specific terms negotiated with the

20  Debtor).  After reviewing the company's cash flow, checks are signed by the Debtor's Chief

21  Executive Officer each Thursday, and mailed each Friday.  Each day, US Bank pays the checks

22  that are presented.   Additionally, each day, the Debtor then transfers from the Main Account to

23  the Disbursement Account, the exact dollar amount to cover the payments presented.

24          43.      The Debtor's cash management system allows the Debtor to effectively and

25  efficiently run its business.  The Debtor believes that the success of its reorganization is best

26  ensured by minimal interference with its ordinary day-to-day affairs, including its current cash

27  management system, which is essential to its business.  Disturbance of the Debtor's existing cash

28  management system would disrupt the Debtor's ability to maximize the value of its assets for the

1    benefit of all of its creditors and employees.

2          44.    <u>The Debtor's Existing Business Forms</u>.  In the ordinary course of its business, the

3    Debtor uses checks labeled "Fili Enterprises, Inc., d/b/a Daphne's Greek Café", stationery labeled

4    "Daphne's Greek Café" and other business forms stamped with its name.  Based on the nature

5    and scope of the Debtor's business – and the many other parties with whom the Debtor transacts –

6    altering or changing the Debtor's checks, stationary, and other business forms would needlessly

7    affect the ease with which the Debtor conducts business.  Although altering or changing these

8    items is possible, significant time and expense would be required.  The Debtor respectfully

9    submits that printing new checks, stationary, and other business forms would engender confusion

10   and create undue delay among its employees, customers and other third parties.  Accordingly, the

11   Debtor requests that the Court authorize the Debtor  to continue to use its existing checks,

12   stationary, and other business forms.

13          45.    Allowing the Debtor to maintain the existing cash management system, bank

14   accounts, and business forms best allow the Debtor to accomplish the objectives of a successful

15   rehabilitation and creating maximum value for the estate  With these objectives in mind, the

16   Court should allow the Debtor to maintain its existing cash management system, bank accounts,

17   and business forms, despite the United States Trustee ("UST") Operating Requirements.

18          46.    ***First Day Motion by Debtor for Order (A) Authorizing Interim Use of Cash***

19   ***Collateral, (B) Granting Adequate Protection for Use of Prepetition Collateral, and (C)***

20   ***Granting Related Relief***:  The Debtor filed the Cash Collateral Motion because the Debtor has an

21   immediate and ongoing need for use of cash collateral to maintain its business operations, which

22   as described above contains 68 locations, a corporate office and a website.  The Debtor must have

23   access to cash collateral to make payments to vendors for postpetition goods, employees, rent,

24   sales taxes and other pertinent, ordinary expenses for its business operations.  The Debtor's

25   expected use of cash collateral is fully set out in Exhibit "A."  Any inability to fund operating

26   costs on a postpetition basis will significantly and adversely impair the estate.  It is critical to the

27   success of the restructuring process that the Debtor be able to fund reasonable and necessary

28   business operations.

DLA PIPER LLP (US)
LOS ANGELES

WEST\21846895.4

Case No. 10-bk-00324-PB

**DECLARATION OF GEORGE KATAKALIDIS**

47. ***First Day Motion by Debtor for Order (A) Prohibiting Utility Providers from Altering, Refusing or Discontinuing Service, (B) Deeming Utility Companies Adequately Assured of Future Performance, and (C) Establishing Procedures for Determining Adequate Assurance of Payment***:  By this Motion (the "Utilities Motion"), the Debtor seeks an order from this Court approving procedures for providing its utility companies with adequate protection.  To ensure the continued and uninterrupted provision of utility services (the "Utility Services") to the Debtor's restaurants and corporate office, the Debtor seeks entry of an order prohibiting utility companies (each, a "Utility Company") from altering, refusing, or discontinuing any Utility Service.

48.    The Debtor's restaurants and corporate office receive one or more essential Utility Services from various Utility Companies, including but not limited to water, gas, electric, telephone, and garbage services.  Attached to the Utilities Motion as Exhibit "A," is a list of the Utility Companies and Debtor's utility accounts ("Utility Accounts"). Not included on Exhibit "A," however, are those Utility Accounts for which the Debtor will no longer require Utility Services.

49.    The Debtor has over 50 accounts with Utility Companies.  At this critical time, and given the nature of the Debtor's business, uninterrupted Utility Services are essential to the ongoing operations of the Debtor's business and to the preservation of value of the Debtor's estate.  Any interruption in the delivery of Utility Services, however brief, will irreparably disrupt the Debtor's operations and its ability to reorganize as a going concern.

50.    The Debtor has established a good payment history with virtually all of the Utility Companies, consistently making payments on a regular and timely basis.  To the best of my knowledge, there are few, if any, defaults or arrearages of any significance with respect to the Debtor's undisputed invoices for prepetition Utility Services, other than payment interruptions that may be caused by the commencement of this Case.  The Debtor anticipates that it will pay all utility bills for postpetition Utility Services as billed and when due subject to the Debtor's rights, if any, in the ordinary course, to contest, among other things, the amount of a bill or the services rendered.

51.     Given the vital nature of the Utility Services and the critical importance of the continued and uninterrupted flow of Utility Services, but recognizing the Utility Companies' right to receive adequate assurance of payment, the Debtor will provide the Utility Companies (from which it seeks to continue to receive Utility Services), a deposit equal to one-half of the Debtor's November 2009 monthly invoice amount (an "Adequate Assurance Deposit").[2] Attached as Exhibit "B" to the Utilities Motion, is a chart which details the amount of each Adequate Assurance Deposit to be provided to the Debtor's Utility Companies.

52.     The Debtor has specifically included in its budget amounts for payments to Utility Companies, including the payment of the Adequate Assurance Deposits.

53.     Moreover, the Debtor believes that the establishment of certain procedures, specifically detailed in the Utilities Motion (the "Adequate Assurance Procedures"), in conjunction with the provision of the Adequate Assurance Deposits and the Debtor's ability to pay for Utility Services in the ordinary course ("Proposed Adequate Assurance"), constitutes adequate assurance of payment to the Utility Companies. Such Adequate Assurance Procedures provide that:

(a)     If a Utility Company is not satisfied with the assurance of future payment provided by the Debtor, such Utility Company must, within 30 days of the entry date of the order granting this First Day Motion (the "Request Deadline") serve a written request (a "Request") so that it is actually received by the Request Deadline upon counsel for the Debtor, DLA Piper LLP (US), 550 S. Hope Street, Suite 2300, Los Angeles, California 90071-2678 (Attention: Bambi Clark), setting forth the location(s) for which Utility Services are provided, the account number(s) for such location(s), the outstanding balance for each account, a summary of the Debtor's payment history on each account, and an explanation of why the Adequate Assurance Deposit is not adequate assurance of future payment.

(b)     Without further order of the Court, the Debtor, in its sole discretion, may, but is not required, to enter into agreements granting additional adequate assurance to a Utility Company timely serving a Request, if the Debtor determines such Request is reasonable.

(c)     If the Debtor believes that a Request is unreasonable, then it shall, within 30 days after the Request Deadline, file a motion (the

---

[2] The Adequate Assurance Deposits to be provided to the City of San Diego, Moulton Niguel Water District, and Southern California Water are equal to one-quarter of the Debtor's November 2009 monthly invoice amount. These three Utility Companies issue invoices to the Debtor every other month.

1

2

3

4

"Determination Motion") pursuant to 11 U.S.C. § 366(c)(3) seeking an order that the Adequate Assurance Deposit, plus any additional consideration offered by the Debtor, in its discretion, constitutes adequate assurance of payment.  Pending notice and a hearing on the Determination Motion, the Utility Company that is the subject of an unresolved Request may not alter, refuse, or discontinue any Utility Services to the Debtor, or otherwise discriminate against the Debtor.

5

6

(d)    The Adequate Assurance Deposit shall be deemed adequate assurance of payment for any Utility Company that fails to timely make a Request.

7

8

9

10

11

12

13

14

54.    The Debtor reserves the right to supplement the list of Utility Companies attached as Exhibit "B" to the Utilities Motion without further order of the Court, if a Utility Company has been omitted, mistakenly included, or commences providing Utility Services to the Debtor postpetition.  To the extent the Debtor identifies additional Utility Companies, the Debtor will promptly file an amendment to the list of Utility Companies, as identified on Exhibit "B" to the Utilities Motion adding the name and other information of the newly-identified Utility Company, and promptly serve copies of the order (the "Utilities Order") granting the Utilities Motion on such newly-identified Utility Companies (the "Supplemental Service").

15

16

17

18

19

20

21

22

23

55.    The Debtor will provide an Adequate Assurance Deposit for the newly-identified Utility Company within 30 days of the entry of the Utilities Order or on or before 30 days after the Supplemental Service, whichever is later.  If the newly-identified Utility Company has not provided Utility Services to the Debtor prior to the Petition Date, then such Adequate Assurance Deposit will be equal to one-half of the Debtor's expected monthly invoice amount for the Utility Services to be provided.  The newly-identified Utility Company shall have 30 days from the date of the Supplemental Service to make a Request.  If such Request is made, the Adequate Assurance Procedures, as detailed above, shall apply to this Court's consideration and resolution of such Request.

24

25

26

27

56.    The Debtor additionally requests that the Utilities Order provide that the Utility Companies must refund any Adequate Assurance Deposit to the Debtor within ten (10) business days of (x) the date the Debtor terminates the services of a Utility Company or (y) the date of entry of an order closing this Case, if not returned or applied earlier, whichever date is later.

28

57. The Debtor's Proposed Adequate Assurance, in conjunction with the Adequate Assurance Procedures, are not prejudicial to the rights of any Utility Company, and the importance of the continuation and uninterrupted flow of Utility Services cannot be understated. The relief requested by the Utilities Motion is necessary and in the best interests of the Debtor's estate and its creditors. Such relief ensures that the Debtor's business operations will not be disrupted, as well as provides the Utility Companies and the Debtor with an orderly, fair procedure for determining adequate assurance.

58. ***First Day Motion by Debtor for Order: (1) Authorizing, but not Requiring, Payment of Pre-Petition (A) Wages, Salaries and Other Compensation; (B) Employee Benefits; (C) Reimbursable Expenses; and (D) Related Taxes; and (2) Authorizing and Directing Financial Institutions to Receive, Process, Honor, and Pay All Checks Presented for Payment***: By this Motion (the "Wage Motion"), the Debtor seeks an order (1) authorizing, but not requiring, payment of prepetition (A) wages, salaries, and other compensation; (B) employee benefits; (C) reimbursable expenses; and (D) related taxes; and (2) authorizing and directing financial institutions to receive, process, honor and pay all checks presented for payment.

59. <u>The Debtor's Employees.</u> As set forth above, the Debtor collectively employs a total of 1,030 individuals consisting of 132 full-time employees and a total of 898 part-time employees who contribute their services at the Debtor's restaurants and its corporate headquarters located in San Diego. The majority of those who are employed on a part-time basis work in one of the Debtor's restaurants. The Debtor's 141 full-time Employees hold the following types of positions:

| Type of Employment | Number of Full Time Employees |
|---|---|
| Corporate | 17 |
| Regional Directors | 2 |
| Area Managers | 6 |
| General Managers | 58 |

DLA PIPER LLP (US)
LOS ANGELES

WEST\21846895.4

Case No. 10-bk-00324-PB
**DECLARATION OF GEORGE KATAKALIDIS**

| Restaurant Managers | 49 |
|---|---|
| **Total:** | **132** |

60.     <u>The Debtor's Payroll Service.</u>  The Debtor utilizes a payroll service, Modern Business Associates ("MBA"), to process the payment of salary and wages (collectively, the "Wages") to the Debtor's Employees.  In the normal course of their relationship with MBA, sufficient funds necessary for the payment of Wages for each pay period are wire transferred to MBA from the Debtor's payroll account with Bank of America just one day prior to payday. MBA then withdraws the amounts necessary to cover (a) the Employees' net wages (for both direct deposits and checks); and (b) payroll taxes, FICA and unemployment taxes (collectively, the "Employee Tax Deductions").

61.     In addition, MBA ensures that appropriate funds are withheld from the Employees' paychecks, including, but not limited to, (a) employee contributions for health and disability related benefits; (b) employee contributions to 401(k) plans; and (c) legally ordered deductions such as wage garnishments and child support (collectively, the "Employee Non-Tax Deductions").  The Employee Tax Deductions and the Employee Non-Tax Deductions are collectively referred to herein as the "Employee Deductions".  As of the Petition Date, all Employee Tax Deductions and Employee Non-Tax Deductions have been remitted to the appropriate third-parties.

62.     <u>Salary, Wages and Other Compensation.</u>  All of the Debtor's Employees are paid biweekly (*i.e.,* every two weeks) by way of checks or direct deposits.  These Employees are either paid on a salary or hourly basis.  The Debtor's last payroll was issued on December 31, 2009 and covered the period from December 14, 2009 through December 27, 2009.  For salaried employees, approximately $96,000.00 will cover the prepetition period of December 14, 2009 through December 27, 2009.  For hourly employees, approximately $453,000.00 covered the prepetition period of December 14, 2009 through December 27, 2009.  The total amount of Wages that were paid to the Employees on December 31, 2009 was approximately $549,000.

63.     As set forth above, the next payroll is expected to take place on January 15, 2010

-20-

DLA PIPER LLP (US)
LOS ANGELES

Case No. 10-bk-00324-PB
**DECLARATION OF GEORGE KATAKALIDIS**

(the "Next Payroll") and will cover the period from December 28, 2009 through January 9, 2010 and is expected to total approximately $550,000.  For salaried employees, approximately $96,000. will cover the period from December 28, 2009 through January 9, 2010.  For hourly employees, approximately $454,000. will cover the prepetition period from December 28, 2009 through January 9, 2010.  Thus, the Next Payroll will cover the entire prepetition period totaling $550,000.00 (collectively, the "Prepetition Wages").  With the exception of my prepetition wages, none of the Employees will receive more than $10,950 in Prepetition Wages.

64.    <u>Commissions.</u>  The Debtor has established two different types of sales incentive plans designed to reward optimum performance by either restaurant managers or area managers. Both programs have been designed to increase sales of each of the Debtor's restaurants and improve profitability through proper execution of the Debtor's standards.  In general, under the "Monthly Incentive Bonus Plan", all "general mangers" and "restaurant managers" who meet certain eligibility requirements and the minimum requirements for incentive payouts are paid a commission based on, among other things, actual sales according to a sales incentive schedule which is based on the restaurant's performance.  Likewise, under the "Monthly Incentive Bonus Plan" designed for area managers, all "area managers" who meet certain eligibility requirements and the minimum requirements for incentive payments receive commission based on a sales incentive schedule based on the area's performance.  The Debtor will owe approximately $7,500 in commissions as of the Petition Date.  The Debtor seeks authority to continue honoring its sales incentive plans.

65.    <u>Employee Benefits.</u>  The Debtor has established a variety of benefit plans and programs designed to assist their Employees and their eligible dependents in meeting certain financial burdens, including, without limitation, medical, dental and vision insurance coverage, disability insurance, accidental and death and dismemberment, and life insurance (collectively, "Employee Benefits"), for which the Debtor makes certain contributions.

<u>Health Related Benefits</u>

66.    <u>Medical and Dental Plans.</u>  For full-time and part-time employees, the Debtor

-21-

provides basic medical insurance (standard HMO or PPO) through CIGNA and dental coverage through Principal. All premiums are paid one month in advance on a cost-sharing basis (with necessary adjustments made in the next billing period), as follows:

| Tier | Debtor | Employee |
|------|--------|----------|
| Employee Only | 65% - 75% | 25% - 35% |
| Employee + Spouse | 50% - 60% | 40% - 50% |
| Employee + Child(ren) | 50% - 60% | 40% - 50% |
| Employee + Family | 50% - 60% | 40% - 50% |

67.    The Debtor's monthly average premium is approximately $54,000.00 with an annual cost of approximately $648,000.00. The Debtor withholds a pre-set amount from the Employees' Wages and subsequently submits payment to CBIZ Benefits & Insurance Services, Inc. ("CBIZ"), the Debtor's third-party carrier who administers the Debtor's medical and dental plans.

68.    The Debtor is current on its monthly premiums for the prepetition period, including the Employees' withholdings portions. The next bill, which will cover medical and dental insurance premiums for the month of February 2010, is expected shortly after the Petition Date. The Debtor seeks authority to continue with their medical and dental insurance programs, which are both valuable components of the Debtor's Employee Benefits that the Debtor provides to its Employees.

69.    Vision Plan. The Debtor offers vision insurance for all of its full-time Employees. The Debtor's monthly average premium for vision coverage is approximately $1,000.00. Participating Employees are responsible for 100% of the costs through payroll deductions. The Debtor is current on its vision insurance premiums through January 2010. The next monthly premium will cover vision insurance for the month of February 2010 and is expected shortly after the Petition Date.

70.    Life, Disability, Workers' Compensation and Other Benefits. The Debtor offers

-22-

1   group life insurance and accidental death and dismemberment ("AD&D") insurance coverage to

2   all of its employees at the restaurant support center ("RSC"), regional directors and area managers

3   (collectively, the "Group Employees"), which are fully funded by the Debtor.  With respect to the

4   Debtor's life insurance coverage, the Group Employees receive benefits equal to one times their

5   base salary, not to exceed $250,000.  However, additional life insurance and AD&D coverage can

6   be purchased by these Group Employees.  The Debtor also offers long-term disability insurance

7   to its Group Employees, with a minimum monthly benefit of $100 and a maximum monthly

8   benefit of $6,000.  The Debtor pays approximately $12,000 annually for life insurance, AD&D

9   and long-term disability insurance coverage described herein.  The Debtor also offers voluntary

10  life insurance and AD&D coverage to its general managers and regional managers (collectively,

11  the "Managers").

12      71.     The Debtor has workers' compensation insurance policies in place.  For the

13  Debtor's California restaurant locations, the Debtor is a member of a self-insured group policy

14  with California Restaurant Mutual Benefit Corporation.  The Debtor owes approximately

15  $283,000.00 on a prepetition basis in annual workers' compensation premiums for its California

16  locations for the year 2010.

17      72.     For the Debtor's Arizona and Colorado locations, the Debtor is insured by

18  Hartford Insurance.  The Debtor will owe approximately $11,000.00 through December 23, 2009

19  in annual worker's compensation premiums for the year 2010.

20      73.     Lastly, premiums are paid directly to the state of Washington on a quarterly basis

21  based on the Debtor's payroll.  The Debtor owes estimated quarterly payments of approximately

22  $2,400.00 for the prepetition period from October 1, 2009 through the Petition Date.  The Debtor

23  seeks authority to continue to provide the foregoing Employee Benefits and to honor associated

24  obligations with respect thereto.

25  Paid Time Off

26      74.     The Debtor has established certain paid time off policies for its Employees for the

27  purpose of providing vacation related benefits.  These Employees accrue vacation time on a

28  biweekly basis in accordance with an accrual policy established by the Debtor.  For all of the

WEST\21846895.4

Debtor's RSC staff, regional directors, area managers, general managers and restaurant managers, those who have provided service to the Debtor up to a period of five years are entitled to ten days of vacation per year — increasing as the length of the employee's service increases — up to a maximum of twenty days per year after ten years of service with the company.  The accrual schedule is subject to a cap and once these employees reach their allowed cap, they stop accruing any additional vacation time until their balance decreases below the allowed cap.  The Employees are paid out at termination or severance with the company for any unused vacation time only.

75.    The Debtor's RSC staff also has the opportunity to earn paid "sick" days in accordance with an accrual schedule established by the Debtor.  The aggregate obligation for the Debtor's "paid time off" policy as of the Petition Date is approximately $215,000.00 for vacation pay.

401(k) Plan

76.    The Debtor offers all eligible Employees the opportunity to participate in a 401(k) savings and retirement plan ("401(k) Plan").  In April 2009, the Debtor's 401(k) Plan changed from a safe harbor 401(k) plan to a non-safe harbor 401(k) plan.  In order to qualify, each employee must attain the minimum age of 21 and have completed at least twelve months of service.  Employees participating in this program may contribute up to the federal statutory cap per year.

77.    The Debtor does not contribute any funds to the employee's 401(k) Plan.  Instead, the Debtor deducts and withholds the Employees' 401(k) Plan contributions from the participating Employees' paychecks and issues a wire transfer of the withholdings to the appropriate third-party within ten days of the pay date.  The average amount of biweekly deferrals of the Employees is approximately $1,800.  The Debtor believes that $1,800.00 constitutes the total amount of any deducted but unremitted 401(k) Plan contributions outstanding as of the Petition Date.

78.    Reimbursable Expenses.  Eligible Employees may submit certain business-related expenses (the "Employee Expenses") to the Debtor's third-party administrator for reimbursement. An expense report is submitted to the Employees' supervisor for approval, and then sent to the

-24-

third-party administrator for payment.  There are no reimbursable Employee Expenses issued out of the Debtor's payroll.  As of the Petition Date, the Debtor estimates that it does not owe any Employee Expenses.  The Debtor seeks authority to continue to pay any Employee Expenses in the ordinary course of business to its current Employees.

79.    <u>Withholding Taxes.</u>  Attendant to the payment of employee wages, salary, commissions and expenses is the Debtor's obligation to pay, among other things, federal, state and payroll taxes such as FICA, FUTA and state disability taxes (collectively, the "Employee Tax Deductions").  The Debtor utilizes the services of MBA to act as its third-party payroll service, to process all of its payroll obligations and to process and remit its Employee Tax Deductions.  The Debtor issues a wire transfer to MBA in connection with the Debtor's payroll amounts and MBA fully remits the Employee Tax Deductions to the applicable taxing authorities after the disbursement of the funds to each of the Employees.

80.    To the best of the Debtor's knowledge, the Debtor is current on all of the Employee Tax Deductions in connection with its prepetition payroll.  The Employee Tax Deductions to be issued relating to the December 31, 2009 payroll was paid as required by wire transfer.  The Debtor seeks authority to pay the Debtor's share of Employee Tax Deductions in connection with its Next Payroll.

81.    It is critically important that the Debtor be permitted to pay their Employees certain prepetition wages, salaries, sick leave, vacation and other accrued yet unpaid wages and to honor existing Employee Benefits policies in the ordinary course of business.  If the Debtor is not permitted to meet its payroll and pre-petition obligations, not only will the Debtor suffer tremendous hardship based on its inability to continue its business operations, the Debtor will undoubtedly suffer excessive turnover resulting in inadequate staffing and deterioration in employee morale causing irreparable harm to the estate and a material and adverse impact on the Debtor's ability to reorganize and preserve its going concern value and the value.

82.    Similarly, the Debtor requires the requisite authority to continue to meet its Employee Benefits obligations to ensure that the Debtor continues to provide Employees with an important incentive to provide quality services to the Debtor during the postpetition period and to

-25-

1   avoid the devastation to employee morale.  Employee benefits are essential in order for the

2   Debtor to maintain its employees in a highly competitive market and employee satisfaction is

3   critical to the Debtor's objective of maximizing the estate's value.  In short, adequate and

4   appropriate staffing is necessary to maintain the highest value for the Debtor's business and to

5   maximize the value of its business operations.

6         83.    In summary, the Debtor seeks authority, in its sole discretion:

7         a.    To honor and pay, when due, all Prepetition Wages;

8         b.    To pay the Debtor's share of applicable employment taxes in

9   connection with such Prepetition Wages;

10        c.    To continue providing Employees with their Employee Benefits

11  and to pay, or otherwise honor, earned prepetition Employee Benefits;

12        d.    To permit the Debtor and its Employees to utilize Paid Time Off in

13  the ordinary course of business and to pay terminated employees up to the maximum statutory

14  amount of $10,950 for prepetition compensation;

15        e.    To honor and pay, when due, all Employee Expenses; and

16        f.    To make all Employee Deductions and to forward the Employee

17  Deductions to the appropriate agency or third-party plan administrator(s).

18        84.    In order for the Debtor to meet all of its prepetition obligations, the Debtor

19  requires that all applicable banks and other financial institutions be authorized to receive, process,

20  honor and pay all which are presented for payment and to honor any and all transfer requests

21  related to the Debtor's Employee Obligations, whether such transfer requests were made prior to

22  or after the Petition Date (and regardless of whether they were previously presented yet

23  dishonored by the respective banks).  As set forth in the Budget, the Debtor expects to have

24  sufficient funds within which to pay all Employee Obligations, within the ordinary course of

25  business.  Lastly, checks (other than the Employee Obligations) will not be paid inadvertently or

26  without justification.

27        85.    ***First Day Motion by Debtor for Order Pursuant to Sections 503(b) and***

28  ***507(a)(2) Confirming Grant of Administrative Expense Status to Undisputed Obligations***

-26-

***Arising from the Postpetition Delivery of Goods:*** By this Motion (the "Vendor Motion"), and in order to obtain and ensure the timely delivery from their suppliers and vendors (collectively, the "Vendors") of materials, supplies, goods, products and related items (collectively, the "Goods"), the Debtor seeks entry of an order pursuant to sections 503(b) and 507(a)(2) confirming administrative expense status to undisputed obligations arising from the postpetition delivery of Goods.

86.     Specifically, the Debtor seeks entry of an order (1) confirming that Vendors will have administrative expense priority claims under Bankruptcy Code sections 503(b) and 507(a)(2) for those undisputed obligations arising from the Debtor's numerous prepetition purchase orders outstanding that have not yet been delivered and for which no payment has been made (the "Outstanding Orders") as of the date of the Petition Date and for those undisputed obligations arising from all other postpetition shipments and deliveries of Goods by Vendors, and (2) authorizing, but not directing, the Debtor to pay, pursuant to its customary practice prior to the Petition Date and in the ordinary course of business, its undisputed obligations arising from the Outstanding Orders and its undisputed obligations arising from the postpetition shipments and deliveries of Goods by Vendors.

87.     In the ordinary course, numerous Vendors provide the Debtor with a variety of Goods that are delivered to the Debtor's restaurants. On the Petition Date, there will be a number of Outstanding Orders. The Debtor's good faith estimate of the aggregate amount of invoices related to the Outstanding Orders is approximately $250,000. These Goods are essential to the sustained operation of the Debtor's business and will be necessary in the Debtor's efforts to reorganize.

88.     Vendors may be concerned that the delivery of such Goods will render the Vendors general unsecured creditors in respect of claims related to the Outstanding Orders. This concern may lead such Vendors to refuse to ship or transport Goods (or recall shipments of Goods) if this Court does not (i) confirm that all the *undisputed* obligations of the Debtor, arising from the Debtor's postpetition receipt of Goods under the Outstanding Orders are entitled to administrative expense priority status under sections 503(b) and 507(a)(2) of the Bankruptcy

DLA PIPER LLP (US)
LOS ANGELES

WEST\21846895.4

Case No. 10-bk-00324-PB
**DECLARATION OF GEORGE KATAKALIDIS**

Code and (ii) authorize, but not direct, the Debtor to satisfy such obligations related to the Outstanding Orders in the ordinary course of business, subject to the limitations imposed by any orders of this Court and the prior rights of holders of security interests in such Goods or the proceeds of such Goods under the Debtor's proposed debtor-in-possession financing agreements and prepetition financing agreements, to the extent of such interests.

89.     Absent the relief requested by the Vendor Motion, the Debtor would be required to expend substantial time and resources convincing Vendors of the Debtor's authority to make certain payments, reissuing Outstanding Orders, and/or establishing the Debtor's right to retain Goods.  The attendant disruption could significantly hinder the Debtor's operations and without the Goods, the Debtor's business would deteriorate at the expense of all creditors of the estate. The Debtor has a critical need to maintain an uninterrupted supply of Goods from Vendors and the granting of an order confirming administrative expense status for Vendors with claims under the Outstanding Orders (as well as for all other Goods shipped and delivered to the Debtor postpetition), directly addresses this critical need.

90.     Therefore, the Debtor believes that an order confirming that Vendors will have administrative expense priority claims for undisputed obligations arising from the Debtor's receipt of Goods under the Outstanding Orders (as well as for all other Goods shipped and delivered to the Debtor postpetition) is in the best interests of the estate.

91.     ***First Day Motion by Debtor for Order Authorizing, but not Requiring, Debtor to Pay Interim Compensation to Insiders***:  By this Motion ("Insider Compensation Motion"), the Debtor is requesting that the Court enter an order authorizing, but not requiring, the Debtor to pay interim compensation to the Debtor's management team which includes George Katakalidis, Anne Geiling, and Ricardo Camberos ("Insiders"). Specifically the Debtor is requesting that the Court authorize it to compensate the Insiders the same salaries and benefits paid to them prepetition on an interim basis for sixty (60) days.

92.     The retention of the Insiders is not only critical to the success of the Debtor's reorganization efforts, it is also critical to the continued operation of the Debtor's business operations and oversight.  If the Debtor is not permitted to compensate the Insiders in the

-28-

1  ordinary course of business, then the Insiders will be forced to seek employment elsewhere,

2  resulting in a significant negative impact on the Debtor's ability to reorganize during a critical

3  point in the process.  The Insiders comprise the Debtor's key team who fully know and

4  understand the Debtor's business.  In addition, the Budget illustrates that there are sufficient

5  funds to pay the Insiders.  Specific information related to each of the Insiders and their position

6  with Daphne's is set forth in the declarations of the Insiders attached to the Insider

7  Compensation Motion.

8          93.    ***First Day Motion by Debtor for Order (A) Authorizing the Debtor to Pay***

9  ***Prepetition Insurance Premiums; and (B) Directing Banks and Financial Institutions to***

10 ***Honor and Process Checks and Transfers Related to the Payment of These Obligations***:  By

11 this Motion (the "Insurance Payment Motion"), the Debtor seeks an order authorizing the Debtor

12 to pay its prepetition insurance premiums.  Prior to the petition date ("Petition Date"), the Debtor

13 obtained and paid for a variety of insurance coverage in the ordinary course of business.  In some

14 cases, the insurance policies were required as a matter of law.  In other cases, the Debtor obtained

15 the insurance either because its lenders and landlords required, or based on prudent business

16 practices.  Regardless, continued maintenance of the insurance policies is essential to the Debtor's

17 reorganization.

18         94.    A majority of the payments associated with these various insurance policies were

19 maintained and paid prior to the Petition Date.  In some  instances, however, the insurance

20 obligations were incurred prepetition and have not yet been paid (the "Insurance Obligations").

21 These incurred, but unpaid Insurance Obligations are set forth on Exhibit "B" attached to the

22 Insurance Payment Motion.

23         95.    The Debtor is obligated, both by federal statute, and the UST Operating

24 Requirements to pay the Insurance Obligations.[3]  If the Debtor fails to pay the Insurance

25 Obligations, the Debtor will no longer be authorized to continue with its business operations, or

26 this case could be dismissed.  The Debtor respectfully submits nothing is more catastrophic to a

27 chapter 11 reorganization process than being legally prohibited from operating or having its case

28

---

[3] In some cases, state law may also place further requirements on the Debtor to carry insurance coverage.

WEST\21846895.4

Case No. 10-bk-00324-PB

**DECLARATION OF GEORGE KATAKALIDIS**

dismissed.

96.    Keeping in mind that the objective of this Debtor's chapter 11 proceeding is to maximize value for the benefit of the estate and its creditors, it is vitally important that the Court (1) authorize (but not direct) the Debtor to, in its sole discretion, pay prepetition insurance premiums, and (2) direct banks and financial institutions to honor and process checks and transfers related to these Insurance Obligations.

97.    As described above, the debtor is obligated to pay the Insurance Obligations. Regardless, paying the Insurance Obligations is in the Debtor's best interest and serves the chapter 11 objectives of protecting the estate's value and rehabilitating the Debtor.  Indeed, any delay in paying the Insurance Obligations will be detrimental to the Debtor and its reorganization efforts.  For these reasons, the Debtor requests that the Court direct the Debtor's banks and financial institutions to honor and process checks and transfers related to the payment of Insurance Obligations.

98.    ***First Day Motion By Debtor For Order Authorizing The Debtor To Honor Certain Prepetition Obligations To Customers And To Otherwise Continue Customer Programs And Practices***:  By this motion (the "Customer Programs Motion"), the Debtor seeks an order from this Court authorizing it to honor certain prepetition obligations to customers and to otherwise continue customer programs and practices as set forth below.

99.    Prior to the Petition Date, the Debtor had in place certain marketing, sales, and promotional programs and practices, designed to not only develop, but to sustain positive reputations and competitive positions for their restaurants (collectively, the "Customer Programs").  Each month, tens of thousands of customers participate in the Customer Programs at the Debtor's restaurants.  The Debtor's Customer Programs include the following:

a.    Gift Cards:  Like many retailers – including the restaurants with which the Debtor competes – the Debtor has a gift card program.   Under this program, a customer can purchase a gift card in various amounts.  The customer may then use these "loaded" gift cards at some future time.  As of December 23, 2009, approximately $284,770 in value remained outstanding on customer gift cards.

b.    "Pita Points" Customer Rewards Program: The Debtor runs a customer rewards

-30-

program known as the "Pita Points" program.  Under the Pita Points program, customers enroll by providing basic personal information (e.g., name, phone number, birth date), which is entered into a database.  Each Pita Points member receives 1 point for every $1 spent in one of the Debtor's restaurants.  When a Pita Points member accrues 200 points, that member's account is given a $10 credit, which is applied to the member's next transaction.  As of December 23, 2009, the Debtor estimates that there were approximately 70,000 members of the Pita Points program.  As of January 6, 2010, the value of $10 Pita Points awards is approximately $23,080/month or $276,960 on an annualized basis.  The cost of designing and producing materials to support the Pita Points program is approximately $5,000/year.

c.    <u>Coupon Offers</u>:  The Debtor's coupons fall into two main categories: ongoing coupons and promotional coupons.  Ongoing coupons are used by the local restaurant marketing programs and promotional coupons are conducted at the corporate level (e.g., direct mailing efforts).   Approximately 8% of the Debtor's customers use ongoing coupons.  On a monthly basis, approximately 24,000 coupons are redeemed for customer savings of approximately $40,000.  A direct mail "booklet" is planned to hit the market the week of January 11, 2010.  Based on past data, the Debtor expects that approximately 5,575 customers per week (i.e., approximately 1.5% of its clientele) will redeem promotional coupons from this direct mail booklet.  As of January 6, 2010, the value of ongoing coupons is approximately $39,622/month or $475,464 on an annualized basis.  The annual cost of the e-mail marketing platform for the coupon program is $33,000.  The annual cost of designing and producing materials and coupons related to local store marketing programs is $35,000.  The annual cost of media which include coupons (e.g., by newsprint, direct mail) is $348,000.

d.    <u>Big Fat Greek Fundraiser Program</u>: Under the Debtor's Big Fat Greek Fundraiser Program, local non-profit organizations and charities schedule a "fundraiser" night at one of the Debtor's restaurants.  The local non-profit organization or charity organization then promotes the event with flyers.  Supporters of the non-profit organization or charity bring the flyers to the Debtor's chosen restaurant location on the night of the event.  For each flyer presented, the Debtor donates 20% of the pre-tax sale price to the non-profit organization or charity.  For the first five months of 2010, the Debtor has scheduled 35 fundraisers.  Based on past data, the Debtor estimates an approximate cash donation of $7,500 for 2010.

e.    <u>In-home Delivery</u>: The Debtor has advertised – and maintains – a program under which free delivery is made on catering orders totaling over $100.

100.    The Debtor seeks authority, in its discretion, to continue to honor the Customer Programs in the ordinary course of business.   If the Court authorizes the Debtor to maintain the Customer Programs, the Debtor will more efficiently maximize the value of the estate and successfully rehabilitate.  The Debtor developed its Customer Programs, in the ordinary course of business, in response to the competitive nature of its industry and based on the sound business

1   judgment of its professionals and advisors.  The Customer Programs not only engender goodwill

2   between the Debtor and its customers, but they attract more customers.

3       101.    Each month, tens of thousands of customers participate in the Customer Programs

4   at the Debtor's restaurants.  If the Debtor is not authorized to continue its Customer Programs, the

5   Debtor will have more difficultly attracting new customers and maintaining existing ones.  The

6   cash flow the Debtor's business operation generates is one of the most important, if not the most

7   important element of the Debtor's reorganization.  Interfering with this cash flow by

8   discontinuing the Customer Programs could jeopardize the Debtor's reorganization and will have

9   a severe detrimental impact on the Debtor maximizing the estate's value. Accordingly, the Court

10  should authorize (but not direct) the Debtor to, in its sole discretion, honor prepetition obligations

11  to customers arising under the Customer Programs and otherwise continue the Customer

12  Programs.

13      102.    ***Motion by Debtor for Entry of Final Order Pursuant to Sections 105, 361, 362,***

14  ***364(c) and 364(d) (A) Authorizing the Debtor to Incur Postpetition Financing on a Secured***

15  ***Basis, (B) Granting Adequate Protection, and (C) Modifying the Automatic Stay***:  By the

16  motion ("DIP Financing Motion"), the Debtor is seeking to obtain authorization to obtain post-

17  petition financing ("DIP Financing") from GPG Capital LLC ("Postpetition Lender").  The

18  Debtor is seeking the relief sought by the DIP Financing Motion on regular notice.

19      103.    The Debtor requires DIP Financing to ensure it maintains sufficient liquidity to

20  consistently meet the obligations of operating its restaurant business.  Subject to court approval,

21  Postpetition Lender has agreed to provide the Debtor with a $1,000,000 revolving credit facility

22  on a senior secured super-priority basis.  While the Debtor's projected cash flow projects that it

23  will be able to meet obligations without additional funds for at least several weeks, the Debtor's

24  analysis shows that at some point during this chapter 11 case, funds from operations may be

25  insufficient.  The proposed DIP Financing will be available to the Debtor on a revolving basis to

26  cover cash shortfalls, if and when there are shortfalls.  Funds will not be drawn – and

27  accordingly, the estate will not be obligated to pay interest – unless and until there is a need.

28      104.    The DIP Financing will preserve the value of the Debtor's operations to allow the

-32-

1    Debtor time to file and confirm a plan of reorganization.  In addition, postpetition financing is

2    necessary to pay the administrative costs which will arise in connection with this Case.  Due to

3    the volatility in the cash generated from the Debtor's business based on the seasonal dips inherent

4    in the restaurant industry, and the Debtor's historical access to a line of credit from Bank of

5    America which has been cut off, the Debtor cannot expect its projected cash collections to fund

6    its operating needs through the its exit from bankruptcy without having DIP Financing that can be

7    accessed if necessary.  Equally important is the sense of confidence that the financing will instill

8    in suppliers, customers and employees of the Debtor.  Any failure of the Debtor's suppliers and

9    employees to extend credit and services at this time could have a deeply negative impact on

10    Debtor's ability to conduct a successful reorganization.

11        105.    Consequently, a need exists for the Debtor to obtain financing, in order to assure

12    the orderly administration of the estate. Without such financing, the Debtor may be unable to

13    timely and consistently pay payroll and payroll expenses, rent, utility charges, general overhead

14    and otherwise expend funds necessary to continue its business and operations.  In addition,

15    without the DIP Financing, the Debtor will be unable to absorb the administrative costs inherent

16    in any Chapter 11 case.  Without the additional available funding from the DIP Financing, the

17    Debtor will be unable to meet its cash needs as it attempts to reorganize.  A forced liquidation of

18    the Debtor would result in only a benefit to Bank of America, however, even a forced liquidation

19    would be insufficient to satisfy Bank of America's claim.  The only hope of maximizing recovery

20    for creditors is the maintenance of Debtor as a going concern.  This can only be accomplished

21    through the Debtor's access to additional cash through the DIP Financing.

22        106.    Prior to the Petition Date, the Debtor and CRG actively engaged in the pursuit of

23    debtor-in-possession financing.  The Debtor has spent a considerable amount of time discussing

24    DIP financing and facilitated due diligence efforts with a number of conventional lenders.  After

25    extensive efforts, the best DIP financing proposal the Debtor received is a proposal from GPG

26    Capital LLC to borrow up to $1 million  on a secured basis in accordance with the terms of the

27    Debtor in Possession Loan and Security Agreement attached to the DIP Financing Motion as

28    Exhibit "A" (together with any ancillary documents, the "DIP Financing Documents").  As is

1    typical in a Chapter 11 bankruptcy case in this economy, no lender is willing to provide the

2    Debtor with needed DIP financing on an unsecured basis.

3          107.    The Court and creditors are requested to review the proposed DIP Financing

4    Order (a copy of which is attached to the DIP Financing Motion as Exhibit "B")[4] in order to

5    become familiar with the specific terms.  The material provisions of the proposed DIP Financing

6    are summarized as follows and set forth in the following sections of the DIP Financing

7    Documents

| | |
|---|---|
| Borrower: | Fili Enterprises, Inc. (d/b/a Daphne's Greek Café), a California corporation ("Borrower"), as the debtor-in-possession in bankruptcy case [10-bk-00324-PB] (the "Case") under Chapter 11 of Title 11, United States Code (the "Bankruptcy Code") filed in the Bankruptcy Court for the Southern District of California (the "Bankruptcy Court"). |
| Lender: | GPG Capital, a California Limited Liability Company ("Lender"). |
| Facility: | Lender shall provide to Borrower a debtor-in-possession credit facility (the "DIP Facility"), in an amount of up to $1,000,000. |
| Availability: | Loans under the DIP Facility may be made on a revolving basis up to the full amount of the DIP Facility. |
| Purpose: | To fund general working capital in the ordinary course of business and to pay ordinary operating costs and expenses of the Obligated Parties during the term of the DIP Facility, to the extent permitted by the Bankruptcy Code or the Bankruptcy Court. |
| Closing Date: | Not later than January __, 2010 (the "Closing Date"), or as otherwise agreed. |
| Maturity: | The DIP Facility will terminate and all amounts outstanding thereunder shall be due and payable (unless accelerated earlier following an Event of Default) on the earliest of (i) July 31, 2010 (the "Maturity Date"), subject to extension of such Maturity Date upon terms and conditions to be agreed upon by Lender, (ii) the date of entry of an Order confirming any Plan of Reorganization in the Case acceptable to Lender ("Plan"), or (iii) the conversion of the Case to a case under Chapter 7 of the Bankruptcy Code. |
| Interest Rate: | Advances outstanding under the DIP Facility shall bear interest at 14.0%. Interest will be payable monthly in arrears and calculated on the basis of a 360-day year and actual days elapsed. |
| Default Rate: | During the continuance of an Event of Default (as defined below), all outstanding obligations under the DIP Facility shall bear interest at 2.0% above the otherwise applicable rate. |

---

[4] All capitalized terms used but not defined have the meaning ascribed to them in the DIP Financing Order.

DLA PIPER LLP (US)
LOS ANGELES

WEST\21846895.4

Case No. 10-bk-00324-PB
**DECLARATION OF GEORGE KATAKALIDIS**

| | | |
|---|---|---|
| _Fees:_ | Lender shall receive a commitment fee in the amount equal to 5.0% of the DIP Facility commitment. Such fee shall be deemed fully earned and paid upon the disbursement of the DIP Facility. | |

Borrower shall also pay to Lender from and after the date of the final order is entered, a non-refundable unused commitment fee of 0.50% per annum of the daily average unused portion of the DIP Facility, payable monthly in arrears and on the Maturity Date.

_Collateral and Lien Priority:_ All obligations of Borrower under the DIP Facility shall be: (a) entitled to super-priority administrative expense claim status pursuant to Section 364(c)(1) of the Bankruptcy Code in the Case, subject only to the payment of fees pursuant to 28 U.S.C. § 1930 (the "Carve-Out Expenses"), and (b) secured pursuant to Sections 364(c)(2), (c)(3) and (d) of the Bankruptcy Code by a security interest in and lien on all now owned or hereafter acquired property and assets of Borrower, both tangible and intangible and real and personal, and the proceeds thereof (the "Collateral"). The security interests in and liens on the aforementioned assets of Borrower shall be first priority, senior secured liens not subject to subordination, but subject to the Carve-Out Expenses.

All borrowings by Borrower, all reimbursement obligations with respect to all costs, fees and expenses of the Investors, and all other obligations owed to Lender (collectively, the "Obligations") shall be secured as described above and charged to the loan account to be established under the DIP Facility.

_Repayment:_ All Obligations shall be payable upon the Maturity Date. Interest shall be payable as specified under "Interest Rate" and "Default Rate" above. Fees shall be payable as specified under "Fees" above.

_Prepayment:_ The DIP Facility may be repaid at any time in whole or in part without premium or penalty.

_Covenants:_ Borrower shall not make any capital expenditure in excess of $100,000 without Lender approval. In addition, there shall be other customary covenants (both positive and negative) which are customary in facilities of this nature.

_Defaults:_ Usual events of default, including, but not limited to, payment, cross-default, violation of covenants, breach of representations or warranties, judgments, and other events of default which are customary in facilities of this nature.

In addition, an Event of Default shall occur if: (i) (A) (1) the Case shall be dismissed or converted to a Chapter 7 case, (2) a Chapter 11 trustee or an examiner with enlarged powers shall be appointed in the Case, or (3) any other superpriority administrative expense claim which is senior to or pari passu with Lender's claims shall be granted; (B) a Plan shall be confirmed in the Case which does not provide for termination of the commitment under the DIP Facility and payment in full in cash of Borrower's obligations thereunder on the effective date of the Plan; or an order shall be entered which dismisses the Case and which order does not provide for termination of the DIP Facility and payment in full in cash of all obligations thereunder; (C) Borrower shall take any action, including the filing of an application, in support of any of the foregoing or any

person other than Borrower shall do so and such application is not contested in good faith by Borrower and the relief requested is granted in an order that is not stayed pending appeal; (ii) the Bankruptcy Court shall enter an order granting relief from the automatic stay to the holder of any security interest in any asset of Borrower having a book value in an amount equal to or exceeding an amount to be agreed upon; and (iii) such other similar Events of Default as are usual and customary in DIP credit facilities.

Expenses:      Borrower shall reimburse Lender for all reasonable fees and expenses (the "Expenses") incurred by or on behalf of Lender in connection with the negotiation, preparation, execution and delivery of this term sheet and the transactions contemplated hereby.

Governing Law:      The definitive DIP Facility documentation will be governed by California Law, subject to applicable bankruptcy law and each of the parties thereto shall waive its right to a trial by jury.

Indemnification      Borrower shall indemnify and hold harmless Lender and its assignees, affiliates and directors, officers, employees, and agents (each an "Indemnified Party") from and against any and all losses, claims, damages, liabilities, or other expenses to which such Indemnified Party may become subject, insofar as such losses, claims, damages, liabilities (or actions or other proceedings commenced or threatened in respect thereof), or other expenses arise out of or in any way relate to or result from, this term sheet or the transactions contemplated herein, or in any way arise from any use or intended use thereof; provided, that upon the execution of the DIP Facility documentation, the indemnification provisions contained in such agreements shall, except as otherwise provided therein, supersede the indemnification provisions contained herein with respect to indemnification obligations for the transaction to which such agreement relates. Borrower further agrees to reimburse each Indemnified Party for any legal or other expenses incurred in connection with investigating, defending or participating in any such loss, claim, damage, liability or action or other proceeding (whether or not such Indemnified Party is a party to any action or proceeding out of which indemnified expenses arise).  Notwithstanding the foregoing, all expenses, losses, claims, damages, and liabilities that are finally determined in a non-appealable decision of a court of competent jurisdiction to have resulted solely from the gross negligence or willful misconduct of the Indemnified Party shall be excluded from Borrower's indemnification and reimbursement obligations hereunder.

108.      The Debtor has exercised sound business judgment in determining that a postpetition credit facility is necessary and appropriate and has satisfied the legal prerequisites to enter into the financing pursuant to the terms of the DIP Financing Order.  As discussed above, in the ordinary course of business, the Debtor historically had access to outside working capital from

1    Bank of America in order to operate notwithstanding the volatility of the restaurant industry.

2    Now that Bank of America has cut off access to the credit facility, the Debtor has been unable to

3    maintain its required liquidity to sustain profitable operations in today's economy, and certainly

4    not with the added costs and uncertainty related to its chapter 11 case. Accordingly, the terms of

5    the DIP Financing are fair and reasonable and are in the best interests of the Debtor's estate. The

6    Debtor believes that the interest rate, fees and expenses provided for in the DIP Financing are

7    within market parameters and that those terms were negotiated in good faith and are favorable to

8    the estate.

9

10        I declare under penalty of perjury of the laws of the United States of America that the

11    foregoing is true and correct.

12        Executed on this  11  day of January, 2010, in San Diego, California.

13

14

15

16    George Katakalidis
       Chief Executive Officer
       Fili Enterprises, Inc.
17

18

19

20

21

22

23

24

25

26

27

28

Case No. 10-bk-_____ -
**DECLARATION OF GEORGE KATAKALIDIS**

# EXHIBIT "A"

**FILI ENTERPRISES, INC.**
Weekly Cash Flow Jan 17 - April 25

| | January | | | February | | | | March | | | | April | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | 1/17/10 | 1/24/10 | 1/31/10 | 2/7/10 | 2/14/10 | 2/21/10 | 2/28/10 | 3/7/10 | 3/14/10 | 3/21/10 | 3/28/10 | 4/4/10 | 4/11/10 | 4/18/10 | 4/25/10 |
| **Operating** | | | | | | | | | | | | | | | |
| **Cash Receipts** | | | | | | | | | | | | | | | |
| Bank Deposits | 882,361 | 855,674 | 785,942 | 777,788 | 748,498 | 722,824 | 763,455 | 718,350 | 737,497 | 729,623 | 864,885 | 867,510 | 747,695 | 757,608 | 772,750 |
| Vendor Rebate (Pepsi/USF) | | | | | | | | | | | | | | | |
| | 882,361 | 855,674 | 785,942 | 777,788 | 748,498 | 722,824 | 763,455 | 718,350 | 737,497 | 729,623 | 864,885 | 867,510 | 747,695 | 757,608 | 772,750 |
| **Disbursements** | | | | | | | | | | | | | | | |
| Other/Prepaid | 2,000 | 24,000 | 10,233 | 5,000 | 4,000 | 32,000 | 2,000 | 7,000 | 2,000 | 22,000 | 4,000 | 5,000 | 2,000 | 24,000 | 2,000 |
| Marketing | | | | | 12,646 | 2,000 | 6,247 | 13,500 | | 38,500 | 3,000 | 2,000 | 19,000 | 3,000 | 25,000 |
| 401K - Employee/er | 3,000 | | 3,000 | 3,000 | | | 3,000 | | | 3,000 | | 3,000 | | 3,000 | |
| Vendor Payments - Product | 240,047 | 246,752 | 239,289 | 219,789 | 217,508 | 209,317 | 202,138 | 213,500 | 200,887 | 206,241 | 204,039 | 241,865 | 242,599 | 209,093 | 211,865 |
| Vendor Payments - Other Period Vendors | 42,103 | 6,954 | 12,103 | 66,985 | 41,985 | 6,836 | 11,985 | 69,494 | 44,494 | 9,345 | 14,494 | 69,494 | 41,985 | 6,836 | 11,985 |
| Rent/CAMs | - | - | 591,822 | - | - | - | - | 592,826 | - | - | - | 602,215 | - | - | - |
| Utilities | | | | | 61,023 | 31,058 | 30,339 | 28,822 | 37,487 | 38,609 | 47,795 | 15,536 | 34,318 | 43,104 | 22,348 |
| Capital Maintenance | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 |
| Insurance - WC and Commercial | 21,625 | - | - | 10,000 | 21,625 | - | - | 15,000 | 21,625 | - | - | 26,000 | 21,625 | - | - |
| Payroll and Taxes | 550,000 | - | 513,000 | - | 499,000 | - | 451,000 | - | 454,000 | - | 447,000 | - | 421,000 | - | 454,000 |
| Employee Benefits (Med, Dent,) | - | 53,973 | - | - | - | 53,973 | - | - | - | 53,973 | - | - | - | 53,973 | - |
| Sales Taxes | - | 17,000 | 326,721 | - | - | 17,000 | 257,534 | - | - | 17,000 | 223,345 | - | - | - | 17,000 |
| Merchant fees/Bank Fees | - | - | - | 49,161 | - | - | - | 43,038 | - | - | - | 41,817 | - | - | - |
| **Disbursements - Operations** | 859,775 | 349,679 | 1,697,168 | 351,935 | 861,788 | 353,185 | 965,243 | 984,180 | 761,493 | 389,668 | 944,673 | 1,007,928 | 783,528 | 344,006 | 745,199 |
| **Net Cash flow From Operations** | **22,586** | **505,995** | **(911,226)** | **425,853** | **(113,290)** | **369,640** | **(201,788)** | **(265,830)** | **(23,996)** | **339,955** | **(79,789)** | **(140,418)** | **(35,832)** | **413,603** | **27,552** |
| Cumulative Cash Flow | 22,586 | 528,581 | (382,645) | 43,208 | (70,082) | 299,558 | 97,769 | (168,060) | (192,056) | 147,899 | 68,111 | (72,307) | (108,140) | 305,463 | 333,014 |
| **Non - Operating** | | | | | | | | | | | | | | | |
| **Cash Receipts** | | | | | | | | | | | | | | | |
| Other | | | | | | | | | | | | | | | |
| | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| **Disbursements** | | | | | | | | | | | | | | | |
| Utility Deposits | | | | 140,000 | | | | | | | | | | | |
| PACA Claims | | | | 122,734 | | | | | | | | | | | |
| Consultant - Accounting (Retainer and Exp) | 8075 | 8075 | 8075 | 8075 | 8075 | 8075 | 8075 | 8075 | 8075 | 8075 | 8075 | 8075 | 8075 | 8075 | 8075 |
| Retainer/Fees - Retail Resource Group | | | | 10,000 | | | | 10,000 | | | | 10,000 | | | |
| Legal, Consulting, Lenders and Committee | 50,000 | | | | 280,000 | | | | 130,000 | | | | | 130,000 | |
| Disbursements - Non-Operating | 58,075 | 8,075 | 8,075 | 280,809 | 288,075 | 8,075 | 8,075 | 18,075 | 138,075 | 8,075 | 8,075 | 18,075 | 8,075 | 138,075 | 8,075 |
| **Net Cash flow From Non-Operating** | **(58,075)** | **(8,075)** | **(8,075)** | **(280,809)** | **(288,075)** | **(8,075)** | **(8,075)** | **(18,075)** | **(138,075)** | **(8,075)** | **(8,075)** | **(18,075)** | **(8,075)** | **(138,075)** | **(8,075)** |
| Cumulative Cash Flow | (58,075) | (66,150) | (74,225) | (355,034) | (643,109) | (651,184) | (659,259) | (677,334) | (815,409) | (823,484) | (831,559) | (849,634) | (857,709) | (995,784) | (1,003,859) |
| **Total Net Cash Flow** | (35,489) | 497,920 | (919,301) | 145,044 | (401,365) | 361,565 | (209,863) | (283,905) | (162,071) | 331,880 | (87,864) | (158,493) | (43,907) | 275,528 | 19,477 |
| *Cumulative Total Net Cash Flow* | (35,489) | 462,431 | (456,870) | (311,826) | (713,191) | (351,627) | (561,490) | (845,395) | (1,007,465) | (675,585) | (763,449) | (921,942) | (965,849) | (690,321) | (670,845) |
| **Summary of Cash Activity** | | | | | | | | | | | | | | | |
| Beginning Cash | 1,034,397 | 998,908 | 1,496,828 | 577,527 | 722,571 | 321,206 | 682,770 | 472,907 | 189,002 | 26,931 | 358,812 | 270,948 | 112,455 | 68,548 | 344,076 |
| Total Net Cash Flow | (35,489) | 497,920 | (919,301) | 145,044 | (401,365) | 361,565 | (209,863) | (283,905) | (162,071) | 331,880 | (87,864) | (158,493) | (43,907) | 275,528 | 19,477 |
| **Ending Cash** | **998,908** | **1,496,828** | **577,527** | **722,571** | **321,206** | **682,770** | **472,907** | **189,002** | **26,931** | **358,812** | **270,948** | **112,455** | **68,548** | **344,076** | **363,552** |