1    KAROL K. DENNISTON (Bar No. CA 141667)
     karol.denniston@dlapiper.com
2    BRENDAN P. COLLINS (Bar No. CA 260260)
     brendan.collins@dlapiper.com
3    NATASHA L. JOHNSON (Bar No. CA 260562)
     natasha.johnson@dlapiper.com
4
5    **DLA PIPER LLP (US)**
     550 South Hope Street, Suite 2300
     Los Angeles, CA  90071-2678
6    Tel:  213.330.7700
     Fax:  213.330.7701
7
8    [Proposed] Attorneys for Fili Enterprises, Inc., d/b/a
     Daphne's Greek Cafe, a California corporation
     Debtor and Debtor-in-Possession
9

10                    UNITED STATES BANKRUPTCY COURT

11                    SOUTHERN DISTRICT OF CALIFORNIA

12

| | |
|---|---|
| In re: | CASE NO.  10-bk-00324-PB |
| FILI ENTERPRISES, INC., d/b/a Daphne's Greek Cafe, a California corporation, | Chapter 11 |
| Debtor. | **MOTION BY DEBTOR FOR ENTRY OF FINAL ORDER PURSUANT TO SECTIONS 105, 361, 362, 364(c) AND 364(d) (A) AUTHORIZING THE DEBTOR TO INCUR POSTPETITION FINANCING ON A SECURED BASIS, (B) GRANTING ADEQUATE PROTECTION, AND (C) MODIFYING THE AUTOMATIC STAY** |
| | Date:        February 17, 2010<br>Time:        11:00 a.m.<br>Place:       Dept. 4, Room 328<br>Judge:      The Hon. Peter W. Bowie |

# TABLE OF CONTENTS

**Page**

I.  JURISDICTION ................................................................................................ 2

II. FACTUAL BACKGROUND ............................................................................ 2

III. THE DEBTOR'S NEED FOR POST-PETITION FINANCING ...................... 2

IV. OVERVIEW OF DEBTOR IN POSSESSION FINANCING AND RELATED
    RELIEF ........................................................................................................... 3

    A.  Efforts to Obtain Debtor in Possession Facility .................................... 3

    B.  Terms of Debtor in Possession Facility (Rule 4001 Concise Statement) ............. 4

    C.  Adequate Protection to Bank of America ............................................... 7

V.  THE DEBTOR HAS SATISFIED THE BANKRUPTCY REQUIREMENTS
    REGARDING AUTHORITY TO OBTAIN CREDIT ...................................... 8

    A.  The Requested Relief Should be Granted Pursuant to Sections 364(c) and
        (d) of the Bankruptcy Code .................................................................... 8

    B.  The Proposed Priming Liens Are Specifically Authorized By The
        Bankruptcy Code, Even Absent Bank Of America's Consent ............... 11

    C.  Automatic stay should be modified ......................................................... 13

VI. THE DEBTOR HAS SATISFIED THE PROCEDURAL REQUIREMENTS
    REGARDING AUTHORITY TO OBTAIN CREDIT ...................................... 13

VII. CONCLUSION ................................................................................................ 14

1

## <u>TABLE OF AUTHORITIES</u>

2

<u>Page</u>

3

4

**CASES**

5

*Deico Elecs., Inc. (In re Deico Elecs., Inc.),*
    139 B.R. 945 (B.A.P. 9th Cir. 1992) .................................................................. 11

*First Federal Bank of California v.Weinstein (In re Weinstein),*
    227 B.R. 284 (B.A.P. 9th Cir. 1998) .................................................................. 11

*General Electric Mortgage Corp. v. South Village, Inc. (In re South Village, Inc.),*
    25 Bankr. 987 (Bankr. D. Utah 1982) .................................................................. 11

*Group of Institutional Investors v. Chicago Mil St. P. & Pac. Ry.,*
    318 U.S. 523 (1943) .................................................................................... 8

*In re 495 Cent. Park Ave. Corp.,*
    136 B.R. 626 (Bankr. S.D.N.Y. 1992) .................................................................. 12

*In re Ames Dept. Stores,*
    115 B.R. 34 (Bankr. S.D.N.Y. 1990) ................................................................ 8, 9

*In re Antico Mfg. Co.,*
    31 B.R. 103 (Bankr. E.D.N.Y. 1983) .................................................................. 10

*In re Aqua Assoc.,*
    123 B.R. 192 (Bankr. E.D. Pa. 1991) .................................................................. 12

*In re Defender Drug Stores,*
    126 B.R. 76 (Bankr. D. Ariz. 1991), *aff'd* 145 B.R. 312 (Bankr. 9th Cir. 1992) ................. 10

*In re Hubbard Power & Light,*
    202 B.R. 680 (Bankr. E.D.N.Y. 1996) .................................................................. 12

*In re Shanandoah Fed. Sav. & Loan Assoc. (In re Snowshoe Co.),*
    789 F.2d 1085 (4th Cir. 1986) ........................................................................ 9, 12

*In re Simasko Production Co.,*
    47 B.R. 444 (D. Colo. 1985) ............................................................................ 8

*United Savings Assoc. of Texas v. Timbers of Inwood Forest Assoc., Ltd.,*
    484 U.S. 365, 108 S. Ct. 626, 98 L.Ed.2d 740 (1988) ...................................... 11, 12

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

**TABLE OF AUTHORITIES**
(continued)

2

**Page**

3

STATUTES

4

11 U.S.C. § 361 ........................................................................................................... 11

5

11 U.S.C. §361(1),(2), (3) ......................................................................................... 11

6

11 U.S.C. § 363(e) ...................................................................................................... 11

7

11 U.S.C. §1108 ............................................................................................................. 8

8

28 U.S.C. § 157 .............................................................................................................. 2

9

28 U.S.C § 157(b)(2)(A), (D) ...................................................................................... 2

10

28 U.S.C. § 1334 ............................................................................................................. 2

11

28 U.S.C. § 1408 ............................................................................................................. 2

12

28 U.S.C § 1409 ............................................................................................................. 2

13

28 U.S.C. § 1930 ............................................................................................................. 6

14

Chapter 7 of the Bankruptcy Code ......................................................................... 5, 6

15

Bankruptcy Code Sections ......................................................................................... 13

16

Bankruptcy Code § 361(1) .......................................................................................... 11

17

Bankruptcy Code § 361(2) .......................................................................................... 11

18

section 362 of the bankruptcy code ............................................................................. 7

19

Bankruptcy Code § 363 ................................................................................................. 2

20

Bankruptcy Code § 364 ................................................................................................. 9

21

Bankruptcy Code § 364(a) ........................................................................................ 4, 9

22

Bankruptcy Code § 364(b) ........................................................................................ 4, 9

23

Bankruptcy Code § 364(c) ......................................................................... 8, 9, 10, 13

24

Bankruptcy Code § 364(c)(1) ................................................................................... 4, 5

25

Bankruptcy Code § 364(d)(1) ...................................................................................... 9

26

Bankruptcy Code § 364(d)(1)(B) .......................................................................... 11, 12

27

28

DLA PIPER LLP (US)
LOS ANGELES

WEST\21850323.3

-iii-

Case No. 10-bk-00324-PB
**MOTION  RE DIP FINANCING**

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## TABLE OF AUTHORITIES
### (continued)

**Page**

Bankruptcy Code § 503(b)........................................................................................... 9

Bankruptcy Code § 503(b)(1)................................................................................... 3, 9

Bankruptcy Code § 506(a)......................................................................................... 11

Bankruptcy Code § 507(b)........................................................................................... 9

**OTHER AUTHORITIES**

H.R. Rep. No. 950-595, pp.181, 356 (1977)............................................................. 11

Rule 1007(d) ............................................................................................................. 13

Rules 2002, 4001 and 9014........................................................................................ 2

Rule 4001 ................................................................................................................... 4

Rule 4001(c) ............................................................................................................. 13

Rule 4001(c)(1) .................................................................................................... 13, 14

Rule 9014 ................................................................................................................. 13

S. Rep. No. 95-989, p. 68 (1978).............................................................................. 11

U.S. Code Cong. & Admin. News, 1978 pp. 5787, 5854, 6141, 6312. ..................... 11

## I.    JURISDICTION

The court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334.  This proceeding is a core proceeding under 28 U.S.C § 157(b)(2)(A), (D).  Venue is proper under 28 U.S.C.  §§ 1408 and 1409.  The statutory predicates for the relief requested herein are Sections 362, 363, 364, 503(b), and 507 of the Bankruptcy Code and Bankruptcy Rules 2002, 4001 and 9014.

## II.    FACTUAL BACKGROUND

The facts relevant to this Motion, along with a detailed summary of the Debtor's business, financial and operational history and a description of the facts leading up to the Chapter 11 filing, are set forth in the Declaration of George Katakalidis Filed in Support of First Day Motions (the "Katakalidis Declaration") filed concurrently herewith.

## III.    THE DEBTOR'S NEED FOR POST-PETITION FINANCING

The Debtor requires postpetition financing ("DIP Financing")  to ensure it maintains sufficient liquidity to consistently meet the obligations of operating its restaurant business. Subject to court approval, GPG Capital, LLC ("Postpetition Lender") has agreed to provide the Debtor with a $1,000,000 revolving credit facility on a senior secured super-priority basis. While the Debtor's projected cash flow projects that it will be able to meet obligations without additional funds for at least several weeks, the Debtor's analysis shows that at some point during this chapter 11 case, funds from operations may be insufficient.  The proposed DIP Financing will be available to the Debtor on a revolving basis to cover cash shortfalls, if and when there are shortfalls.  Funds will not be drawn – and accordingly, the estate will not be obligated to pay interest – unless and until there is a need.

The DIP Financing will preserve the value of the Debtor's operations to allow the Debtor time to file and confirm a plan of reorganization.  In addition, postpetition financing is necessary to pay the administrative costs which will arise in connection with this Case.  Due to the volatility in the cash generated from the Debtor's business based on the seasonal dips inherent in the

2

restaurant industry, and the Debtor's historical access to a line of credit from Bank of America which has been cut off, the Debtor cannot expect its projected cash collections to fund its operating needs through the its exit from bankruptcy without having DIP Financing that can be accessed if necessary.  Equally important is the sense of confidence that the financing will instill in suppliers, customers and employees of the Debtor.  Any failure of the Debtor's suppliers and employees to extend credit and services at this time could have a deeply negative impact on Debtor's ability to conduct a successful reorganization.

Consequently, a need exists for the Debtor to obtain financing, in order to assure the orderly administration of the estate. Without such financing, the Debtor may be unable to timely and consistently pay payroll and payroll expenses, rent, utility charges, general overhead and otherwise expend funds necessary to continue its business and operations.  In addition, without the DIP Financing, the Debtor will be unable to absorb the administrative costs inherent in any Chapter 11 case.  Without the additional available funding from the DIP Financing, the Debtor will be unable to meet its cash needs as it attempts to reorganize.  A forced liquidation of the Debtor would result in only a benefit to Bank of America, however, even a forced liquidation would be insufficient to satisfy Bank of America's claim.  The only hope of maximizing recovery for creditors is the maintenance of Debtor as a going concern.  This can only be accomplished through the Debtor's access to additional cash through the DIP Financing.

In light of the foregoing, the Debtor requires final approval of the DIP Financing in order to maintain its restaurant operations and the goodwill of its customers.

## IV.    OVERVIEW OF DEBTOR IN POSSESSION FINANCING AND RELATED RELIEF

### A.    Efforts to Obtain Debtor in Possession Facility

The terms of the DIP Financing are the product of good faith negotiations with the Postpetition Lender.  The Debtor believes that the terms of the DIP Financing are reasonable and appropriate under the circumstances.  The Debtor is unable to procure financing in the form of unsecured credit allowable under section 503(b)(1) of the Bankruptcy Code, as an administrative

1   expense under section 364(a) or (b) of the Bankruptcy Code, or in exchange for the grant of an

2   administrative expense priority pursuant to section 364(c)(1) of the Bankruptcy Code without the

3   grant of liens on assets.  The Debtor has been unable to procure the necessary financing on terms

4   more favorable than the DIP Financing.  No other lender was prepared to provide the financing

5   needed by the Debtor.

6       Prior to the Petition Date, the Debtor and CRG actively engaged in the pursuit of debtor-

7   in-possession financing.  The Debtor has spent a considerable amount of time discussing DIP

8   financing and facilitated due diligence efforts with a number of conventional lenders.  After

9   extensive efforts, the best DIP financing proposal the Debtor received is a proposal from GPG

10  Capital LLC to borrow up to $1 million  on a secured basis in accordance with the terms of the

11  Debtor in Possession Loan and Security Agreement attached hereto as Exhibit "A" (together with

12  any ancillary documents, the "DIP Financing Documents").  As is typical in a Chapter 11

13  bankruptcy case in this economy, no lender is willing to provide the Debtor with needed DIP

14  financing on an unsecured basis.

15      Accordingly, the Debtor has an urgent need to obtain authority from this Court to obtain

16  postpetition financing under the terms set forth in the DIP Financing Order to continue

17  operations, fund its reorganization efforts and preserve its going concern value.

18  **B.      Terms of Debtor in Possession Facility (Rule 4001 Concise Statement)**

19

20      The Court and creditors are requested to review the proposed DIP Financing Order (a

21  copy of which is attached as Exhibit "B")[1] in order to become familiar with the specific terms.

22      Since the Postpetition Lender is not owed any obligations by Debtor as of the Petition

23  Date, the DIP Financing is entirely new postpetition financing, and there is no cross-

24  collateralization or satisfaction of pre-petition obligations owed to Lender through application of

25  cash collateral post-petition – such as a "roll-up" of any prepetition debt.[2]

26      The material provisions of the proposed DIP Financing are summarized as follows and set

27  [1] All capitalized terms used but not defined have the meaning ascribed to them in the DIP Financing Order and DIP
    Financing Documents.

28  [2] Furthermore, neither the DIP Financing Documents – nor any other aspect of the DIP Financing –  contain any of
    the items prohibited by this Court's checklist listed in Appendix D2 of the Local Bankruptcy Rules.

forth in the following sections of the DIP Financing Documents

| | |
|---|---|
| Borrower: | Fili Enterprises, Inc. (d/b/a Daphne's Greek Café), a California corporation ("Borrower"), as the debtor-in-possession in bankruptcy case 10-bk-00324 (the "Case") under Chapter 11 of Title 11, United States Code (the "Bankruptcy Code") filed in the Bankruptcy Court for the Southern District of California (the "Bankruptcy Court"). |
| Lender: | GPG Capital, a California Limited Liability Company ("Lender"). |
| Facility: | Lender shall provide to Borrower a debtor-in-possession credit facility (the "DIP Facility"), in an amount of up to $1,000,000. |
| Availability: | Loans under the DIP Facility may be made on a revolving basis up to the full amount of the DIP Facility. |
| Purpose: | To fund general working capital in the ordinary course of business and to pay ordinary operating costs and expenses of the Obligated Parties during the term of the DIP Facility, to the extent permitted by the Bankruptcy Code or the Bankruptcy Court. |
| Closing Date: | Not later than January __, 2010 (the "Closing Date"), or as otherwise agreed. |
| Maturity: | The DIP Facility will terminate and all amounts outstanding thereunder shall be due and payable (unless accelerated earlier following an Event of Default) on the earliest of (i) July 31, 2010 (the "Maturity Date"), subject to extension of such Maturity Date upon terms and conditions to be agreed upon by Lender, (ii) the date of entry of an Order confirming any Plan of Reorganization in the Case acceptable to Lender ("Plan"), or (iii) the conversion of the Case to a case under Chapter 7 of the Bankruptcy Code. |
| Interest Rate: | Advances outstanding under the DIP Facility shall bear interest at 14.0%. Interest will be payable monthly in arrears and calculated on the basis of a 360-day year and actual days elapsed. |
| Default Rate: | During the continuance of an Event of Default (as defined below), all outstanding obligations under the DIP Facility shall bear interest at 2.0% above the otherwise applicable rate. |
| Fees: | Lender shall receive a commitment fee in the amount equal to 5.0% of the DIP Facility commitment.  Such fee shall be deemed fully earned and paid upon the disbursement of the DIP Facility. |
| | Borrower shall also pay to Lender from and after the date of the final order is entered, a non-refundable unused commitment fee of 0.50% per annum of the daily average unused portion of the DIP Facility, payable monthly in arrears and on the Maturity Date. |
| Collateral and Lien Priority: | All obligations of Borrower under the DIP Facility shall be: (a) entitled to super-priority administrative expense claim status pursuant to Section 364(c)(1) of the Bankruptcy Code in the Case, subject only to (i) the payment of allowed professional fees and disbursements incurred by |

Borrower and any official committees appointed in this Case in an amount not to exceed $750,000 in the aggregate, and (ii) the payment of fees pursuant to 28 U.S.C. § 1930 (collectively the "Carve-Out Expenses"), and (b) secured pursuant to Sections 364(c)(2), (c)(3) and (d) of the Bankruptcy Code by a security interest in and lien on all now owned or hereafter acquired property and assets of Borrower, both tangible and intangible and real and personal, and the proceeds thereof (the "Collateral"). The security interests in and liens on the aforementioned assets of Borrower shall be first priority, senior secured liens not subject to subordination, but subject to the Carve-Out Expenses.

All borrowings by Borrower, all reimbursement obligations with respect to all costs, fees and expenses of the Investors, and all other obligations owed to Lender (collectively, the "Obligations") shall be secured as described above and charged to the loan account to be established under the DIP Facility.

| | |
|---|---|
| Repayment: | All Obligations shall be payable upon the Maturity Date.  Interest shall be payable as specified under "Interest Rate" and "Default Rate" above. Fees shall be payable as specified under "Fees" above. |
| Prepayment: | The DIP Facility may be repaid at any time in whole or in part without premium or penalty. |
| Covenants: | Borrower shall not make any capital expenditure in excess of $100,000 without Lender approval.  In addition, there shall be other customary covenants (both positive and negative) which are customary in facilities of this nature. |
| Defaults: | Usual events of default, including, but not limited to, payment, cross-default, violation of covenants, breach of representations or warranties, judgments, and other events of default which are customary in facilities of this nature. |

In addition, an Event of Default shall occur if: (i) (A) (1) the Case shall be dismissed or converted to a Chapter 7 case, (2) a Chapter 11 trustee or an examiner with enlarged powers shall be appointed in the Case, or (3) any other superpriority administrative expense claim which is senior to or pari passu with Lender's claims shall be granted; (B) a Plan shall be confirmed in the Case which does not provide for termination of the commitment under the DIP Facility and payment in full in cash of Borrower's obligations thereunder on the effective date of the Plan; or an order shall be entered which dismisses the Case and which order does not provide for termination of the DIP Facility and payment in full in cash of all obligations thereunder; (C) Borrower shall take any action, including the filing of an application, in support of any of the foregoing or any person other than Borrower shall do so and such application is not contested in good faith by Borrower and the relief requested is granted in an order that is not stayed pending appeal; (ii) the Bankruptcy Court shall enter an order granting relief from the automatic stay to the holder of any security interest in any asset of Borrower having a book value in an amount equal to or exceeding an amount to be agreed upon; and (iii) such other similar Events of Default as are usual and customary in DIP credit facilities.

Expenses:      Borrower shall reimburse Lender for all reasonable fees and expenses (the "Expenses") incurred by or on behalf of Lender in connection with the negotiation, preparation, execution and delivery of this term sheet and the transactions contemplated hereby.

Governing Law:    The definitive DIP Facility documentation will be governed by California Law, subject to applicable bankruptcy law and each of the parties thereto shall waive its right to a trial by jury.

Indemnification    Borrower shall indemnify and hold harmless Lender and its assignees, affiliates and directors, officers, employees, and agents (each an "Indemnified Party") from and against any and all losses, claims, damages, liabilities, or other expenses to which such Indemnified Party may become subject, insofar as such losses, claims, damages, liabilities (or actions or other proceedings commenced or threatened in respect thereof), or other expenses arise out of or in any way relate to or result from, this term sheet or the transactions contemplated herein, or in any way arise from any use or intended use thereof; provided, that upon the execution of the DIP Facility documentation, the indemnification provisions contained in such agreements shall, except as otherwise provided therein, supersede the indemnification provisions contained herein with respect to indemnification obligations for the transaction to which such agreement relates. Borrower further agrees to reimburse each Indemnified Party for any legal or other expenses incurred in connection with investigating, defending or participating in any such loss, claim, damage, liability or action or other proceeding (whether or not such Indemnified Party is a party to any action or proceeding out of which indemnified expenses arise).  Notwithstanding the foregoing, all expenses, losses, claims, damages, and liabilities that are finally determined in a non-appealable decision of a court of competent jurisdiction to have resulted solely from the gross negligence or willful misconduct of the Indemnified Party shall be excluded from Borrower's indemnification and reimbursement obligations hereunder.

## C.    Adequate Protection to Bank of America

While the DIP Facility grants priming liens to the Postpetition Lender, Bank of America will only be primed to the extent the Debtor draws from the DIP Facility.  Nevertheless – as will be discussed below – by this Motion, the Debtor requests that it be authorized to provide Bank of America adequate protection in the Collateral with respect to any diminution in the value of its interests in the Prepetition Collateral from the priming liens and security interests to be granted pursuant to the terms of the DIP Financing, the use sale or lease of the Prepetition Collateral, or the imposition of the automatic stay pursuant to section 362 of the bankruptcy code, including replacement liens on the DIP Collateral junior only to the liens created by the DIP Financing.

DLA PIPER LLP (US)
LOS ANGELES

WEST\21850323.3

1

## V.   THE DEBTOR HAS SATISFIED THE BANKRUPTCY REQUIREMENTS REGARDING AUTHORITY TO OBTAIN CREDIT

2

3

### A.   The Requested Relief Should be Granted Pursuant to Sections 364(c) and (d) of the Bankruptcy Code

4

5       Pursuant to Bankruptcy Code §§364(c) and (d), the Debtor requests authority to incur the

6   DIP Financing allowable as an administrative expense, having priority over other administrative

7   expenses (subject only to the Carve-Out, as defined in the DIP Financing Documents) and

8   secured by a senior lien on substantially all property of the Debtor's estate.

9       Pursuant to Bankruptcy Code §364(c), a debtor may, in the exercise of its business

10  judgment, incur secured debt if the debtor has been unable to obtain unsecured credit and the

11  borrowing is in the best interest of the estate.  *See, e.g., In re Simasko Production Co.,* 47 B.R.

12  444, 448-49 (D. Colo. 1985) (authorizing financing agreement where debtor's business judgment

13  indicated financing was necessary and reasonable for the benefit of the estate); *In re Ames Dept.*

14  *Stores,* 115 B.R. 34, 38 (Bankr. S.D.N.Y. 1990) ("Ames") (with respect to post-petition credit,

15  courts "permit debtors-in-possession to exercise their basis business judgment consistent with

16  their fiduciary duties").  Courts routinely defer to the debtor's business judgment on most

17  business decisions, including the decision to borrow money.  *See Group of Institutional Investors*

18  *v. Chicago Mil St. P. & Pac. Ry.,* 318 U.S. 523, 550 (1943). A debtor-in-possession's power to

19  incur secured debt necessarily follows from the debtor-in-possession's general power to operate

20  its business in the exercise of its business judgment.  *See* 11 U.S.C. §1108.  Without the ability to

21  incur secured debt, the debtor-in-possession would be placed at a significant competitive

22  disadvantage and its efforts to reorganize could be seriously impaired.

23       Here, the Debtor has exercised sound business judgment in determining that a postpetition

24  credit facility is necessary and appropriate and has satisfied the legal prerequisites to enter into

25  the financing pursuant to the terms of the DIP Financing Order.  As discussed above, in the

26  ordinary course of business, the Debtor historically had access to outside working capital from

27  Bank of America in order to operate notwithstanding the volatility of the restaurant industry.

28  Now that Bank of America has cut off access to the credit facility, the Debtor has been unable to

-8-

maintain its required liquidity to sustain profitable operations in today's economy, and certainly not with the added costs and uncertainty related to its chapter 11 case. Accordingly, the terms of the DIP Financing are fair and reasonable and are in the best interests of the Debtor's estate. The Debtor believes that the interest rate, fees and expenses provided for in the DIP Financing are within market parameters and that those terms were negotiated in good faith and are favorable to the estate.

Section 364(c) of the Bankruptcy Code provides, in pertinent part, that:

> (c)    if the trustee is unable to obtain unsecured credit allowable under section 503(b)(1) of this title as an administrative expense, the court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt -

> (1)    with priority over any and all administrative expenses of the kind specific in section 503(b) or 507(b) of this title;

> (2)    secured by a lien on property of the estate that is not otherwise subject to a lien; or

> (3)    secured by a junior lien on property of the estate that is subject to lien.

> In addition, section 364(d)(1) governs the incurrence of senior secured debt or "priming" loans. Pursuant to Section 364(d)(1), the Court may, after notice and a hearing, authorizing the obtaining of credit or the incurring of debt secured by a senior or equal lien only if-

> (A)    the trustee is unable to obtain such credit otherwise; and

> (B)    there is adequate protection of the interest of a holder of the lien on the        property of the estate on which such senior or equal lien is proposed to be granted.

In satisfying the standards of Section 364, a debtor need not seek credit from every available source, but should make a reasonable effort to seek other sources of available credit under Section 364(a) and (b). *See e.g., In re Snowshoe Co.,* 789 F.2d 1085, 1088 (4th Cir. 1986) (trustee had demonstrated good faith effort that credit was not available without senior lien by unsuccessfully contacting other financial institutions; "the statute imposes no duty to seek credit from every possible lender before concluding that such credit is unavailable"); *Ames,* 115 B.R. at

1  40 (debtors demonstrated the unavailability of unsecured financing where debtors approached

2  four lending institutions).  As stated above, the Debtor has made numerous attempts by itself and

3  with the help of CRG and North Point to identify alternative DIP Financing Sources.

4      The liens granted to the Postpetition Lender to secure repayment of the DIP Financing

5  prime Bank of America and any other junior lienholder (the Debtor is unaware of any such

6  holder).  Nevertheless, by continuing operations on a going concern basis, the Debtor preserves

7  and maintains the market value of its collateral and such preservation constitutes adequate

8  protection of the interests of Bank of America.  Specifically, the Budget shows that there is little

9  to no diminution in the value of the collateral securing the amounts owed to Bank of America

10  during the period covered by the DIP Financing.  As such, the DIP Financing (and the priming of

11  Bank of America's lien to secure such DIP Financing) in and of itself adequately protects Bank of

12  America because it preserves the overall value of the business and the estate.  Accordingly, the

13  DIP Financing constitutes a reasonable and necessary expense of the preserving the value of the

14  Debtor's assets.

15      Further, Section 364(c) of the Bankruptcy Code also enumerates certain incentives that a

16  court may grant to postpetition lenders.  The Section 364(c) list of potential scenarios is not

17  exhaustive, and courts have frequently authorized the use of inducements not specified in the

18  statute.  *See, e.g. In re Defender Drug Stores,* 126 B.R. 76 (Bankr. D. Ariz. 1991) (authorizing

19  enhancement fee to postpetition lender), *aff'd* 145 B.R. 312, 316 (Bankr. 9th Cir. 1992)

20  ("Bankruptcy courts…have regularly authorized postpetition financing arrangements containing

21  lender incentives beyond the explicit priorities and liens specified in section 364."); *In re Antico*

22  *Mfg. Co.,* 31 B.R. 103 (Bankr. E.D.N.Y. 1983 (authorizing lien on prepetition collateral to

23  secured postpetition indebtedness).  Consistent with Section 364(c) and the case law, the senior

24  liens granted to the DIP Financing Lender are reasonable and appropriate inducements to provide

25  the DIP Financing.

26  ///

27  ///

28  ///

DLA PIPER LLP (US)
LOS ANGELES

WEST\21850323.3

Case No. 10-bk-00324-PB
**MOTION  RE DIP FINANCING**

**B.    The Proposed Priming Liens Are Specifically Authorized By The Bankruptcy Code, Even Absent Bank Of America's Consent**

Bankruptcy Code Section 364(d)(1)(B) requires the furnishing of adequate protection in favor of lien holders which assert an interest in collateral.  Neither this nor any other provision in the Bankruptcy Code defines the term "adequate protection."  However, Bankruptcy Code Section 361 provides that adequate protection is furnished to the extent the debtor's "use, sale, lease or grant results in a decrease in the value of such entity's interest in such property."  11 U.S.C. §361(1),(2), (3).

Similarly, neither Section 361 nor any other provision of the Bankruptcy Code defines the nature and extent of the "interest in property" of which a secured creditor is entitled to adequate protection under Section 361.  However, the statute plainly provides that a qualifying interest demands protection only to the extent that the use of the creditor's collateral will result in a decrease in the "value of such entity's interest in such property."  11 U.S.C. §§ 361, 363(e).  *See First Federal Bank of California v.Weinstein (In re Weinstein),* 227 B.R. 284, 296 (B.A.P. 9th Cir. 1998); *Deico Elecs., Inc. (In re Deico Elecs., Inc.),* 139 B.R. 945, 947 (B.A.P. 9th Cir. 1992); *General Electric Mortgage Corp. v. South Village, Inc. (In re South Village, Inc.),* 25 Bankr. 987, 989-990 n.4 (Bankr. D. Utah 1982).

The phrase "value of such entity's interest" was addressed by the Supreme Court in the landmark decision, *United Savings Assoc. of Texas v. Timbers of Inwood Forest Assoc., Ltd.,* 484 U.S. 365, 108 S. Ct. 626, 98 L.Ed.2d 740 (1988).   For the meaning of "value of such entity's interest," the Supreme Court was guided by Section 506(a) of the Bankruptcy Code which defines a secured creditor's claim:

> The phrase "value of such creditor's interest in §506(a) means the value of the collateral."  H.R. Rep. No. 950-595, pp.181, 356 (1977); see also S. Rep. No. 95-989, p. 68 (1978), U.S. Code Cong. & Admin. News, 1978 pp. 5787, 5854, 6141, 6312.  We think the phrase "value of such entity's interest" in §361(1) and (2), when applied to secured creditors means the same.

*Id.* at 630.  *Timbers* instructs that a secured creditor is entitled to adequate protection only against the diminution in the value of the collateral securing the creditors' allowed secured claim.  Under

-11-

*Timbers,* therefore, where the value of the collateral is not diminishing by its use, sale, or lease, the creditor's interest is adequately protection.  This conclusion flows from the notion that the "value of such entity's interests" is the equivalent to "value of the collateral."

This standard applies equally with respect to a proposed "priming" financing under section 364(d)(1)(B).  *See e.g. In re Hubbard Power & Light,* 202 B.R. 680, 685 (Bankr. E.D.N.Y. 1996) ("The goal of adequate protection for purposes of the provision entitling a debtor to obtain financing secured by liens senior to all other interests is to safeguard the secured creditor from diminution in the value of its interests."); *In re Aqua Assoc.,* 123 B.R. 192, 196 (Bankr. E.D. Pa. 1991).

The Court has broad discretion to determine whether adequate protection is furnished. *See, e.g., In re 495 Cent. Park Ave. Corp.,* 136 B.R. 626, 631 (Bankr. S.D.N.Y. 1992).  Whether the party entitled to protection is over or undersecured is not dispositive of whether adequate protection is furnished.  As the Court in *Aqua Assoc.* noted:

> The important question, in determination of whether the protection to a creditor's secured interest is adequate, is whether that interest, whatever it is, is being unjustifiably jeopardized.

*Aqua Assoc.,* 123 B.R. at 196 (approving priming financing where interest rate was 5% over prime and loan likely would enhance value of estate).  *Accord In re Shenandoah Fed. Sav. & Loan Assoc. (In re Snowshoe Co.),* 789 F.2d 1085, 1087-90 (4th Cir. 1986).

Here, in a forced liquidation, there is insufficient value in the collateral at issue to satisfy Bank of America's prepetition claim.  The infusion of the superpriority DIP Financing allows the continued operation of the Debtor through confirmation of a plan of reorganization which maintains the collateral value and protects Bank of America from any diminution in the value of its collateral.  *See In re 495 Cent. Park Ave. Corp.* 136 B.R. at 631 (approving  "priming" financing for real property improvements: "Although appraisers for both sides disagree as to what value of the building would be following the infusion of approximately $600,000, there is no question that the property would be improved by the proposed renovations and that an increase in value will result").  In any event, Bank of America will only be primed to the extent that the

-12-

1    Debtor needs to access the DIP Facility.

2         In sum, the Debtor respectfully submits that the DIP Financing satisfies the standards of

3    Bankruptcy Code Sections 364(c) and (d).  As indicated above, the Debtor has attempted to

4    obtain financing from multiple sources to no avail.  The best and only credit available to Debtor is

5    the DIP Financing.  Thus, Debtor believes that it is fair, reasonable, and necessary to enter into

6    the DIP Financing with the Postpetition Lender.  In addition to representing the best terms

7    presently available to the Debtor, the DIP Financing is also in the best interests of the Debtor's

8    estate.  The DIP Financing will provide Debtor needed funding to continue to operate

9    postpetition, cover any cash shortfalls, and help ease the administrative burden attendant in any

10   chapter 11 case.  The DIP Financing will preserve the Debtor's going concern value pending plan

11   confirmation and is in the best interests of the estate and its creditors.

12        **C.    Automatic stay should be modified**

13

14        The relief requested herein contemplates a modification of the automatic stay to permit the

15   Debtors to (a) grant the security interests, liens, and superpriority claims described above with

16   respect to the DIP Lender and to perform such other acts as may be requested to assure the

17   perfection and priority of such security interests and liens; (b) permit the DIP Lender to exercise

18   all the rights and remedies under the DIP Financing Order; and (c) implement the terms of the

19   DIP Financing Order.

20        Stay modifications of this kind are ordinary and standard features of postpetition debtor

21   financing facilities and, in the Debtor's business judgment, are reasonable and fair in the present

22   circumstances.

23   **VI.   THE DEBTOR HAS SATISFIED THE PROCEDURAL REQUIREMENTS
          REGARDING AUTHORITY TO OBTAIN CREDIT**

24

25        Bankruptcy Rule 4001(c) sets forth the procedural requirements for obtaining credit.

26   Bankruptcy Rule 4001(c)(1) requires that: "A motion for authority to obtain credit shall be made

27   in accordance with Rule 9014 and shall be served on …the creditors included on the list filed

28   pursuant to Rule 1007(d), and on such other entities as the court may direct.  The motion shall be

1    accompanied by the copy of the Agreement."  A copy of the Motion has been served by on the

2    following parties or counsel for parties in interest: the Office of the United States Trustee on

3    January 14, 2010, as set forth on the attached proof of service, any committee of creditors or

4    equity security holders established prior or subsequent to the chapter 11 filing or, if none, the

5    twenty largest unsecured creditors and any secured creditor whose collateral includes cash collateral

6    or whose lien(s) might be affected by the relief sought.  The Motion is accompanied by a copy of

7    the DIP Financing Documents and proposed DIP Financing Order setting forth the terms of the

8    proposed DIP Financing.  The Motion complies with the requirements of Bankruptcy Rule

9    4001(c)(1), and accordingly, Debtor requests that the Court authorize Debtor to enter into the DIP

10   Financing pursuant to the terms of the DIP Financing Order.

11   **VII.    CONCLUSION**

12           **WHEREFORE,** for all the foregoing reasons, and such additional reasons as may be

13   addressed at the hearing on this Motion, the Debtor respectfully requests that this Court enter a

14   final order (a) authorizing the Debtor to incur postpetition financing on a secured basis, (b)

15   granting adequate protection, and (c) granting such other and further relief as is just and proper

16   under the circumstances.

17   Dated:  January 14, 2010                    DLA PIPER LLP (US)

18

19                                              By  _/s/ Brendan P. Collins_____
                                                   BRENDAN P. COLLINS
20                                                 [Proposed] Attorneys for Fili Enterprises, Inc.,
                                                   d/b/a Daphne's Greek Cafe, a California
21                                                 corporation, Debtor and Debtor-in-Possession

22

23

24

25

26

27

28

# EXHIBIT "A"

DRAFT

# SUPER-PRIORITY DEBTOR-IN-POSSESSION

# LOAN AND SECURITY AGREEMENT

dated as of January [___], 2010

by and between

FILI ENTERPRISES, INC. (d/b/a Daphne's Greek Café), a California corporation, as Borrower,
a Debtor and Debtor-in-Possession under Chapter 11 of the Bankruptcy Code

and

GPG CAPITAL LLC, a California limited liability company,
as Lender

Exhibit "A"

## TABLE OF CONTENTS

DRAFT

**ARTICLE**                                                                                          **PAGE**

ARTICLE 1      INCORPORATION AND DEFINITIONS ..................................................... 2

   1.1      Incorporation and Definitions ........................................................................... 2


ARTICLE 2      REPRESENTATIONS AND WARRANTIES............................................ 10

   2.1      Representations and Warranties........................................................................ 10
   2.2      Continuation of Representations and Warranties .............................................. 11


ARTICLE 3      AMOUNT AND TERMS OF COMMITMENT ......................................... 11

   3.1      Agreement to Lend and to Borrow; Note ......................................................... 11
   3.2      Use of Loan Proceeds ....................................................................................... 12
   3.3      Prepayments...................................................................................................... 12
   3.4      Super-Priority Nature of Obligations and Status of Lender's Liens.................. 12
   3.5      No Discharge; Survival of Liens and Claims; Waiver of Priming Rights.......... 13
   3.6      Adequate Protection.......................................................................................... 14
   3.7      Payment of Obligations..................................................................................... 14


ARTICLE 4      PRINCIPAL, INTEREST; SPECIAL PROVISIONS FOR LOANS ............ 14

   4.1      Interest Rate ...................................................................................................... 14
   4.2      Payment of Principal and Interest ..................................................................... 14
   4.3      Computation of Interest and Fees ..................................................................... 15
   4.4      Illegality ............................................................................................................ 15
   4.5      Legal Requirements .......................................................................................... 15
   4.6      Taxes ................................................................................................................. 16
   4.7      Loan Indemnification ........................................................................................ 16
   4.8      Fees and Expenses ............................................................................................ 17


ARTICLE 5      LOAN DOCUMENTS .............................................................................. 17

   5.1      Conditions Precedent to Each Advance ............................................................ 17


ARTICLE 6      CONDITIONS TO CLOSING ................................................................... 18

   6.1      Conditions to Closing ....................................................................................... 18


ARTICLE 7      FUNDING CONDITIONS AND MECHANICS ........................................ 20

   7.1      Funding Conditions and Mechanics.................................................................. 20


ARTICLE 8      FURTHER AGREEMENTS OF BORROWER........................................ 21

   8.1      Furnishing Information ..................................................................................... 21
   8.2      Affirmative Covenants ...................................................................................... 22
   8.3      Negative Covenants .......................................................................................... 24

**ARTICLE**                                                                                                    ~~PAGE~~ DRAFT

ARTICLE 9        ASSIGNMENTS; CONFIDENTIALITY ..................................................... 27

    9.1      Successors and Assigns ......................................................................... 27
    9.2      Confidentiality ...................................................................................... 27

ARTICLE 10      EVENTS OF DEFAULT BY BORROWER ................................................. 27

    10.1    Event of Default Defined ...................................................................... 27

ARTICLE 11      LENDER'S REMEDIES UPON EVENT OF DEFAULT ............................ 29

    11.1    Remedies ............................................................................................... 29
    11.2    Setoff Rights ......................................................................................... 29
    11.3    Right of Lender to Make Advances to Cure Event of Defaults; Obligatory
           Advances ............................................................................................... 30
    11.4    Attorneys' Fees ..................................................................................... 30
    11.5    No Waiver .............................................................................................. 30
    11.6    Application of Funds ............................................................................. 30

ARTICLE 12      SECURITY ........................................................................................... 31

    12.1    Security ................................................................................................. 31
    12.2    Perfection of Security Interests ............................................................. 31
    13.3    Limitations on Lender's Obligations ..................................................... 31
    12.4    Covenants of Borrower with Respect to Collateral ............................... 32
    12.5    Performance by Lender of Borrower's Obligations ................................ 33
    12.6    Limitation on Lender's Duty in Respect of Collateral ........................... 33
    12.7    Remedies; Rights Upon Default ............................................................ 33
    12.8    Lender's Appointment as Attorney-in-Fact ........................................... 34

ARTICLE 13      MISCELLANEOUS ............................................................................... 36

    13.1    Time is of the Essence ........................................................................... 36
    13.2    Amendments, Etc .................................................................................. 36
    13.3    Lender's Determination of Facts ........................................................... 36
    13.4    Prior Agreements ................................................................................... 36
    13.5    Disclaimer by Lender ............................................................................ 36
    13.6    Borrower Indemnification ..................................................................... 36
    13.7    Captions ................................................................................................ 37
    13.8    Inconsistent Terms and Partial Invalidity ............................................. 37
    13.9    Gender and Number ............................................................................... 37
    13.10   Notices .................................................................................................. 37
    13.11   Effect of Agreement .............................................................................. 37
    13.12   Governing Law ...................................................................................... 37
    13.13   Waiver of Defenses ............................................................................... 37
    13.14   Consent to Jurisdiction ......................................................................... 37
    13.15   Waiver of Jury Trial .............................................................................. 38
    13.16   Usury Savings Clause ............................................................................ 38
    13.17   Counterparts; Facsimile Signatures ...................................................... 38

**ARTICLE**

**SCHEDULES**

Schedule 1 – Permitted Existing Contingent Obligations
Schedule 2 – Permitted Existing Indebtedness
Schedule 3 – Permitted Existing Liens

**EXHIBITS**

EXHIBIT A    –    BUDGET
EXHIBIT B    –    FORM OF NOTE
EXHIBIT C        FORM OF LOAN NOTICE

18                    Exhibit "A"

DRAFT

# SUPER-PRIORITY DEBTOR-IN-POSSESSION LOAN AND SECURITY AGREEMENT

**THIS SUPER-PRIORITY DEBTOR-IN-POSSESSION LOAN AND SECURITY AGREEMENT** ("Agreement"), is made and entered into as of January [__], 2010, by and between FILI ENTERPRISES, INC. (d/b/a Daphne's Greek Café), a California corporation, and a debtor and debtor-in-possession ("Borrower"), and GPG CAPITAL LLC, a California limited liability company ("Lender").

## R E C I T A L S:

A.      On January 11, 2010 (the "Filing Date"), Borrower commenced a case (the "Chapter 11 Case") under Chapter 11 of Title 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of California (such court, or any other court having jurisdiction over the Chapter 11 Case from time to time, the "Bankruptcy Court"), and Borrower has retained possession of its assets and is authorized under the Bankruptcy Code to continue the operation of its businesses as debtor-in-possession.

B.      Borrower has requested that Lender provide a revolving credit debtor-in-possession facility to Borrower in an aggregate principal amount not to exceed One Million Dollars ($1,000,000) (the "Loan"), and subject to the terms and conditions set forth herein, Lender is willing to extend such credit to Borrower.

C.      Lender has indicated its willingness to agree to extend such credit to Borrower, all on the terms and conditions set forth herein and in the other Loan Documents and in accordance with the Bankruptcy Code, so long as, inter alia, such postpetition credit obligations are (i) secured by Liens on all of the property and interests, real and personal, tangible and intangible, of Borrower whether now owned or hereafter acquired, subject in priority only to certain Liens and the Carve Out as hereinafter provided and (ii) given super-priority status as provided in the Order.

D.      Borrower has been unable to obtain debtor-in-possession financing on an unsecured basis or on terms as favorable or more favorable than the terms provided herein.

E.      Lender has agreed to provide the Loan made pursuant to this Agreement with the express understanding that Borrower has agreed to the super-priority status and priming liens subject to the approval of the Bankruptcy Court.

**NOW, THEREFORE**, in consideration of the mutual representations, warranties, covenants and agreements herein contained, the sufficiency of which is hereby acknowledged, the parties hereto represent and agree as follows:

DRAFT

# ARTICLE 1

## INCORPORATION AND DEFINITIONS

1.1     **Incorporation and Definitions**.  The foregoing recitals and all exhibits hereto are hereby made a part of this Agreement.  The following terms shall have the following meanings in this Agreement:

**Advance**:  An advance of Loan Proceeds made by Lender to Borrower hereunder.

**Affiliate**:  Any Person which, directly or indirectly, controls or is controlled by or is under common control with Borrower.  A Person shall be deemed to control another Person if the controlling Person is the "beneficial owner" (as defined in Rule 13d-3 under the Exchange Act) of ten percent (10%) or more of any class of voting securities (or other voting interests) of the controlled Person or possesses, directly or indirectly, the power to direct or cause the direction of the management or policies of the controlled Person, whether through ownership of Capital Stock, any other Equity Interest, by contract or otherwise.  In no event shall Lender be considered an Affiliate of Borrower.

**Agreement**:  As defined in the preamble hereto.

**Applicable Commitment Fee Percentage**:  From and after the Order Entry Date, as at any date of determination, a non-refundable unused commitment fee of 0.50% per annum of the daily average unused portion of the Commitment (whether or not then available), payable monthly in arrears and on the Maturity Date.

**Available Commitment**:   The difference at any time, and from time to time, between (a) the amount of the Commitment, and (b) the aggregate principal amount of all Advances outstanding hereunder.

**Availability Period**:  The period commencing on the Closing Date and ending on the Maturity Date.

**Bankruptcy Code**:  Title 11 of the United States Code.

**Bankruptcy Court**:  As defined in the recitals hereto.

**Borrower**:  As defined in the preamble hereto.

**Borrowing Date**:  Any date on which an Advance is made hereunder.

**Budget**:  The cash flow projections of Borrower attached hereto as **Exhibit A**.

**Business Day**:  Any day other than a Saturday, Sunday or other day on which lenders in the State of California are required or permitted to close.

**Capitalized Lease**:   Any lease of property by a Person (as lessee) which would be capitalized on a balance sheet of such Person prepared in accordance with GAAP.

DRAFT

**Capital Stock**:  (a) in the case of a corporation, corporate stock, (b) in the case of an association or business entity, any and all shares, interests, participations, rights or other equivalents (however designated) of corporate stock, (c) in the case of a partnership, partnership interests (whether general or limited), (d) in the case of a limited liability company, membership, ownership or other equity interests, and (e) any other interest or participation that confers on a Person the right to receive a share of the profits and losses of, or distributions of assets of, the issuing Person.

**Carve Out**:  At any time of determination, the sum of (a) professional fees (including Borrower's professional fees) incurred in the Chapter 11 Case in an amount not to exceed $750,000 in the aggregate, and (b) payment of fees pursuant to 28 U.S.C. § 1930.

**Chapter 11 Case**:  As defined in the recitals hereto.

**Closing Date**:  The date on which the Order is granted and all conditions precedent to the first Advance are satisfied or waived.

**Collateral**:  All of Borrower's right, title and interest in and to the following, wherever located, whether now owned or hereafter acquired or arising, and all proceeds and products thereof:  (a) all goods, equipment, inventory, contract rights or rights to payment of money, leases, license agreements, franchise agreements, general intangibles (including payment intangibles), accounts (including health-care receivables), documents, instruments (including any promissory notes), chattel paper (whether tangible or electronic), cash, deposit accounts, fixtures, letters of credit rights (whether or not the letter of credit is evidenced by a writing), commercial tort claims, securities, and all other investment property, supporting obligations, and financial assets, whether now owned or hereafter acquired, wherever located; (b) any copyright rights, copyright applications, copyright registrations and like protections in each work of authorship and derivative work, whether published or unpublished, now owned or later acquired; (c) any patents, trademarks, service marks and applications therefor; (d) any trade styles, trade names, any trade secret rights, including any rights to unpatented inventions, know-how, operating manuals, license rights and agreements and confidential information, now owned or hereafter acquired; (e) any claims for damages by way of any past, present and future infringement of any of the foregoing; and (f) all of Borrower's books relating to the foregoing and any and all claims, rights and interests in any of the above and all substitutions for, additions, attachments, accessories, accessions and improvements to and replacements, products, proceeds and insurance proceeds of any or all of the foregoing.

**Commitment**:  The commitment of Lender to make the Loan under this Agreement.

**Contingent Obligation**:  As applied to any Person, means (i) any Contractual Obligation, contingent or otherwise, of that Person with respect to any Indebtedness of another or other obligation or liability of another, including, without limitation, any such Indebtedness, obligation or liability of another directly or indirectly guaranteed, endorsed

DRAFT

(otherwise than for collection or deposit in the ordinary course of business), co-made or discounted or sold with recourse by that Person, or in respect of which that Person is otherwise directly or indirectly liable, including Contractual Obligations (contingent or otherwise) arising through any agreement to purchase, repurchase, or otherwise acquire such Indebtedness, obligation or liability or any security therefor, or to provide funds for the payment or discharge thereof (whether in the form of loans, advances, stock purchases, capital contributions or otherwise), or to maintain solvency, assets, level of income, or other financial condition, or to make payment other than for value received, and (ii) any other contingent obligation or liability of such Person, whether or not reflected in financial statements of such Person as a liability.

**Contractual Obligation**:  As applied to any Person, means any provision of any equity or debt securities issued by that Person or any indenture, mortgage, deed of trust, security agreement, pledge agreement, guaranty, contract, undertaking, agreement or instrument, in any case in writing, to which that Person is a party or by which it or any of its properties is bound, or to which it or any of its properties is subject.

**Customary Permitted Liens**: means:

(a)     Liens with respect to the payment of taxes, assessments or governmental charges in all cases which are not yet due or (if foreclosure, distraint, sale or other similar proceedings shall not have been commenced) which are being contested in good faith by appropriate proceedings properly instituted and diligently conducted and, in each case, with respect to which adequate reserves or other appropriate provisions are being maintained;

(b)     statutory Liens of landlords and Liens of suppliers, mechanics, carriers, materialmen, warehousemen or workmen and other similar Liens imposed by law created in the ordinary course of business for amounts not yet due or which are being contested in good faith by appropriate proceedings properly instituted and diligently conducted and with respect to which adequate reserves or other appropriate provisions are being maintained;

(c)     Liens incurred or deposits made in the ordinary course of business in connection with worker's compensation, unemployment insurance or other types of social security benefits or to secure the performance of bids, tenders, sales, contracts (other than for the repayment of borrowed money), surety, appeal and performance bonds; provided, that (i) all such Liens do not in the aggregate materially detract from the value of Borrower's assets or property taken as a whole or materially impair the use thereof in the operation of the businesses taken as a whole, and (ii) all Liens securing bonds to stay judgments or in connection with appeals do not secure at any time an aggregate amount exceeding $500,000;

(d)     Liens arising with respect to zoning restrictions, easements, licenses, reservations, covenants, rights-of-way, utility easements, building restrictions and other similar charges or encumbrances on the use of real property which do not in any case

DRAFT

materially detract from the value of the property subject thereto or interfere with the ordinary conduct of the business of Borrower;

(e)    Liens of attachment or judgment with respect to judgments, writs or warrants of attachment, or similar process against any which do not constitute an Event of Default;

(f)    normal and customary rights of setoff upon deposits of cash in favor of banks or other depository institutions;

(g)    Liens of a collection bank arising on items in the course of collection; and

(h)    any interest or title of the lessor in the property subject to any operating lease entered into by Borrower in the ordinary course of business.

**Default**:  A condition or event that, after notice or lapse of time or both, would constitute an Event of Default.

**Equity Interests**:  Capital Stock and all warrants, options or other rights to acquire Capital Stock (but excluding any debt security that is convertible into, or exchangeable for, Capital Stock).

**Event of Default**:  One or more of the events or occurrences referred to in **Article 10** of this Agreement.

**Exchange Act**:  The Securities Exchange Act of 1934, and regulations promulgated thereunder.

**Filing Date**:  As defined in the recitals hereto.

**GAAP**:  Generally accepted accounting principles in the United States of America in effect from time to time as applied by nationally recognized accounting firms.

**Governmental Authority**:  Any nation or government, any state or other political subdivision thereof and any entity exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to government.

**Highest Lawful Rate**:  The maximum lawful interest rate, if any, that at any time or from time to time may be contracted for, charged, or received under the laws applicable to Lender which are presently in effect or, to the extent allowed by law, under such applicable laws which may hereafter be in effect and which allow a higher maximum nonusurious interest rate than applicable laws now allow.

**Indebtedness**:  As to any Person at a particular time, without duplication, all of the following, whether or not included as indebtedness or liabilities in accordance with GAAP:

DRAFT

(a)    all obligations of such Person for borrowed money and all obligations of such Person evidenced by bonds, debentures, notes, loan agreements or other similar instruments;

(b)    all direct or contingent obligations of such Person arising under letters of credit (including standby and commercial), bankers' acceptances, bank guaranties, surety bonds and similar instruments;

(c)    all obligations of such Person to pay the deferred purchase price of property or services (other than trade accounts payable in the ordinary course of business);

(d)    indebtedness (excluding prepaid interest thereon) secured by a Lien on property owned or being purchased by such Person (including indebtedness arising under conditional sales or other title retention agreements), whether or not such indebtedness shall have been assumed by such Person or is limited in recourse;

(e)    capital leases and synthetic lease obligations;

(f)    all obligations of such Person to purchase, redeem, retire, defease or otherwise make any payment in respect of any equity interest in such Person or any other Person, valued, in the case of a redeemable preferred interest, at the greater of its voluntary or involuntary liquidation preference plus accrued and unpaid dividends; and

(g)    all guarantees of such Person in respect of any of the foregoing.  For all purposes hereof, the Indebtedness of any Person shall include the Indebtedness of any partnership or joint venture (other than a joint venture that is itself a corporation or limited liability company) in which such Person is a general partner or a joint venturer, unless such Indebtedness is expressly made non-recourse to such Person.

**Legal Requirements**:  As to any person or party, the certificate of incorporation and by-laws or other organizational or governing documents of such person or party, and any law, treaty, rule or regulation or determination of an arbitrator or a court or other Governmental Authority, in each case applicable to or binding upon such person or party or any of its property or to which such person or party or any of its property is subject.

**Lender**:  As defined in the preamble hereto.

**Lien**:  With respect to any property or assets, any right or interest therein of a creditor to secure liabilities owed to it or any other arrangement with such creditor which provides for the payment of such liabilities out of such property or assets or which allows such creditor to have such liabilities satisfied out of such property or assets prior to the general creditors of any owner thereof, including any lien, mortgage, security interest, pledge, deposit, production payment, rights of a vendor under any title retention or conditional sale agreement or lease substantially equivalent thereto, tax lien, mechanic's or materialman's lien, or any other charge or encumbrance for security purposes, whether arising by law or agreement or otherwise, but excluding any right of offset which arises without agreement in the ordinary course of business.

DRAFT

**Loan**:  As defined in the recitals hereto.

**Loan Documents**:  This Agreement, all agreements, instruments and documents executed in connection with this Agreement that are intended to create, perfect, or evidence Liens to secure the Obligations, including, without limitation, all security agreements, pledge agreements, mortgages, deeds of trust, loan agreements, notes, guarantees, subordination agreements, pledges, powers of attorney, consents, assignments, contracts, fee letters, notices, leases, financing statements and all other written matter whether heretofore, now, or hereafter executed by or on behalf of Borrower and delivered to Lender, together with all agreements and documents referred to therein or contemplated thereby.

**Loan Notice**:  A request for an Advance made by Borrower substantially in the form of **Exhibit C** hereto.

**Loan Proceeds**:  All amounts advanced as part of the Loan, whether advanced directly to Borrower or otherwise.

**Material Adverse Effect**:    Any event, condition, obligation, liability or circumstance or set of events, conditions, obligations, liabilities or circumstances or any change(s) which:

(a)    has or reasonably could be expected to have a material adverse effect upon or change in (i) the legality, validity or enforceability of any Loan Document, or (ii) the perfection or priority of any Lien granted to Lender under any of the Loan Documents;

(b)    has or reasonably could be expected to have a material and adverse effect upon the value of any of the Collateral or the business, operations, prospects, properties, assets, liabilities or financial condition of Borrower; or

(c)    materially impairs or reasonably could be expected to materially impair the ability of Borrower to perform any of the Obligations or its obligations, or to consummate the transactions, under the Loan Documents;

provided, for the avoidance of doubt, any changes attributable to the commencement of the Chapter 11 Case or any defaults under the Permitted Existing Indebtedness which have been disclosed to Lender relating to the Chapter 11 Case shall not constitute a Material Adverse Effect.

**Maturity Date**:  The earlier of (a) July 31, 2010, (b) the acceleration of the Obligations and the termination of the Commitment in accordance with the terms hereof, (c) the effective date of a plan of reorganization in the Chapter 11 Case, or (d) the conversion of the Chapter 11 Case to a Chapter 7 case.

**Note**:  The promissory note made by Borrower and payable to Lender in the Form of **Exhibit B** hereto.

DRAFT

**Obligations**:  All obligations of every nature of Borrower from time to time owed to Lender or any indemnitee under any Loan Document, whether for principal, interest (including interest which, but for the filing of a petition in bankruptcy with respect to Borrower, would have accrued on any Obligation, whether or not a claim is allowed against Borrower for such interest in the related bankruptcy proceeding), fees, expenses, indemnification or otherwise.

**Order**:   A non-appealable order of the Bankruptcy Court entered in the Chapter 11 Case after a hearing under Bankruptcy Rule 4001(c)(2) granting approval of this Agreement and the other Loan Documents and granting the priming liens and super-priority claims and other benefits and protections with respect to Borrower described herein and in the Loan Documents in favor of Lender, with such changes thereto as may be satisfactory to Lender.

**Order Entry Date**:  The date the Order is entered in the Chapter 11 Case.

**Permitted Existing Contingent Obligations**:  The Contingent Obligations of Borrower existing on the date hereof and identified as such on **Schedule 1** to this Agreement.

**Permitted Existing Indebtedness**:  The Indebtedness of Borrower existing on the date hereof and identified as such on **Schedule 2** to this Agreement.

**Permitted Existing Liens**:  The Liens on assets of Borrower existing on the date hereof and identified as such on **Schedule 3** to this Agreement.

**Permitted Lien**:  Any Lien of any type that is found by the Bankruptcy Court to be legal, valid, enforceable, perfected and non-avoidable.

**Permitted Purchase Money Indebtedness**:  As defined in **Section 8.3(a)(v)**.

**Person**:  Natural persons, corporations, limited partnerships, general partnerships, limited liability companies, limited liability partnerships, joint stock companies, joint ventures, associations, companies, trusts, banks, trust companies, land trusts, business trusts or other organizations, whether or not legal entities, and Governmental Authorities.

**Prepetition Collateral**:  All collateral securing the Prepetition Indebtedness pursuant to the Prepetition Loan Documents.

**Prepetition Indebtedness**:  All Indebtedness owing by Borrower pursuant to the terms of the Prepetition Loan Agreement.

**Prepetition Lender**:  Bank of America, N.A. (as successor in interest to Fleet National Bank).

**Prepetition Loan Agreement**:  That certain Credit Agreement dated as of February 1, 2005, by and between Borrower and the Prepetition Lender (as heretofore amended, modified, supplemented, or restated from time to time).

DRAFT

**Prepetition Loan Documents**:  All "Loan Documents" as defined in the Prepetition Loan Agreement.

**Regulatory Change**:  As to Lender, the introduction of, or any change in any applicable law, treaty, rule, regulation or guideline or in the interpretation or administration thereof by any Governmental Authority or any central bank or other fiscal, monetary or other authority having jurisdiction over Lender.

**Revolving Credit Maximum Amount**:  At any particular time, the Commitment; provided, that in no event shall the Revolving Credit Maximum Amount exceed the maximum principal amount of the Loan approved by the Bankruptcy Court pursuant to the Order.

**Revolving Credit Obligations**:  At any particular time, the outstanding principal amount of the Loan.

**Subsidiary**:  As to any Person, (i) any corporation more than fifty percent (50%) of the outstanding securities having ordinary voting power of which shall at the time be owned or controlled, directly or indirectly, by such Person or by one or more of its Subsidiaries or by such Person and one or more of its Subsidiaries, or (ii) any partnership, association, joint venture or similar business organization more than fifty percent (50%) of the ownership interests of which shall at the time be so owned or controlled.  For purposes of this Agreement, a Person or Persons shall be deemed to have a majority ownership interest in a partnership, association, joint venture or similar business organization if such Person or Persons shall be allocated a majority of the partnership, association, joint venture or similar business organization gains or losses or shall be or control the managing general partner of such partnership, association, joint venture or similar business organization.  In no event shall Borrower be considered a Subsidiary of Lender.

**UCC**:  At any time, the Uniform Commercial Code in effect in the State of California at such time.

## ARTICLE 2

## REPRESENTATIONS AND WARRANTIES

2.1    **Representations and Warranties**.  To induce Lender to execute and perform this Agreement, Borrower hereby represents, covenants and warrants to Lender as follows:

(a)    At the Closing and at all times thereafter until the Loan is paid in full, Borrower will have good and indefeasible fee simple title to the Collateral, subject only to the Permitted Liens and the Lien of the Loan Documents;

(b)    Borrower is a duly formed corporation under the laws of the State of California and is duly qualified to do business under the laws of each jurisdiction in which failure to be so qualified could reasonably be expected to have a Material Adverse Effect;

DRAFT

(c)    Subject to the approval of the Bankruptcy Court, the execution, delivery and performance of this Agreement and the Loan Documents have been duly authorized by all necessary action on the part of Borrower, and no consent of any other party is required for the performance by Borrower of its obligations hereunder and under the Loan Documents;

(d)    The Loan Documents and any other documents and instruments required to be executed and delivered by Borrower in connection with this Agreement, when executed and delivered, will constitute the duly authorized, valid and legally binding obligations of the party required to execute the same and will be enforceable strictly in accordance with their respective terms;

(e)    The execution, delivery and performance of the Loan Documents and any other documents or instruments to be executed and delivered by Borrower pursuant to this Agreement or in connection with the Loan will not:  (i) violate any Legal Requirements, or (ii) conflict with, be inconsistent with, or result in any breach or default of any of the terms, covenants, conditions or provisions of any indenture, mortgage, deed of trust, instrument, document, agreement or contract of any kind to which Borrower is a party or by which it may be bound.

(f)    Except for the defaults under the Prepetition Indebtedness which have been disclosed to Lender, Borrower is not in default under any contract or agreement entered into on or after the Filing Date to which it is a party, the effect of which default will have a Material Adverse Effect on the performance by Borrower of its obligations pursuant to and as contemplated by the terms and provisions of this Agreement or the other Loan Documents;

(g)    No condition, circumstance, event, agreement, document, instrument, restriction, litigation or proceeding (or to the knowledge of Borrower, litigation threatened in writing) exists which could (i) adversely affect the validity or priority of the Liens and security interests granted to Lender under the Loan Documents; (ii) could reasonably be expected to have a Material Adverse Effect on the ability of Borrower to perform its obligations under the Loan Documents; or (iii) constitute an Event of Default under any of the Loan Documents or an event which, with the giving of notice, the passage of time or both, would constitute such an Event of Default;

(h)    All governmental permits and licenses required by applicable law to conduct Borrower's business are validly issued and in full force and effect;

(i)    The financial reports and other information provided by Borrower to Lender are true, correct and accurate in all material respects;

(j)    There is no claim, action, litigation, arbitration or other proceeding pending against Borrower which relates to the Collateral or which could result in the imposition of a lien against the Collateral, which lien is either pari passu or senior to the Liens granted to Lender.  To the best of Borrower's knowledge, there is no action threatened against Borrower or the Collateral which, if adversely determined, could give

DRAFT

rise to an event, condition, liability or circumstance that would constitute a Material Adverse Effect;

(k)    To the best of Borrower's knowledge, it is in full and complete compliance with the Order; and

(l)    Neither Borrower nor any Affiliate (individually or in the aggregate) is or, after giving effect to the transactions contemplated by the Loan Documents, will be, an "investment company" within the meaning of the Investment Company Act of 1940, as amended.

2.2    **Continuation of Representations and Warranties**.    Borrower represents and warrants to Lender that each of the foregoing statements is true and correct on the date hereof, and, subject to **Section 7.1**, will be true and correct and at all times thereafter so long as any part of the Loan shall remain outstanding.

## ARTICLE 3

## AMOUNT AND TERMS OF THE COMMITMENT

3.1    **Agreement to Lend and to Borrow; Note**.

(a)    Subject to the terms and conditions set forth herein, Lender agrees to make Advances under the Loan to Borrower from time to time.  At no time shall Lender have any obligation to make any Advance hereunder which would cause the Revolving Credit Obligations to exceed the Revolving Credit Maximum Amount.  Subject to the terms of this Agreement, Borrower may borrow, repay and re-borrow the Loan Proceeds at any time prior to the Maturity Date.  On the Maturity Date, Borrower shall repay in full in cash the Revolving Credit Obligations, together with all accrued and unpaid interest thereon.

(b)    The Loan and all Advances made in connection therewith shall be evidenced by the Note.  The date and amount of each Advance, and the payment or prepayment of principal and/or interest with respect thereto, shall be recorded by Lender on its books.  Each such recordation shall constitute prima facie evidence of the accuracy of the information so recorded in the absence of manifest error.

3.2    **Use of Loan Proceeds**.  Loan Proceeds may be used solely in accordance with the Budget, and as required under the Loan Documents.  Loan Proceeds shall be used for the following purposes:

(a)    to pay interest, fees and expenses in connection with the Loan to Lender in accordance with the Loan Documents;

(b)    to fund the post-petition operating expenses incurred by Borrower in the ordinary course of business; and

DRAFT

(c)    to pay certain other costs and expenses in connection with the administration of the Chapter 11 Case.

3.3    **Prepayments**.    Borrower may, at any time or from time to time, voluntarily prepay all or part of the Revolving Credit Obligations, without premium or penalty.    Any prepayment shall be accompanied by all accrued interest on the amount prepaid, together with any additional amounts required hereunder.    If for any reason the Revolving Credit Obligations at any time exceed the Revolving Credit Maximum Amount, Borrower shall immediately prepay the Revolving Credit Obligations in an amount equal to such excess.

3.4    **Super-Priority Nature of Obligations and Status of Lender's Liens**.

(a)    On and after the Closing Date, subject to **Section 3.4(b)** below, the provisions of the Loan Documents and the Order shall be effective to create in favor of Lender legal, valid and perfected Liens on and security interests in all right, title and interest of Borrower in the Collateral, enforceable against Borrower:

(i)    Pursuant to Section 364(c)(2) of the Bankruptcy Code and the Order, all Obligations shall be secured by a perfected first priority senior Lien on all Collateral that is not otherwise subject to valid, perfected and non-avoidable Liens as of the Filing Date;

(ii)    Pursuant to Section 364(c)(3) of the Bankruptcy Code and the Order, all Obligations shall be secured by a perfected second priority junior Lien on all Collateral that is otherwise subject to (1) valid, perfected and non-avoidable Liens as of the Filing Date or (2) valid Liens in existence at the Filing Date that are perfected subsequent to the Filing Date as permitted by Section 546(b) of the Bankruptcy Code and perfected thereafter as permitted by Section 546(b) of the Bankruptcy Code (other than with respect to the Liens described in **clause (iii)** below, which Liens shall be primed by the Liens described in such clause); and

(iii)    Pursuant to Section 364(d)(1) of the Bankruptcy Code and the Order, all Obligations shall be secured by a perfected first priority senior priming Lien on the Prepetition Collateral.

Subject to the Order, no filings, recordings or other actions shall be necessary to perfect and maintain the perfection and status of such Liens.

(b)    Notwithstanding anything in this Agreement to the contrary, Lender's Liens shall be subject to the Carve Out, but, for the avoidance of doubt, payment of the Carve Out shall not reduce the amounts payable to Lender hereunder or under the Loan Documents or affect the rights of Lender to receive such payment.

(c)    Pursuant to Section 364(c)(1) of the Bankruptcy Code and Order (as applicable), all Obligations at all times shall constitute allowed super-priority administrative expense claims in the Chapter 11 Case having priority over all allowed administrative expenses, subject only to the Carve Out.

DRAFT

(d)    Except for the Carve Out, no costs or expenses of administration shall be imposed against Lender or any of the Collateral under Section 105 or 506(c) of the Bankruptcy Code, or otherwise, and Borrower hereby waives for itself and on behalf of its estate in bankruptcy, any and all rights under Section 105 or 506(c), or otherwise, to assert or impose or seek to assert or impose, any such costs or expenses of administration against Lender or the Collateral.

(e)    Borrower acknowledges that, pursuant to the Order, the Liens in favor of Lender on all of Borrower's right, title and interest in all Collateral shall be perfected without the filing or recordation of any UCC financing statements, notices of Lien or other instruments of mortgage or assignment and without the necessity of any party delivering, filing, registering or recording any other financing statements, filings, notices, recordings or other instruments or otherwise taking any other action to perfect such security interests or Liens.

3.5    **No Discharge; Survival of Liens and Claims; Waiver of Priming Rights**.

(a)    Borrower agrees that the Obligations hereunder shall not be discharged by (i) the entry of an order confirming a Chapter 11 plan of reorganization or liquidation in the Chapter 11 Case (and Borrower pursuant to Section 1141(d)(4) of the Bankruptcy Code hereby waives any such discharge), (ii)  the conversion of the Chapter 11 Case to a Chapter 7 case, or (iii) the dismissal of the Chapter 11 Case.

(b)    Borrower agrees that the Liens and super-priority administrative expense claim granted to Lender pursuant to the Order shall not be affected in any manner by the entry of an order confirming a Chapter 11 plan of reorganization or liquidation in the Chapter 11 Case.

(c)    Upon the Closing Date, and on behalf of itself and its estate, and for so long as any Obligations shall be outstanding, Borrower hereby irrevocably waives any right, pursuant to Section 364(c) or 364(d) of the Bankruptcy Code or otherwise, to grant any Lien on the Collateral that is of equal or greater priority than the Liens securing the Obligations, or to approve a claim of equal or greater priority than the super-priority administrative expense claim granted to the Obligations.

3.6    **Adequate Protection**.  Borrower acknowledges and agrees that, as adequate protection for the use of the Prepetition Lender's cash collateral, the use, sale, or lease of the Prepetition Collateral (other than such cash collateral), the Prepetition Lender's interests in the Liens that are being primed as set forth in this Agreement and the imposition of the automatic stay pursuant to Section 362(a) of the Bankruptcy Code, the Prepetition Lender shall be granted the protections provided in the Order.

3.7    **Payment of Obligations**.  On the Maturity Date, Borrower shall pay to Lender in cash all of the Obligations owed by Borrower to Lender hereunder or under any of the Loan Documents.  Upon the maturity (whether by acceleration or otherwise) of any of the Obligations under this Agreement or any of the other Loan Documents, Lender shall be entitled to immediate

DRAFT

payment of such Obligations in cash without further application to or order of the Bankruptcy Court.

# ARTICLE 4

## PRINCIPAL, INTEREST; SPECIAL PROVISIONS FOR LOANS

4.1 **Interest Rate**. Borrower promises to pay interest on the Revolving Credit Obligations for the period commencing on the date of each Advance until such Advance is paid in full at a rate per annum equal to fourteen percent (14.0%).

4.2 **Payment of Principal and Interest**.

(a) Through and including the Maturity Date, accrued interest on each Advance shall be payable in arrears on the first Business Day of each calendar month and on the Maturity Date. The Revolving Credit Obligations shall be due and payable in full on the Maturity Date.

(b) Payments shall be applied as required under applicable law and in the absence of any such requirements, payments may be applied to amounts owed hereunder and under the Loan Documents in such order as Lender shall determine, in its sole discretion.

(c) All payments of principal (including prepayments) and accrued interest shall be paid by wire transfer in United States Dollars, to Lender at such place as Lender may from time to time direct.

(d) If any payment hereunder becomes due and payable on a day other than a Business Day, such payment shall be extended to the next succeeding Business Day, and, with respect to payments of principal, interest thereon shall be payable at the then applicable interest rate during such extension.

(e) Prepayments of the Revolving Credit Obligations shall be made in accordance with **Article 3**.

4.3 **Computation of Interest and Fees**.

(a) Fees and interest shall be calculated on the basis of a 360-day year for the actual days elapsed in any portion of a month in which interest is due. In no event shall the interest rate hereunder exceed the Highest Lawful Rate.

(b) After the occurrence and during the continuance of an Event of Default, the interest rate applicable to the Obligations shall be increased by two percent (2.0%) *per annum* above the rate otherwise applicable thereto.

4.4 **Illegality**. Notwithstanding any other provision herein, if Lender shall reasonably determine that any Regulatory Change shall make it unlawful for Lender to make or maintain the Loan as contemplated by this Agreement, Lender shall give notice of such determination to

WEST\21854176.2

14

Exhibit "A"

DRAFT

Borrower.  Upon receipt of such notice, the right of Borrower to request further Advances and the obligation of Lender to make further Advances shall immediately cease, and the Revolving Credit Obligations shall immediately become due and payable.

4.5    **Legal Requirements**.

(a)    If any Regulatory Change made subsequent to the date hereof shall:

(i)    subject Lender to any tax of any kind whatsoever with respect to this Agreement, the Note or the Loan, or change the basis of taxation of payments to Lender in respect thereof (except for Non-Excluded Taxes covered by **Section 4.6** and changes in the rate of tax on the overall net income of Lender); or

(ii)    impose on Lender any other condition regarding the Loan or Lender's funding thereof;

and the result of any of the foregoing is to increase the cost to Lender by an amount which Lender in good faith deems to be material, then, in any such case, Borrower shall promptly pay to Lender, upon demand, any additional amounts necessary to compensate Lender for such increased cost or reduced amount receivable.

(b)    If Lender shall have reasonably determined that any Regulatory Change regarding capital adequacy or in the interpretation or application thereof or compliance by Lender with any request or directive regarding capital adequacy (whether or not having the force of law) from any Governmental Authority, in any such case made subsequent to the date hereof, does or shall have the effect of reducing the rate of return on Lender's capital as a consequence of its obligations hereunder to a level below that which Lender could have achieved but for such change or compliance (taking into consideration Lender's policies with respect to capital adequacy) by an amount deemed by Lender to be material, then from time to time, after submission by Lender to Borrower of a written request therefor, Borrower shall pay to Lender such additional amount as will compensate Lender for such reduction.

(c)    If Lender becomes entitled to claim any additional amounts pursuant to this subsection, it shall promptly notify Borrower of the event by reason of which it has become so entitled.  A certificate as to any additional amounts payable pursuant to this subsection submitted by Lender to Borrower shall be conclusive in the absence of manifest error.  This covenant shall survive the termination of this Agreement and the payment of the Note and all other amounts payable hereunder.

(d)    Notwithstanding anything to the contrary contained in this subsection, Borrower shall not be required to pay any additional amounts to Lender pursuant to this subsection to the extent such additional amounts result from Lender's gross negligence or willful misconduct as found in a final non-appealable judgment by a court of competent jurisdiction.

4.6    **Taxes**.  All payments made by Borrower under this Agreement and the Note shall be made free and clear of, and without deduction or withholding for or on account of, any

DRAFT

present or future income, stamp or other taxes, levies, imposts, duties, charges, fees, deductions or withholdings, now or hereafter imposed, levied, collected, withheld or assessed by any Governmental Authority, excluding net income taxes and franchise taxes (imposed in lieu of net income taxes) imposed on Lender as a result of a present or former connection between Lender and the jurisdiction of the Governmental Authority imposing such tax or any political subdivision or taxing authority thereof or therein (other than any such connection arising solely from Lender having executed, delivered or performed its obligations or received a payment under, or enforced, this Agreement or the Note).  If any such non-excluded taxes, levies, imposts, duties, charges, fees, deductions or withholdings ("Non-Excluded Taxes") are required to be withheld from any amounts payable to Lender hereunder or under the Note, the amounts so payable to Lender shall be increased to the extent necessary to yield to Lender (after payment of all Non-Excluded Taxes) interest or any such other amounts payable hereunder at the rates or in the amounts specified in this Agreement.  Whenever any Non-Excluded Taxes are payable by Borrower, as promptly as possible thereafter Borrower shall send to Lender a certified copy of an original official receipt received by Borrower showing payment thereof.  If Borrower fails to pay any Non-Excluded Taxes when due to the appropriate taxing authority or fails to remit to Lender the required receipts or other required documentary evidence, Borrower shall indemnify Lender for any incremental taxes, interest or penalties that may become payable by Lender as a result of any such failures.  The agreements in this subsection shall survive the termination of this Agreement and the payment of the Obligations, as set forth in the Loan Documents.  Notwithstanding anything to the contrary contained in this subsection, Borrower shall not be required to pay any additional amounts to Lender pursuant to this subsection to the extent such additional amounts result from Lender's gross negligence or willful misconduct.

4.7    **Loan Indemnification**.  Borrower shall indemnify and hold harmless Lender and its Affiliates and each of their respective officers, directors, employees, agents, advisors, attorneys and representatives of each (each, an "Indemnified Party") from and against any and all claims, damages, losses, liabilities and expenses (including, without limitation, reasonable fees and disbursements of counsel), joint or several, that may be incurred by or asserted or awarded against any Indemnified Party, in each case arising out of or in connection with or relating to any investigation, litigation or proceeding or the preparation of any defense with respect thereto, arising out of or in connection with or relating to this Agreement, the Loan Documents or the transactions contemplated hereby, or any use made or proposed to be made with the proceeds of the Loan, whether or not such investigation, litigation or proceeding is brought by Borrower, any of its shareholders or creditors, an Indemnified Party or any other person, or an Indemnified Party is otherwise a party thereto and whether or not the transactions contemplated hereby are consummated, except to the extent such claim, damage, loss, liability or expense is found in a final non-appealable judgment by a court of competent jurisdiction to have resulted from such Indemnified Party's gross negligence or willful misconduct.  No Indemnified Party shall have any liability (whether direct or indirect, in contract, tort or otherwise) to Borrower or any of its shareholders or creditors for or in connection with the transactions contemplated hereby, except to the extent such liability is found in a final non-appealable judgment by a court of competent jurisdiction to have resulted from such Indemnified Party's gross negligence or willful misconduct.  In no event, however, shall any Indemnified Party be liable on any theory of liability for any special, indirect, consequential or punitive damages.

DRAFT

4.8    **Fees and Expenses**.

(a)    Borrower shall pay to Lender a commitment fee on the Order Entry Date in the amount of 5.0% of the Commitment or such other amount as shall be approved by the Bankruptcy Court.

(b)    Borrower shall pay to Lender an unused commitment fee equal to the Applicable Commitment Fee Percentage.  The unused commitment fee shall accrue at all times during the period from the Order Entry Date to the Maturity Date and shall be due and payable monthly in arrears on the first Business Day of each calendar month (for the prior calendar month), commencing with the first such date to occur after the Order Entry Date.  Any portion of the unused commitment fee which has not been paid in accordance with the immediately preceding sentence shall be due and payable on the Maturity Date.

(c)    Upon demand, Borrower shall reimburse Lender for all fees (including legal fees), costs, charges and reasonable out-of-pocket expenses associated with (i) the preparation and negotiation of this Agreement and the Loan Documents, (ii) the consummation of the transactions described in this Agreement and the Loan Documents, (iii) administration of the Loan, and (iv) the enforcement of rights and remedies set forth in this Agreement and the Loan Documents, that have been billed to Lender.  Such reimbursements shall commence with the first such demand to occur after the Closing Date, but the obligation of Borrower to make any final reimbursement shall survive the Maturity Date.

## ARTICLE 5

## LOAN DOCUMENTS

5.1    **Conditions Precedent to Each Advance**.  The obligation of Lender to honor any Loan Notice is subject to the following conditions precedent:

(a)    There exists no Default or Event of Default;

(b)    The representations and warranties contained in this Agreement and each of the other Loan Documents are true and correct in all material respects as of such Borrowing Date except for changes reflecting events, conditions or transactions permitted or not prohibited by this Agreement; provided, that the words "in all material respects" in this **subsection (b)** shall, as to any representation or warranty that contains a materiality standard, operate without duplication with such standard;

(c)    During the Availability Period, (i) the Order shall be in full force and effect and shall not have been stayed, reversed, modified or amended in any respect without the prior written consent of Lender, and (ii) the Revolving Credit Obligations shall not exceed the Revolving Credit Maximum Amount;

(d)    The Order is a final, non-appealable order;

WEST\21854176.2

17

Exhibit "A"

DRAFT

(e)    Before and after giving effect to the requested Advance and the application of the proceeds thereof, Borrower shall be in compliance in all respects with the Budget;

(f)    There has been no event, condition, obligation, liability, or circumstance that would constitute a Material Adverse Effect; provided that, any changes attributable to the commencement of the Chapter 11 Case or regulatory rulings shall not constitute a Material Adverse Effect;

(g)    Borrower shall have executed such Loan Documents as Lender shall reasonably require to secure the performance of Borrower's obligations and to perfect Lender's interest in the Collateral; and

(h)    Lender shall have received such other information and materials relating to the Collateral as Lender shall reasonably require.

Each request for an Advance shall constitute a representation and warranty by Borrower that the conditions contained in this **Section 5.1** have been satisfied or waived in writing by Lender.

## ARTICLE 6

## CONDITIONS TO CLOSING

6.1    **Conditions to Closing**.    The obligation of Lender to close is subject to the satisfaction, or waiver in accordance with **Section 13.2**, of the following conditions on or before the Closing Date:

(a)    **Delivery of Documents**.    Borrower shall have furnished to Lender each of the following, all in form and substance satisfactory to Lender:

(i)    Executed copies of this Agreement and each of the other Loan Documents required to be executed and delivered by Borrower on or prior to the Closing Date;

(ii)    A copy of the certificate of incorporation of Borrower, as amended, certified as of a recent date by the Secretary of State of the state of its incorporation;

(iii)    A certificate of the Secretary of State in the state of Borrower's incorporation, dated as of a recent date, as to the good standing of and payment of taxes by Borrower;

(iv)    A certificate of the Secretary or an Assistant Secretary of Borrower dated the Closing Date and certifying on behalf of Borrower (A) that attached thereto is a true and complete copy of the by-laws of Borrower as in effect on the date of such certification, (B) that attached thereto is a true and complete copy of resolutions adopted by the board of directors of Borrower authorizing the filing of its bankruptcy petition and authorizing the execution, delivery and performance in

DRAFT

accordance with the terms of this Agreement, each of the Loan Documents, and any other documents required or contemplated hereunder or thereunder, the granting of the security interests contemplated by the Loan Documents, and the other transactions contemplated by this Agreement, (C) that the certificate of incorporation of Borrower has not been amended since the date of the last amendment thereto indicated on the certificate of the Secretary of State furnished pursuant to **clause (iii)** above, and (D) as to the incumbency and specimen signature of each officer or manager of that entity executing this Agreement and the other Loan Documents or any other document delivered by it in connection herewith or therewith;

(v)     Copies of the Budget; and

(vi)    Such other documents as Lender or its counsel may have reasonably requested.

(b)    **Fees and Expenses**.  All costs, charges, fees, expenses (including, without limitation, reasonable legal fees and expenses) and other compensation payable to Lender shall have been paid to the extent due.

(c)    **Entry of Order**.  Lender shall have obtained a copy (to be followed by a certified copy when available) of the Order granting approval of the Loan Documents and granting the super-priority claim status and first-priority priming lien described in this Agreement, which Order (i) shall be in form and substance satisfactory to Lender, (ii) shall authorize extensions of credit in amounts satisfactory to Lender, (iii) shall approve the payment by Borrower of all of the fees contemplated under this Agreement and the fees of professionals of Lender, (iv) shall be in full force and effect, and (v) shall not have been stayed, reversed, modified or amended in any respect without the prior written consent of Lender.

(d)    **Objections to Lender's Liens and Security**.  No timely objection shall have been filed challenging (i) the amount, validity, enforceability or non-avoidability of the Lender's Liens, or (ii) the validity, enforceability, perfection, non-avoidability or seniority of the Obligations.

(e)    **First Day Orders**.  All orders approving all of the First Day Motions ("First Day Orders") shall have been entered by the Bankruptcy Court at the commencement of the Chapter 11 Case, and they shall be substantially similar in form and substance to those reviewed and approved by Lender immediately prior to the commencement of the Chapter 11 Case.

(f)    **Motions and Other Documents**.  Borrower shall not have filed any motion or pleading which has or may have an affect on the rights granted to Lender hereunder or under the Order without first providing Lender with sufficient and reasonable notice of such a motion or pleading.  Notwithstanding the foregoing, Borrower waives any right to file any motion or pleading that materially and adversely alters Lender's rights hereunder or under the Order.

DRAFT

(g)    **No Material Adverse Effect**.  No change shall have occurred that results in a Material Adverse Effect; provided, that any changes attributable to the commencement of the Chapter 11 Case or regulatory rulings shall not constitute a Material Adverse Effect.

(h)    **Additional Documents**.  Lender shall have received such other papers, reports and documents regarding Borrower or the Collateral as Lender or its counsel may reasonably require.

## ARTICLE 7

## FUNDING CONDITIONS AND MECHANICS

7.1    **Funding Conditions and Mechanics**.  The obligation of Lender to honor any Loan Notice is subject to the following conditions precedent:

(a)    Each request for an Advance shall be made by Borrower in an irrevocable Loan Notice to Lender, which may be given by telephone.  Each telephonic notice by Borrower pursuant to this **Section 7.1(a)** must be confirmed promptly by delivery to Lender of a written Loan Notice, appropriately completed and signed by a responsible officer of Borrower.  Each Loan Notice (whether telephonic or written) shall specify (i) the requested date of the Advance (which shall be a Business Day), and (ii) the principal amount of the Advance requested to be borrowed.

(b)    Following receipt of a Loan Notice, and upon satisfaction of the applicable conditions set forth in **Section 5.1** (and, if such borrowing is the initial Advance, **Section 6.1**), Lender shall make the amount of the requested Advance available to Borrower in accordance with instructions provided by Borrower to (and reasonably acceptable to) Lender.

(c)    During the existence of a Default, Lender shall have no obligation to honor any Borrower request for an Advance.

## ARTICLE 8

## FURTHER AGREEMENTS OF BORROWER

8.1    **Furnishing Information**.  Borrower will:

(a)    deliver to Lender weekly updates of the cash flow results and weekly variance reports;

(b)    deliver to Lender reports demonstrating compliance within 20% of the total net cash flow as shown in the Budget, reported weekly and tested weekly on a rolling four week basis;

(c)    deliver to Lender, as soon as practicable, and in advance of filing with the Bankruptcy Court: (i) the Order, (ii) all other proposed orders and pleadings related to the

DRAFT

Collateral, (iii) any plan of reorganization or liquidation, and/or (iv) any disclosure statement related to such plan.  All of the forgoing must be in form and substance reasonably satisfactory to Lender;

(d)      file a plan of reorganization in the Chapter 11 Case on or around the end of the second fiscal quarter of 2010;

(e)      not later than the 15th Business Day of each month after the date of this Agreement, deliver to Lender, an updated rolling cash flow forecast setting forth on a line-item basis anticipated cash receipts and expenditures for Borrower for the succeeding 13-week period (together with a comparison of actual payments to budgeted line items for the immediately preceding monthly period);

(f)      promptly supply Lender with such information concerning Borrower's assets, liabilities and affairs, as Lender may reasonably request from time to time hereafter; which shall include, without necessity of any request by Lender, as soon as available and in no event later than 90 days after the close of each fiscal year, and within 30 days of the end of each fiscal quarter, unaudited financial statements of Borrower showing the results of operations and consisting of a balance sheet, cash flow statement, and statement of income and expense prepared in accordance with GAAP and signed by an officer of Borrower;

(g)      promptly notify Lender of any condition or event which constitutes (or which, with the giving of notice or lapse of time, or both, would constitute) an Event of Default;

(h)      promptly notify Lender of any circumstance or condition that would constitute a Material Adverse Effect, and of any material adverse change in the financial condition of Borrower or the value of the Collateral;

(i)      promptly after the same is available (to the extent not otherwise previously delivered), furnish to Lender and its counsel all pleadings, motions, applications, judicial information, financial information and other documents filed by or on behalf of Borrower with the Bankruptcy Court or the United States Trustee in the Chapter 11 Case (other than confidential information provided to Borrower by any other bidder for Borrower's assets);

(j)      file Borrower's bankruptcy schedules and statements of financial affairs no later than the date set forth in the Federal Rules of Bankruptcy Procedure or in any order entered by the Bankruptcy Court on or about the Filing Date with respect to an extension of time to file such schedules and statements (and shall not, without the consent of Lender, seek a further extension of time to file such schedules and statements) and shall promptly deliver a copy thereof to Lender and its counsel; and

(k)      promptly upon receiving a request therefor from Lender, prepare and deliver to Lender such other information with respect to Borrower or the Collateral, including, without limitation, schedules identifying and describing the Collateral and any dispositions thereof, as from time to time may be reasonably requested by Lender.

DRAFT

8.2    **Affirmative Covenants**.

(a)    **Existence, Etc**.  Borrower shall at all times maintain its organizational existence and preserve and keep, or cause to be preserved and kept, in full force and effect its rights and franchises material to its businesses.

(b)    **Powers; Conduct of Business**.  Borrower shall qualify and remain qualified to do business in each jurisdiction in which the nature of its business requires it to be so qualified and where the failure to be so qualified will have or could reasonably be expected to have a Material Adverse Effect.  Borrower shall carry on and conduct its business in substantially the same manner and in substantially the same fields of enterprise as it is presently conducted.

(c)    **Compliance with Laws, Etc.**  Borrower shall (i) comply with all Legal Requirements and all restrictive covenants affecting such Person or the business, properties, assets or operations of such Person, and (ii) obtain, as needed, all permits necessary for its operations and maintain such permits in good standing unless failure to comply or obtain could not reasonably be expected to have a Material Adverse Effect.

(d)    **Use of Proceeds**.  Borrower will solely and exclusively use the Loan Proceeds in the manner specified in the Budget and the Order.  No portion of the Loan Proceeds shall be used in any manner that causes or might cause the Loan or the application of such proceeds to violate Regulation T, Regulation U or Regulation X of the Board of Governors of the Federal Reserve System or any other regulation thereof or to violate the Exchange Act.

(e)    **Payment of Taxes**.  To the extent provided for in the Budget, Borrower shall pay all post-petition taxes, assessments and other governmental charges imposed upon it or on any of its properties or assets or in respect of any of its franchises, business, income or property before any penalty or interest accrues thereon; provided, that no such taxes, assessments and governmental charges (and interest, penalties or fines relating thereto) need be paid if being contested in good faith by appropriate proceedings diligently instituted and conducted.

(f)    **Insurance**.  Borrower shall maintain in full force and effect insurance policies and programs or other policies and programs as reflect coverage that is reasonably consistent with prudent industry practice.  Not later than ten Business Days following the Closing Date (or such later date as Lender may agree), Borrower shall deliver to Lender endorsements in form and substance acceptable to Lender (i) to all "All Risk" physical damage insurance policies on all of such Borrower's tangible real and personal property and assets and business interruption insurance policies naming Lender as loss payee, and (ii) to all general liability and other liability policies naming Lender as an additional insured.  In the event Borrower at any time or times hereafter shall fail to obtain or maintain any of the policies or insurance required herein or to pay any premium in whole or in part relating thereto, then Lender, without waiving or releasing any obligations or resulting Event of Default hereunder and without obligation to do so, may at any time or times thereafter obtain and maintain such policies of insurance and pay

DRAFT

such premiums and take any other action with respect thereto which Lender deems advisable.  All sums so disbursed by Lender shall constitute part of the Obligations, payable as provided in this Agreement.

(g)    **Inspection of Property; Books and Records; Discussions**.  Borrower shall permit any authorized representative(s) designated by Lender to visit and inspect any of the properties of Borrower to examine, audit, check and make copies of its financial and accounting records, books, journals, orders, receipts and any correspondence and other data relating to their respective businesses or the transactions contemplated hereby (including, without limitation, in connection with environmental compliance, hazard or liability), and to discuss their affairs, finances and accounts with their officers and independent certified public accountants, all upon reasonable notice and at such reasonable times during normal business hours, as often as may be reasonably requested.  Without limiting the foregoing, Borrower shall permit any authorized representatives designated by Lender to complete each such audit, collateral analysis, appraisal, field examination, environmental survey, or other business analysis with respect to Borrower as Lender shall request, all upon reasonable notice and at such reasonable times during normal business hours, as often as may be reasonably requested.

(h)    **Insurance and Condemnation Proceeds**.  Borrower directs all insurers under policies of property damage, boiler and machinery and business interruption insurance and payors of any condemnation claim or award relating to the property to pay all proceeds payable under such policies or with respect to such claim or award for any loss with respect to the Collateral directly to Lender.

(i)    **Order**.  Borrower shall cause the Order Entry Date to occur no later than March 11, 2010.

(j)    **Maintenance of Property**.  Borrower shall cause all property used or useful in the conduct of its business to be maintained and kept in good condition, repair and working order and supplied with all necessary equipment and shall cause to be made all necessary repairs, renewals, replacements, betterments and improvements thereof, all as in the judgment of the applicable Borrower may be necessary so that the business carried on in connection therewith may be properly and advantageously conducted at all times; provided, that nothing contained herein shall prevent Borrower from discontinuing the operation or maintenance of any of such property if such discontinuance is, in the judgment of Borrower, desirable in the conduct of its business and not disadvantageous in any material respect to the interests of Lender.

(k)    **Waiver of Claims**.  Borrower shall waive any claims arising under Bankruptcy Code section 506(c) against Lender or the Loan, and shall not commence any actions adverse to Lender or its rights and remedies under the Loan.

(l)    **Further Assurance**.  At Lender's request, Borrower will execute and deliver such documents as may be necessary to perfect and maintain perfected and valid Liens upon the Collateral and the personal property located thereon, the Liens granted to

DRAFT

Lender pursuant to this Agreement or any of the other Loan Documents, and to fully consummate the transactions contemplated by this Agreement.

8.3    **Negative Covenants**.

(a)    **Indebtedness**.  Neither Borrower nor its Subsidiaries shall directly or indirectly create, incur, assume or otherwise become or remain directly or indirectly liable with respect to any Indebtedness, except:

(i)    the Obligations;

(ii)    Permitted Existing Indebtedness;

(iii)    Indebtedness constituting Contingent Obligations permitted by **Section 8.3(d)**;

(iv)    secured or unsecured purchase money Indebtedness (including Capitalized Leases) incurred subsequent to the Filing Date to finance the acquisition of assets used in the business, if (A) at the time of such incurrence, no Default or Event of Default has occurred and is continuing or would result from such incurrence, (B) such Indebtedness has a scheduled maturity and is not due on demand, (C) such Indebtedness does not exceed the lower of the fair market value or the cost of the applicable fixed assets on the date acquired, (D) such Indebtedness does not exceed $150,000 in the aggregate outstanding at any time, and (E) any Lien securing such Indebtedness is permitted under Section 8.3(c) (such Indebtedness being referred to herein as "Permitted Purchase Money Indebtedness"); and

(v)    unsecured Indebtedness with respect to surety, appeal and performance bonds obtained by Borrower in the ordinary course of business.

(b)    **Sales of Assets**.  Borrower will not sell, transfer, lease, exchange, alienate or dispose of any or all Collateral, other than (i) in the ordinary course of Borrower's business, and then only to the extent such transfers are limited to $250,000 in the aggregate, and (ii) in accordance with the Order.

(c)    **Liens**.  Neither Borrower nor its Subsidiaries shall directly or indirectly create, incur, assume or permit to exist any Lien on or with respect to any of their respective property or assets except:

(i)    Liens created by the Loan Documents or otherwise securing the Obligations;

(ii)    Permitted Existing Liens;

(iii)    Customary Permitted Liens;

DRAFT

(iv)    Replacement Liens in favor of Pre-Petition Lender as adequate protection granted pursuant to the Order, which Liens are junior to the Liens contemplated hereby in favor of Lender; <u>provided</u>, that the Order provides that the holders of such junior Liens shall not be permitted to take any action to foreclose with respect to such junior Liens so long as any amounts shall remain outstanding hereunder or any Commitment shall be in effect; and

(v)    purchase money Liens (including the interest of a lessor under a Capitalized Lease and Liens to which any property is subject at the time of the applicable Borrower's acquisition thereof) securing Permitted Purchase Money Indebtedness; <u>provided</u>, that such Liens shall not apply to any property of Borrower other than that purchased or subject to such Capitalized Lease.

(d)    **Contingent Obligations**.  Neither Borrower nor its Subsidiaries shall directly or indirectly create or become or be liable with respect to any Contingent Obligation, except:  (i) recourse obligations resulting from endorsement of negotiable instruments for collection in the ordinary course of business; (ii) Permitted Existing Contingent Obligations; (iii) obligations, warranties, and indemnities, not relating to Indebtedness of any Person, which have been or are undertaken or made in the ordinary course of business and not for the benefit of or in favor of an Affiliate of Borrower; (iv) Contingent Obligations entered into in connection with any Indebtedness of Borrower permitted by **Section 8.3(a)(v)**; and (v) Contingent Obligations with respect to surety, appeal and performance bonds obtained by Borrower in the ordinary course of business.

(e)    **Sales and Leasebacks**.  Borrower shall not become liable, directly, by assumption or by Contingent Obligation, with respect to any lease, whether an operating lease or a Capitalized Lease, of any property (whether real or personal or mixed) (i) which it or one of its Subsidiaries sold or transferred or is to sell or transfer to any other Person, or (ii) which it or one of its Subsidiaries intends to use for substantially the same purposes as any other property which has been or is to be sold or transferred by it or one of its Subsidiaries to any other Person in connection with such lease.

(f)    **Distributions**.  Borrower shall not make any distributions to its members, partners or shareholders.

(g)    **Capital Expenditures**.  Borrower shall not make any capital expenditure in excess of $100,000 without Lender's prior written consent.

(h)    **Restriction on Fundamental Changes**.  Borrower shall not enter into any merger or consolidation, or liquidate, wind-up or dissolve (or suffer any liquidation or dissolution), or convey, lease, sell, transfer or otherwise dispose of, in one transaction or series of transactions, all or substantially all of Borrower's business or property, whether now or hereafter acquired.

DRAFT

(i)    **Corporate Documents**.  Borrower shall not amend, modify or otherwise change any of the terms or provisions in any of its constituent documents as in effect on the date hereof, without the prior written consent of Lender.

(j)    **Prohibition Against Additional Recordings**.  Borrower will not record or permit to be recorded any document, instrument, agreement or other writing against the Collateral without the prior written consent of Lender.

(k)    **Chapter 11 Claims; Adequate Protection**.  Borrower shall not incur, create, assume, suffer to exist or permit any (i) administrative expense, unsecured claim, or other super-priority claim or Lien (except Permitted Liens) that is pari passu with or senior to the claims of Lender against Borrower hereunder, or apply to the Bankruptcy Court for authority to do so, except for the Carve Out, or (ii) obligation to make adequate protection payments, or otherwise provide adequate protection, other than with respect to the Obligations, the Prepetition Indebtedness or otherwise as approved by Lender.

(l)    **Limitation on Prepayments of Permitted Existing Indebtedness**. Except as otherwise permitted by the Order or agreed to by Lender, including with respect to the Prepetition Indebtedness, Borrower shall not (i) make any payment or prepayment on or redemption or acquisition for value (including, without limitation, by way of depositing with the trustee with respect thereto money or securities before due for the purpose of paying when due) of any Permitted Existing Indebtedness, (ii) pay any interest on any Permitted Existing Indebtedness (whether in cash, in kind securities or otherwise), (iii) make any payment or create or permit any Lien pursuant to Section 361 of the Bankruptcy Code (or pursuant to any other provision of the Bankruptcy Code authorizing adequate protection), or (iv) apply to the Bankruptcy Court for the authority to do any of the foregoing; provided, that (A) Borrower shall make payments required to be made by the Bankruptcy Code, including under Section 365 of the Bankruptcy Code and adequate protection payments approved by the Bankruptcy Court consented to by Lender, and (B) Borrower may make payments permitted by any of the "first day" orders consented to by Lender and any other orders of the Bankruptcy Court consented to by Lender.

(m)    **Order**.  Borrower shall not make or permit to be made any change, amendment or modification, or make any application or motion for any change, amendment or modification, to the Order other than as approved in writing by Lender.

## ARTICLE 9

## ASSIGNMENTS; CONFIDENTIALITY

9.1    **Successors and Assigns**.  The terms and provisions of the Loan Documents shall be binding upon and inure to the benefit of Borrower and Lender and their respective successors and assigns, except that Borrower shall not have the right to assign its rights or obligations under the Loan Documents.

DRAFT

9.2    **Confidentiality**.  Lender and its representatives, consultants and advisors shall hold all nonpublic information obtained pursuant to the requirements of this Agreement and identified as such by Borrower in accordance with such Person's customary procedures for handling confidential information of this nature and in accordance with safe and sound banking practices and in any event may make disclosure (a) to Affiliates of Lender, or (b) as required or requested by any Governmental Authority or representative thereof or pursuant to legal process and shall require any such Affiliate to agree to comply with this **Section 9.2**.

## ARTICLE 10

## EVENTS OF DEFAULT BY BORROWER

10.1    **Event of Default Defined**.  The occurrence of any one or more of the following shall constitute an "Event of Default" hereunder, and any Event of Default which may occur hereunder shall constitute an Event of Default under each of the other Loan Documents:

(a)    Borrower shall fail to pay when due hereunder or under the other Loan Documents any of the Obligations, including without limitation, any interest or other charges required to be paid;

(b)    Borrower fails to perform or cause to be performed any other obligation or observe any other condition, covenant, term, agreement or provision required to be performed or observed by Borrower under this Agreement or under the other Loan Documents, and the same shall remain unremedied for five Business Days or more;

(c)    The existence of any inaccuracy or untruth in any material respect in any representation or warranty contained in this Agreement or any of the other Loan Documents or of any statement or certification as to facts delivered to Lender by Borrower;

(d)    The dissolution, termination or merger of Borrower;

(e)    Borrower, or any of its Affiliates, shall be in default under any material commitment or Indebtedness (other than in connection with any Permitted Existing Indebtedness) affecting such Persons or the Collateral;

(f)    Any judgments as to any postpetition obligation which, to the extent not covered by insurance, are in the aggregate in excess of $100,000 shall be rendered against Borrower and the enforcement thereof shall not be stayed (by court ordered stay or by consent of the party litigants); or there shall be rendered against Borrower a non-monetary judgment with respect to a postpetition event which causes or would reasonably be expected to have a Material Adverse Effect on the ability of Borrower to perform its obligations under the Loan Documents;

(g)    Other than payments permitted pursuant to the Order, Borrower shall make any payment (whether by way of adequate protection or otherwise) of principal or interest or otherwise on account of any Permitted Existing Indebtedness;

DRAFT

(h)     The Bankruptcy Court shall dismiss the Chapter 11 Case or shall convert the Chapter 11 Case to a Chapter 7 case;

(i)     Borrower, or any of its Affiliates, shall file, support or fail to oppose a motion seeking, or the Bankruptcy Court shall enter, an order in the Chapter 11 Case appointing (i) a trustee under Chapter 7 or Chapter 11 of the Bankruptcy Code, (ii) a responsible officer, or (iii) an examiner, in each case with enlarged powers relating to the operation of the business (powers beyond those set forth in subclauses (3) and (4) of Section 1106(a) of the Bankruptcy Code) under Section 1106(b) of the Bankruptcy Code in the Chapter 11 Case (in each case other than Borrower's current financial advisor or the appointment by Borrower or its Affiliates of a successor);

(j)     Borrower, or any of its Affiliates, shall file, support or fail to oppose a motion seeking, or the Bankruptcy Court shall enter, an order in the Chapter 11 Case (i) approving additional financing under Section 364(c) or (d) of the Bankruptcy Code not otherwise permitted pursuant to this Agreement, (ii) granting any Lien (other than Liens expressly permitted in the Order) upon or affecting any Collateral which are pari passu or senior to the Liens on the Collateral in favor of Lender, (iii) granting any claim priority senior to or pari passu with the claims of Lender under the Loan Documents or any other claim having priority over any or all administrative expenses of the kind specified in Section 503(b) or Section 507(b) of the Bankruptcy Code, or (iv) granting any other relief that is adverse to Lender's interests under any Loan Document or its rights and remedies hereunder or its interest in the Collateral;

(k)     Borrower shall fail to comply with the terms of the Order or any other Bankruptcy Court Order in any material respect;

(l)     The Order shall be amended, supplemented, stayed, reversed, vacated or otherwise modified without the written consent of Lender;

(m)     Borrower, or any of its Affiliates, shall file a motion for reconsideration or other motion which seeks to materially and adversely affect Lender's rights;

(n)     The right of Borrower to borrow under this Agreement is terminated by an order entered by the Bankruptcy Court;

(o)     Borrower, or any of its Affiliates, shall seek to, or shall support (in any such case by way of any motion or other pleading filed with the Bankruptcy Court or any other writing to another party-in-interest executed by or on behalf of Borrower) any other Person's motion to, disallow in whole or in part Lender's claim in respect of the Obligations or to challenge the validity, perfection, non-avoidability or enforceability of the Liens in favor of Lender;

(p)     Unless in connection with a duly confirmed plan of reorganization, the Bankruptcy Court shall enter an order granting relief from the automatic stay to any creditor or party in interest (i) to permit foreclosure (or the granting of a deed in lieu of foreclosure or the like) on any assets of Borrower which have an aggregate value in

DRAFT

excess of $100,000.00, or (ii) to permit other actions that would have a Material Adverse Effect on Borrower or the Chapter 11 estates;

(q)    Absent the written consent of Lender and unless in connection with a duly confirmed plan of reorganization, entry by the Bankruptcy Court of an order under Section 363 or 365 of the Bankruptcy Code authorizing or approving the sale or assignment of any of Borrower's assets, or procedures in respect thereof, or Borrower, or any of its Affiliates, shall seek, support, or fail to contest in good faith, the entry of such an order in the Chapter 11 Case;

(r)    A Chapter 11 plan of reorganization or liquidation with respect to Borrower is filed and (i) the treatment of the claims of Lender in such plan is not approved by Lender, or (ii) such plan does not provide for the payment in full in cash of the Obligations on or prior to the date of consummation thereof; and

(s)    The Order Entry Date shall not have occurred by March 11, 2010 (or such later date as Lender may agree in its sole discretion).

## ARTICLE 11

## LENDER'S REMEDIES UPON EVENT OF DEFAULT

11.1    **Remedies**.  Upon the occurrence of any Event of Default, upon notice to Borrower, (a) the Commitment shall immediately terminate; (b) all Obligations, including the unpaid principal amount of and accrued interest on the Loan, shall immediately become due and payable, in each case without presentment, demand, protest or other requirements of any kind, all of which are hereby expressly waived by Borrower; (c) Lender may enforce any and all Liens and security interests created pursuant to the Loan Documents; and (d) Lender may enforce its other rights and remedies under the Loan Documents or applicable law.

11.2    **Setoff Rights**.  In addition to any rights of setoff that Lender may have under applicable law, Lender, without notice of any kind to Borrower, may appropriate and apply to the payment of the Note or of any sums due under this Agreement or the other Loan Documents any and all balances, deposits, credits, accounts, certificates of deposit, instruments or money of Borrower then or thereafter in the possession of Lender.

11.3    **Right of Lender to Make Advances to Cure Event of Defaults; Obligatory Advances**.  If Borrower shall fail to perform any of its covenants or agreements herein or in any of the other Loan Documents, Lender may (but shall not be required to) perform any of such covenants and agreements, and any amounts expended by Lender in so doing, and any amounts advanced by Lender pursuant to this Agreement shall be deemed advanced by Lender under an obligation to do so regardless of the identity of the person or persons to whom said funds are disbursed.  Loan Proceeds advanced by Lender to protect its security for the Loan are obligatory advances hereunder and shall constitute additional indebtedness payable on demand and evidenced and secured by the Loan Documents.

11.4    **Attorneys' Fees**.  Borrower will pay Lender's reasonable attorneys' fees and costs in connection with the negotiation, preparation, administration and enforcement of this

Agreement and will pay Lender's reasonable attorneys' fees and costs in connection with the administration and enforcement of this Agreement and the other Loan Documents. Without limiting the generality of the foregoing, if at any time or times hereafter Lender employs counsel for advice or other representation with respect to any matter concerning Borrower, this Agreement, the Collateral or the Loan Documents (including any bankruptcy proceeding) or if Lender employs one or more counsel to protect, collect, lease, sell, take possession of, or liquidate any of the Collateral, or to attempt to enforce or protect any security interest or Lien or other right in any of the Collateral or under any of the Loan Documents, or to enforce any rights of Lender or obligations of Borrower or any other person, firm or corporation which may be obligated to Lender by virtue of this Agreement or under any of the Loan Documents or any other agreement, instrument or document, heretofore or hereafter delivered to Lender in furtherance hereof, then in any such event, all of the attorneys' fees arising from such services, and any expenses, costs and charges relating thereto, shall constitute an additional indebtedness owing by Borrower to Lender payable on demand and evidenced and secured by the Loan Documents.

11.5    **No Waiver**.  No failure by Lender to exercise, and no delay by Lender in exercising, any right, remedy, power or privilege hereunder shall operate as a waiver thereof. No single or partial exercise of any right, remedy, power or privilege hereunder shall preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege. The rights, remedies, powers and privileges herein provided are cumulative and not exclusive of any rights, remedies, powers and privileges provided by law.

11.6    **Application of Funds**.    After the exercise of remedies provided for in **Section 11.1** (or after the Loan has automatically become immediately due and payable as set forth in **Section 11.1**), any amounts received on account of the Obligations shall be applied by Lender in the following order:

**First**, to payment of that portion of the Obligations constituting fees, indemnities, expenses and other amounts (including fees, charges and disbursements of counsel to Lender and amounts payable under **Section 4.8**) payable to Lender;

**Second**, to payment of accrued and unpaid interest on the Loan and the other Obligations;

**Third**, to payment of unpaid principal of the Loan and the other Obligations; and

**Last**, the balance, if any, after all of the Obligations have been indefeasibly paid in full, to Borrower or as otherwise required by law.

## ARTICLE 12

## SECURITY

12.1    **Security**.  To induce Lender to make the Loan, Borrower hereby grants to Lender as security for the full and prompt payment when due (whether at stated maturity, by acceleration or otherwise) of the Obligations, a continuing first priority Lien and security interest (subject to **Section 3.4**) in and to the Collateral.

DRAFT

12.2    **Perfection of Security Interests**.

(a)    Borrower shall, at its expense, promptly and duly execute and deliver, and have recorded, such agreements, instruments and documents and perform any and all actions requested by Lender at any time and from time to time to perfect, maintain, protect, and enforce Lender's security interest in the Collateral.

(b)    Borrower hereby authorizes Lender at any time and from time to time to execute and file financing statements or continuation statements and amendments thereto and other filing or recording documents or instruments with respect to the Collateral without the signature of Borrower in such form and in such offices as Lender determines appropriate to perfect the security interests of Lender under this Agreement. Borrower shall pay the costs of, or incidental to, any recording or filing of any financing statements concerning the Collateral. Until all Obligations have been fully satisfied and the Commitment shall have been terminated, Lender's security interest in the Collateral, and all proceeds and products thereof, shall continue in full force and effect.

(c)    Notwithstanding **subsections (a)** and **(b)** of this **Section 12.2**, or any failure on the part of Borrower or Lender to take any of the actions set forth in such subsections, the Liens and security interests granted herein shall be deemed valid, enforceable and perfected by entry of the Order. No financing statement, notice of lien, mortgage, deed of trust or similar instrument in any jurisdiction or filing office need be filed or any other action taken in order to validate and perfect the Liens and security interests granted by or pursuant to this Agreement, the Order.

12.3    **Limitations on Lender's Obligations**. Subject to Borrower's rights and duties under the Bankruptcy Code (including Section 365 of the Bankruptcy Code), it is expressly agreed by Borrower that, anything herein to the contrary notwithstanding, Borrower shall remain liable under its contracts to observe and perform all the conditions and obligations to be observed and performed by it thereunder. Lender shall not have any obligation or liability under any contract by reason of or arising out of this Agreement, the Loan Documents, or the granting to Lender of a security interest therein or the receipt by Lender of any payment relating to any contract pursuant hereto, nor shall Lender be required or obligated in any manner to perform or fulfill any of the obligations of Borrower under or pursuant to any contract, or to make any payment, or to make any inquiry as to the nature or the sufficiency of any payment received by it or the sufficiency of any performance by any party under any contract, or to present or file any claim, or to take any action to collect or enforce any performance or the payment of any amounts which may have been assigned to it or to which it may be entitled at any time or times.

12.4    **Covenants of Borrower with Respect to Collateral**. Borrower hereby covenants and agrees with Lender that from and after the date of this Agreement and until the Obligations are fully satisfied:

(a)    **Changes in Locations, Name, Etc**. Borrower will not, except upon 30 day's prior written notice to Lender and delivery to Lender of all additional executed financing statements and other documents reasonably requested by Lender to maintain the validity, perfection and priority of the security interests provided for herein (i) change

DRAFT

its jurisdiction of organization or the location of its chief executive office or sole place of business, or (ii) change its name, identity, taxpayer identification number, organizational identification number, or organizational structure or form.

(b)    **Maintenance of Records**.  Borrower will keep and maintain, at its own cost and expense, satisfactory and complete records of the Collateral, in all material respects.  Upon the occurrence and during the continuation of an Event of Default, Borrower shall deliver and turn over any such books and records relating to the Collateral to Lender or to its representatives at any time on demand of Lender.

(c)    **Indemnification With Respect to Collateral**.  In any suit, proceeding or action brought by Lender relating to any Collateral for any sum owing thereunder or to enforce any provision of any Collateral, Borrower will save, indemnify and keep Lender harmless from and against all expense, loss or damage suffered by Lender by reason of any defense, setoff, counterclaim, recoupment or reduction of liability whatsoever of the obligor thereunder, arising out of a breach by Borrower of any obligation thereunder or arising out of any other agreement, indebtedness or liability at any time owing to, or in favor of, such obligor or its successors from Borrower, and all such obligations of Borrower shall be and remain enforceable against and only against Borrower and shall not be enforceable against Lender.

(d)    **Limitation on Liens on Collateral**.  Borrower will not create, permit or suffer to exist, and will defend the Collateral against and take such other action as is necessary to remove, any Lien on the Collateral except Permitted Liens, and will defend the right, title and interest of Lender in and to all of Borrower's rights under the Collateral and in and to the proceeds thereof against the claims and demands of all Persons whomsoever other than claims or demands arising out of Permitted Liens.

(e)    **Notices**.  Borrower will advise Lender promptly, in reasonable detail, (i) of any Lien asserted against any of the Collateral other than Permitted Liens, and (ii) of the occurrence of any other event which could have a Material Adverse Effect with respect to the aggregate value of the Collateral or on the security interests created hereunder.

12.5    **Performance by Lender of the Loan Parties' Obligations.**  If Borrower fails to perform or comply with any of its agreements contained herein and Lender, as provided for by the terms of this Agreement, shall itself perform or comply, or otherwise cause performance or compliance, with such agreement, the expenses of Lender incurred in connection with such performance or compliance, together with interest thereon at the rate then in effect in respect of the Loan, shall be payable by Borrower to Lender on demand and shall constitute Obligations secured by the Collateral.  Performance of Borrower's obligations as permitted under this **Section 12.5** shall in no way constitute a violation of the automatic stay provided by Section 362 of the Bankruptcy Code and Borrower hereby waives applicability thereof.  Moreover, Lender shall not be responsible for the payment of any costs incurred in connection with preserving or disposing of Collateral pursuant to Section 506(c) of the Bankruptcy Code and the Collateral may not be charged for the incurrence of any such cost.

DRAFT

12.6    **Limitation on Lender's Duty in Respect of Collateral.**  Lender shall not have any duty as to any Collateral in its possession or control or in the possession or control of any agent or nominee of it or any income thereon or as to the preservation of rights against prior parties or any other rights pertaining thereto, except that Lender shall, with respect to the Collateral in its possession or under its control, deal with such Collateral in the same manner as Lender deals with similar property for its own account.  Upon request of Borrower, Lender shall account for any moneys received by it in respect of any foreclosure on or disposition of the Collateral of Borrower.

12.7    **Remedies, Rights Upon Default.**

(a)    If any Event of Default shall occur and be continuing, Lender may exercise in addition to all other rights and remedies granted to it in this Agreement, the Order and in any other Loan Document, all rights and remedies of a secured party under the UCC.  Borrower agrees, at Lender's request, to assemble the Collateral and make it available to Lender at places which Lender shall reasonably select, whether at Borrower's premises or elsewhere.  Lender shall apply the proceeds of any collection, recovery, receipt, appropriation, realization or sale of the Collateral (net of all expenses incurred by Lender in connection therewith, including, without limitation, attorney's fees and expenses), to the Obligations in any order deemed appropriate by Lender.  Borrower shall remain liable for any deficiency remaining unpaid after such application.  Only after paying over such net proceeds and after the payment by Lender of any other amount required by any provision of law, including, without limitation, the UCC, shall Lender account for the surplus, if any, to Borrower.  To the maximum extent permitted by applicable law, Borrower waives all claims, damages, and demands against Lender arising out of the repossession, retention or sale of the Collateral except such as arise out of the gross negligence or willful misconduct of Lender.  Lender and its agents shall have the right to enter upon any real property owned or leased by Borrower to exercise any of its rights or remedies under this Agreement.  .

(b)    Borrower hereby waives  presentment, demand, protest or any notice (to the maximum extent permitted by applicable law) of any kind in connection with this Agreement or any Collateral.

12.8    **Lender's Appointment as Attorney-in-Fact.**

(a)    Borrower hereby irrevocably constitutes and appoints Lender and any officer or agent thereof, with full power of substitution, as its and its Subsidiaries true and lawful attorney-in-fact with full irrevocable power and authority in the place and stead of Borrower and in the name of Borrower, or in its own name, from time to time in Lender's discretion, for the purpose of carrying out the terms of this Agreement, to take any and all appropriate action and to execute and deliver any and all documents and instruments which may be necessary and desirable to accomplish the purposes of this Agreement and the transactions contemplated hereby, and, without limiting the generality of the foregoing, hereby give Lender the power and right, on behalf of Borrower, without notice to or assent by Borrower to do the following:

DRAFT

(i)    to ask, demand, collect, receive and give acquittances and receipts for any and all moneys due and to become due under any Collateral and, in the name of Borrower, its own name or otherwise, to take possession of and endorse and collect any checks, drafts, notes, acceptances or other instruments for the payment of moneys due under any Collateral and to file any claim or to take any other action or proceeding in any court of law or equity or otherwise deemed appropriate by Lender for the purpose of collecting any and all such moneys due under any Collateral whenever payable and to file any claim or to take any other action or proceeding in any court of law or equity or otherwise deemed appropriate by Lender for the purpose of collecting any and all such moneys due under any Collateral whenever payable;

(ii)    to pay or discharge taxes, liens, security interests or other encumbrances levied or placed on or threatened against the Collateral, to effect any repairs or any insurance called for by the terms of this Agreement and to pay all or any part of the premiums therefor and the costs thereof; and

(iii)    (A) to direct any party liable for any payment under any of the Collateral to make payment of any and all moneys due, and to become due thereunder, directly to Lender or as Lender shall direct; (B) to receive payment of and receipt for any and all moneys, claims and other amounts due, and to become due at any time, in respect of or arising out of any Collateral; (C) to sign and indorse any invoices, freight or express bills, bills of lading, storage or warehouse receipts, drafts against debtors, assignments, verifications and notices in connection with accounts and other documents constituting or relating to the Collateral; (D) to commence and prosecute any suits, actions or proceedings at law or equity in any court of competent jurisdiction to collect the Collateral or any part thereof and to enforce any other right in respect of any Collateral; (E) to defend any suit, action or proceeding brought against Borrower with respect to any Collateral of Borrower; (F) to settle, compromise or adjust any suit, action or proceeding described above and, in connection therewith, to give such discharges or releases as Lender may deem appropriate; (G) to license or, to the extent permitted by an applicable license, sublicense, whether general, special or otherwise, and whether on an exclusive or non-exclusive basis, any trademarks, throughout the world for such term or terms, on such conditions, and in such manner, as Lender shall in its sole discretion determine; and (H) generally to sell, transfer, pledge, make any agreement with respect to or otherwise deal with any of the Collateral as fully and completely as though Lender were the absolute owner thereof for all purposes, and to do, at Lender's option and Borrower's expense, at any time, or from time to time, all acts and things which Lender reasonably deems necessary to protect, preserve or realize upon the Collateral and Lender's Lien therein, in order to effect the intent of this Agreement, all as fully and effectively as Borrower might do.

(b)    Lender agrees that it will forbear from exercising the power of attorney or any rights granted to Lender pursuant to this **Section 12.8**, except upon the occurrence or during the continuation of an Event of Default.  Borrower hereby ratifies, to the extent

permitted by law, all that said attorneys shall lawfully do or cause to be done by virtue hereof.  Exercise by Lender of the powers granted hereunder is not a violation of the automatic stay provided by Section 362 of the Bankruptcy Code and Borrower waives applicability thereof.  The power of attorney granted pursuant to this **Section 12.8** is a power coupled with an interest and shall be irrevocable until the Obligations are indefeasibly paid in full.

(c)    The powers conferred on Lender hereunder are solely to protect Lender's interests in the Collateral and shall not impose any duty upon it to exercise any such powers.  Lender shall be accountable only for amounts that it actually receives as a result of the exercise of such powers and neither it nor any of its officers, directors, employees or agents shall be responsible to Borrower for any act or failure to act, except for its own gross negligence or willful misconduct.

(d)    Borrower also authorizes Lender, at any time and from time to time upon the occurrence and during the continuation of any Event of Default or as otherwise expressly permitted by this Agreement, (i) to communicate in its own name or the name of its Subsidiaries with any party to any contract with regard to the assignment of the right, title and interest of Borrower in and under the contracts hereunder and other matters relating thereto, and (ii) to execute any endorsements, assignments or other instruments of conveyance or transfer with respect to the Collateral.

(e)    All Obligations shall constitute, in accordance with Section 364(c)(1) of the Bankruptcy Code, claims against Borrower in the Chapter 11 Case which are administrative expense claims having priority over any all administrative expenses of the kind specified in Sections 503(b) or 507(b) of the Bankruptcy Code.

## ARTICLE 13

## MISCELLANEOUS

13.1    **Time is of the Essence**.  Borrower agrees that time is of the essence with respect to all of its covenants and obligations under this Agreement.

13.2    **Amendments, Etc**.  No amendment or waiver of any provision of this Agreement or any other Loan Document, and no consent to any departure by Borrower therefrom, shall be effective unless in writing and signed by Lender and Borrower, and each such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given.

13.3    **Lender's Determination of Facts**.  Lender shall be free at all times to establish independently to its satisfaction, and in its sole and absolute discretion, the existence or nonexistence of any fact or facts, the existence or nonexistence of which is a condition of this Agreement.

13.4    **Prior Agreements**.  This Agreement and the other Loan Documents, and any other documents or instruments executed pursuant thereto or contemplated thereby, shall represent the entire, integrated agreement between the parties hereto with respect to the transactions contemplated hereby, and shall supersede all prior negotiations, representations or

DRAFT

agreements pertaining thereto, either oral or written.  This Agreement and any provision hereof shall not be modified, amended, waived or discharged in any manner other than by a written amendment executed by all parties to this Agreement.

13.5    **Disclaimer by Lender**.  Lender shall not be liable for any debts or claims accruing in favor of any party against Borrower or against the Collateral.  Borrower is not and shall not be an agent of Lender for any purposes, and Lender is not a venture partner with Borrower in any manner whatsoever.  Lender shall not be deemed to be in privity of contract with any provider of services on or to any Collateral, nor shall any payment of funds directly to a provider of services be deemed to create any third party beneficiary status or recognition of same by Lender unless and until Lender expressly assumes such status in writing.  Approvals granted by Lender for any matters covered under this Agreement shall be narrowly construed to cover only the parties and facts identified in any written approval or, if not in writing, such approvals shall be solely for the benefit of Borrower.

13.6    **Borrower Indemnification**.  To the fullest extent permitted by law, Borrower hereby agrees to protect, indemnify, defend and save Lender and its directors, officers, agents and employees from and against any and all liability, expense or damage of any kind or nature and from any suits, claims or demands, including legal fees and expenses on account of any matter or thing or action or failure to act by Lender, whether or not in litigation, arising out of this Agreement or in connection herewith unless such suit, claim or damage is caused solely by any act, omission or willful malfeasance of Lender, its directors, officers, agents and authorized employees.  This indemnity is not intended to excuse Lender from performing hereunder.  This obligation on the part of Borrower shall survive the closing of the Loans, the repayment thereof and any cancellation of this Agreement.

13.7    **Captions**.  The captions and headings of various Articles and Sections of this Agreement and exhibits pertaining hereto are for convenience only and are not to be considered as defining or limiting in any way the scope or intent of the provisions hereof.

13.8    **Inconsistent Terms and Partial Invalidity**.  In the event of any inconsistency among the terms hereof (including incorporated terms), or between such terms and the terms of any other Loan Document, Lender may elect which terms shall govern and prevail.  If any provision of this Agreement, or any paragraph, sentence, clause, phrase or word, or the application thereof, in any circumstances, is adjudicated by a court of competent jurisdiction to be invalid, the validity of the remainder of this Agreement shall be construed as if such invalid part were never included herein.

13.9    **Gender and Number**.  Any word herein which is expressed in the masculine or neuter gender shall be deemed to include the masculine, feminine and neuter genders.  Any word herein which is expressed in the singular or plural number shall be deemed, whenever appropriate in the context, to include the singular and the plural.

13.10    **Notices**.  Any notices, communications and waivers under this Agreement shall be in writing and shall be (i) delivered in person, (ii) mailed, postage prepaid, either by registered or certified mail, return receipt requested, or (iii) by overnight express carrier.  All notices shall be deemed received (i) if personally delivered, then on the date of delivery, (ii) if sent by

DRAFT

overnight, express carrier, then on the next federal banking day immediately following the day sent, or (iii) if sent by registered or certified mail, then on the earlier of the third federal banking day following the day sent or when actually received.

13.11 **Effect of Agreement**.  The submission of this Agreement and the Loan Documents to Borrower for examination does not constitute a commitment or an offer by Lender to make a commitment to lend money to Borrower; this Agreement shall become effective only upon execution and delivery hereof by Lender to Borrower.

13.12 **Governing Law**.  This Agreement shall be construed and enforced in accordance with the laws of the State of California, without reference to the choice of law or conflicts of law principles of such State.

13.13 **Waiver of Defenses**.  OTHER THAN CLAIMS BASED UPON THE FAILURE OF LENDER TO ACT IN A COMMERCIALLY REASONABLE MANNER, BORROWER HEREBY WAIVES EVERY PRESENT AND FUTURE DEFENSE (OTHER THAN THE DEFENSE OF PAYMENT IN FULL), CAUSE OF ACTION, COUNTERCLAIM OR SETOFF WHICH BORROWER MAY NOW HAVE OR HEREAFTER MAY HAVE TO ANY ACTION BY LENDER IN ENFORCING THIS AGREEMENT.  PROVIDED THAT LENDER ACTS IN GOOD FAITH, BORROWER RATIFIES AND CONFIRMS WHATEVER LENDER MAY DO PURSUANT TO THE TERMS OF THIS AGREEMENT.  THIS PROVISION IS A MATERIAL INDUCEMENT FOR LENDER GRANTING ANY FINANCIAL ACCOMMODATION TO BORROWER.

13.14 **Consent to Jurisdiction**.  TO INDUCE LENDER TO ACCEPT THE NOTE, BORROWER IRREVOCABLY AGREES THAT ALL ACTIONS OR PROCEEDINGS IN ANY WAY ARISING OUT OF OR RELATED TO THE LOAN DOCUMENTS WILL BE LITIGATED IN COURTS HAVING SITUS IN CALIFORNIA.  BORROWER HEREBY CONSENTS AND SUBMITS TO THE JURISDICTION OF ANY COURT LOCATED WITHIN CALIFORNIA, WAIVES PERSONAL SERVICE OF PROCESS UPON BORROWER, AND AGREES THAT ALL SUCH SERVICE OF PROCESS MAY BE MADE BY REGISTERED MAIL DIRECTED TO BORROWER AT THE ADDRESS STATED HEREIN AND SERVICE SO MADE WILL BE DEEMED TO BE COMPLETED UPON ACTUAL RECEIPT.

13.15 **Waiver of Jury Trial**.  BORROWER AND LENDER (BY ACCEPTANCE HEREOF), HAVING BEEN REPRESENTED BY COUNSEL EACH KNOWINGLY AND VOLUNTARILY WAIVES ANY RIGHT TO A TRIAL BY JURY IN ANY ACTION OR PROCEEDING TO ENFORCE OR DEFEND ANY RIGHTS UNDER THIS AGREEMENT OR ANY RELATED AGREEMENT OR UNDER ANY AMENDMENT, INSTRUMENT, DOCUMENT OR AGREEMENT DELIVERED OR WHICH MAY IN THE FUTURE BE DELIVERED IN CONNECTION WITH THIS AGREEMENT, AND AGREES THAT ANY SUCH ACTION OR PROCEEDING WILL BE TRIED BEFORE A COURT AND NOT BEFORE A JURY.  BORROWER AGREES THAT IT WILL NOT ASSERT ANY CLAIM AGAINST LENDER OR ANY OTHER PERSON INDEMNIFIED UNDER THIS AGREEMENT ON ANY THEORY OF LIABILITY FOR SPECIAL, INDIRECT, CONSEQUENTIAL, INCIDENTAL OR PUNITIVE DAMAGES.

DRAFT

13.16  **Usury Savings Clause.**    Notwithstanding any other provision herein, the aggregate interest rate charged with respect to any of the Obligations, including all charges or fees in connection therewith deemed in the nature of interest under applicable law, shall not exceed the Highest Lawful Rate.  If the rate of interest (determined without regard to the preceding sentence) under this Agreement at any time exceeds the Highest Lawful Rate, the outstanding amount of the Loan made hereunder shall bear interest at the Highest Lawful Rate.

13.17  **Counterparts; Facsimile Signatures**.  This Agreement may be executed in any number of counterparts and by the different parties hereto on separate counterparts and each such counterpart shall be deemed to be an original, but all such counterparts shall together constitute but one and the same Agreement.  Receipt of an executed signature page to this Agreement by facsimile or other electronic transmission shall constitute effective delivery thereof.  Electronic records of executed Loan Documents maintained by Lender shall be deemed to be originals thereof.

**THIS AGREEMENT REPRESENTS THE FINAL AGREEMENT BETWEEN THE PARTIES AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES.**

**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]**

DRAFT

**IN WITNESS WHEREOF**, Lender and Borrower have caused these presents to be executed the day and year first above written.

| "**Borrower**" | "**Lender**" |
|---|---|
| FILI ENTERPRISES, INC. | GPG CAPITAL LLC |

By: _____      By: _____
Name: _____      Name: _____
Title: _____      Title: _____

39

57                                                      Exhibit "A"

DRAFT

# **SCHEDULE 1**

<u>PERMITTED EXISTING CONTINGENT OBLIGATIONS</u>

A-1

Exhibit "A"

DRAFT

# **SCHEDULE 2**

## PERMITTED EXISTING INDEBTEDNESS

A-1

Exhibit "A"

DRAFT

# **SCHEDULE 3**

## PERMITTED EXISTING LIENS

A-1

Exhibit "A"

DRAFT

# **EXHIBIT A**

## BUDGET

(See attached)

A-1

Exhibit "A"

DRAFT

# EXHIBIT B

## PROMISSORY NOTE

$1,000,000                                                          January [__], 2010


**FOR VALUE RECEIVED**, FILI ENTERPRISES, INC. (d/b/a Daphne's Greek Café), a California corporation ("Borrower"), hereby promises to pay to the order of GPG CAPITAL LLC, a California limited liability company ("Lender"), on or before the Maturity Date (as defined in the hereinafter referred to Loan Agreement), the lesser of (i) One Million Dollars ($1,000,000), or (ii) the aggregate principal amount of all Advances made to Borrower by Lender under and pursuant to that certain Super-Priority Debtor-in-Possession Loan and Security Agreement dated as of the date hereof, executed by and between Borrower and Lender (as amended, restated, supplemented or otherwise modified from time to time, the "Loan Agreement").  Capitalized words and phrases not otherwise defined herein shall have the meanings assigned thereto in the Loan Agreement.

Borrower further promises to pay interest on the unpaid principal amount of all Advances outstanding from time to time, at the rate and at the times set forth in the Loan Agreement.  The outstanding principal amount of all Advances shall be repaid by Borrower on the Maturity Date unless payable sooner pursuant to the provisions of the Loan Agreement.  Payments of both principal and interest are to be made in lawful money of the United States of America.  The Loan made by Lender and all payments on account of the principal and interest thereof, shall be recorded on the books and records of Lender and the principal balance as shown on such books and records shall be rebuttably presumptive evidence of the principal amount owing hereunder.

This Note evidences indebtedness incurred under, and is subject to the terms and provisions of, the Loan Agreement, to which Loan Agreement reference is hereby made for a statement of the terms and provisions under which this Note may or must be paid prior to the Maturity Date or pursuant to which the Maturity Date may be accelerated.  The holder of this Note is entitled to all of the benefits and security provided for in the Loan Agreement.

Except for such notices as may be expressly required under the Loan Documents, Borrower waives presentment, demand, notice, protest, and all other demands, or notices, in connection with the delivery, acceptance, performance, default, or enforcement of this Note, and assents to any extension or postponement of the time of payment or any other indulgence.  No failure to exercise, and no delay in exercising, any rights under any of the Loan Documents by Lender shall operate as a waiver of such rights.

This Note shall be governed and construed in accordance with the laws of the State of California applicable to contracts made and to be performed entirely within such State.

### [REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

DRAFT

**IN WITNESS WHEREOF**, Borrower has executed this Promissory Note as of the date set forth above.

"**Borrower**"

FILI ENTERPRISES, INC.


By: _____

Name: _____

Title: _____

DRAFT

# **EXHIBIT C**

## **FORM OF LOAN NOTICE**

LOAN NOTICE

Date: _____, 20_____

To:  GPG Capital LLC, as Lender

Re:    The Super-Priority Debtor-in-Possession Loan and Security Agreement dated January [__], 2010 ("Loan Agreement"), between FILI ENTERPRISES, INC. (d/b/a Daphne's Greek Café), a California corporation, and a debtor and debtor-in-possession ("Borrower"), and GPG CAPITAL LLC, a California limited liability company ("Lender").  Capitalized terms used but not otherwise defined herein have the meanings provided in the Loan Agreement.

1.    Borrower hereby requests an Advance to be made on the following day (which shall be a Business Day): _____ __, ____.

2.    Such Advance shall be in the following principal amount: $_____

3.    Borrower hereby represents and warrants that, as of the date hereof, (a) the use of the Loan Proceeds complies with the requirements of Section 3.2 of the Loan Agreement, and (b) Borrower has satisfied or fulfilled each of the conditions set forth in Section 5.1, Section 7.1 and Article 8 of the Loan Agreement.

"**Borrower**"

FILI ENTERPRISES, INC.

By: _____
Name: _____
Title: _____

DRAFT

## **DEBTOR-IN-POSSESSION FINANCING**

## SUMMARY OF TERMS AND CONDITIONS

Borrower: Fili Enterprises, Inc. (d/b/a Daphne's Greek Café), a California corporation ("Borrower"), as the debtor-in-possession in bankruptcy case 10-bk-00324-PB (the "Case") under Chapter 11 of Title 11, United States Code (the "Bankruptcy Code") filed in the Southern District of California (the "Bankruptcy Court").

Lender: GPG Capital LLC, a California limited liability company ("Lender").

Facility: Lender shall provide to Borrower a debtor-in-possession credit facility (the "DIP Facility"), in an amount of up to $1,000,000.

Availability: Loans under the DIP Facility may be made on a revolving basis up to the full amount of the DIP Facility.

Purpose: To fund general working capital in the ordinary course of business and to pay ordinary operating costs and expenses of the Obligated Parties during the term of the DIP Facility, to the extent permitted by the Bankruptcy Code or the Bankruptcy Court.

Closing Date: Not later than January __, 2010 (the "Closing Date"), or as otherwise agreed.

Maturity: The DIP Facility will terminate and all amounts outstanding thereunder shall be due and payable (unless accelerated earlier following an Event of Default) on the earliest of (i) July 31, 2010 (the "Maturity Date"), subject to extension of such Maturity Date upon terms and conditions to be agreed upon by Lender, (ii) the date of entry of an Order confirming any Plan of Reorganization in the Case acceptable to Lender ("Plan"), or (iii) the conversion of the Case to a case under Chapter 7 of the Bankruptcy Code.

Interest Rate: Advances outstanding under the DIP Facility shall bear interest at 14.0%. Interest will be payable monthly in arrears and calculated on the basis of a 360-day year and actual days elapsed.

Default Rate: During the continuance of an Event of Default (as defined below), all outstanding obligations under the DIP Facility shall bear interest at 2.0% above the otherwise applicable rate.

Fees: Lender shall receive a commitment fee in the amount equal to 5.0% of the DIP Facility commitment. Such fee shall be deemed fully earned and paid upon the disbursement of the DIP Facility.

Borrower shall also pay to Lender from and after the date the final order is entered, a non-refundable unused commitment fee of 0.50% per annum

DRAFT

of the daily average unused portion of the DIP Facility, payable monthly in arrears and on the Maturity Date.

**Collateral and Lien Priority:** All obligations of Borrower under the DIP Facility shall be: (a) entitled to super-priority administrative expense claim status pursuant to Section 364(c)(1) of the Bankruptcy Code in the Case, subject only to(i) the payment of allowed professional fees and disbursements incurred by Borrower and any official committees appointed in the Case in an amount not to exceed $750,000 in the aggregate, and (ii) the payment of fees pursuant to 28 U.S.C. § 1930 (collectively, the "Carve-Out Expenses" ), and (b) secured pursuant to Sections 364(c)(2), (c)(3) and (d) of the Bankruptcy Code by a security interest in and lien on all now owned or hereafter acquired property and assets of Borrower, both tangible and intangible and real and personal, and the proceeds thereof (the "Collateral"). The security interests in and liens on the aforementioned assets of Borrower shall be first priority, senior secured liens not subject to subordination, but subject to the Carve-Out Expenses.

All borrowings by Borrower, all reimbursement obligations with respect to all costs, fees and expenses of the Investors, and all other obligations owed to Lender (collectively, the "Obligations") shall be secured as described above and charged to the loan account to be established under the DIP Facility.

**Repayment:** All Obligations shall be payable upon the Maturity Date.  Interest shall be payable as specified under "Interest Rate" and "Default Rate" above. Fees shall be payable as specified under "Fees" above.

**Prepayment:** The DIP Facility may be repaid at any time in whole or in part without premium or penalty.

**Covenants:** Borrower shall not make any capital expenditure in excess of $100,000 without Lender approval.   In addition, there shall be other customary covenants (both positive and negative) which are customary in facilities of this nature.

**Defaults:** Usual events of default, including, but not limited to, payment, cross-default, violation of covenants, breach of representations or warranties, judgments and other events of default which are customary in facilities of this nature.

In addition, an Event of Default shall occur if: (i) (A) (1) the Case shall be dismissed or converted to a Chapter 7 case, (2) a Chapter 11 trustee or an examiner with enlarged powers shall be appointed in the Case, or (3) any other superpriority administrative expense claim which is senior to or pari passu with Lender's claims shall be granted; (B) a Plan shall be confirmed in the Case which does not provide for termination of the commitment under the DIP Facility and payment in full in cash of

DRAFT

Borrower's obligations thereunder on the effective date of the Plan; or an order shall be entered which dismisses any of the Case and which order does not provide for termination of the DIP Facility and payment in full in cash of all obligations thereunder; (C) Borrower shall take any action, including the filing of an application, in support of any of the foregoing or any person other than Borrower shall do so and such application is not contested in good faith by Borrower and the relief requested is granted in an order that is not stayed pending appeal; (ii) the Bankruptcy Court shall enter an order granting relief from the automatic stay to the holder of any security interest in any asset of Borrower having a book value in an amount equal to or exceeding an amount to be agreed upon; and (iii) such other similar Events of Default as are usual and customary in DIP credit facilities.

Expenses:   Borrower shall reimburse Lender for all reasonable fees and expenses (the "Expenses") incurred by or on behalf of Lender in connection with the negotiation, preparation, execution and delivery of this term sheet and the transactions contemplated hereby.

Governing Law:   The definitive DIP Facility documentation will be governed by California Law, subject to applicable bankruptcy law and each of the parties thereto shall waive its right to a trial by jury.

Indemnification   Borrower shall indemnify and hold harmless Lender and its assignees, affiliates and directors, officers, employees and agents (each an "Indemnified Party") from and against any and all losses, claims, damages, liabilities or other expenses to which such Indemnified Party may become subject, insofar as such losses, claims, damages, liabilities (or actions or other proceedings commenced or threatened in respect thereof) or other expenses arise out of or in any way relate to or result from, this term sheet or the transactions contemplated herein, or in any way arise from any use or intended use thereof; provided, that upon the execution of the DIP Facility documentation, the indemnification provisions contained in such agreements shall, except as otherwise provided therein, supersede the indemnification provisions contained herein with respect to indemnification obligations for the transaction to which such agreement relates. Borrower further agrees to reimburse each Indemnified Party for any legal or other expenses incurred in connection with investigating, defending or participating in any such loss, claim, damage, liability or action or other proceeding (whether or not such Indemnified Party is a party to any action or proceeding out of which indemnified expenses arise).  Notwithstanding the foregoing, all expenses, losses, claims, damages and liabilities that are finally determined in a non-appealable decision of a court of competent jurisdiction to have resulted solely from the gross negligence or willful misconduct of the Indemnified Party shall be excluded from Borrower's indemnification and reimbursement obligations hereunder.

EXHIBIT "B"

**CSD 1001A** [11/15/04]
Name, Address, Telephone No. & I.D. No.

Karol K. Denniston (Bar No. CA 141667)
Brendan P. Collins (Bar No. CA 260260)
DLA PIPER LLP (US)
550 South Hope Street, Suite 2300
Los Angeles, CA 90071-2678
Telephone: (213) 330-7700

## UNITED STATES BANKRUPTCY COURT
### SOUTHERN DISTRICT OF CALIFORNIA
325 West "F" Street, San Diego, California 92101-6991

In Re

Fili Enterprises, Inc., dba Daphne's Greek Cafe, a California Corporation,

Debtor.

BANKRUPTCY NO. 10-bk-00324-PB

Date of Hearing: 2/17/2010
Time of Hearing: 11:00 a.m.
Name of Judge: The Hon. Peter W. Bowie

# ORDER ON

MOTION BY DEBTOR FOR ENTRY OF FINAL ORDER PURSUANT TO SECTIONS 105, 361, 362, 364(c) AND 364(d) (A) AUTHORIZING THE DEBTOR TO INCUR POSTPETITION FINANCING ON A SECURED BASIS, (B) GRANTING ADEQUATE PROTECTION, AND (C) MODIFYING THE AUTOMATIC STAY

IT IS ORDERED THAT the relief sought as set forth on the continuation pages attached and numbered two (2)

through __10__ with exhibits, if any, for a total of __10__ pages, is granted. Motion/Application Docket Entry No. _____

//

//

//

//

//

//

DATED: _____

_____
Judge, United States Bankruptcy Court

Signature by the attorney constitutes a certification under
Fed. R. of Bankr. P. 9011 that the relief in the order is the
relief granted by the court.

Submitted by:

DLA Piper LLP (US)
(Firm name)

By: /s/ Brendan P. Collins
Attorney for ☑ Movant ☐ Respondent

ORDER ON
DEBTOR:    MOTION BY DEBTOR FOR ENTRY OF FINAL ORDER PURSUANT TO SECTIONS 105, 361, 362, 364(c) AND 364(d) (A) AUTHORIZING THE DEBTOR TO INCUR POSTPETITION FINANCING ON A SECURED BASIS, (B) GRANTING ADEQUATE PROTECTION, AND (C) MODIFYING THE AUTOMATIC STAY,    CASE NO: 10-bk-00324-PB

Fili Enterprises, Inc., dba Daphne's Greek Cafe, a California Corporation,

Upon consideration of the Motion By Debtor For Entry Of Final Order Pursuant To Sections 105, 361, 362, 364(c) And 364(c) (A) Authorizing The Debtor To Incur Postpetition Financing On A Secured Basis, (B) Granting Adequate Protection, And (C) Modifying The Automatic Stay  (the "DIP Financing Motion"), seeking entry of an order under sections 105, 361, 362, 364(c), 364(d), 503(b), and 507 of title 11 of the United States Code, 11 U.S.C. §§ 101-1330 (as amended, the "Bankruptcy Code"), in which Debtor seeks a final order:

   a.    approving the DIP Credit Agreement, a copy of which is attached to the DIP Financing Motion as Exhibit "A";

   b.    authorizing the Debtor to obtain postpetition credit in the aggregate amount not to exceed $1 million under the DIP Financing Order and to execute or deliver the related agreements, instruments and documents, as they may be amended, supplemented or otherwise modified from time to time (collectively, the "DIP Financing"), by and between the Debtor, as borrower, and GPG Capital, LLC ("Postpetition Lender");

   c.    granting to the Postpetition Lender: (i) pursuant to section 364(c)(2) and (c)(3) of the Bankruptcy Code, a  first priority valid enforceable perfected liens and security interests, senior to all other secured and unsecured creditors of the Debtor's estate in substantially all present and after acquired rights, title and interests in  property of the Debtor's estates which are not subject to a lien as of the Petition Date (except avoidance actions); (ii) pursuant to section 364(d) of the Bankruptcy Code, a valid, enforceable and perfected first priority, priming security interest and lien on such assets with priority over and senior to any and all valid, enforceable, and perfected security interests and liens existing as of the Petition Date, and (ii) superpriority administrative expense treatment of the Postpetition Lender's claims against the estate to secure the repayment of the Debtor's obligations under the DIP Financing (subject only to payment of allowed PACA Claims, allowed professional fees and expenses incurred by the Debtor and any official committees appointed in the Case, and the payment of US Trustee fees pursuant to 28 U.S.C. §1930;

   d.    determining that the security interests of the existing lienholders, including Bank of America, are adequately protected, pursuant to Sections 364(d)(1)(B), 363(e) and 361 of the Bankruptcy Code in connection with the approval of the DIP Financing Order; and

   e.    modifying the automatic stay established pursuant to section 362 of the Bankruptcy Code to permit the Postpetition Lender, in its discretion, to take certain actions in respect of the DIP Financing and to permit certain other actions as further described in the DIP Financing Order.

and this Court having reviewed the DIP Financing Motion and any responses and objections thereto, having considered the pleadings filed with the Court and the evidence and testimony presented, and upon the representations of counsel for Debtor and other parties in interest, and after due deliberation and consideration and good and sufficient cause appearing therefor,

IT IS FOUND AND DETERMINED THAT

   A.    On January 11, 2010 (the "Petition Date"), the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  The Debtor is continuing in the management and possession of its business and properties as a debtor-in-possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

   B.    No request has been made for the appointment of a trustee or examiner and no statutory committee (a "Committee") has yet been appointed in this Chapter 11 Case.

   C.    Consideration of this Motion constitutes a "core proceeding" as defined in 28 U.S.C. §§ 157(b)(2).  This Court has jurisdiction over this proceeding and the parties and property affected hereby pursuant to 28 U.S.C. §§ 157 and 1334.  Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

(continued)

CSD 1001A [11/15/04] (Page 3)

ORDER ON MOTION BY DEBTOR FOR ENTRY OF FINAL ORDER PURSUANT TO SECTIONS 105, 361, 362, 364(c) AND 364(d) (A) AUTHORIZING THE DEBTOR TO INCUR POSTPETITION
DEBTOR: FINANCING ON A SECURED BASIS, (B) GRANTING ADEQUATE PROTECTION, AND (C) MODIFYING THE AUTOMATIC STAY CASE NO: 10-bk-00324-PB

Fili Enterprises, Inc., dba Daphne's Greek Cafe, a California Corporation,

D.    An immediate and critical need exists for the Debtor to obtain funds in order to continue the operation of their business. The use of "cash collateral," as defined by section 363(a) of the Bankruptcy Code ("Cash Collateral"), alone would be insufficient to meet the Debtor's immediate postpetition liquidity needs. The Debtors is unable to obtain the required funds: (i) in the forms of (v) unsecured credit or debt allowable under section 503(b)(1) of the Bankruptcy Code, (w) an administrative expense pursuant to section 364(a) or (b) of the Bankruptcy Code, (x) unsecured debt having the priority afforded by section 364(c)(1) of the Bankruptcy Code, (y) secured as described in section 364(c)(2) and (c)(3) of the Bankruptcy Code, or (z) other than the DIP Facility, debt secured only as described in section 364(c)(2) and (d) of the Bankruptcy Code; or (ii) on terms more favorable than those offered by the Postpetition Lender pursuant to this Order and all other agreements, documents, notes or instruments delivered pursuant thereto or in connection therewith, including, without limitation, the Budget and the Term Sheet (collectively with, this Order, the "DIP Financing Documents").

E.    The Debtor has requested that, pursuant to the terms of the DIP Financing Documents, the Postpetition Lender makes loans and advances and provide other financial accommodations to the Debtor. The ability of the Debtor to continue to operate its business in the ordinary course under chapter 11 of the Bankruptcy Code depends upon the Debtor obtaining such financing. The Postpetition Lender is willing to make such loans and advances and provide such other financial accommodations on a superpriority and priming secured basis, as more particularly described herein, pursuant to the terms and conditions of the DIP Financing Documents. Accordingly, the relief requested in the DIP Financing Motion is necessary, essential and appropriate for the continued operation of the Debtor's businesses, the management and preservation of their assets and properties, and is in the best interests of the Debtor, its estate and creditors.

F.    Based on the record before the Court, the terms of the DIP Financing Documents have been negotiated and in "good faith," as that term is used in section 364(e) of the Bankruptcy Code, and are in the best interests of the Debtor, its estate and creditors. The Postpetition Lender is extending financing to the Debtor in good faith and the Postpetition Lender is entitled to the benefits of the provisions of section 364(e) of the Bankruptcy Code.

G.    It is in the best interests of the Debtor's estate that it be allowed to finance its operations under the terms and conditions set forth herein and in the DIP Financing Documents.   The relief requested by the DIP Financing Motion is necessary to avoid irreparable harm to the Debtor's estates, and good, adequate and sufficient cause has been shown to justify the granting of the relief requested herein, and the immediate entry of this Order.

H.    The security interests of the existing lienholders, including Bank of America, are adequately protected, pursuant to Sections 364(d)(1)(B), 363(e) and 361 of the Bankruptcy Code.

I.    The Debtor has satisfied the procedural requirements regarding authority to obtain postpetition financing.

J.    Notice of the relief sought by the DIP Financing Motion, and the hearing with respect thereto was delivered on January 14, 2010 via facsimile and/or overnight delivery to the following parties in interest: the Office of the United States Trustee on, any committee of creditors or equity security holders established prior or subsequent to the chapter 11 filing or, if none, the twenty largest unsecured creditors and any secured creditor whose collateral includes cash collateral or whose lien(s) might be affected by the relief sought.  Given the nature of the relief sought in the DIP Financing Motion, such notice constitutes sufficient and adequate notice of this Order pursuant to Bankruptcy Rules 2002, 4001(c) and (d) and 9014 and section 102(1) of the Bankruptcy Code, as required by sections 363(b) and 364(c) of the Bankruptcy Code, and no further notice of the DIP Financing Motion or this Order is necessary or required.

IT IS ORDERED THAT:

1.    The Motion is GRANTED in its entirety.

CSD 1001A [11/15/04] (Page 4)
ORDER ON MOTION BY DEBTOR FOR ENTRY OF FINAL ORDER PURSUANT TO SECTIONS 105, 361, 362, 364(c) AND 364(d) (A) AUTHORIZING THE DEBTOR TO INCUR POSTPETITION
FINANCING ON A SECURED BASIS, (B) GRANTING ADEQUATE PROTECTION, AND (C) MODIFYING THE AUTOMATIC STAY
DEBTOR: Fili Enterprises, Inc., dba Daphne's Greek Cafe, a California Corporation,    CASE NO: 10-bk-00324-PB

2.    The DIP Credit Agreement is APPROVED in its entirety.

3.    All objections to the DIP Financing Motion and/or the relief requested in the DIP Financing Motion are overruled on the merits.  This Order shall become effective immediately upon its entry.

4.    Capitalized terms used – but not otherwise defined – in this Order have the meaning ascribed to those terms in the DIP Financing Motion or DIP Financing Documents.

5.    The Debtor is hereby (i) authorized to enter into the DIP Financing Documents, substantially in the form filed with the Court, and any other related documents necessary to close on the DIP Facility, and (ii) authorized to borrow funds up to the DIP Loan Amount, perform their obligations in accordance with the terms and conditions of the DIP Financing Documents.  The Postpetition Lender, with the consent of Debtor, is hereby authorized to amend, modify, supplement or waive any provision of the DIP Financing Documents (an "Amendment") without the further approval or order of the Court for purposes of, among other things, modifying or waiving compliance with covenants contained in the DIP Financing Documents, or increasing the amount of loans subject to Availability or changes related to any of the foregoing, so long as any such Amendment is made in writing, filed with the Court, served upon counsel for the Committee (if any) and the United States Trustee and no objection to such Amendment is filed with the Court within three (3) business days from the later of the date notice of the Amendment is served or the date the Amendment notice is filed with the Court in accordance with this section; provided that no Amendment shall increase the aggregate amount of the DIP Loan Amount under the DIP Financing Documents without further approval or order of the Court.

6.    Upon execution and delivery of the DIP Financing Documents (including the approval by the Bankruptcy Court of the Term Sheet whether or not executed), the DIP Financing Documents shall constitute valid and binding obligations of the Debtor, enforceable against the Debtor in accordance with their terms; provided, however, that notwithstanding any other provision of this Order or of the other DIP Financing Documents, the Debtor shall not incur Postpetition Obligations in the principal amount of more than Loan Amount. No transfer or grant of security under this Order or the other DIP Financing Documents shall be stayed, restrained, voidable or recoverable under the Bankruptcy Code or any applicable non-bankruptcy law, or subject to any defense, reduction, setoff, recoupment or counterclaim.

7.    The Debtor shall use the Loans or advances made under or in connection with the DIP Financing Documents solely as provided in this Order and in the other DIP Financing Documents. From and after the Petition Date, amounts Loaned and advanced under or in connection with the DIP Financing Documents and all proceeds of the DIP Collateral (as defined below) (collectively, "Lender Funds"), including, without limitation, all of the Debtor's existing or future cash and Cash Collateral, shall not, directly or indirectly, be used to pay expenses of the Debtor or otherwise disbursed except for (i) those expenses and/or disbursements that are expressly permitted under the Budget (as such Budget may be extended, varied, supplemented or otherwise modified in accordance with the provisions of the DIP Financing Documents) and (ii) compensation and reimbursement of fees and expenses payable pursuant to sections 330 or 331 of the Bankruptcy Code by this Court or pursuant to any  fee procedures approved by this Court to attorneys, accountants, investment bankers, financial advisors or other professional persons retained by the Debtor or any Committee(s) pursuant to an order of this Court; provided, however, that the foregoing shall not be construed as consent to the allowance of any of the amounts referred to in the preceding clause.

8.    Except to the extent of the Carve-Out, no expenses of administration of the Chapter 11 Cases or any future proceeding that may result therefrom, including liquidation in bankruptcy or other proceedings under the Bankruptcy Code, shall be charged against or recoverable from the Collateral pursuant to section 506(c) of the Bankruptcy Code or any similar principle of law.

(continued)

ORDER ON      MOTION BY DEBTOR FOR ENTRY OF FINAL ORDER PURSUANT TO SECTIONS 105, 361, 362, 364(c) AND 364(d) (A) AUTHORIZING THE DEBTOR TO INCUR POSTPETITION
DEBTOR:        FINANCING ON A SECURED BASIS, (B) GRANTING ADEQUATE PROTECTION, AND (C) MODIFYING THE AUTOMATIC STAY.      CASE NO: 10-bk-00324-PB
              Fili Enterprises, Inc., dba Daphne's Greek Cafe, a California Corporation,

9.    For any and all Postpetition Obligations, subject only to: (a) any valid and enforceable claims under the Perishable Agricultural Commodities Act of 1930, as amended, or the Packers and Stockyards Act of 1921, as amended PACA/PASA claims ("PACA Claims") and (b) the Carve-Out, the Postpetition Lender is hereby granted under section 364(c)(1) of the Bankruptcy Code superpriority administrative expense claims against the Debtor having priority over all administrative expenses of the kind specified in, or ordered pursuant to, any provision of the Bankruptcy Code, including those specified in, or ordered pursuant to, sections 326, 328, 330, 331, 503(a), 503(b), 507(a), 507(b), 546(c) and 1114 of the Bankruptcy Code, or otherwise (whether incurred in the Chapter 11 Cases or any conversion thereof to a case under chapter 7 of the Bankruptcy Code or any other proceeding related hereto or thereto) (the "Super-priority Claim"), which Super-priority Claim shall be payable from and have recourse to all prepetition and postpetition property of the Debtor and all proceeds thereof, including, without limitation, proceeds of avoidance actions under Chapter 5 of the Bankruptcy Code (the "Avoidance Actions").

10.    The Debtor is hereby authorized to enter into any additional agreements providing for the establishment of lock boxes, blocked accounts or similar arrangements for the benefit and in favor of the Postpetition Lender for purposes of facilitating cash collections from the Debtor in accordance with the terms of the DIP Financing Documents.

11.    Interest on the Postpetition Obligations shall accrue at the rates (including any default rates) and shall be paid at the times as provided in the DIP Financing Documents.

12.    Any and all fees paid, or required to be paid, in connection with the DIP Financing Documents are hereby authorized and shall be paid to the extent disclosed in the DIP Financing Motion or contained in the DIP Financing Documents filed with the Court prior to entry of this Order.

13.    As security for all Postpetition Obligations, subject only to: (a) the PACA Claims and (b) the Carve-Out, the Postpetition Lender is hereby granted (effective as of the Petition Date and without the necessity of the execution by Debtor of mortgages, security agreements, pledge agreements, financing statements or otherwise, or the recordation of any of the foregoing):

(i)    valid, enforceable and perfected first priority security interests in and liens upon all prepetition and postpetition property of the Debtor, pursuant to section 364(c)(2) of the Bankruptcy Code, that is unencumbered or subject to an avoidable, invalid, unenforceable, recharacterized or unperfected lien or otherwise becomes unencumbered, including, but not limited to, all of the assets (tangible, intangible, real, personal or mixed) of the Debtor, whether now owned or hereafter acquired, including, without limitation, accounts, inventory, equipment, capital stock in subsidiaries (only up to 66% in foreign subsidiaries), investment property, instruments, chattel paper, real estate, proceeds from the sale of any leasehold interests, contracts, patents, copyrights, trademarks, causes of action (excluding Avoidance Actions), and other general intangibles, and all products and proceeds thereof (collectively, "DIP Collateral" and together with the Prepetition Collateral, the "Collateral"); and

(ii)    valid, enforceable and perfected priming security interests and liens upon the Collateral, pursuant to section 364(d) of the Bankruptcy Code, but subject and junior to the PACA Claims, Pre-existing Liens and the Carve-Out (the security interests and liens described in clauses (i) and (ii) the "DIP Liens").

14.    Except as expressly set forth in this Order, the DIP Liens granted herein shall not be (i) subject or junior to any lien that is avoided and preserved for the benefit of the Debtor's estate under section 551 of the Bankruptcy Code or (ii) subordinated to or made pari passu with any other lien under section 364(d) of the Bankruptcy Code or otherwise.  No claim or lien having a priority superior to or  pari passu with those granted by this Order shall be granted until the indefeasible payment in full in cash and satisfaction in the manner provided in the DIP Financing Documents of the Postpetition Obligations.

(continued)

ORDER ON MOTION BY DEBTOR FOR ENTRY OF FINAL ORDER PURSUANT TO SECTIONS 105, 361, 362, 364(c) AND 364(d) (A) AUTHORIZING THE DEBTOR TO INCUR POSTPETITION
FINANCING ON A SECURED BASIS, (B) GRANTING ADEQUATE PROTECTION, AND (C) MODIFYING THE AUTOMATIC STAY
DEBTOR: Fili Enterprises, Inc., dba Daphne's Greek Cafe, a California Corporation,        CASE NO: 10-bk-00324-PB

15.     Any provision of this Order, or the other DIP Financing Documents to the contrary notwithstanding, any and all liens, security interests and claims of the Postpetition Lender, whether existing as of the Petition Date or to be granted or provided for pursuant to the terms hereof or the other DIP Financing Documents shall be subject and subordinate to a carve-out (the "Carve-Out") for: (a) the payment of all allowed professional fees and disbursements incurred by the professionals retained, pursuant to Bankruptcy Code §§ 327 or 1103(a), by Debtor and the Creditors' Committee (if any) from the Filing Date until the occurrence and continuation of an Event of Default (as defined in the DIP Financing Documents) (the "Pre-Default Carve-Out") and until receipt by Debtor, its counsel, counsel to the Creditors' Committee (if any) and the United States Trustee of a written notice from the Postpetition Lender identifying such Event of Default and terminating the Pre-Default Carve-Out (a "Carve-Out Notice"); (b) the payment of allowed professional fees and disbursements incurred by professionals retained, pursuant to Bankruptcy Code §§ 327 or 1103(a), by Debtor and the Creditors' Committee (if any), in an aggregate amount not to exceed $750,000 (the "Post-Default Carve-Out") for services rendered after receipt by Debtor, its counsel, counsel to the Creditors' Committee (if any) and the United States Trustee of such Carve-Out Notice; provided that any payments actually made to such professionals for services rendered following the occurrence and continuation of an Event of Default, and after receipt by Debtor, its counsel, counsel to the Creditors' Committee (if any) and the United States Trustee of a Carve-Out Notice, shall reduce the Post-Default Carve-Out on a dollar-for-dollar basis; and (c) quarterly fees required to be paid pursuant to 28 U.S.C. § 1930(a)(6) and any fees payable to the Clerk of the Bankruptcy Court. So long as an Event of Default shall not have occurred and be continuing and no Carve-Out Notice shall have been given, Debtor shall, to the extent provided in the Approved Budget, be permitted to pay fees, compensation and reimbursement of expenses allowed and payable (including any such fees and expenses that are accrued but unpaid and ultimately allowed) under Bankruptcy Code §§ 330, 331 and/or 503, as the same may be due and payable, and the same shall be applied to the Pre-Default Carve-Out but shall not reduce the Post-Default Carve-Out.

16.     Notwithstanding anything herein or in the other DIP Financing Documents, on the Maturity Date (as defined in the DIP Financing Documents) the Debtor shall no longer, pursuant to this Order, the other DIP Financing Documents or otherwise, be authorized to borrow funds or incur indebtedness hereunder or under the DIP Financing Documents (and any obligations of the Postpetition Lender to make loans or advances hereunder or under the DIP Financing Documents shall be terminated) and; provided that this paragraph shall in no way affect the Carve-Out.

17.     Notwithstanding anything herein or the occurrence of the Maturity Date, all of the rights, remedies, benefits and protections provided to the Postpetition Lender under this Order and the other DIP Financing Documents and the rights of the professionals with respect to the Carve-Out shall survive such Maturity Date. Upon such Maturity Date, the principal of and all accrued interest and fees and all other amounts owed to the Postpetition Lender hereunder or under the DIP Financing Documents shall be immediately due and payable and the Postpetition Lender shall have all other rights and remedies provided in this Order, the DIP Financing Documents and applicable law.

18.     Except as otherwise specifically provided with respect to the Postpetition Lender's rights and remedies after the occurrence of an Event of Default under the terms of the DIP Financing Documents and subject to the provisions of this Order, the automatic stay provisions of section 362 of the Bankruptcy Code are vacated and modified to the extent necessary to permit Postpetition Lender to implement the provisions of this Order.

19.     The automatic stay provisions of section 362 of the Bankruptcy Code are hereby vacated and modified to the extent necessary to permit the Postpetition Lender to exercise, upon the occurrence and during the continuation of any Event of Default, all rights and remedies provided for in the DIP Financing Documents, and to take any or all of the following actions without further order of or application to this Court: (a) cease to make any loans or advances to the Debtor; (b) declare all Postpetition Obligations to be immediately due and payable; (c) terminate the commitments and any unfunded commitments under the DIP Financing Documents; (d) enforce rights against the DIP Collateral in the possession of the Postpetition Lender for application towards the Postpetition Obligations; and (e) take any other actions

(continued)

ORDER ON MOTION BY DEBTOR FOR ENTRY OF FINAL ORDER PURSUANT TO SECTIONS 105, 361, 362, 364(c) AND 364(d) (A) AUTHORIZING THE DEBTOR TO INCUR POSTPETITION
DEBTOR: FINANCING ON A SECURED BASIS, (B) GRANTING ADEQUATE PROTECTION, AND (C) MODIFYING THE AUTOMATIC STAY CASE NO: 10-bk-00324-PB

Fili Enterprises, Inc., dba Daphne's Greek Cafe, a California Corporation,

or exercise any other rights or remedies permitted under this Order, the DIP Financing Documents or applicable law to effect the repayment and satisfaction of the Postpetition Obligations; provided, however, that the Postpetition Lender shall provide five (5) business days written notice (by facsimile, telecopy, electronic mail or otherwise) to the U.S. Trustee, counsel to the Debtor and counsel to any Committee, prior to exercising any enforcement rights or remedies in respect of the DIP Collateral (other than the rights described in clauses (a), (b) and (c) above (to the extent they might be deemed remedies in respect of the DIP Collateral). The rights and remedies of the Postpetition Lender specified herein are cumulative and not exclusive of any rights or remedies that the Postpetition Lender may have under the DIP Financing Documents or under applicable law.

20. If the Postpetition Lender shall at any time exercise any of its rights and remedies hereunder, under the other DIP Financing Documents or under applicable law in order to effect payment or satisfaction of the Postpetition Obligations or to receive any amounts or remittances due hereunder or under the other DIP Financing Documents, including without limitation, foreclosing upon and selling all or a portion of the DIP Collateral, the Postpetition Lender shall have the right without any further action or approval of this Court to exercise such rights and remedies as to all or such part of the DIP Collateral as the Postpetition Lender shall elect in their sole discretion, subject to the provision by the applicable Postpetition Lender of the written notice as provided in the preceding paragraph. The Postpetition Lender shall be entitled to apply the payments or proceeds of the DIP Collateral in accordance with the provisions of this Order and the other DIP Financing Documents, and in no event shall any of the Postpetition Lender be subject to the equitable doctrine of "marshaling" or any other similar doctrine with respect to any of the Collateral or otherwise.

21. Subject to any agreement by and between any landlord and the Postpetition Lender, notwithstanding anything contained herein to the contrary and without limiting any other rights or remedies of the Postpetition Lender contained in this Order or the DIP Financing Documents, or otherwise available at law or in equity, and subject to the terms of the DIP Financing Documents, upon written notice to the landlord of any leased premises that an Event of Default has occurred and is continuing hereunder, the Postpetition Lender may enter upon any leased premises of the Debtors for the purpose of exercising any remedy with respect to the Collateral located thereon and shall be entitled to all of the Debtors' rights and privileges as lessee under such lease without interference from the landlords thereunder, provided that the Postpetition Agent Lender only pay rent and additional rent obligations of the Debtor that first arises after the Postpetition Lender's written notice referenced above and that are payable during the period of such occupancy by the Postpetition Lender, calculated on a per diem basis, unless otherwise ordered by the Court. Nothing herein shall require the Postpetition Agent to assume any lease as a condition to the rights afforded to the Postpetition Agent in this paragraph.

22. The failure or delay by the Postpetition Lender to seek relief or otherwise exercise their rights and remedies under this Order or any other DIP Financing Document shall not constitute a waiver of any of the rights of the Postpetition Lender hereunder, thereunder or otherwise.

23. Absent further order of the Court, except as expressly provided in the DIP Financing Documents and this Order, the Debtor shall be enjoined and prohibited from at any time during the Chapter 11 Cases granting liens in the Collateral or any portion thereof to any other parties pursuant to sections 364(d) of the Bankruptcy Code or otherwise. Absent further order of the Court, the Debtor shall be enjoined and prohibited from at any time (i) using the DIP Collateral or the Cash Collateral except pursuant to the terms and conditions of this Order and the DIP Financing Documents and (ii) applying to any court for an order authorizing the use of the DIP Collateral or the Cash Collateral except on the terms of this Order and the other DIP Financing Documents.

24. The Debtor is authorized to execute and deliver to the Postpetition Lender all such agreements, financing statements, instruments and other documents as the Postpetition Lender may reasonably request to evidence, confirm, validate or perfect the DIP Liens granted pursuant hereto.

(continued)

ORDER ON
DEBTOR:

MOTION BY DEBTOR FOR ENTRY OF FINAL ORDER PURSUANT TO SECTIONS 105, 361, 362, 364(c) AND 364(d) (A) AUTHORIZING THE DEBTOR TO INCUR POSTPETITION FINANCING ON A SECURED BASIS, (B) GRANTING ADEQUATE PROTECTION, AND (C) MODIFYING THE AUTOMATIC STAY

CASE NO: 10-bk-00324-PB

Fili Enterprises, Inc., dba Daphne's Greek Cafe, a California Corporation,

25.    All DIP Liens granted herein and in the DIP Financing Documents to or for the benefit of the Postpetition Lender and Replacement Liens granted to Bank of America, shall, pursuant to this Order, be and they hereby are, valid, enforceable and perfected, effective as of the Petition Date, and (notwithstanding any provisions of any agreement, instrument, document, the Uniform Commercial Code or any other relevant law or regulation of any jurisdiction) no further notice, filing or other act shall be required to effect such perfection, provided, however, that if the Postpetition Lender or Bank of America shall, in their respective sole discretion, choose to require the execution of and/or file (as applicable) such mortgages, financing statements, notices of liens and other similar instruments and documents, all such mortgages, financing statements, notices of liens or other similar instruments and documents shall be deemed to have been executed, filed and/or recorded nunc pro tunc at the time and on the date of the Petition Date. Each and every federal, state and local government agency or department is hereby authorized and directed to accept the entry by this Court of this Order as further evidence of the validity, enforceability and perfection on the Petition Date of the DIP Liens and Replacement Liens granted herein and in the other DIP Financing Documents to or for the benefit of the Postpetition Lender for itself and for the benefit of Bank of America.

26.    The provisions of this Order shall be binding upon and inure to the benefit of each of the Postpetition Lender, Bank of America and the Debtor, their estates and their respective successors and assigns (including any chapter 7 trustee or other trustee or fiduciary hereafter appointed as a legal representative of the Debtors or with respect to the property of the estates of the Debtor).

27.    Based on the findings set forth in this Order and in accordance with section 364(e) of the Bankruptcy Code, which is applicable to the relief contemplated by this Order, in the event that any or all of the provisions of this Order or any other DIP Financing Documents are hereafter modified, amended or vacated by a subsequent order of this or any other Court, no such modification, amendment or vacation shall affect the validity, enforceability or priority of any lien or claim authorized or created hereby or thereby or any Postpetition Obligations incurred hereby or thereby. Notwithstanding any such modification, amendment or vacation, any Postpetition Obligations incurred and any claim granted to the Postpetition Lender hereunder or under the other DIP Financing Documents arising prior to the effective date of such modification, amendment or vacation shall be governed in all respects by the original provisions of this Order and the other DIP Financing Documents, and the Postpetition Lender shall be entitled to all of the rights, remedies, privileges and benefits, including the liens and priorities granted herein and therein, with respect to any such Postpetition Obligations.

28.    The validity, enforceability, priority, perfection or amount of any lien or claim authorized or created pursuant to this Order or any other DIP Financing Documents shall not be affected by any finding or order of this Court or any other court regarding any Prepetition Obligations or Prepetition Liens, including, without limitation, any order of this Court or any other Court invalidating, subordinating, recharacterizing or avoiding the Prepetition Obligations or Prepetition Liens; provided, however, that Bank of America shall not be entitled to Replacement Liens or a superpriority administrative expense claim to the extent (and only to the extent) that any Prepetition Lien is determined to be invalid or unenforceable.

29.    The Debtor is authorized to do and perform all acts, to make, execute and deliver all instruments and documents (including, without limitation, the execution of additional security agreements, mortgages and financing statements), and shall pay fees and expenses that may be required or necessary for the Debtors' performance under the DIP Financing Documents, including, without limitation, (i) the execution of the DIP Financing Documents and (ii) the payment of the fees and other expenses described in the DIP Financing Documents as such become due. None of such reasonable attorneys', financial advisers' and accountants' fees and disbursements shall be subject to the prior approval of this Court, and no recipient of any such payment shall be required to file with respect thereto any interim or final fee application with this Court.  In addition, the Debtor is hereby authorized to indemnify the Postpetition Lender against any liability arising in connection with the DIP Financing Documents to the extent provided in the DIP Financing Documents.  All such unpaid

(continued)

ORDER ON MOTION BY DEBTOR FOR ENTRY OF FINAL ORDER PURSUANT TO SECTIONS 105, 361, 362, 364(c) AND 364(d) (A) AUTHORIZING THE DEBTOR TO INCUR POSTPETITION
DEBTOR: FINANCING ON A SECURED BASIS, (B) GRANTING ADEQUATE PROTECTION, AND (C) MODIFYING THE AUTOMATIC STAY
CASE NO: 10-bk-00324-PB

Fili Enterprises, Inc., dba Daphne's Greek Cafe, a California Corporation,

fees, expenses and indemnities of the Postpetition Lender shall constitute Postpetition Obligations and shall be secured by the DIP Liens and afforded all of the priorities and protections afforded to the Postpetition Obligations under this Order and the other DIP Financing Documents. Notwithstanding the foregoing, promptly after payment of invoices for any such fees and disbursements subject to this paragraph, the Debtor shall provide copies of such paid invoices to the Committee (if any) and the U.S, Trustee, who shall have ten (10) days from receipt of the invoices to object to such fees and disbursements. Any unresolved objections shall be presented to the Bankruptcy Court for determination.

30.    The Postpetition Obligations, and the claims and DIP Liens granted to or for the benefit of the Postpetition Lender pursuant to this Order, shall not be discharged by the entry of an order (a) confirming a chapter 11 plan in any of the Chapter 11 Cases (and, pursuant to section 1141(d)(4) of the Bankruptcy Code, the Debtors hereby waive such discharge) or (b) converting any of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code. Under no circumstances shall a plan in these Chapter 11 Cases be confirmed or become effective unless such plan provides that the Postpetition Obligations are paid in full in cash and satisfied in the manner provided in the DIP Financing Documents on or before the effective date of such plan. On a weekly basis, the Debtor is directed to remit to the Postpetition Lender, one hundred percent (100%) of all sales and collections on, and proceeds of, the DIP Collateral, with all such collections, remittances and proceeds to be retained by the Postpetition Lender and indefeasibly applied to reduce the obligations under the DIP Financing Documents, as set forth in the Budget.

31.    Until all obligations and indebtedness owing to the Lenders shall have been indefeasibly paid in full in cash and satisfied, the Debtor shall not seek an order dismissing the Chapter 11 Case, without the Postpetition Lender's consent. If an order dismissing the Chapter 11 Case under section 1112 of the Bankruptcy Code or otherwise is at any time entered, such order shall provide (in accordance with sections 105 and 349(b) of the Bankruptcy Code) that (i) the claims and liens granted pursuant to this Order to or for the benefit of the Postpetition Lender shall continue in full force and effect and shall maintain their priorities as provided in this Order until all obligations in respect thereof shall have been indefeasibly paid in full in cash and satisfied (and that such claims and DIP Liens shall, notwithstanding such dismissal, remain binding on all parties in interest) and (ii) this Court shall retain jurisdiction, notwithstanding such dismissal, for the purposes of enforcing such claims and DIP Liens.

32.    The provisions of this Order, including the grant of claims, DIP Liens and Replacement Liens to or for the benefit of the Postpetititon Lender or Bank of America, and any actions taken pursuant hereto shall survive the entry of any order converting any of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code.

33.    Bank of America shall receive replacement security interests and liens ("Replacement Liens") on all Collateral for all diminution of collateral under any prepetition credit agreement ("Prepetition Credit Agreement") and DIP Liens, junior in each case only to the PACA Claims and the Pre-existing Liens, the DIP Liens and the Carve-Out.

34.    It shall be an Event of Default under the DIP Financing Documents if: (i) any order providing for the sale of any Prepetition Collateral shall be entered by the Bankruptcy Court unless, upon the consummation of such sale transaction, the proceeds (subject to the satisfaction of any PACA Claims and/or Pre-existing Liens which have priority over the claims of Bank of America and Postpetition Lender) are applied to permanently and indefeasibly pay the obligations under the DIP Facility; (ii) any order providing for the sale of any Collateral shall be entered by the Bankruptcy Court unless (x) upon the consummation of such transaction, the obligations under the DIP Facility are permanently and indefeasibly paid in full in cash, or (y) the Postpetition Lender has consented to such sale; and (iii) any motion to approve bidding procedures for the sale of any assets of the Debtor that constitute Collateral under the DIP Facility fails to provide, pursuant to Section 363(k) of the Bankruptcy Code, that the Postpetition Lender shall have the right to credit bid.

35.    The determinations, findings, judgments, decrees and orders set forth herein constitute the Bankruptcy Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to

(continued)

CSD 1001A [11/15/04] (Page 10)
ORDER ON  MOTION BY DEBTOR FOR ENTRY OF FINAL ORDER PURSUANT TO SECTIONS 105, 361, 362, 364(c) AND 364(d) (A) AUTHORIZING THE DEBTOR TO INCUR POSTPETITION
          FINANCING ON A SECURED BASIS, (B) GRANTING ADEQUATE PROTECTION, AND (C) MODIFYING THE AUTOMATIC STAY
DEBTOR: Fili Enterprises, Inc., dba Daphne's Greek Cafe, a California Corporation,        CASE NO: 10-bk-00324-PB

Bankruptcy Rule 9014. Each finding of fact set forth herein, to the extent it is or may be deemed a conclusion of law, also shall constitute a conclusion of law. Each conclusion of law set forth herein, to the extent it is or may be deemed a finding of fact, also shall constitute a finding of fact.

36.    In the event that any provision of this Order conflicts with any term of the DIP Financing Documents, this Order shall govern.

IT IS SO ORDERED.

1

## **PROOF OF SERVICE**

2

    I am a resident of the State of California, over the age of eighteen years, and not a party to the within action.  My business address is DLA Piper LLP (US), 550 South Hope Street, Suite 2300, Los Angeles, California  90071-2678.  On January 14, 2010, I served the within documents:

3

4

**MOTION BY THE DEBTOR FOR ORDER (A) AUTHORIZING INTERIM USE OF CASH COLLATERAL, (B) GRANTING ADEQUATE PROTECTION FOR USE OF PREPETITION COLLATERAL, AND (C) GRANTING RELATED RELIEF**

5

6

☐    by transmitting via facsimile the document(s) listed above to the fax number(s) set forth below on this date before 5:00 p.m.

7

8

☒    **TO BE SERVED BY U.S. MAIL**: by placing the document(s) listed above in a sealed envelope with postage thereon fully prepaid, in the United States mail at Los Angeles, California addressed as set forth below.

9

10

☐    by personally delivering the document(s) listed above to the person(s) at the address(es) set forth below.

11

12

☐    **TO BE SERVED OVERNIGHT DELIVERY**
I deposited in a box or other facility regularly maintained by Federal Express, an express service carrier, or delivered to a courier or driver authorized by said express service carrier to receive documents, true and correct copies of the foregoing documents in a sealed envelope or package designated by the express service carrier, addressed as set forth on the attached mailing list, with fees for overnight delivery paid or provided for:

13

14

15

16

See attached service list.

17

18

    I am readily familiar with the firm's practice of collection and processing correspondence for mailing.  Under that practice it would be deposited with the U.S. Postal Service on that same day with postage thereon fully prepaid in the ordinary course of business.  I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit for mailing in affidavit.

19

20

21

    I declare that I am employed in the office of a member of the Bar of or permitted to practice before this Court at whose direction the service was made.

22

    Executed on January 14, 2010, at Los Angeles, California.

23

24

                   /s/ Bambi Clark
                    Bambi Clark

25

26

27

28

**Secured Creditor**
Gerald E. Wilson
Bank of America
Legal Department
MA5-503-04-01
100 Federal Street
Boston, MA 02110
Tel:    (617) 346-4267
Fax:    (617) 346-0980
**E-mail:** gerald.e.wilson@bankofamerica.com

**Counsel for Bank of America**
Matthew F. Furlong, Esq.
Morgan, Lewis & Bockius
225 Franklin Street, 16th Floor
Boston, MA 02100
Tel:    (617) 341-7000
Fax:    (617) 341-7701
**E-mail**:    mfurlong@morganlewis.com

**RSN - Counsel for Bank of America**
Richard Esterkin, Esq.
Morgan, Lewis & Bockius
300 S. Grand Avenue, 22nd Floor
Los Angeles, CA 90071-3132
Tel:    (213) 612-1163
Fax:    (213) 612-2501
**E-mail:** resterkin@morganlewis.com

**Secured**
Bank of America
Trade Finance Operations
1 Fleet Way PA6-580-02-30
Scranton, PA 18507

**U.S. Trustee**
United States Trustee
Attn: David Ortiz
402 West Broadway, Suite 600
San Diego, CA 92101
**Facsimile:** (619) 557-5339

**Secured**
Riverside County Assessor
County Administrative Center
4080 Lemon Street, 1st Floor
Riverside, CA 92502
Telephone:    (951) 955-6210
Facsimile:    (951) 955-3906

**Secured**
Vestar/Kimco Tustin, LP
c/o Vestar Property Management
2425 East Camelback Road, Suite 750
Phoenix, AZ 85016
Telephone:    (602) 866-0900
**Facsimile:    (602) 955-2298**

**Secured**
Weingarten Nostat, Inc.
Attn: Chris Byrd
2600 Citadel Plaza Drive, Suite 125
Houston, TX 77008
Telephone: (602) 217-8842
Facsimile: (602) 263-8852

**Twenty Largest Unsecured Creditor**
U.S. Foodservice, Inc.
Attn: Jon A. Jezierski
15155 Northam Street
La Mirada, CA 90638
Telephone: (714) 670-3500

**Twenty Largest Unsecured Creditor**
Transwestern Harvest Lakeshore LLC
Attn: Bob Baker
c/o Harvest Partners/Lorrie Holmes
8070 Park Lane, Suite 100
Dallas, TX 75231
Telephone:  (214) 389-0860
Fax:  (214) 389-1991

DLA Piper LLP (US)
Los Angeles

WEST\21860166.1

-2-

| | | |
|---|---|---|
| 1 | **Twenty Largest Unsecured Creditor**<br>AW Southglenn, LLC | **Twenty Largest Unsecured Creditor**<br>PCCP CS Alberta |
| 2 | Attn: Laura Carstenson<br>8480 E. Orchard Road, Suite 2460 | Cornerstar Colorado, LLC<br>Attn: Brad Beck |
| 3 | Englewood, CO 80111<br>Telephone:  (303) 771-4004 | 8480 E. Orchard Road, Suite 2460<br>Englewood, CO 80111 |
| 4 | Fax:  (303) 771-4086 | Telephone:  (303) 771-4004<br>Fax:  (303) 771-4086 |
| 5 | | |
| 6 | **Twenty Largest Unsecured Creditor**<br>Media Spot | **Twenty Largest Unsecured Creditor**<br>SCI Parkplace Fund, LLC |
| 7 | 1550 Bayside Drive<br>Corona, CA 92625 | Attn: Rina Lessing<br>1512 Eureka Road, Suite 100<br>Roseville, CA 95661 |
| 8 | | |
| 9 | **Twenty Largest Unsecured Creditor**<br>Jackson II, LLC | **Twenty Largest Unsecured Creditor**<br>Forest City Commercial Management |
| 10 | Attn: Bernardo Hubbard<br>5665 Power Inn Road, Suite 140 | Temecula Towne Center Associates, LP<br>Attn: George Stitz |
| 11 | Sacramento, CA 95824 | 1100 Terminal Tower, 50 Public Square<br>Cleveland, HO 44113-3267<br>Telephone:  (216) 621-6060 |
| 12 | | Fax:  (216) 599-4202 |
| 13 | **Twenty Largest Unsecured Creditor**<br>The Robford Company, LLC | **Twenty Largest Unsecured Creditor**<br>P&R Paper Supply Co., Inc. |
| 14 | Attn: Bonnie Larson-de Paz<br>1309 West Main Street | 1898 E. Colton Avenue<br>Redlands, CA 92373 |
| 15 | Rapid City, SD 57709-2624<br>Telephone:  (303) 930-9700 | |
| 16 | Fax:  (323) 930-9797 | |
| 17 | **Twenty Largest Unsecured Creditor**<br>FR Crow Canyon, LLC | **Twenty Largest Unsecured Creditor**<br>Sudberry Properties, Inc. |
| 18 | c/o Federal Realty Investment Trust<br>Attn: Shahram Moussavi | Attn: Mike Seiber |
| 19 | 3055 Lion Avenue, Suite 2100<br>San Jose, CA 95128 | 5465 morehouse Drive, Suite 260<br>San Diego, CA 92121-4714 |
| 20 | | |
| 21 | **Twenty Largest Unsecured Creditor**<br>Aloha Technologies, Inc. | **Twenty Largest Unsecured Creditor**<br>Playa de Oro |
| 22 | c/o Radiant Systems, Inc.<br>3925 Brookside Parkway | c/o Decron Properties, LP<br>Attn: David Nagel |
| 23 | Alpharetta, GA 30022<br>Telephone:  (770) 576-6000 | 6222 Wilshire Boulevard, #650<br>Los Angeles, CA 90048 |
| 24 | Facsimile:  (770) 754-7790 | |
| 25 | **Twenty Largest Unsecured Creditor**<br>Pepsi Cola | **Twenty Largest Unsecured Creditor**<br>Southern California Gas Company |
| 26 | 4532 U.S. 67<br>Dallas, TX 75201 | 1801 S. Atlantic Blvd.<br>Monterey Park, CA 91754-5207 |
| 27 | Telephone:  (800) 789-2626<br>Fax:  (336) 896-6118 | |
| 28 | | |

1

2

3

4

**Twenty Largest Unsecured Creditor**
Prudential Overall Supply
Attn: Mark Hamilton
17641 Fabrica Way
Cerritos, CA 90703

**Twenty Largest Unsecured Creditor**
Village Square Dana Park, LLC
Attn: Michael Bannic
1744 Val Vista Drive, Suite 204
Mesa, AZ 85204
Telephone:  (480) 890-0555 x12
Fax:  (480) 989-0832

5

6

7

8

**Twenty Largest Unsecured Creditor**
Regency Centers Corporation
Attn: Greg Sadowsky
121 West Forsyth Street, Suite 200
Solana Beach, CA 92075
Telephone:  (858) 831-0411
Fax:  (858) 831-0411

**Twenty Largest Unsecured Creditor**
DDR Oliver McMillian LP
Attn: Grace Wilson
733 Eighth Avenue
San Diego, CA 92101

9

10

11

12

13

**RSN – Counsel for Bella Terra Associates, LLC and Montalvo Shopping Center, LLC**
J. Bennett Friedman, Esq.
Friedman Law Group
1900 Avenue of the Stars, Suite 1800
Los Angeles, CA 90067-4409
Telephone: (310) 552-8210
Facsimile: (310) 733-5442
E-mail: ffriedman@jbflawfirm.com

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DLA Piper LLP (US)
Los Angeles

-4-

WEST\21860166.1