1   KAROL K. DENNISTON (Bar No. CA 141667)
    kdenniston@bhfs.com
2   BRENDAN P. COLLINS (Bar No. CA 260260)
    bpcollins@bhfs.com
3   **BROWNSTEIN HYATT FARBER SHRECK,
    LLP**
4   2029 Century Park East
    Suite 2100
5   Los Angeles, California 90067-3007
    Telephone:  (310) 500-4600
6   Facsimile:  (310) 500-4602

7   *Proposed* Attorneys for Fili Enterprises, Inc.,
    d/b/a Daphne's Greek Café, a California corporation,
8   Debtor and Debtor-in-Possession

9
                    UNITED STATES BANKRUPTCY COURT
10
                    SOUTHERN DISTRICT OF CALIFORNIA
11

12  | In re: | Case No.  10-BK-00324-PB11 |

13  FILI ENTERPRISES, INC., d/b/a          Chapter 11
    Daphne's Greek Café, a California
14  corporation,                          **DEBTOR'S NOTICE OF MOTION AND
                                          MOTION FOR AN ORDER: (1)
15              Debtor.                   AUTHORIZING THE SALE OF
                                          SUBSTANTIALLY ALL OF DEBTOR'S
16                                        ASSETS FREE AND CLEAR OF ANY
                                          LIENS, CLAIMS, ENCUMBRANCES AND
17                                        INTERESTS PURSUANT TO SECTIONS
                                          105 AND 363 OF THE BANKRUPTCY
18                                        CODE AND BANKRUPTCY RULES 2002
                                          AND 6004; AND (2) AUTHORIZING IN
19                                        CONNECTION THEREWITH PURSUANT
                                          TO SECTION 365 OF THE BANKRUPTCY
20                                        CODE AND BANKRUPTCY RULES 2002
                                          AND 6006, PURSUANT TO THAT
21                                        CERTAIN ASSET PURCHASE
                                          AGREEMENT WITH 1350BA, LLC OR ITS
22                                        DESIGNEE, AND WITH REGARD TO
                                          CERTAIN EXECUTORY CONTRACTS
23                                        AND UNEXPIRED LEASES, (A)
                                          ASSUMPTION AND ASSIGNMENT, (B)
24                                        ASSUMPTION, ASSIGNMENT, AND
                                          MODIFICATION, AND (C) REJECTION;
25                                        MEMORANDUM OF POINTS AND
                                          AUTHORITIES IN SUPPORT THEREOF;
26                                        DECLARATION OF WILLIAM
                                          TREFETHEN IN SUPPORT THEREOF;
27                                        AND DECLARATION OF JEFF NERLAND
                                          IN SUPPORT THEREOF**

28                                        -1-

LA 128,953,007v4 6-30-10

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

| | |
|---|---|
| Date: | August 3, 2010 |
| Time: | 2:00 pm |
| Place: | Jacob Weinberger Courthouse |
| | Dept. 4; Room 328 |
| | 325 West F Street |
| | San Diego, California 92101-6991 |
| Judge: | The Hon. Peter W. Bowie |

-2-

*LA 128,953,007v4 6-30-10*

**TO THE HONORABLE PETER W. BOWIE, UNITED STATES BANKRUPTCY JUDGE; THE UNITED STATES TRUSTEE; OFFICIAL COMMITTEE OF UNSECURED CREDITORS; SECURED CREDITORS; COUNTERPARTIES TO EXECUTORY CONTRACTS AND UNEXPIRED LEASES; ALL PARTIES REQUESTING SPECIAL NOTICE; AND OTHER PARTIES IN INTEREST:**

Fili Enterprises, Inc., d/b/a Daphne's Greek Café, debtor and debtor in possession (the "Debtor") hereby gives notice that on **AUGUST 3, 2010 at 2:00 PM**, in Department 4, Room 328, of the Jacob Weinberger United States Courthouse, located at 325 West F Street, San Diego, California 92101-6991, there will be a hearing regarding the Debtor's Motion for an Order: (1) Authorizing the Sale of Substantially All of Debtor's Assets Free and Clear of Any Liens, Claims, Encumbrances and Interests Pursuant to Sections 105 and 363 of Title 11 of the United States Code, 11 U.S.C. §§ 101-1532 ("Bankruptcy Code") and Federal Rules of Bankruptcy Procedure ("Bankruptcy Rules") 2002 and 6004; and (2) Authorizing in Connection Therewith Pursuant to Section 365 of the Bankruptcy Code and Bankruptcy Rules 2002 and 6006, Pursuant to That Certain Asset Purchase Agreement with 1350BA, LLC or Its Designee, and with Regard to Certain Executory Contracts and Unexpired Leases, (A) Assumption and Assignment, (B) Assumption, Assignment, and Modification, and (C) Rejection (the "Sale Motion").

The Debtor has determined that a sale (the "Sale") of substantially all of its assets to its secured lender 1350BA LLC or its designee ("1350BA" or "Purchaser") pursuant to that certain asset purchase agreement to be executed by the Debtor and the Purchaser (the "APA"), which APA will be filed on or about July 9, 2010, and which APA will follow the terms and conditions of that certain Credit Bid Transaction Term Sheet dated June 28, 2010 by and among the Debtor (as Seller), 1350BA (as Purchaser), and the Committee (the "Term Sheet")—and in accordance with section 363 of the Bankruptcy Code—will maximize the benefit to the Debtor's estate (the "Estate") and the Estate's various constituencies. A true and correct copy of the Term Sheet is attached to the Declaration of Jeff Nerland ("Nerland Decl.") filed concurrently herewith as **Exhibit A**. The Official Committee of Unsecured Creditors ("Committee") supports the Sale.

-1-

More particularly, the Debtor respectfully requests the Court to enter an Order:

(a)     Finding that the notice and opportunity for hearing given in connection with this Motion were adequate and proper under the Bankruptcy Rules and the Local Rules for the United States Bankruptcy Court for the Southern District of California;

(b)     Finding that this Motion is a "core proceeding" within the meaning of 28 U.S.C. § 157(b)(2)(A), (M), (N) and (O) and that any order granting this Motion will be final within the meaning of 28 U.S.C. § 158(a)(1);

(c)     Approving the APA and the transactions contemplated therein pursuant to Sections 105(a), 363 and 365 of the Bankruptcy Code;

(d)     Authorizing the sale of the Purchased Assets free and clear of all liens, claims (including successor liability claims), and other interests in the Purchased Assets, pursuant to Bankruptcy Code section 363(f);

(e)     Authorizing the (i) assumption and assignment and (ii) assumption and assignment and modifications of the Assumed Agreements (defined below) pursuant to Bankruptcy Code section 365(f) and rejection of the Rejected Agreements (defined below);

(f)     Authorizing parties to take all actions necessary or advisable to consummate other transactions provided for in the APA;

(g)     Finding and determining that all applicable statutory and legal requirements attending the transactions contemplated by the APA and herein have been met, including, without limitation, a determination that 1350BA is a "good faith" purchaser within the meaning of Bankruptcy Code section 363(m);

(h)     Containing such other findings and authorizations as required under the APA;

(i)     Waiving the fourteen-day waiting periods set forth in bankruptcy rules 6004(h) and 6006(d); and

-2 -

LA 128,953,007v4 6-30-10

1    (j)    Granting such other and further relief as may be just and proper.

2    This Sale Motion is based upon these moving papers, the accompanying Memorandum of

3    Points and Authorities and the Exhibits thereto, the Declaration of George Katakalidis in Support

4    of First Day Motions filed January 11, 2010,[1] the Nerland Decl., the Declaration of William

5    Trefethen filed concurrently herewith, the record in these cases, matters of which the Court may

6    take judicial notice, and such other evidence or argument as may properly be presented at or

7    before the hearing on this Sale Motion.

8    Any opposition or other response to the Sale Motion must be served upon and received

9    by the following:  (i) the Debtor's counsel at the above contact information; (ii) Counsel for

10    George Katakalidis, Attn: Martin A. Eliopulos, Higgs, Fletcher & Mack, LLP, 401 West A Street

11    Suite 2600, San Diego, CA  92101-7910; (iii) counsel for the Official Committee of Unsecured

12    Creditors, Attn: Jeff Pomerantz, Pachulski Stang Ziehl & Jones, 10100 Santa Monica Blvd, 11th

13    Floor, Los Angeles, CA 90067-4100; Email: jpomerantz@pszjlaw.com; Facsimile: (310) 201-

14    0760; (iv) counsel for Purchaser, Attn: Michael H. Goldstein, Greenberg Traurig, LLP, 2450

15    Colorado Avenue, Suite 400 East, Santa Monica, CA 90404; Email: goldsteinmh@gtlaw.com;

16    Facsimile: (310) 586-0250; and (v) the Office of the United States Trustee, Attn: David A. Ortiz,

17    402 W. Broadway, Suite 600, San Diego, CA 92101-8511; Email: david.a.ortiz@usdoj.gov;

18    Facsimile: (619) 557-5339, so that the objection is actually **received** by all of the foregoing

19    parties by **5:00 p.m. (Pacific Time) on July 19, 2010**.

20    Any objecting or responding party must provide the Clerk of the Court with one original

21    and one copy of such papers along with proof of service and must file such papers with the Clerk

22    of the Court in accordance with the Local Rules for the United States Bankruptcy Court for the

23    Southern District of California.  You may serve your response by fax or e-mail (to all e-dresses

24    shown above); if you do so, (a) you thereby consent to service by such means for all subsequent

25    matters in the cases, and (b) you must also follow-up with a hard copy by first-class mail.

26    **WHEREFORE**, the Debtor respectfully requests entry of an order, substantially in the

27    form attached hereto to the APA, granting the relief requested herein and granting such other and

28

---

[1] See Docket No. 12.

Case No. 10-bk-00324-PB11
**NOTICE OF SALE MOTION**

LA 128,953,007v4 6-30-10

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

further relief as the Court deems just and proper.

Dated:  July 2, 2010                    BROWNSTEIN HYATT FARBER SHRECK, LLP

By:  /s/ Brendan P. Collins
        Karol K. Denniston, Esq.
        Brendan P. Collins, Esq.
        *Proposed* Attorneys for Fili Enterprises, Inc.,
        d/b/a Daphne's Greek Café, a California
        corporation Debtor and Debtor-in-Possession

-4 -

LA 128,953,007v4 6-30-10

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.    INTRODUCTION

Fili Enterprises, Inc., d/b/a Daphne's Greek Café, a California corporation, as debtor and debtor in possession ("Debtor," "Daphne's," or "Seller"), by and through its undersigned counsel, submits this Memorandum of Points and Authorities in support of Debtor's Motion For An Order: (1) Authorizing the Sale of Substantially All of Debtor's Assets Free and Clear of Any Liens, Claims, Encumbrances and Interests Pursuant to Sections 105 and 363 of Title 11 of the United States Code, 11 U.S.C. §§ 101-1532 ("Bankruptcy Code") and Federal Rules of Bankruptcy Procedure ("Bankruptcy Rules") 2002 and 6004; and (2) Authorizing in Connection Therewith Pursuant to Section 365 of the Bankruptcy Code and Bankruptcy Rules 2002 and 6006, Pursuant to That Certain Asset Purchase Agreement with 1350BA, LLC, and with Regard to Certain Executory Contracts and Unexpired Leases, (A) Assumption and Assignment, (B) Assumption, Assignment, and Modification, and (C) Rejection (the "Sale Motion").

The Debtor has, subject to Court approval, agreed to sell substantially all of its assets to its secured lender 1350BA, LLC or its designee ("1350BA," or "Purchaser") pursuant to that certain asset purchase agreement to be executed by the Debtor and the Purchaser (the "APA"), which APA will be filed on or about July 9, 2010, and which APA will follow the terms and conditions of that certain Credit Bid Transaction Term Sheet dated June 28, 2010 by and among the Debtor (as Seller), 1350BA (as Purchaser), and the Committee (the "Term Sheet")—and in accordance with sections 105, 363 and 365 of the Bankruptcy Code—will maximize the benefit to the Debtor's estate (the "Estate") and the Estate's various constituencies. A true and correct copy of the Term Sheet is attached to the Declaration of Jeff Nerland ("Nerland Decl.") filed concurrently herewith as **Exhibit A**. The Official Committee of Unsecured Creditors ("Committee") supports the Sale.

The purchase price (the "Purchase Price") for the Purchased Assets (as defined below) shall be the sum of:

- as elected by Purchaser, either (i) a credit bid in the aggregate amount equal to the secured portion of the outstanding Obligations due and owing under the Credit Agreement as of the Petition Date plus the Adequate Protection Obligations (as defined in the Final Cash

Collateral Order.[Docket No. 282) (collectively, the "Outstanding Obligations") (in the amount determined by Purchaser in its sole and absolute discretion but not to exceed $13,829,683.96[1] (the "Credit Bid")); or (ii) a sale of the Purchased Assets subject to all Outstanding Obligations and Purchaser's liens, claims and interests which secure the Outstanding Obligations;

- assumption of the Assumed Liabilities (as defined below); and

- payment of cash in the amount of $666,417[2] (the "Cash Payment"), subject to: (i) increase in an amount equal to the extent that Seller pays payroll expenses before Closing that are scheduled to be part of the Post-Petition Ordinary Course Liabilities (as defined below); and (ii) to the extent that the Purchaser assumes any of such Excess Assumed Ordinary Course Liabilities, reduction in an amount equal to the amount by which such assumed Excess Assumed Ordinary Course Liabilities is in an amount in excess of the sum of: (i) Excess Cash; and (ii) $100,000.

The parties have agreed to use commercially reasonable efforts to obtain entry of an order confirming the sale (the "Sale Order") by August 6, 2010.

## II.    JURISDICTION

This Court has jurisdiction over this Motion under 28 U.S.C. §§ 157 and 1334.  This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2)(A).  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  The statutory predicate for the relief sought herein includes sections 105, 363 and 365 of the Bankruptcy Code.

## III.    BACKGROUND FACTS

### A.    The Debtor's Bankruptcy Filing

On January 11, 2010 (the "Petition Date"), the Debtor, commenced this case by filing a petition for relief under chapter 11 of the Bankruptcy Code.  No trustee or examiner has yet been appointed in this case, and the Debtor continues to manage its assets and conduct its business operations as a debtor in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.  The Office of the United States Trustee has appointed an Official Committee of Unsecured Creditors (the "Committee").

### B.    The Fili Business

Prior to the Petition Date, the Debtor was doing business under the trade names of Daphne's Greek Express and Daphne's Greek Café ("Daphne's").  In 1988, George Katakalidis

---

[1]    *See* Declaration of Matthew Wright re Bank of America, N.A. Loan Documents [Docket No 193]; Final Cash Collateral Order [Docket No. 282].

[2]    The Cash Payment is based upon the difference between the projected cash at 8/01/10 and the projected administrative expenses at 8/01/10 per the Term Sheet, and is subject to the adjustment in the APA.

LA 128,953,007v4 6-30-10

founded Daphne's to produce quality Greek food in a fast casual environment and at an affordable price. From the Debtor's inception through the appointment of Mr. Nerland as Chief Restructuring Officer, Mr. Katakalidis was the Chief Executive Officer of Daphne's. Daphne's began as one small unit in the Sorrento Valley area of San Diego County.

Currently, the Debtor designs, develops, builds, owns, and operates restaurant facilities, in California, Arizona, Washington, and Colorado. Daphne's is the largest national chain of Greek restaurants in the country. The Debtor, headquartered in San Diego, California, employs 1,034 people. As of the Petition Date, the Debtor was operating out of sixty eight (68) leased locations with the largest concentration of restaurants in Southern California. Additional information about the Debtor and its history can be found at www.daphnesgreekcafe.com.

**C.    Secured Debt—1350BA LLC**

On or about February 1, 2005, the Debtor and Fleet National Bank, predecessor in interest to Bank of America ("BofA"), entered into a Credit Agreement (as amended from time to time, and together with all ancillary documents, the "Prepetition Senior Secured Credit Agreement") pursuant to which the lender agreed to make certain loans and letter of credit extensions to the Debtor (the "Loan"). The Loan provided the Debtor with funds to build and operate multiple restaurants throughout the western United States. The Loan is secured by a lien and security interest on substantially all of the Debtor's assets in favor of BofA. As will be discussed in detail below, prior to the Debtor's default, the Debtor had a credit facility of $16,500,000 of which $3,500,000 was available. As of the Petition Date, the outstanding balance under the Loan was $13,829,683.96.

Effective April 7, 2010, BofA sold, assigned, and transferred to GBE LLC ("GBE") all right, title and interest in and to: (1) that certain Prepetition Senior Secured Credit Agreement; (2) that certain Second Amended and Restated Revolving Note, dated as January 31, 2007 by and between Debtor and BofA (as successor in interest to Fleet National Bank) (the "Note"); (3) the Loan Documents as defined in the Prepetition Senior Secured Credit Agreement; and (4) all other documents and agreements related to the Prepetition Senior Secured Credit Agreement; provided, however, Bank of America did not assign to GBE the L/C Obligations (as defined in the

-3-

Prepetition Senior Secured Credit Agreement) and the documents and agreements that specifically relate to the L/C Obligations (collectively, the "Assigned Assets"). GBE, in turn, assigned the Assigned Assets to 1350BA.

### D.    Appointment of Jeff Nerland as Chief Restructuring Officer

On June 23, 2010, the Debtor, 1350BA, the Committee, and Mr. Katakalidis stipulated to the resignation of Mr. Katakalidis as the President, Chief Executive Officer and Chairman of the Board for the Debtor and the appointment of Jeff Nerland as the Chief Restructuring Officer ("CRO") for the Debtor. Accordingly, the Debtor filed on that same day the Motion Of Debtor For Order Approving Stipulation Re: (I) Appointment of Jeff Nerland as the Debtor's Chief Restructuring Officer; and (II) Resignation of George Katakalidis (the "Emergency Motion")[3]. On June 30, 2010 the Court entered an order granting the Emergency Motion, thereby vesting Mr. Nerland with the power to make decisions in the best interest—an on behalf—of the Estate.

### E.    Decision to Sell Substantially All of the Debtor's Assets

As part of its fulsome and comprehensive postpetition restructuring efforts, the Debtor has examined—and is now focused on—a sale of the Company to 1350BA in accordance with the APA. Although the Debtor has worked hard to stabilize its operations, the Debtor has determined—after deep analysis and constructive negotiations with the Committee and 1350BA—that a section 363 sale of substantially all of its assets in accordance with the APA will maximize the return obtained for the Estate, avoid damage to the ongoing business operations of the Debtor, and best provide for recovery by all interested constituencies.

### F.    Terms of the Asset Purchase Agreement

The Term Sheet sets forth the principal terms and conditions of a transaction (the "Transaction") pursuant to which Purchaser, as assignee of the Assigned Assets, shall, among other things, (x)(i) either credit bid in the aggregate amount equal to the secured portion of the outstanding Obligations due and owing under the Prepetition Senior Credit Agreement as of the Petition Date plus the Adequate Protection Obligations (as defined in the Final Cash Collateral Order (collectively, the "Outstanding Obligations") (in the amount determined by Purchaser in its

---

[3] See Docket No. 269.

-4-

sole and absolute discretion but not to exceed $13,829,683.96); or (ii) agree to a sale of the Purchased Assets subject to all Outstanding Obligations and Purchaser's liens, claims and interests which secure the Outstanding Obligations, and (y) and provide other consideration as set forth in the APA and generally described herein to acquire the Purchased Assets of the Seller. A true and correct copy of the Term Sheet is attached to the Nerland Decl. as **Exhibit A**. All terms not otherwise defined within this Sale Motion have the meanings ascribed to them in the Term Sheet. The principal terms are summarized below and are subject in all respects to the final form of the APA:

| I. | Parties |
|---|---|
| **A. Purchaser:** | 1350BA LLC, or its designee ("Purchaser"). |
| **B. Seller:** | Fili Enterprises, Inc. (d/b/a Daphne's Greek Café), a California corporation, as debtor and debtor in possession (the "Seller") in the chapter 11 case (the "Bankruptcy Case") filed on January 11, 2010 (the "Petition Date") and pending in the United States Bankruptcy Court, Southern District of California, Case No. 10-BK-00324-PB11. |
| **C. Committee:** | The Official Committee of Creditor's Holding Unsecured Claims (the "Committee") appointed in the Bankruptcy Case. |
| II. | Sale |
| **A. Sale:** | 1. Seller shall sell and Purchaser shall purchase the Purchased Assets (defined below) for the Purchase Price (defined below) pursuant to the terms and conditions set forth in the APA, which terms and conditions shall be substantially on the terms and conditions set forth in the Term Sheet . |
| | 2. The Definitive Documentation will include the APA, the Sale Motion, the order approving the Sale Motion, and related agreements, exhibits and schedules all in form and substance satisfactory to Purchaser in its sole and absolute discretion, and not inconsistent with the Term Sheet and the Final Cash Collateral Order. |
| **B. Consideration and Waterfall:** | 1. The purchase price (the "Purchase Price") for the Purchased Assets (as defined below) shall be the sum of: |
| | (i) as elected by Purchaser, either (i) a credit bid in the aggregate amount equal to the secured portion of the outstanding Obligations due and owing under the Credit Agreement as of the Petition Date plus the Adequate Protection Obligations (as defined in the Fifth Interim Order On First Day Motion By Debtor For Order (A) Authorizing Interim Use Of Cash Collateral, Etc." [Docket No. 251]) (collectively, the "Outstanding Obligations") (in the amount determined by Purchaser in its sole and absolute discretion but not |

LA 128,953,007v4 6-30-10

to exceed $13,829,683.96 (the "Credit Bid")); or (ii) a sale of the Purchased Assets subject to all Outstanding Obligations and Purchaser's liens, claims and interests which secure the Outstanding Obligations;

(ii) assumption of the Assumed Liabilities (as defined below); and

(iii) payment of cash in the amount of $666,417[4] (the "Cash Payment"), subject to: (i) increase in an amount equal to the extent that Seller pays payroll expenses before Closing that are scheduled to be part of the Post-Petition Ordinary Course Liabilities (as defined below); and (ii) to the extent that the Purchaser assumes any of such Excess Assumed Ordinary Course Liabilities, reduction in an amount equal to the amount by which such assumed Excess Assumed Ordinary Course Liabilities is in an amount in excess of the sum of: (i) Excess Cash; and (ii) $100,000.

2. It is contemplated that the Cash Payment and the Excluded Cash will fund the allowed administrative claims against the Seller's estate as described in the Term Sheet (subject to a cap of $1,365,000 in the aggregate for allowed professional fees of the Debtor's and the Committee's professionals, allocated among the Debtor's professionals and the Committee's professionals as described in the Term Sheet, which $1,364,475 cap includes amounts projected to be paid to professionals prior to the Closing Date pursuant to Budgets approved in connection with entered orders governing the Debtor's use of cash collateral). To the extent the administrative claims as described in the Term Sheet are greater than the amounts stated, the professionals employed by the Debtor and the Committee shall receive a distribution on their allowed claims limited to and based upon the cap amounts as set forth above. To the extent that the administrative claims described in the Term Sheet are paid prior to the Closing Date in accordance with a Budget approved by entered orders governing the Debtor's use of cash collateral, such payments shall reduce dollar for dollar the Excluded Cash as described below. If, after paying all administrative claims, including cure claims, that the Seller is obligated to pay, the Seller has any remaining cash, such remaining cash may be used to pay allowed professional fee claims of the Debtor's professionals and the Committee's professionals which exceed the caps set forth in the Term Sheet.

3. If the Committee affirmatively supports, and does not object to or otherwise impede, and no creditor objects or otherwise impedes, approval of the Sale Motion and the closing of the Transaction, then Purchaser will at Closing deposit $185,525 in a trust account (the "Trust") to be established and administered by the Committee (or its designee) for the purpose, at the election of the Committee (to be elected in writing three (3) business days prior to the Closing) of either: (i) funding a pro-rata distribution for the benefit of holders as of the Petition Date of allowed general unsecured claims against the Seller; or (ii) added to the Cash Payment. To the extent that

---

[4]    The Cash Payment is based upon the difference between the projected cash at 8/01/10 and the projected administrative expenses at 8/01/10 per Term Sheet, subject to adjustment in the APA.

Purchaser has an allowed general unsecured claim against Seller, Purchaser will waive the right to participate in any distribution to general unsecured creditors from the Trust or the Estate. Administrative costs incurred to establish and administer the Trust will be borne by the Trust.

**C. Purchased Assets:**  1.  Purchaser shall acquire from Seller, free and clear of all liens, claims, interests and encumbrances, all of the tangible and intangible assets, real property and personal property constituting, used in the conduct of, or related to, the business (the "Business") conducted at the locations described in the Term Sheet (collectively, the "Locations") and that are not Disposed Locations (as defined herein), including the right to designate the assumption by the Seller and the assignment to Purchaser of executory contracts and real property leases related to the Business; provided, however, the foregoing shall not include Excluded Assets (collectively, the "Purchased Assets").  The Purchased Assets shall be set forth on a schedule, which may be amended by Purchaser adding assets any time up to seven (7) days prior to the date scheduled for hearing (or any continued hearing) on the Sale Motion, and by Purchaser deleting assets any time up to the closing.  The APA will also include provision for noticing counterparties to Assumed Contracts (as defined below).  The Term Sheet includes a cure amount of $400,000 which is based upon the estimated cure amounts for the Locations.  If the aggregate amount to pay cure claims for all Locations and executory contracts to be assumed by the Seller and assigned to Purchaser exceeds $400,000, then the Cash Payment shall be increased by such amount that the aggregate cure claims exceed $400,000.  If the aggregate cure claims to be paid with respect to all Locations and executory contracts to be assumed and assigned to Purchaser is less than $400,000, then the Cash Payment shall decrease by the difference between $400,000 and the actual aggregate amount of cure claims.  For purposes hereof, and for the avoidance of doubt, any "stub rent" to be paid in connection with a Location shall not be counted as part of the cure claims to be paid.

2  "Disposed Locations" are those Locations listed in the Term Sheet that are designated by Purchaser (in its sole and absolute discretion) as a Location to be closed, and with respect to such Locations to be closed: (x) the related inventory and furniture, fixture and equipment to be, in the sole and absolute discretion of Purchaser: (i) moved to a Location that is not a Disposed Location at the expense of the Seller; (ii) abandoned to the landlord at the applicable Disposed Location (the "Abandoned Assets"); or (ii) sold with the proceeds to be included in Cash (as defined below) as of the Closing Date; (y) the related executory contracts assumed and assigned, or rejected; and (z) the leases related to the Disposed Locations assumed and assigned, or rejected.

3.  The Purchased Assets shall include all of Seller's personal and fixture property of every kind and nature and all real property of every kind and nature, including, without limitation, the following related to, used in, required for, or connected with the Business: (i) accounts receivable, rights of payment, insurance claims, and all other contract rights or rights to the payment of money; (ii) goods;

- 7 -

(iii) inventory; (iv) furniture, fixtures, and equipment; (v) intellectual property (including, patents, copyrights, trademarks, trade secrets, proprietary information); (v) goodwill; (vi) general intangibles; (vii) instruments, securities, investment property, (viii) executory contracts (including executory agreements and licenses) and leased real property interests (i.e., the Locations) that are assumed by Seller and assigned to Purchaser (the "Assumed Contracts"), which Assumed Contracts shall include the assumption and assignment of the leases associated with the Locations as designated by Purchaser in its sole and absolute discretion; (ix) documents, software, permits, licenses, and all books and records of the Seller in whatever form and wherever located; (x) all claims and causes of action that the Seller has, including claims against vendors who provided goods and services pertaining to the Purchased Assets and against the non-Seller parties under Assumed Contracts, including any and all claims and causes of action arising under, or available pursuant to, the Bankruptcy Code, and including all commercial tort claims; (xi) all Cash as of Closing in excess of the Excluded Cash (the "Excess Cash"); and (xii) Landlord and Utility Deposits.

For purposes hereof: (i) "Cash" means all cash and cash equivalents held by or for the benefit of, on deposit with (but excluding any Landlord or Utility Deposits), or in transit to, the Seller; and (ii) "Landlord or Utility Deposits" means all deposits made by Seller and held by a landlord or a utility company.

**D. Excluded Assets:**    The Purchased Assets shall not include the following assets, or any other assets Purchaser elects (in its sole and absolute discretion) to exclude from the Purchased Assets on or before the Closing Date: (collectively, the "Excluded Assets"): (i) all Cash as of Closing in an amount up to $2,225,058[5] (the "Excluded Cash") with such benchmark amount subject to reduction to the extent that any of the administrative expense amounts set forth in the Term Sheet are paid prior to the Closing Date; provided, however, if the Post-Petition Ordinary Course Liabilities exceed $1,990,000[6] (the positive difference of the Post-Petition Ordinary Course Liabilities minus $1,990,000 being defined as the "Excess Assumed Ordinary Course Liabilities") (with the $1,990,000 benchmark amount subject to reduction if the Seller pays prior to Closing amounts for payroll that is included in the $1,990,000 amount), then: (x) if there is Excess Cash, Purchaser will assume such amount of Excess Assumed Ordinary Course Liabilities to the extent of such Excess Cash; (y) if there is no Excess Cash, or the Excess Assumed Ordinary Course Liabilities exceeds the Excess Cash, then the Purchaser will assume $100,000 of Excess Assumed Ordinary Course Liabilities in excess of the Excess Cash; and (z) if the Excess Assumed Ordinary Course Liabilities are in excess of the sum of: (i) Excess Cash; and (ii) $100,000 (the "Overage Excess Assumed Ordinary Course Liabilities"), then Purchaser shall assume the Overage Excess

---

[5] As set forth in the Term Sheet, the $2,225,058 is based upon estimated amounts as of August 1, 2010 and is subject to adjustment in the APA.

[6] As set forth the Term Sheet, the $1,990,000 amount is based upon estimated amounts as of August 1, 2010 and is subject to adjustment in the APA.

LA 128,953,007v4 6-30-10

Assumed Ordinary Course Liabilities up to an amount equal to the Cash Payment, and the Cash Payment shall be reduced dollar for dollar; (ii) Abandoned Assets; (iii) executory contracts (including executory agreements and licenses) and leased real property interests that are not Assumed Contracts; and (iv) Seller's rights under the Definitive Documentation and Seller's corporate charter, minute and stock record book and corporate seal. The Excluded Assets shall be set forth on a schedule, which may be supplemented by Purchaser any time up to the Closing.

If the Excess Assumed Ordinary Course Liabilities exceed the sum of: (x) the Excess Cash; (y) $100,000; and (z) the Cash Payment, the Seller shall be responsible for the payment of such Excess Assumed Ordinary Course Liabilities and such Excess Assumed Ordinary Course Liabilities shall not be Assumed Liabilities.

**E. Assumed Liabilities:** The liabilities of the Seller to be assumed by Purchaser as of the Closing shall only be the following specified liabilities and no other liabilities whatsoever:

1. The liabilities under the Assumed Contracts that first arise from and after the assignment of the Assumed Contracts (the "Assumed Contract Liabilities"); and

2. The liabilities of the Seller incurred after the Petition Date in the ordinary course of business for: (x) the items specified in the Term Sheet in an amount not to exceed under any circumstances $1,990,000 (with the $1,990,000 benchmark amount subject to reduction if the Seller pays prior to Closing amounts for payroll that is included in the $1,990,000 amount) plus any Excess Assumed Ordinary Course Liabilities assumed at the Closing by the Purchaser in accordance with the provisions hereof (collectively, the "Post-Petition Ordinary Course Liabilities"); and (y) the allowed fees and expenses of KPMG Corporate Finance LLC pursuant to that certain Order On Application Of Debtor and Debtor in Possession For Order Authorizing The Employment And Retention Of KPMG Corporate Finance LLC As Real Estate Advisor Effective As Of March 5, 2010 [Docket No. 188] (as the same may be amended, supplemented, or modified] (the "KPMG Allowed Fees," and along with the Post-Petition Ordinary Course Liabilities and the Assumed Contract Liabilities, collectively, the "Assumed Liabilities").

Except for the Assumed Liabilities, Purchaser shall assume no other liabilities of Seller. Accordingly, except for the Assumed Liabilities, Purchaser will not and does not assume, and in no way will be liable or responsible for, any liability or obligation of Seller related to the pre-petition or post-petition operations of Seller.

3. Specifically, the order of the Bankruptcy Court approving the Transaction shall expressly provide that Purchaser shall have no liability for any claim against, or liability of, the Seller, including, without limitation, any successor liability; provided, however, Purchaser shall be liable for the Assumed Liabilities.

4. The Seller shall be responsible for payment of all sales, use, and

-9 -

transfer taxes related to the Transaction, all other pre-Closing taxes and fees related to the Purchased Assets. Purchaser shall be responsible only for taxes and fees to the extent related to periods following the Closing. Each party shall bear its own income taxes and attorney's fees and expenses.

**F. Representations and Warranties:**

1. The APA shall include representations and warranties by the Seller customary for a transaction similar to the Transaction.

2. The representations and warranties shall not survive the Closing.

**G. Closing Date:**

1. Closing (the "Closing") of the Transaction shall occur within 3 days following the satisfaction, or waiver by Purchaser, of all conditions to closing.

2. The date of Closing (the "Closing Date") of the Transaction shall occur no later than August 9, 2010.

## G.    Executory Contracts and Unexpired Leases

Because of the nature of the Debtor's business as an operator of sixty-eight (68) fast-casual ethnic Greek restaurants, the Debtor leases nonresidential space and maintains certain executory contracts. The Debtor's current sixty-nine (69) leases (the "Unexpired Leases," each an "Unexpired Lease") include leases for those 68 restaurant locations in four different states, and the Debtor's corporate headquarters in San Diego, California. The terms of these 69 Leases vary in both duration and economic terms. Furthermore, the Debtor is a party to certain executory contracts (the "Executory Contracts," each an "Executory Contract") with respect to its business operations, including Executory Contracts related to the Debtor's relationships with its vendors (e.g. U.S. Foodservice, Inc. and PepsiCo, Inc.), merchant services providers, software providers, and intellectual property rights.

Purchaser has identified certain Executory Contracts and Unexpired Leases (collectively, the "Assumed Contracts and Leases") to be assumed by the Debtor and assigned to Purchaser as part of the Sale. A schedule of these Assumed Agreements is attached to the Nerland Decl. as **Exhibit C**. Purchaser reserves the right to modify the schedule of Assumed Contracts and Leases by adding any Executory Contract or Unexpired Lease to the list of Assumed Contracts and Leases up to and including July 27, 2010, or by removing any Executory Contract or Unexpired Lease from the list of Assumed Contracts and Leases up to and including August 3, 2010. If the Purchaser does modify the list of Assumed Contracts and Leases, the Debtor will provide further

notice to the affected counterparty to such Executory Contract or Unexpired Lease of the change in designation.  The Debtor has listed proposed cure amounts (the "Cure Amounts") for the Assumed Contracts, which Cure Amounts are provided in the schedule of these Assumed Contracts attached to the Nerland Decl. as **Exhibit C**.

The APA also includes certain Unexpired Leases ("Assumed and Modified Leases" together with the Assumed Contracts and Leases, the "Assumed Agreements") that Purchaser has designated to be assumed, assigned, and modified by the Debtor.  Each counterparty to an Assumed and Modified Lease is being given separate notice of the proposed modification. A schedule of these Assumed and Modified Leases is attached to the Nerland Decl. as **Exhibit D**. Purchaser reserves the right to modify the list of Assumed and Modified Leases (by adding or removing any unexpired lease to/from the list of Assumed and Modified Leases and, in the case of removing an unexpired lease from the list of Assumed and Modified Leases, adding such unexpired lease to either the list of Assumed Contracts and Leases or the list of Rejected Agreements (as defined below)) up to and including August 3, 2010.  If the Purchaser does modify the list of Assumed and Modified Leases, the Debtor will provide further notice to the affected counterparty to such unexpired lease of the change in designation.

As more fully set forth in the Declaration William Trefethen, Purchaser has proffered evidence of its ability to provide adequate assurance of future performance under the Assumed Agreements.

Finally, Purchaser has designated certain Executory Contracts and Unexpired Leases ("Rejected Agreements") to be rejected by the Debtor (as Seller).  A schedule of these Rejected Agreements is attached to the Nerland Decl. as **Exhibit E**.  Purchaser reserves the right to remove any Executory Contract or Unexpired Lease from the schedule of Rejected Agreements and list such Executory Contract or Unexpired Lease among the Assumed Agreements at any time prior to July 27, 2010, and will have the right to add any Executory Contract or Unexpired Lease to the Rejected Agreements at any time prior to the Sale Hearing, and if Purchaser does so the Debtor will provide notice of such change of designation.

-11-

1
2
3
4
5
6

With respect to the Rejected Agreements currently listed on **Exhibit E** to the Nerland Declaration, the effective date of the rejection shall be July 31, 2010.  For those Executory Contracts or Unexpired Leases or that are subsequently added to the list of Rejected Agreements, the effective date of rejection shall be the earlier of: (i) August 3, 2010; or (ii) in the case of the Unexpired Leases, the date upon which Debtor surrenders possession of the subject leased premises.

7
8

### IV.    THE COURT SHOULD APPROVE THE PROPOSED SALE PURSUANT TO THE APA

9

#### A.    The Court Has Broad Powers To Approve—And Should Approve—The Sale Under The APA

10
11
12
13
14
15
16
17

Section 363(b) of the Bankruptcy Code provides that the Debtor "after notice and hearing, may . . . sell, other than in the ordinary course of business, property of the estate."  11 U.S.C. § 363(b)(1).  The Court of Appeals for the Ninth Circuit has ruled in cases under the Bankruptcy Act that a sale of a debtor's property should be approved if it is in the best interest of the estate and creditors.  See, e.g., In re Huntington Ltd., 654 F.2d 578, 589 (9th Cir. 1991); In re Equity Funding Corp., 492 F.2d 793, 794 (9th Cir. 1974).  Whether such a transaction is in the best interest of the estate is still a significant factor under the Bankruptcy Code.  In re Canyon Partnership, 55 B.R. 520, 526 (Bankr. S.D. Cal. 1985).

18
19
20
21
22
23
24
25
26

Section 105(a) of the Bankruptcy Code provides that "the court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions" of the Bankruptcy Code.  11 U.S.C. § 105(a).  The court may "exercise its equitable power only as a means to fulfill some specific [Bankruptcy] Code provision."  In re Saxman, 325 F.3d 1168, 1174-75 (9th Cir. 2003) (quoting In re Fesco Plastics Corp., 996 F.2d 152, 154 (7th Cir. 1993)).  Because a sale of substantially all assets is permitted under the Bankruptcy Code, section 105(a) of the Bankruptcy Code permits the Court to grant any relief necessary to approve the sale.  Chinichian v. Campolongo (In re Chinichian), 784 F.2d 1440, 1443 (9th Cir. 1986) (the court may "fashion orders as necessary pursuant to the purposes of the Bankruptcy Code").

27
28

In evaluating the propriety of a sale of property of the estate, courts have additionally evaluated whether:

(i) a "sound business purpose" justifies the sale;

(ii) "accurate and reasonable notice" of the sale was provided;

(iii) "the price to be paid is adequate, i.e., fair and reasonable"; and

(iv) "good faith, i.e., the absence of any lucrative deals with insiders, is present."

In re Copy Crafters Quickprinting, Inc., 92 B.R. 973, 983 (Bankr. N.D.N.Y. 1988); In re Industrial Valley Refrig. and Air Cond. Supplies, Inc., 77 B.R. 15, 21 (Bankr. E.D. Pa. 1987); In re WBQ Partnership, 189 B.R. 97, 102 (Bankr. E.D. Va. 1995).

An examination of each of the above four factors reveals that the sale of the Debtor's assets to Purchaser subject to the terms and conditions of the APA should be approved.

### 1. The Proposed Sale To Purchaser Pursuant To The APA Is an Exercise of the Debtor's Sound Business Judgment and Is Supported By the Committee.

The sale of property of the estate outside the ordinary course may be approved outside of the context of a plan of reorganization if a debtor articulates some business justification for the sale. In re Walter, 83 B.R. 14, 19-20 (B.A.P. 9th Cir. 1988) ("For the debtor-in-possession . . . to satisfy its fiduciary duty to the debtor, creditors and equity holders, there must be some articulated business justification for . . . selling . . . property outside the ordinary course of business."); see also In re Ernst Home Ctr., Inc., 209 B.R. 974, 979 (Bankr. W.D. Wash. 1997) (quoting In re Lionel Corp., 722 F.2d 1063, 1070 (2d Cir. 1983)).  The court in In re Lionel Corp. stated that a judge determining a section 363 application must "expressly find . . . a good business reason to grant such an application." 722 F.2d at 1071.

Notably, the application of the business judgment test affords the debtor in possession significant discretion in balancing the costs and benefits of administering or disposing of estate assets according to the needs of the estate. See In re Canyon Partnership, 55 B.R. 520, 524 (Bankr. S.D. Cal. 1985).  Indeed, application of the debtor in possession's sound business judgment in the use, sale or lease of property of the estate is subject to great judicial deference. Matter of WPRV-TV, Inc., 143 B.R. 315, 319 (D.P.R. 1991), affd in part, rev'd in part, 983 F.2d 336 (1st Cir. 1993); In re Thrifty Liquors, Inc., 26 B.R. 26, 28 (Bankr. D. Mass. 1982).

The proposed Sale to Purchaser pursuant to the APA is an exercise of the Debtor's sound

business judgment and is fully supported by the Committee.  The Sale will substantially benefit the Debtor, its Estate, and all creditors because: (a) no valuation of the Estate's assets has even approached the total consideration offered by Purchaser; (b) no other exit proposals acceptable to the Debtor, the Committee, and 1350BA have been proposed or appear to be forthcoming; (c) no other viable purchaser has been identified; and (d) in a liquidation (the only potential alternative to the Sale): (i) the Estate would be unable to pay administrative claims to the extent that Purchaser has agreed to pay or assume, and (ii) unsecured creditors would recover nothing.

### 2.    The Debtor Has Given Accurate And Reasonable Notice Of The Sale

Pursuant to section 363(b)(1), a debtor in possession must give notice of any sale of property of the estate.  Most transactions not in the ordinary course of business are governed by Federal Rule of Bankruptcy Procedure 6004.  Rule 6004(a) refers, in turn, to Rule 2002(a), which requires a twenty one (21) day notice period for any "proposed use, sale, or lease of property of the estate other than in the ordinary course of business, unless the court for cause shown, shortens the time F.R.B.P. 2002(a).  Rule 2002-1(d) of the Local Rules requires twenty-eight days notice of the Sale.  Debtor has served the Notice of this Sale Motion on the United States Trustee, the Committee, all secured creditors, all parties requesting Special Notice, and all other parties in interest in full compliance with the twenty-eight day notice period required by Rule 2002-1(d) of the Local Rules.  Furthermore, 1350BA, as the senior secured lender, and the Committee were active participants in the negotiations culminating in the Term Sheet, the APA, and this Sale Motion.

### 3.    The Purchase Price Offered By Purchaser In The APA Is Fair And Reasonable

All the terms of the APA—including those related to the Purchase Price and the Assumed Liabilities—are the result of a fulsome negotiation between 1350BA (as Purchaser), the Debtor (as Seller and fiduciary of the Estate), and the Committee (as fiduciary for the general unsecured creditors).  Based on analyses conducted by CRG (as the Debtor's Financial Advisor) and Broadway Advisors LLC ("Broadway") (as the Committee's Financial Advisor), the return to administrative claimants and other creditors is greater than any other proposal that has been

-14-

made, and most certainly greater than whatever return would be made under a liquidation scenario.  Further, the assumption and assignment of the Assumed Agreements to the Purchaser will also relieve the Estate of significant rejection claims with which it would be a further burdened in a liquidation scenario.

> **4.    The Sale—As Contemplated Under The APA—Is Proposed In Good Faith**

The "good faith" requirement for sales under section 363 of the Bankruptcy Code focuses principally on whether a debtor's insiders are getting special treatment through the sale transaction. In re Industrial Valley Refrig., 77 B.R. at 21.  Here, the Sale is being conducted under the APA, which is between the Debtor and Purchaser, as approved by the Committee.  The Debtor's insiders are not involved in receiving any benefit—direct or otherwise—from the Sale.  The Debtor, 1350BA, and the Committee engaged in "arm's length" negotiations regarding the Term Sheet and the APA.  Further, the Term Sheet and the APA negotiations are not tainted by improper dealings between these parties, nor has any party presented any evidence to the contrary.

Accordingly, the Sale should be approved, a finding of the Purchaser's good faith made, and the Debtor authorized to consummate the transactions contemplated by the APA.

> **B.    The Sale Under The APA Should Be Approved Under Section 363(f) Free And Clear Of Any Liens, Claims, Encumbrances, And Interests**

The APA requires that the Sale be free and clear of any liens, claims (including successor liability claims), encumbrances and interests of any kind whatsoever. The Debtor may "sell property . . . free and clear of any interest in such property of an entity . . . if such entity consents."  11 U.S.C. §363(f)(2).  Consent may be given by the creditor expressly, or impliedly through a failure to object to the sale. See, e.g., In re Elliot, 94 B.R. 343, 345 (Bankr. E.D. Pa. 1988); In re Metropolitan Mortg. & Securities Co., Inc., No. 04-00757-W11, 2007 Bankr. LEXIS 2679, *11 (Bankr. E.D. Wash. Aug, 6, 2007) ("Those holders of liens who did not object, or who withdrew their objections, to the Motion [to sell] are deemed to have consented pursuant to section 363(f)(2) of the Bankruptcy Code.").  The 363(f) analysis is straightforward here because 1350BA, the senior secured lender—and holder of secured liens in the Estate's assets—has consented to the Sale to Purchaser on the terms set forth in the APA.  Accordingly, the sale under

the APA should be approved under section 363(f) free and clear of any liens, claims (including successor liabilities claims), encumbrances, and interests, of any kind whatsoever.

### C.     The Purchaser's Expense Claim Should Be Approved

The Term Sheet and APA provide for a break-up fee (the "Purchaser's Expense Claim") to the Purchaser upon the occurrence of certain events giving rise to termination of the APA. Purchaser's Expense Claim will have administrative expense priority under Section 364(c)(1), 503(b)(1)(A) and 507(b)(2) of the Bankruptcy Code. Purchaser's Expense Claim will be in the amount of $250,000 if (i) there is an uncured material breach by Seller or the Committee of their respective representations, warranties and covenants under the APA or the Term Sheet, (ii) the APA is terminated by mutual consent of the Seller and Purchaser or (iii) the Sale Motion and the APA are not approved by the Court because the Seller and the Committee elect, in the exercise of their respective fiduciary duties, to support a transaction involving the sale, conveyance, restructuring or disposition of the Purchased Assets to a person other than Purchaser or a liquidation of the Seller's assets. Purchaser's Expense Claim will be in the amount of $100,000 if the transactions contemplated by the APA are not otherwise approved by the Court or are not consummated by the Closing Date, at no fault of Purchaser.

Here, each of the elements recognized by courts in determining whether a break-up fee is appropriate are satisfied because Purchaser's Expense Claim:  (1) is the result of an arm's length negotiation; (2) is designed to encourage, rather than hamper bidding; and (3) is in an amount reasonably relative to its overall benefit to the Estate. See In re Integrated Resources, Inc., 135 B.R. 746, 750 (Bankr. S.D.N.Y. 1992), aff'd, 147 B.R. 650 (S.D.N.Y. 1992), app. dismissed, 3 F.3d 40 (2d. Cir. 1993) (on jurisdictional grounds). Moreover, a break-up fee which was not tainted by self-dealing should generally be upheld by the bankruptcy court. See In re 995 5th Avenue Associates, 96 B.R. 24 (Bankr. S.D.N.Y. 1989).

Absent specific protection in the form of Purchaser's Expense Claim, Purchaser would be at risk not only of losing the opportunity to consummate the APA, but also of: (i) forfeiting all of its time, effort, costs and expenses incurred in investigating, conducting due diligence regarding,

negotiating and documenting the APA; and (ii) potentially being left entirely uncompensated for creating the very vehicle that will have generated value for the estate.  Purchaser specifically negotiated the Purchaser's Expense Claim with the Debtor and the Committee as part of the Term Sheet provisions.

Moreover, the amount of Purchaser's Expense Claim in relation to the total consideration to be provided by Purchaser to the Estate is well within the range of break-up fees regularly approved and found to be reasonable in other cases.  See In re Philip Servs. Corp., Case No. 03-37718 (Bankr. S.D. Tex. June 2003) (2.9% break-up fee of $5 million for a $170 million investment amount is reasonable); In re FSC Corp., Case No. 00-B-04659 (Bankr. N.D. Ill. 2000) (3.4% break-up fee is reasonable); In re Paging Network, Inc., Case No. 00-3098 (GMS) (Bankr. Del. 2000) (7.24% break-up fee is reasonable); In re O'Brien Envt'l. Energy, Inc., 181 F.3d 527, 536 (3d Cir.1999) (noting that lower court found break-up fee of approximately 4% was "within the range of fees approved by some courts" but ultimately denied the break-up fee on other grounds); In re Hupp Indus., Inc., 140 B.R. 191 (Bankr. N.D. Ohio 1992) (finding that a 3.16% break-up fee of $150,000 for a $4.75 million purchase price is reasonable but ultimately denying break-up fee on other grounds).

### D.    The Purchaser Should Be Deemed A "Good Faith" Purchaser With Respect To the Purchased Assets, Including the Assumed Agreements

"[W]hen a bankruptcy court authorizes a sale of assets pursuant to section 363(b)(1), it is required to make a finding with respect to the 'good faith' of the purchaser."  In re Abbots Dairies, Inc., 788 F.2d 143, 149-50 (3rd Cir. 1986).  The purpose of such a finding is to facilitate the operation of Bankruptcy Code Section 363(m), which provides a safe harbor for purchasers of a debtor's property when the purchase is made in "good faith."  Specifically, section 363(m) provides:

> The reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease of property does not affect the validity of the sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal.

-17-

11 U.S.C. § 363(m); <u>see also</u> <u>Ewell v. Diebert (In re Ewell)</u>, 958 F.2d 276, 280 (9th Cir. 1992);
<u>Irvin v. Lincoln Heritage Life Ins. Co. (In re Irvin)</u>, 950 F.2d 1318, 1323 (7th Cir. 1991).

Section 363(m) serves the important purposes of both encouraging good faith transactions and preserving the finality of bankruptcy court orders (with the exception of orders stayed pending appeal).  <u>In re Abbots Dairies, Inc.</u>, 788 F.2d at 147; <u>Hoese Corp. v. Vetter Corp.</u> (<u>In re Vetter Corp.</u>), 724 F.2d 52, 55 (7th Cir. 1983).  As the Court of Appeals for the Seventh Circuit recognized in <u>In re Edwards</u>, 962 F.2d 641, 643 (7th Cir. 1992), "[i]f purchasers at judicially approved sales of property of a bankruptcy estate, and their lenders, cannot rely on the deed that they receive at the sale, it will be difficult to liquidate bankrupt estates at positive prices."  Although the law balances the competing interests between creditors and purchasers of assets of the estate, it weighs such interest "heavily in favor of the bona fide purchaser." <u>Id.</u> at 643.  This is particularly true where, as here, there are substantial business justifications for the proposed transaction.

"Typically, lack of good faith is shown by fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders." <u>In re M Capital Corporation</u>, 290 B.R. 743, 746 (B.A.P. 9th Cir. 2003).  As mentioned above, and as more fully set forth in the Declaration of William Trefethen and the Nerland Decl., the Sale is being conducted under the APA, which is between the Debtor (as Seller) and 1350BA (as Purchaser), as approved by the Committee.  The Debtor's insiders are not taking any part in the Sale. The Debtor, 1350BA, and the Committee engaged in "arm's length" negotiations regarding the Term Sheet and the APA.  Further, the Term Sheet and the APA negotiations are not tainted by improper dealings between these parties, nor has any party presented any evidence to the contrary.

Accordingly, 1350BA—as the Purchaser under the APA—is a "good faith" purchaser entitled to all of the benefits and protections of § 363(m) with respect to its purchase of the Purchased Assets and the assumption and assignment of the Assumed Agreements.

**V.    THE COURT SHOULD APPROVE THE ASSUMPTION AND ASSIGNMENT, ASSUMPTION AND ASSIGNMENT AND MODIFICATION, OR THE REJECTION OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED**

-18-

1  LEASES PURSUANT TO THE APA

2  **A.    The Legal Standard**

3      *1.    Decision to Assume and Assign or Reject*

4      Under section 365(a) of the Bankruptcy Code, a debtor in possession "subject to the

5  court's approval, may assume or reject any . . . unexpired lease of the debtor."  11 U.S.C. §§

6  365(a); see also In re Robert L. Helms Constr. & Dev. Co., Inc., 139 F.3d 702 (9th Cir. 1998) (en

7  banc).  An executory contract or unexpired lease must be assumed before it may be sold.  In re

8  Quintex Entertainment, Inc., 950 F.2d 1492 (9th Cir. 1991) (a sale of the Debtor's assets cannot

9  include executory contracts and unexpired leases unless such agreements are first assumed and

10  become part of the estate).

11      In deciding whether to grant its approval to a debtor's decision to assume or reject, "a

12  bankruptcy court need engage in **only a cursory review** of a [debtor in possession]'s

13  decision . . . Specifically, a bankruptcy **court applies a business judgment rule** to evaluate a

14  [debtor in possession]'s . . . decision[.]"  Agarwal v. Pomona Valley Med. Group, Inc. (In re

15  Pomona Valley Med. Group, Inc.), 476 F.3d 665, 670 (9th Cir. 2007) (emphasis added) (citation

16  omitted); see also NLRB v. Bildisco & Bildisco, 465 U.S. 513, 523 (1984), In re Chi-Feng

17  Huang, 23 B.R. 798, 800 (B.A.P. 9th Cir. 1982).

18      In In re Pomona Valley Med. Group, Inc., the Court of Appeals for the Ninth Circuit

19  further explained that in evaluating the debtor-in-possessions decision to assume or reject, "the

20  bankruptcy court should presume that the debtor-in-possession acted prudently, on an informed

21  basis, in good faith, and in the honest belief that the action taken was in the best interests of the

22  bankruptcy estate."  476 F.3d at 670 (citing Navellier v. Sletten, 262 F.3d 923, 946 n. 12 (9th Cir.

23  2001)); FDIC v. Castetter, 184 F.3d 1040, 1043 (9th Cir. 1999)); see also In re Chi-Feng Huang,

24  23 B.R. at 801 ("The primary issue is whether rejection would benefit the general unsecured

25  creditors.").  Indeed, the In re Pomona Valley Med. Group, Inc. court stressed that a bankruptcy

26  court should approve a debtor-in-possessions decision to assume and assign or reject an executory

27  contract under section 365(a) unless the bankruptcy court determines that the debtor in

28  possession's decision "is so manifestly unreasonable that it could not be based on sound business

judgment, but only on bad faith, or whim or caprice." 476 F.3d at 670 (citing Lubrizol Enter. v. Richmond Metal Finishers, 756 F.2d 1043, 1047 (4th Cir. 1985)).

### 2.    *Cure Amounts and Adequate Assurance*

Despite a chapter 11 debtor in possession's broad latitude to either assume and assign or reject its Executory Contracts and Unexpired Leases, section 365(b) of the Bankruptcy Code provides that,

> If there has been a default in an executory contract or unexpired lease of the debtor, the trustee may not assume such contract or lease unless, at the time of assumption of such contract or lease, the trustee—
>
> (A) cures, or provides adequate assurance that the trustee will promptly cure, such default other than a default that is a breach of a provision relating to the satisfaction of any provision (other than a penalty rate or penalty provision) relating to a default arising from any failure to perform nonmonetary obligations under an unexpired lease of real property, if it is impossible for the trustee to cure such default by performing nonmonetary acts at and after the time of assumption, except that if such default arises from a failure to operate in accordance with a nonresidential real property lease, then such default shall be cured by performance at and after the time of assumption in accordance with such lease, and pecuniary losses resulting from such default shall be compensated in accordance with the provisions of this paragraph;
>
> (B) compensates, or provides adequate assurance that the trustee will promptly compensate, a party other than the debtor to such contract or lease, for any actual pecuniary loss to such party resulting from such default; and
>
> (C) provides adequate assurance of future performance under such contract or lease.

11 U.S.C. § 365(b).[7]

### B.    The Debtor's Decision to Assume and Assign, Assume and Assign and Modify, or Reject Certain Executory Contracts and Unexpired Leases And The Proposed Cure Amounts Should Be Approved By The Court

Based on the reasons discussed above, the Debtor and 1350BA (as Purchaser under the APA) have determined in their business judgment that certain Executory Contracts and Unexpired Leases should be assumed (i.e, the Assumed Contracts and Leases), assumed and

---

[7]   To the extent that any of the Unexpired Leases qualify for treatment under section 365(b)(3), such conditions are satisfied herein.

modified (i.e., the Assumed and Modified Leases), or rejected (i.e. the Rejected Agreements) to preserve the assets of the Estate.  A schedule of these Assumed Contracts is attached to the Nerland Decl. as **Exhibit C**, a schedule of the Assumed and Modified Leases is attached to the Nerland Decl. as **Exhibit D**, and a schedule of the Rejected Agreements is attached to the Nerland Decl. as **Exhibit E**.  The Debtor and 1350BA—with the input from the Committee, CRG, Broadway, and the Debtor's leasing consultant, KPMG Corporate Finance LLC—believes that treating the Debtor's Executory Contracts and Unexpired Leases as either Assumed Agreements or Rejected Agreements will lead to the greatest benefit for the Estate and support the most expansive recover to the Estate's constituencies.

Under section 365(a) of the Bankruptcy Code, and Ninth Circuit precedent, the Debtor is well within its rights to assume and assign, assume and assign and modify, or reject.  In evaluating the Debtor's decision, the Debtor respectfully submits that this Court should presume that the Debtor "acted prudently, on an informed basis, in good faith, and in the honest belief that the action taken was in the best interests of the [E]state."  In re Pomona Valley Med. Group, Inc., 476 F.3d at 670 (citing Navellier v. Sletten, 262 F.3d 923, 946 n. 12 (9th Cir.2001)); FDIC v. Castetter, 184 F.3d 1040, 1043 (9th Cir. 1999)).  No party has provided any evidence that Debtor's decision regarding whether to assume and assign, assume and assign and modify, or reject its Executory Contracts and Unexpired Leases would be "advantageous is so manifestly unreasonable that it could not be based on sound business judgment, but only on bad faith, or whim or caprice," nor is there any such evidence.  In re Pomona Valley Med. Group, Inc., 476 F.3d at 670 (citing Lubrizol Enter. v. Richmond Metal Finishers, 756 F.2d 1043, 1047 (4th Cir. 1985)).

The Debtor has listed Cure Amounts for the Assumed Contracts and Assumed and Modified Leases, which Cure Amounts are further indicated in the schedule of these Assumed Contracts and Assumed and Modified Leases attached to the Nerland Decl. as **Exhibit C** and **Exhibit D**, respectively.  Furthermore, as more fully set forth in the Declaration of William

Trefethen, Purchaser has demonstrated its ability to provide adequate assurance of future performance under the Assumed Agreements.

The Debtor has provided—or will provide—a separate and additional notice to the counterparties to Assumed and Modified Leases.  Accordingly, subject to the consent of such counterparties or their failure to object to the proposed modifications, the Debtor's assumption and assignment of the Assumed and Modified Leases should be approved.

Accordingly, the Court should approve the assumption and assignment, assumption and assignment and modification, or rejection of certain Executory Contracts and Unexpired Leases pursuant to the APA, as an exercise of the Debtor's sound, good faith business judgment.

## VI.    THE TEN-DAY WAITING PERIODS SET FORTH IN BANKRUPTCY RULES 6004(g) AND 6006(d) SHOULD BE WAIVED

Bankruptcy Rule 6004(h) provides, among other things, that an order authorizing the sale of property other than cash collateral is stayed until the expiration of ten days after entry of the Court order, unless the Court orders otherwise.  Bankruptcy Rule 6006(d) provides, among other things, that an order authorizing the assignment of an executory contract or unexpired lease under Section 365(f) of the Bankruptcy Code is stayed until the expiration of ten days after entry of the Court order, unless the Court orders otherwise.

For all of the reasons set forth above, it is important that the Debtor consummate the transactions contemplated by the APA in the most expeditious manner.  The Debtor therefore requests the Court waive the ten-day "stay" periods set forth in Bankruptcy Rule 6004(h) and Bankruptcy Rule 6006(d) to enable the transactions contemplated under the APA to close as expeditiously as possible.

## VII.   CONCLUSION

For the reasons and based upon the arguments and authorities set forth above, Debtor respectfully requests that the Court grant the Motion in its entirety and enter an order substantially in the form of the proposed order attached as **Exhibit B** to the Nerland Decl.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Dated:  July 2, 2010

BROWNSTEIN HYATT FARBER SHRECK, LLP

By  __/s/ Brendan P. Collins_____
     Karol K. Denniston, Esq.
     Brendan P. Collins, Esq.
     Attorneys for Fili Enterprises, Inc., d/b/a
     Daphne's Greek Cafe, a California corporation
     Debtor and Debtor-in-Possession

-23 -

GREENBERG TRAURIG, LLP
Michael H. Goldstein (SBN 115675)
Nathan A. Schultz (SBN 223539)
Adam M. Starr (SBN 222440)
2450 Colorado Avenue, Suite 400 East
Santa Monica, CA 90404
Telephone:  (310) 586-7700
Facsimile:  (310) 586-7800

Attorneys for 1350BA, LLC

## UNITED STATES BANKRUPTCY COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re | CASE NO.:  10-bk-00324-PB |
| FILI ENTERPRISES, INC., d/b/a Daphne's Greek Café, a California Corporation, | Chapter 11 |
| Debtor. | **DECLARATION OF WILLIAM TREFETHEN IN SUPPORT OF DEBTOR'S NOTICE OF MOTION AND MOTION FOR AN ORDER: (1) AUTHORIZING THE SALE OF SUBSTANTIALLY ALL OF DEBTOR'S ASSETS FREE AND CLEAR OF ANY THIRD PARTY LIENS, CLAIMS, ENCUMBRANCES AND INTERESTS PURSUANT TO SECTIONS 105 AND 363 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULES 2002 AND 6004; AND (2) AUTHORIZING IN CONNECTION THEREWITH PURSUANT TO SECTION 365 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULES 2002 AND 6006, PURSUANT TO THAT CERTAIN CREDIT BID ASSET PURCHASE AGREEMENT WITH 1350BA LLC, AND WITH REGARD TO CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES, (A) ASSUMPTION AND ASSIGNMENT, (B) ASSUMPTION, ASSIGNMENT, AND MODIFICATION, AND (C) REJECTION** |
| | **Hearing** |
| | Date:  August 3, 2010<br>Time:  2:00 p.m.<br>Place:  Department 4, Room 328<br>        Jacob Weinberger Courthouse<br>        325 West F Street<br>        San Diego, California 92101 |

1

## DECLARATION OF WILLIAM TREFETHEN

1)    I am over 18 years of age, and I have personal knowledge of each of the facts stated in this Declaration, except for those facts stated on information and belief and, as to those facts, I am informed and believe them to be true.  If called as a witness, I could and would competently testify as set forth below.

2)    I submit this Declaration in support of the *Debtor's Motion for an Order: (1) Authorizing the Sale of Substantially All of the Debtor's Assets Free and Clear of Any Third Party Liens, Claims, Encumbrances and Interests Pursuant to Sections 105 and 363 of the Bankruptcy Code and Bankruptcy Rules 2002 and 6004; and (2) Authorizing in Connection Therewith Pursuant to Section 365 of the Bankruptcy Code and Bankruptcy Rules 2002 and 6006, Pursuant to That Certain Credit Bid Asset Purchase Agreement with 1350BA LLC, and with Regard to Certain Executory Contracts and Unexpired Leases (a) Assumption and Assignment, (b) Assumption , Assignment, and Modification, and (c) Rejection* (the "Motion").

**Background**

3)    I am the Managing Partner of Trefethen Advisors, LLC, which is a privately held advisory  firm focused on providing advisory services related to mergers and acquisitions, corporate finance, restructuring and strategy development and execution to participants in the multi-unit retail industry, broadly defined.  Prior to forming Trefethen Advisors, I was a founder of American Commercial Capital, LLC ("ACC"), a commercial finance and investment banking company focused on providing capital and advisory services to companies in the multi-unit retail industry.  ACC was acquired by Wells Fargo & Company in 2001, and continues to operate as a Wells Fargo business unit (Wells Fargo Restaurant Finance), providing capital to multi-unit retail companies across the United States.  Prior to forming ACC, I was a Managing Director with Koll Investment Management ("Koll"), an investment management concern, where I was responsible for the development, capitalization and management of new capital market initiatives, including Koll Specialty Finance Company LLC, a commercial finance company providing debt capital to multi-unit retail companies, Koll ENSR Environmental Realty Advisors, an investment fund focused on opportunistic investments in environmentally impacted commercial real estate, and Alliance Capital Koll Real Estate Securities, an

LA 128,959,014v2 7-2-10

investment fund focused on investing in publicly traded REITs. Prior to joining Koll, I was a Director in the Financial Advisory Services Practice of PriceWaterhouseCoopers, where I provided a broad range of advisory services related to mergers and acquisitions, corporate finance, business reorganization, real estate and dispute resolution. I was also a member of the financial advisory services group at Arthur Andersen. I received a Bachelor of Science in Accounting from Arizona State University.

4)     Over the past 12 years, I have been an entrepreneur having founded and managed a variety of companies providing capital and strategic advisory services to companies and investors in the multi-unit retail industry (restaurant, convenience retail, grocery, auto care, drug and other sectors). I have broad and extensive experience in the multi-unit retail industry providing advisory services related to a broad range of transactions and strategic initiatives. I have been a financial advisor on transactions involving mergers, acquisitions, divestitures and corporate finance totaling more than $2.5 billion in the multi-unit retail industry. I also have significant experience advising both private and public companies in the multi-unit retail industry in development and execution of strategic initiatives involving: corporate restructuring and reorganization, acquisitions and new store development, capital allocation, post merger integration, purchasing, brand placement and development, franchise development, store optimization and capital structure optimization. Garrison Investment Group LP ("Garrison") is a leading middle market credit, distressed and asset based investor founded in 2007 by Joe Tansey and Steve Stuart. The firm currently has over $1.4 billion in assets under management across private equity format funds, hedge funds and managed accounts. Garrison manages capital for a diverse set of clients including pensions, high net worth individuals, endowments and other institutional investors. Garrison's team consists of 49 employees (30 on the investment team) with experience over many credit cycles. The team has originated and invested in purchases billions of dollars of transactions over the course of the investment professionals' careers. Garrison takes a hands-on approach to its investments and managing relationships with counterparties. The firm services and manages its investments in-house. Garrison invests capital across three subsectors: Financial Assets, Corporate Finance and Real Estate. Within the Corporate Finance portfolio, Garrison's investments fall across various industries including Restaurants, Media, Healthcare, Consumer, Manufacturing and Pharma.

3

5)    Together, Garrison and Trefethen Holdings, LLC[1] are the beneficial owners of 1350BA LLC and will be the beneficial owners of 1350BA LLC's designee, if such a designee takes title to the Purchased Assets (1350BA LLC and its designee, herein collectively, the "Purchaser").

**Due Diligence and Negotiations**

6)    On behalf of 1350BA, I (and other members of my team) have had numerous detailed discussions with representatives of the Debtor and CRG (the Debtor's financing advisor) and Jeff Nerland, the Debtor's Chief Restructuring Officer, as well as representatives of the Official Committee of Unsecured Creditors (the "Committee"). The topics for these discussions have included (i) the Debtor's historical financial performance, (ii) the Debtor's post-petition financial performance, (iii) ongoing negotiations with the Debtor's landlords, (iv) projections for the Debtor's operations under various restructuring scenarios, (v) accrued and unpaid administrative expenses in the Debtor's case incurred to date, (vi) additional administrative expense projected and other costs associated with resolving the Debtor's case; and (vii) transition issues respecting the proposed sale (the "Sale") of the Debtor's assets (the "Purchased Assets") as set forth in the Motion. In connection with these discussions, I have received and reviewed detailed financial information regarding the Debtor's operations and chapter 11 expenses.

7)    On behalf of 1350BA, I (and other members of my team) have been directly involved in the negotiation and preparation of the Credit Bid Transaction Term Sheet, dated June 28, 2010, (the "Term Sheet") and the Stipulation for Final Order Governing Use Of Cash Collateral (the "Cash Collateral Stipulation"). In addition, I (and other members of my team) have been involved directly in the negotiation and preparation of the asset purchase agreement to be executed by the Debtor and 1350BA (or its designee). The negotiations among the Debtor, the Committee and 1350BA regarding the terms and conditions of the Term Sheet and the Cash Collateral Stipulation have been detailed and focused, with several drafts of each documents being exchanged, and a substantial among of give and take among the parties with respect to negotiating the substantive points set forth in the documents. I anticipate the completion of the APA will follow a similar process.

---

[1]    I personally am the beneficial owner of this entity.

4

8)     Except: (i) that 1350BA LLC has secured claims against the Debtor, and a pledge of the stock of the Debtor; (ii) 1350BA LLC's rights under the Term Sheet and the Cash Collateral Stipulation; and (iii) 1350BA LLC is a party in interest in the Debtor's chapter 11 case, to my knowledge none of the Purchaser, Garrison or Trefethen Advisors has: (x) any claim against or interest in the Debtor, is an officer, director, employee or equity holder of the Debtor; or (y) any agreement with George Katakalidis with respect to the Debtor, its assets, business or operations or the Sale.

**Purchaser**

9)     Purchaser's pro-forma balance sheet upon the closing of the Sale is set forth in **Exhibit A.** As indicated in **Exhibit A**, at closing of the Sale, Purchaser will have cash of approximately $500,000, long term debt equal to $4.0 million (a term of 5 years, interest-only and an interest rate of Libor plus 500 basis points) and approximately $2 million of ordinary course liabilities and ongoing obligations under the assumed leases and contracts, and will have an opening balance sheet equity of approximately $2 million.  In addition, it is presently anticipated that the Purchaser will have a liquidity facility.

10)     In addition to drawing upon the experience of the professionals of Garrison and Trefethen, Purchaser will be managed by an experienced senior management team which is described in detail on **Exhibit B** annexed hereto.

11)     Purchaser's operations will benefit from the positive operating cash flow that the Debtor historically generated, and will build upon that base of a number of operating changes, including, without limitation: (i) closing approximately 17 non-profitable or non-strategic locations resulting in a core network of approximately 58 locations; (ii) revised leases for a number of the ongoing restaurant locations reducing the Purchaser's rent expense from historical levels to current market levels; (iii) a reduced administrative overhead; (iv) revised supply contracts reducing the Purchaser's operating costs as compared to the Debtor's operating costs; and (vii) a new business and marketing plan focused on enhancing Daphne's brand offering, changes to the menu to focus on value, coordinating local advertising and improving customer satisfaction.

LA 128,959,014v2 7-2-10

**The Debtor's Current Operations**

12)   Based the due diligence of the Debtor and my review of the relevant financial information, it is my understanding that accrued and unpaid administrative expenses of the Debtor's estate currently significantly exceed the Debtor's cash on hand. I understand that fees and expenses incurred for the professionals employed at the expense of the Debtor's estate alone total approximately $1,300,000 through May 2010. In addition to accrued and unpaid professional fees and expenses, I understand that other unpaid accrued and/or asserted administrative claims against the Debtor's estate include: (i) accrued and unpaid ordinary course operating expenses of nearly $2,000,000; (ii) unpaid stub rent claims in excess of $250,000; (iii) unpaid asserted (though not yet allowed) administrative expenses under section 503(b)(9) of the Bankruptcy Code in excess of $500,000; and (iv) unpaid post-petition property taxes in excess of $100,000. When all of these claims and expenses are combined, the total administrative claim liabilities of more than $4,150,000 significantly exceeds the Debtor's cash on hand in the amount of approximately $2,558,844 as of the week ending June 20, 2010. I believe that upon the expeditious emergence from this chapter 11 case, if the Debtor's operations were stabilized and effectively managed, they potentially could generate $2,500,000 of earnings before interest, taxes, depreciation and amortization ("EBITDA"). Even based upon this potential EBITDA for the Debtor's restructured operations, I believe that the going concern value of the Debtor's assets as repositioned is substantially less than the amount of 1350BA's secured claim which is not less than $13,829,683.96.

13)   The proposed Sale is in the best interest of the Debtor's estate in that it, among other things: (i) provides for the satisfaction of 1350BA's secured claim on terms that 1350BA consents to; (ii) provides a mechanism for the payment of budgeted allowed administrative claims (with professional fees being subject to a cap); (iii) provides a mechanism for the continued operation of a majority of the Debtor's restaurants, with the accompanying assumption and assignment of related leases (including in some instances, assumption and assignment with proposed modifications to the leases) and contracts and with a cure of outstanding defaults, (iv) enables the continued employment of employees at the locations; and (v) generates a return to unsecured creditors.

LA 128,959,014v2 7-2-10

14)     Given the Debtor's continued accrual of administrative expenses, which it cannot fund from operating cash flow, in the absence of the Sale, the Debtor's ability to operate in the ordinary course of business would be impaired, consequently impairing the value of 1350BA's collateral. Moreover, the Debtor's estate would not be able to pay administrative claims in full, and there would be no recovery for unsecured creditors.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed this 2nd day of July, 2010 at San Clemente, California

William Trefethen

LA 128,959,014v2 7-2-10

# EXHIBIT A

*FF0000Preliminary Draft Subject to Change*

Purchaser (d/b/a Daphne's Greek Café)
Estimated Pro-Forma Balance Sheet at Closing (08/06/10)

| | 08/06/10 (E) | Notes |
|---|---|---|
| **Assets** | | |
| Cash | $500,000 | |
| Other Assets | 7,500,000 | Allocated among A/R, inventory, other assets and PP&E |
| **Total Assets** | **$8,000,000** | |
| | | |
| **Liabilities & Shareholders' Equity** | | |
| Current Liabilities | $1,990,000 | |
| Debt[1] | 4,000,000 | Final loan terms t/b/d |
| Total Liabilities | $5,990,000 | |
| | | |
| Equity | 2,010,000 | |
| **Total Liabilities & Shareholders' Equity** | **$8,000,000** | |

Notes

[1] In addition to funded debt of $4,000,000, it's anticipated that Purchaser will have access to additional capital, if needed, under an undrawn liquidity facility.

# EXHIBIT B

## Exhibit B

### Management Team

The management of the purchaser will consist of a management team of seasoned industry professionals experienced in operations, marketing, real estate, management, finance and IT. The Purchaser's management team consist of:

**William Trefethen, CEO.** Mr. Trefethen is an experienced entrepreneur and manager with functional expertise in mergers and acquisitions, restructuring, post transaction integration, finance and strategy development. Mr. Trefethen is the Managing Partner of Trefethen Advisors, LLC, which is a privately held advisory firm focused on providing advisory services related to mergers and acquisitions, corporate finance, restructuring and strategy to participants in the multi-unit retail industry, broadly defined. Prior to forming Trefethen Advisors, he was the founder of American Commercial Capital, LLC ("ACC"), a commercial finance and investment banking company focused on providing capital and advisory services to companies in the multi-unit retail industry. ACC was acquired by Wells Fargo & Company in 2001, and continues to operate as a Wells Fargo business unit (Wells Fargo Restaurant Finance), providing capital to multi-unit retail companies across the United States. Prior to forming ACC, he was a Managing Director with Koll Investment Management ("Koll"), an investment management concern, where he was responsible for the development, capitalization and management of new capital market initiatives, including Koll Specialty Finance Company LLC, a commercial finance company providing debt capital to multi-unit retail companies, Koll ENSR Environmental Realty Advisors, an investment fund focused on opportunistic investments in environmentally impacted commercial real estate, and Alliance Capital Koll Real Estate Securities, an investment fund focused on investing in publicly traded REITs. Prior to joining Koll, he was a Director in the Financial Advisory Services Practice of PriceWaterhouseCoopers, where he provided a broad range of advisory services related to mergers and acquisitions, corporate finance, business reorganization, real estate and dispute resolution. He was also a member of the financial advisory services group at Arthur Andersen. He received a Bachelor of Science in Accounting from Arizona State University.

**Shannon Bane, CFO.** Mr. Bane is experienced in finance, acquisitions, merger integration and operations. Mr. Bane is a Senior Vice President at Trefethen Advisors, LLC where he focuses providing advisory services related to mergers and acquisitions, corporate finance, post transaction integration and operations to participants in the multi-unit retail industry. Prior to Trefethen, Mr. Bane was an executive in the homebuilding industry with Lennar Corporation where he managed acquisitions and joint ventures. Prior to Lennar Corporation, Mr. Bane was the CFO of the largest Carl's Jr. franchisee with 67 locations plus 14 Papa John's locations with over 2,000 employees and combined annual revenue exceeding over $110 million in sales. Mr. Bane facilitated the acquisition and integration of the Carl's Jr. locations and created the corporate infrastructure to support all operational functions. Mr. Bane's responsibilities included accounting, finance, vendor negotiations, and new store development, business planning and operational management. Prior to his CFO position, Mr. Bane was a Vice President with Wells Fargo Commercial Capital (formerly known as American Commercial Capital) in the Franchise Lending Group. Mr. Bane was responsible for all aspects of transactions, including structuring, underwriting and

negotiating deals. Mr. Bane began his career as a Credit Analyst with Bank of America in their US Corporate Group.

The balance of the management team will consist of the existing management group of the Debtor which will include:

**Greg Hernandez, VP of Operations.**  With over twenty years of industry experience, Mr. Hernandez joined the company's chain of restaurants from the family of Hamlet restaurants (formerly known as Hamburger Hamlet), where he was the Executive Vice President of Operations and managed the chain's operations, oversaw guest relations and strategic market initiatives.
Prior to his experience with Hamlet, Mr. Hernandez served for thirteen years as Vice President of Operations at Ruby's Diner, where he led growth initiatives to take the company from eight restaurants in California to thirty nine locations throughout California, Washington, Colorado, Pennsylvania and Hawaii. Prior to joining Ruby's Diner, Hernandez served as the Director of Marketing for Restaurant Enterprises Group and Marriott, and was the Director of Food and Beverage for the Grace Restaurant company operators of Charlie Brown's, Coco's, Carrow's and El Torito's. As the company's Vice President of Operations, Mr. Hernandez is intimately involved with the company's production and business strategy and is also responsible for supervision and management of all of the company's day-to-day business operations.

**Anne C. Geiling, VP of Marketing.** Ms.Geiling has over 16 years experience in multi-unit marketing with an expertise in the restaurant industry. Her prior industry experience includes her contributions to Chart House Restaurants, Rubio's Fresh Mexican Grill, Hyatt Hotels & Resorts and various other restaurant entities. Herareas of responsibilities and expertise include, but are not limited to, strategic marketing planning and execution, media and promotional planning, development of local store marketing programs and brand and creative strategy and development. Ms. Geiling received a Bachelor of Science in Hospitality Management from The Ohio State University.

**Ricardo Camberos, VP of Accounting.**  Ricardo has over 20 years of accounting experience with Daphne's and F Street Corporation.

**Tara Bland, IT Manager.**  Tara has over 20 years in restaurant industry experience in accounting and IT.

**Thuy Howe,** Human Resources.

1

2

**DECLARATION OF JEFF NERLAND**

3

4

I, JEFF NERLAND, declare and state as follows:

5

1.     I am the duly appointed Chief Restructuring Officer ("CRO") of Fili Enterprises,

6

Inc., d/b/a Daphne's Greek Café, debtor and debtor in possession (the "Debtor"). The matters set

7

forth herein are made of my own personal knowledge and, if called and sworn as a witness, I

8

could and would testify competently thereto.

9

2.     I make this declaration in support of the Debtor's Motion For An Order:

10

(1) Authorizing the Sale of Substantially All of Debtor's Assets Free and Clear of Any Liens,

11

Claims, Encumbrances and Interests Pursuant to Sections 105 and 363 of Title 11 of the United

12

States Code, 11 U.S.C. §§ 101-1532 ("Bankruptcy Code") and Federal Rules of Bankruptcy

13

Procedure ("Bankruptcy Rules") 2002 and 6004; and (2) Authorizing in Connection Therewith

14

Pursuant to Section 365 of the Bankruptcy Code and Bankruptcy Rules 2002 and 6006, Pursuant

15

to That Certain Asset Purchase Agreement with 1350BA, LLC, and with Regard to Certain

16

Executory Contracts and Unexpired Leases, (A) Assumption and Assignment, (B) Assumption,

17

Assignment, and Modification, and (C) Rejection (the "Sale Motion").

18

3.     The Debtor has determined that a sale (the "Sale") of substantially all of its assets

19

to its secured lender 1350BA LLC or its designee ("1350BA" or "Purchaser") pursuant to that

20

certain asset purchase agreement to be executed by the Debtor and the Purchaser (the "APA"),

21

which APA will be filed on or about July 9, 2010, and which APA will follow the terms and

22

conditions of that certain Credit Bid Transaction Term Sheet dated June 28, 2010 by and among

23

the Debtor (as Seller), 1350BA (as Purchaser), and the Committee (the "Term Sheet")—and in

24

accordance with section 363 of the Bankruptcy Code—will maximize the benefit to the Debtor's

25

estate (the "Estate") and the Estate's various constituencies.  A true and correct copy of the Term

26

Sheet is attached hereto  The Official Committee of Unsecured Creditors ("Committee") supports

27

the Sale.

28

4.     More particularly, the Debtor respectfully requests the Court to enter an Order:

- Finding that the notice and opportunity for hearing given in connection with this Motion were adequate and proper under the Bankruptcy Rules and the Local Rules for the United States Bankruptcy Court for the Southern District of California;

- Finding that this Motion is a "core proceeding" within the meaning of 28 U.S.C. § 157(b)(2)(A), (M), (N) and (O) and that any order granting this Motion will be final within the meaning of 28 U.S.C. § 158(a)(1);

- Approving the APA and the transactions contemplated therein pursuant to Sections 105(a), 363 and 365 of the Bankruptcy Code;

- Authorizing the sale of the Purchased Assets free and clear of all liens, claims (including successor liability claims), and other interests in the Purchased Assets, pursuant to Bankruptcy Code section 363(f);

- Authorizing the (i) assumption and assignment and (ii) assumption and assignment and modifications of the Assumed Agreements (defined below) pursuant to Bankruptcy Code section 365(f) and rejection of the Rejected Agreements (defined below);

- Authorizing parties to take all actions necessary or advisable to consummate other transactions provided for in the APA;

- Finding and determining that all applicable statutory and legal requirements attending the transactions contemplated by the APA and herein have been met, including, without limitation, a determination that 1350BA is a "good faith" purchaser within the meaning of Bankruptcy Code section 363(m);

- Containing such other findings and authorizations as required under the APA;

- Waiving the fourteen-day waiting periods set forth in bankruptcy rules 6004(h) and 6006(d); and

- Granting such other and further relief as may be just and proper

## A.    The Debtor's Bankruptcy Filing

5.    On January 11, 2010 (the "Petition Date"), the Debtor, commenced this case by filing a petition for relief under chapter 11 of the Bankruptcy Code.  No trustee or examiner has yet been appointed in this case, and the Debtor continues to manage its assets and conduct its business operations as a debtor in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.  The Office of the United States Trustee has appointed an Official Committee of Unsecured Creditors (the "Committee").

## B.    The Fili Business

6.    Prior to the Petition Date, the Debtor was doing business under the trade names

of Daphne's Greek Express and Daphne's Greek Café ("Daphne's").  In 1988, George Katakalidis founded Daphne's to produce quality Greek food in a fast casual environment and at an affordable price.  From the Debtor's inception through the appointment of Mr. Nerland as Chief Restructuring Officer, Mr. Katakalidis was the Chief Executive Officer of Daphne's.  Daphne's began as one small unit in the Sorrento Valley area of San Diego County.

7.      Currently, the Debtor designs, develops, builds, owns, and operates restaurant facilities, in California, Arizona, Washington, and Colorado.  Daphne's is the largest national chain of Greek restaurants in the country.  The Debtor, headquartered in San Diego, California, employs 1,034 people.  As of the Petition Date, the Debtor was operating out of sixty eight (68) leased locations with the largest concentration of restaurants in Southern California.  Additional information about the Debtor and its history can be found at www.daphnesgreekcafe.com.

**C.      Secured Debt—1350BA LLC**

8.      On or about February 1, 2005, the Debtor and Fleet National Bank, predecessor in interest to Bank of America ("BofA"), entered into a Credit Agreement (as amended from time to time, and together with all ancillary documents, the "Prepetition Senior Secured Credit Agreement") pursuant to which the lender agreed to make certain loans and letter of credit extensions to the Debtor (the "Loan").  The Loan provided the Debtor with funds to build and operate multiple restaurants throughout the western United States.  The Loan is secured by a lien and security interest on substantially all of the Debtor's assets in favor of BofA.  As will be discussed in detail below, prior to the Debtor's default, the Debtor had a credit facility of $16,500,000 of which $3,500,000 was available.  As of the Petition Date, the outstanding balance under the Loan was $13,829,683.96.

9.      Effective April 7, 2010, BofA sold, assigned, and transferred to GBE LLC ("GBE") all right, title and interest in and to: (1) that certain Prepetition Senior Secured Credit Agreement; (2) that certain Second Amended and Restated Revolving Note, dated as January 31, 2007 by and between Debtor and BofA (as successor in interest to Fleet National Bank) (the "Note"); (3) the Loan Documents as defined in the Prepetition Senior Secured Credit Agreement;

1   and (4) all other documents and agreements related to the Prepetition Senior Secured Credit

2   Agreement; provided, however, Bank of America did not assign to GBE the L/C Obligations (as

3   defined in the Prepetition Senior Secured Credit Agreement) and the documents and agreements

4   that specifically relate to the L/C Obligations (collectively, the "Assigned Assets").  GBE, in

5   turn, assigned the Assigned Assets to 1350BA.

6   **D.      Appointment of Jeff Nerland as Chief Restructuring Officer**

7         10.      On June 23, 2010, the Debtor, 1350BA, the Committee, and Mr. Katakalidis

8   stipulated to the resignation of Mr. Katakalidis as the President, Chief Executive Officer and

9   Chairman of the Board for the Debtor and the appointment of Jeff Nerland as the Chief

10  Restructuring Officer ("CRO") for the Debtor.  Accordingly, the Debtor filed on that same day

11  the Motion Of Debtor For Order Approving Stipulation Re: (I) Appointment of Jeff Nerland as

12  the Debtor's Chief Restructuring Officer; and (II) Resignation of George Katakalidis (the

13  "Emergency Motion")[9].  On June 30, 2010 the Court entered an order granting the Emergency

14  Motion, thereby vesting Mr. Nerland with the power to make decisions in the best interest—an

15  on behalf—of the Estate.

16  **E.      Decision to Sell Substantially All of the Debtor's Assets**

17        11.      As part of its fulsome and comprehensive postpetition restructuring efforts, the

18  Debtor has examined—and is now focused on—a sale of the Company to 1350BA in accordance

19  with the APA.  Although the Debtor has worked hard to stabilize its operations, the Debtor has

20  determined—after deep analysis and constructive negotiations with the Committee and

21  1350BA—that a section 363 sale of substantially all of its assets in accordance with the APA will

22  maximize the return obtained for the Estate, avoid damage to the ongoing business operations of

23  the Debtor, and best provide for recovery by all interested constituencies.

24  **F.      Executory Contracts and Unexpired Leases**

25        12.      Because of the nature of the Debtor's business as an operator of sixty-eight (68)

26  fast-casual ethnic Greek restaurants, the Debtor leases nonresidential space and maintains certain

27

28

[9] See Docket No. 269.

executory contracts.  The Debtor's current sixty-nine (69) leases (the "Unexpired Leases," each an "Unexpired Lease") include leases for those 68 restaurant locations in four different states, and the Debtor's corporate headquarters in San Diego, California.  The terms of these 69 Leases vary in both duration and economic terms.  Furthermore, the Debtor is a party to certain executory contracts (the "Executory Contracts," each an "Executory Contract") with respect to its business operations, including Executory Contracts related to the Debtor's relationships with its vendors (e.g. U.S. Foodservice, Inc. and PepsiCo, Inc.), merchant services providers, software providers, and intellectual property rights.

Purchaser has identified certain Executory Contracts and Unexpired Leases (collectively, the "Assumed Contracts and Leases") to be assumed by the Debtor and assigned to Purchaser as part of the Sale.  A schedule of these Assumed Agreements is attached hereto as **Exhibit C**.  Purchaser reserves the right to modify the schedule of Assumed Contracts and Leases by adding any Executory Contract or Unexpired Lease to the list of Assumed Contracts and Leases up to and including July 27, 2010, or by removing any Executory Contract or Unexpired Lease from the list of Assumed Contracts and Leases up to and including August 3, 2010.  If the Purchaser does modify the list of Assumed Contracts and Leases, the Debtor will provide further notice to the affected counterparty to such Executory Contract or Unexpired Lease of the change in designation.  The Debtor has listed proposed cure amounts (the "Cure Amounts") for the Assumed Contracts, which Cure Amounts are provided in the schedule of these Assumed Contracts attached to hereto as **Exhibit C**.

The APA also includes certain Unexpired Leases ("Assumed and Modified Leases" together with the Assumed Contracts and Leases, the "Assumed Agreements") that Purchaser has designated to be assumed, assigned, and modified by the Debtor.  Each counterparty to an Assumed and Modified Lease is being given separate notice of the proposed modification. A schedule of these Assumed and Modified Leases is attached hereto as **Exhibit D**.  Purchaser reserves the right to modify the list of Assumed and Modified Leases (by adding or removing any unexpired lease to/from the list of Assumed and Modified Leases and, in the case of removing an

unexpired lease from the list of Assumed and Modified Leases, adding such unexpired lease to either the list of Assumed Contracts and Leases or the list of Rejected Agreements (as defined below)) up to and including August 3, 2010.  If the Purchaser does modify the list of Assumed and Modified Leases, the Debtor will provide further notice to the affected counterparty to such unexpired lease of the change in designation.

As more fully set forth in the Declaration William Trefethen, Purchaser has proffered evidence of its ability to provide adequate assurance of future performance under the Assumed Agreements.

Finally, Purchaser has designated certain Executory Contracts and Unexpired Leases ("Rejected Agreements") to be rejected by the Debtor (as Seller).  A schedule of these Rejected Agreements is attached hereto as **Exhibit E**.  Purchaser reserves the right to remove any Executory Contract or Unexpired Lease from the schedule of Rejected Agreements and list such Executory Contract or Unexpired Lease among the Assumed Agreements at any time prior to July 27, 2010, and will have the right to add any Executory Contract or Unexpired Lease to the Rejected Agreements at any time prior to the Sale Hearing, and if Purchaser does so the Debtor will provide notice of such change of designation.

With respect to the Rejected Agreements currently listed on **Exhibit E** hereto, the effective date of the rejection shall be July 31, 2010.  For those Executory Contracts or Unexpired Leases or that are subsequently added to the list of Rejected Agreements, the effective date of rejection shall be the earlier of: (i) August 3, 2010; or (ii) in the case of the Unexpired Leases, the date upon which Debtor surrenders possession of the subject leased premises.

**F.      The Sale and the Decision to Assume and Assign, or Reject Contracts and Leases**

13.      The proposed Sale to Purchaser pursuant to the APA is an exercise of the Debtor's sound business judgment and is fully supported by the Committee.  The Sale will substantially benefit the Debtor, its Estate, and all creditors because: (a) no valuation of the Estate's assets has even approached the total consideration offered by Purchaser; (b) no other exit proposals acceptable to the Debtor, the Committee, and 1350BA have been proposed or appear to be

forthcoming; (c) no other viable purchaser has been identified; and (d) in a liquidation (the only potential alternative to the Sale): (i) the Estate would be unable to pay administrative claims to the extent that Purchaser has agreed to pay or assume, and (ii) unsecured creditors would recover nothing.

14.    Debtor has served the Notice of this Sale Motion on the United States Trustee, the Committee, all secured creditors, all parties requesting Special Notice, and all other parties in interest in full compliance with the twenty-eight day notice period required by Rule 2002-1(d) of the Local Rules.  Furthermore, 1350BA, as the senior secured lender, and the Committee were active participants in the negotiations culminating in the Term Sheet, the APA, and this Sale Motion

15.    All the terms of the APA—including those related to the Purchase Price and the Assumed Liabilities—are the result of a fulsome negotiation between 1350BA (as Purchaser), the Debtor (as Seller and fiduciary of the Estate), and the Committee (as fiduciary for the general unsecured creditors).  Based on analyses conducted by CRG (as the Debtor's Financial Advisor) and Broadway Advisors LLC ("Broadway") (as the Committee's Financial Advisor), the return to administrative claimants and other creditors is greater than any other proposal that has been made, and most certainly greater than whatever return would be made under a liquidation scenario.  Further, the assumption and assignment of the Assumed Agreements to the Purchaser will also relieve the Estate of significant rejection claims with which it would be a further burdened in a liquidation scenario.

16.    The Debtor's insiders are not involved in receiving any benefit—direct or otherwise—from the Sale.  The Debtor, 1350BA, and the Committee engaged in "arm's length" negotiations regarding the Term Sheet and the APA.  Further, the Term Sheet and the APA negotiations are not tainted by improper dealings between these parties, nor has any party presented any evidence to the contrary.

17.    Based on the reasons discussed above, the Debtor and 1350BA (as Purchaser under the APA) have determined in their business judgment that certain Executory Contracts and

Unexpired Leases should be assumed (i.e, the Assumed Contracts and Leases), assumed and modified (i.e., the Assumed and Modified Leases), or rejected (i.e. the Rejected Agreements) to preserve the assets of the Estate.  A schedule of these Assumed Contracts is attached hereto as **Exhibit C**, a schedule of the Assumed and Modified Leases is attached hereto as **Exhibit D**, and a schedule of the Rejected Agreements is attached hereto as **Exhibit E**.  The Debtor and 1350BA—with the input from the Committee, CRG, Broadway, and the Debtor's leasing consultant, KPMG Corporate Finance LLC—believes that treating the Debtor's Executory Contracts and Unexpired Leases as either Assumed Agreements or Rejected Agreements will lead to the greatest benefit for the Estate and support the most expansive recover to the Estate's constituencies.

18.    The Debtor has listed Cure Amounts for the Assumed Contracts and Assumed and Modified Leases, which Cure Amounts are further indicated in the schedule of these Assumed Contracts and Assumed and Modified Leases attached hereto as **Exhibit C** and **Exhibit D**, respectively.  Furthermore, as more fully set forth in the Declaration of William Trefethen, Purchaser has demonstrated its ability to provide adequate assurance of future performance under the Assumed Agreements.\

19.    The Debtor has provided—or will provide—a separate and additional notice to the counterparties to Assumed and Modified Leases.  Accordingly, subject to the consent of such counterparties or their failure to object to the proposed modifications, the Debtor's assumption and assignment of the Assumed and Modified Leases should be approved.

20.    It is important that the Debtor consummate the transactions contemplated by the APA in the most expeditious manner.  The Debtor therefore requests the Court waive the ten-day "stay" periods set forth in Bankruptcy Rule 6004(h) and Bankruptcy Rule 6006(d) to enable the transactions contemplated under the APA to close as expeditiously as possible.

21.    The Debtor respectfully requests that the Court grant the Sale Motion in its entirety and enter an order substantially in the form of the proposed order attached as **Exhibit B**.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

EXECUTED at San Diego, California this 1st day of July, 2010.

JEFF NERLAND