1  KAROL K. DENNISTON (Bar No. CA 141667)
   kdenniston@bhfs.com
2  BRENDAN P. COLLINS (Bar No. CA 260260)
   bpcollins@bhfs.com
3  BROWNSTEIN HYATT FARBER SHRECK, LLP
   2029 Century Park East
4  Suite 2100
   Los Angeles, California 90067-3007
5  Telephone:  (310) 500-4600
   Facsimile:  (310) 500-4602
6
7  *Proposed* Attorneys for Fili Enterprises, Inc.,
   d/b/a Daphne's Greek Café, a California corporation,
8  Debtor and Debtor in Possession

ENTERED AUG - 4 2010

FILED

AUG - 3 2010

CLERK, U.S. BANKRUPTCY COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY _____ DEPUTY

9              UNITED STATES BANKRUPTCY COURT

10             SOUTHERN DISTRICT OF CALIFORNIA

11 | In re:                          | Case No.  10-BK-00324-PB11
12 |                                 |
   | FILI ENTERPRISES, INC., d/b/a   | Chapter 11
13 | Daphne's Greek Café, a California |
   | corporation,                    | **[PROPOSED] ORDER APPROVING SALE**
14 |                                 | **MOTION AND ASSET PURCHASE**
   |            Debtor.              | **AGREEMENT**
15 |                                 |
   |                                 | Date:     August 3, 2010
16 |                                 | Time:     2:00 pm
   |                                 | Place:    Jacob Weinberger Courthouse
17 |                                 |           Dept. 4; Room 328
   |                                 |           325 West F Street
18 |                                 |           San Diego, California 92101-6991
   |                                 | Judge:    The Hon. Peter W. Bowie
19

20

21

22

23

24

25

26

27

28

-1-

Case No. 10-bk-00324-PB11
ORDER APPROVING SALE MOTION AND ASSET PURCHASE AGREEMENT

LA 128,953,753v6 8-2-10

A hearing on the *Motion For an Order: (1) Authorizing the Sale of Substantially All of Debtor's Assets Free and Clear of Any Liens, Claims, Encumbrances and Interests Pursuant to Sections 105 and 363 of Title 11 of the United States Code, 11 U.S.C. §§ 101-1532* (the "Bankruptcy Code") *and Federal Rules of Bankruptcy Procedure* ("Bankruptcy Rules") *2002 and 6004; and (2) Authorizing in Connection Therewith Pursuant to Section 365 of the Bankruptcy Code and Bankruptcy Rules 2002 and 6006, Pursuant to That Certain Asset Purchase Agreement with 1350BA, LLC or its Designee* ("1350BA")*, and with Regard to Certain Executory Contracts and Unexpired Leases, (A) Assumption and Assignment, (B) Assumption, Assignment, and Modification, and (C) Rejection* [Docket No. 288] (the "Sale Motion") filed by Fili Enterprises, Inc. (d/b/a Daphne's Greek Café) the debtor and debtor in possession in the above-captioned chapter 11 case (the "Debtor"), was held before this Court on August 3, 2010 at 2:00 p.m. (the "Sale Hearing"); appearances were as noted in the record.

Having considered the arguments of counsel and the facts set forth in the pleadings of record in these cases and the evidence admitted, and finding that appropriate and sufficient notice of the hearing on the Sale Motion was given under the circumstances, and good cause appearing therefor;

THE COURT FINDS THAT:[1]

A.      On January 11, 2010 (the "Petition Date"), the Debtor, commenced this case by filing a petition for relief under chapter 11 of the Bankruptcy Code. No trustee or examiner has yet been appointed in this case, and the Debtor continues to manage its assets and conduct its business operations as a debtor in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code. The Office of the United States Trustee has appointed an Official Committee of Unsecured Creditors (the "Committee").

B.      Prior to the Petition Date, the Debtor was doing business under the trade names of Daphne's Greek Express and Daphne's Greek Café ("Daphne's"). In 1988, George Katakalidis founded Daphne's to produce quality Greek food in a fast casual environment and at an

---

[1] In accordance with Federal Rule of Bankruptcy Procedure 7052, all findings of fact shall be construed as conclusions of law, and all conclusions of law shall be construed as findings of fact, when appropriate.

-2-

1   affordable price.  From the Debtor's inception through the appointment of Mr. Nerland as Chief

2   Restructuring Officer, Mr. Katakalidis was the Chief Executive Officer of Daphne's.  Daphne's

3   began as one small unit in the Sorrento Valley area of San Diego County.

4          C.      The Debtor designs, develops, builds, owns, and operates restaurant facilities, in

5   California, Arizona, Washington, and Colorado.  Daphne's is the largest national chain of Greek

6   restaurants in the country.  The Debtor, headquartered in San Diego, California, employs 1,034

7   people.  As of the Petition Date, the Debtor was operating out of sixty eight (68) leased locations

8   with the largest concentration of restaurants in Southern California.

9          D.      Pursuant to 28 U.S.C. sections 157(b)(1) and 1334(b), this court has jurisdiction to

10  hear the Sale Motion and to grant the relief requested therein and grant by this Order.

11         E.      Pursuant to the *FINAL Order (A) Authorizing Use Of Cash Collateral, (B)*

12  *Granting Adequate Protection For Use Of Prepetition Collateral, And (C) Granting Related*

13  *Relief* [Docket No. 300] entered on July 12, 2010 (the "Final Cash Collateral Order"), the Court

14  determined *inter alia* that: (i) 1350BA's Pre-Petition Liens[2] in and to the Pre-Petition Collateral

15  are senior, valid and fully perfected, and that the Pre-Petition Liens, the Obligations, the

16  Adequate Protection Obligations are not subject to avoidance, recharacterization, subordination

17  under any provision of the Bankruptcy Code or other applicable law and not subject to any other

18  legal or equitable defense or claim under any law; (ii) 1350BA's secured claim is not less than

19  $13,829,683.96; and (iii) in all events, pursuant to 363(k) of the Bankruptcy Code, 1350BA shall

20  have the right to use Obligations (except for the L/C Obligations) and the Adequate Protection

21  Obligations, or any part thereof, to credit bid with respect to any bulk or piecemeal sale of all or

22  any portion of its Collateral.

23         F.      On June 23, 2010, the Debtor, 1350BA, the Committee, and Mr. Katakalidis

24  stipulated to the resignation of Mr. Katakalidis as the President, Chief Executive Officer and

25  Chairman of the Board for the Debtor and the appointment of Jeff Nerland as the Chief

26  Restructuring Officer ("CRO") for the Debtor.  Accordingly, the Debtor filed on that same day

27

28  [2] Unless otherwise defined in paragraph E, all capitalized terms used in paragraph E shall have the meaning ascribed to them in the Final Cash Collateral Order.

-3-

Case No. 10-bk-00324-PB11

[PROPOSED] ORDER APPROVING SALE MOTION AND ASSET PURCHASE AGREEMENT

LA 128,953,753v6 8-2-10

the *Motion Of Debtor For Order Approving Stipulation Re: (I) Appointment of Jeff Nerland as the Debtor's Chief Restructuring Officer; and (II) Resignation of George Katakalidis* (the "Emergency Motion")[3]. On June 30, 2010 the Court entered an order granting the Emergency Motion, thereby vesting Mr. Nerland with the power to make decisions in the best interest—an on behalf—of the Estate. See Docket No. 269.

G.      On or about June 11, 2010, 1350BA assigned its secured claim in the Debtor's chapter 11 case to Wreath LLC ("Wreath"), a Delaware limited liability company. Subsequently, Wreath Equity LLC ("Purchaser"), a Delaware limited liability company was formed and was designated by Wreath as the proposed purchaser of the Debtor's assets.

H.      The Debtor has determined after extensive analysis and consultation with the Committee and Purchaser that a section 363 sale of substantially all of its assets in accordance with the APA (as defined below) will maximize the return obtained for the Estate, avoid damage to the ongoing business operations of the Debtor, and best provide for recovery by all interested constituencies.

I.      As evidenced by the certificates of service previously filed with the Court, and based on the representations of counsel at the hearing, notice of the hearing on the Sale Motion, the sale transactions (the "Sale") described and contemplated by the "Asset Sale and Purchase Agreement By and Among Fili Enterprises, Inc. (d/b/a Daphne's Greek Café), as Seller, and Wreath Equity LLC, as Purchaser" dated August 2, 2010 [Docket Nos. 347 and 348] (including all related documents, schedules, exhibits, agreements or instruments (the "APA")), a copy of which is annexed hereto as **Exhibit A**[4], the assumption and assignment of the Assumed Contracts and Leases and the Assumed and Modified Leases[5] (as defined in the APA and listed on **Exhibits B and C**, respectively, annexed hereto), the Bankruptcy Code, the Bankruptcy Rules, the Local Rules of the United States Bankruptcy Court for the Southern District of California, and

---

[3] See Docket No. 269.
[4] Capitalized terms used but not otherwise defined herein shall have the meaning ascribed to them in the APA. This Order is referred to herein as the "Order."
[5] The Assumed and Modified Leases are modified as described on Exhibit C to "Debtor's Notice of Revised Proposed Sale Order Exhibits" [Docket No. 351] filed on August 2, 2010.

- 4 -

1    applicable orders of this Court, the notice of hearing on the Sale Motion was adequate, sufficient

2    and proper and no further notice of the Sale Motion is necessary for the Court to enter this Order.

3        J.      A reasonable opportunity to object or to be heard regarding the requested relief has

4    been afforded to creditors and parties in interest.

5        K.      Notice of the Sale Motion has been provided to each non-debtor party to an

6    Assumed Agreement, together with a statement therein from the Debtor with respect to the

7    amount, if any, to be paid to such non-debtor party to cure any defaults under, and to otherwise

8    comply with the requirements of Section 365(b) of the Bankruptcy Code with respect to the

9    Assumed Agreements to which such non-debtor party is party (the "Cure Costs"). **Exhibits B**

10   and **C** to this order set forth all the Cure Costs, if any, that are required to be paid for the Debtor

11   to assume and assign each of the Assumed Agreements, and (2) other than as set forth on

12   **Exhibits B** and **C** to this Order, no other Cure Costs need be satisfied in order for the Debtor to

13   assume, and assign to Purchaser, the Assumed Agreements, and except as otherwise may be

14   agreed in writing by Purchaser and the counterparty to an Assumed Agreement, no other Cure

15   Costs are due.

16       L.      Purchaser has provided adequate assurance of future performance with respect to

17   each of the Assumed Agreements, as required pursuant to sections 365(b)(1)(C) and 365(f)(2)(B)

18   of the Bankruptcy Code.  The Debtor has, to the extent necessary, satisfied all of the requirements

19   of section 365(b)(1) of the Bankruptcy Code in connection with the assumption of the Assumed

20   Agreements, and all of the requirements of section 365(f)(2) of the Bankruptcy Code in

21   connection with the assignment of the Assumed Agreements to Purchaser.

22       M.      As demonstrated by the testimony and/or other evidence proffered, adduced or

23   admitted at the Sale Hearing, including the Declaration of Jeff Nerland and the Declaration of

24   William Trefethen, and the representations of counsel made on the record at the Sale Hearing, the

25   Debtor's decision to enter into the APA and to consummate the transactions contemplated by the

26   APA is a sound exercise of the Debtor's business judgment.  The Sale will substantially benefit

27   the Debtor, its Estate, and all creditors because: (a) no valuation of the Estate's assets has even

28   approached the total consideration offered by Purchaser; (b) no other exit proposals acceptable to

LA 128,953,753v6 8-2-10

1   the Debtor, the Committee, and Wreath have been proposed; (c) no other viable purchaser has

2   been identified; and (d) in a liquidation (the only potential alternative to the Sale): (i) the estate

3   would be unable to pay administrative claims to the extent that Purchaser has agreed to pay or

4   assume; and (ii) unsecured creditors would recover nothing.  Based upon analyses conducted by

5   CRG Partners Group, the Debtor's financial advisor, and Broadway Advisors LLC, the

6   Committee's financial advisor, the return to administrative claimants and other creditors is greater

7   under the Sale than any other proposal that has been made, and is greater than the return in a

8   liquidation.  The assumption and assignment of the Assumed Agreements to the Purchaser will

9   relieve the Estate of significant rejection claims.

10          N.      The Debtor has presented good and sufficient business justification for (i) the Sale

11  pursuant to sections 105, 363 and 365 of the Bankruptcy Code, (ii) the assumption and

12  assignment of the Assumed Contracts and Leases and the Assumed Modified Leases pursuant to

13  section 365 of the Bankruptcy Code, (iii) the rejection of the Rejected Agreements pursuant to

14  section 365 of the Bankruptcy Code, and (iv) the other relief granted herein.

15          O.      The Debtor has articulated good and sufficient reasons for the Court to approve

16  Purchaser's Expense Claim as provided in the APA.  Purchaser's Expense Claim may be paid in

17  accordance with the terms, conditions, and limitations of the APA, (i) if triggered, shall be

18  deemed an actual and necessary cost and expense of preserving the Debtor's estate, within the

19  meaning of sections 364(c)(1), 503(b)(1)(A) and 507(a)(2) of the Bankruptcy Code, (ii) is of

20  substantial benefit to the Debtor's estate, (iii) is reasonable and appropriate, including in light of

21  the size and nature of the Sale and the efforts that have been and will be expended by the

22  Purchaser, and (iv) was negotiated by the parties at arms' length and in good faith.

23          P.      The APA represents the highest and best offer for the Purchased Assets, the

24  Purchase Price (as defined in the APA) is fair and reasonable and constitutes fair consideration

25  and reasonably equivalent value under the Bankruptcy Code and any other applicable federal or

26  state law.

27          Q.      The Purchased Assets are property of the Debtor's estate and title thereto is vested

28  in the Debtor's estate pursuant to 11 U.S.C. §541.

Case No. 10-bk-00324-PB11

[PROPOSED] ORDER APPROVING SALE MOTION AND ASSET PURCHASE AGREEMENT

LA 128,953,753v6 8-2-10

1    R.    The Purchase Price and the terms of the APA were negotiated, proposed and

2 entered into by the parties without collusion, in good faith, from arm's length bargaining

3 positions and for fair value.

4    S.    Based upon, among other things, the Declaration of William Trefethen and the

5 Declaration of Jeff Nerland annexed to the Sale Motion, Purchaser is a good faith purchaser of the

6 Purchased Assets and assignee of the Assumed Agreements within the meaning of section 363(m)

7 of the Bankruptcy Code and with respect to the acquisition of the Purchased Assets and the

8 assignment of the Assumed Agreements is entitled to all of the benefits of section 363(m) of the

9 Bankruptcy Code.  Purchaser has disclosed (1) that it has no relationships with the Debtor, and

10 (2) the extent to which any offers of employment or compensation have been or will be offered to

11 the Debtor's present or former management or employees.  There is no fraud and collusion

12 between Purchaser and the Debtor, or any attempt to take unfair advantage.  Purchaser has not

13 engaged in any conduct that would cause the transactions to be avoided as contemplated in

14 section 363(n) of the Bankruptcy Code.  The reversal or modification on appeal of this Order

15 shall not affect the authorization or validity of the Sale, unless such authorization and the Sale is

16 stayed pending appeal. Purchaser is a good faith purchaser for value of the Purchased Assets

17 without notice of any voidable transactions relating thereto within the meaning of section

18 550(b)(1) of the Bankruptcy Code.

19    T.    The Debtor is authorized to consummate and carry out the transactions described

20 in the APA and to undertake the obligations imposed therein, and the Sale to Purchaser of the

21 Purchased Assets is determined to be free and clear of all liens, claims, encumbrances and

22 interests (including any rights under section 365(n) of the Bankruptcy Code) other than:

23 (i) Permitted Liens (as defined in the APA); (ii) the Assumed Liabilities; (iii) as agreed to by the

24 Purchaser in writing; and (iv) as agreed to between Wreath and the Purchaser (collectively, the

25 "Liens/Claims/Encumbrances/Interests").

26    U.    All of the parties holding or asserting Liens/Claims/Encumbrances/Interests over

27 any of the Purchased Assets have consented to the Sale, or the requirements of Section 363(f)

28 have otherwise been satisfied.

-7-

1    V.    Purchaser is not a "successor" to the Debtor or its estate by reason of any theory of

2  law or equity, and Purchaser shall not assume, nor be deemed to assume, or in any way be

3  responsible for any liability or obligation of the Debtor and/or its estate including, without

4  limitation, any bulk sales law, successor or vicarious liability or similar liability except as

5  otherwise expressly provided in the APA.  Except to the extent Purchaser assumes the Assumed

6  Liabilities pursuant to the APA, neither the purchase of the Purchased Assets by Purchaser or its

7  affiliates or designees, nor the fact that the Purchaser or its affiliates or its designees are using any

8  of the Purchased Assets previously operated by the Debtor, will cause Purchaser or any of its

9  affiliates or designees to be deemed a successor in any respect to the Debtor's business; and

10    W.    On July 27, 2010, George Katakalidis filed his "Limited Objection to Proposed

11  Transfer of Trademarks" [Docket No. 330] (the "Katakalidis Objection") asserting that the

12  trademarks for Fire Feta®, Gyro Zesta®,  Chicken Zesta®, Falafel Zesta® and EXY®

13  (collectively, the "Disputed Trademarks") are not property of the Debtor's Estate under

14  Bankruptcy Code section 541 and cannot be transferred to Purchaser.  The Debtor and Purchaser

15  have disputed this assertion and believe that the Disputed Trademarks are property of the

16  Debtor's Estate and can be transferred to Purchaser.  Since the filing of the Limited Objection,

17  Mr. Katakalidis, the Debtor, Wreath and the Purchaser have been engaged in settlement

18  discussions which have culminated in the settlement agreement filed with Court as Docket No.

19  346 (the "Katakalidis Settlement Agreement") which resolves the Limited Objection.  The

20  Debtor's entry into, and the approval of, the Katakalidis Settlement Agreement is in the best

21  interests of the Estate.

22    X.    There is no just reason to delay the closing of the Sale to Purchaser.  The

23  Debtor's ongoing operational costs and mounting administrative claims provide cause to lift the

24  stays imposed by Bankruptcy Rules 6004 and 6006.

25    The Court, having reviewed and considered the Sale Motion and the declarations, exhibits,

26  and other papers filed in support of the Sale Motion, any objections to the Sale Motion and any

27  supporting papers thereto, and the files and records in this case; and the Court finding good cause

28  therefor,

LA 128,953,753v6 8-2-10

IT IS HEREBY ORDERED THAT:

1.      The notice of the Sale Motion and the Sale Hearing thereon is approved as being fair, reasonable and adequate under the circumstances, and any additional notice as may otherwise be required under state or federal law is hereby waived.

2.      The Sale Motion is granted in its entirety and any objection to, or reservation of rights with respect to, the Sale Motion is overruled, resolved pursuant to this Order or was withdrawn at or prior to the Sale Hearing.

3.      The Debtor is authorized to take any and all actions necessary or appropriate to consummate and carry out the transactions described in the APA, and to undertake the obligations or other matters imposed, required or provided for therein such that, among other things, the Debtor, may sell the Purchased Assets, assume and assign the Assumed Agreements, perform its obligations under the APA and enter into any other agreement or document reasonably necessary or appropriate to effectuate the Sale without further order of this Court.

4.      Purchaser's Expense Claim is hereby approved, and no objections to Purchaser's Expense Claim were filed.  The Debtor's obligation to pay Purchaser's Expense Claim, as provided by the APA, shall survive termination of the APA and, until paid in accordance with the APA, shall constitute a superpriority administrative expense claim in favor of the Purchaser.  The Debtor shall be authorized to pay Purchaser's Expense Claim to the Purchaser in accordance with the terms of the APA without further order of the Court.

5.      Pursuant to section 363(f) of the Bankruptcy Code and without further order of this Court, upon the Closing (as defined in the APA), the Purchased Assets (including, without limitation, all Intellectual Property of the Debtor) shall be transferred, sold and delivered to Purchaser free and clear of the Liens/Claims/Encumbrances/Interests, and further free and clear of all pre and post-petition claims, obligations, liabilities, lawsuits, interests, contractual commitments, de facto merger, or substantial continuity, whether based in law or equity, including without limitation, any theory of successor or transferee liability (including, but not limited to, claims arising in or under ERISA, the WARN Act, OSHA, CERCLA, RCRA, NLRA or any other environmental statute or regulation, employment-related claims, payroll taxes,

LA 128,953,753v6 8-2-10

1    employee contracts, tax claims or environmental liability claims), and any and all pre and post-

2    petition claims that relate to or purport to relate to the Purchased Assets, with any

3    Liens/Claims/Encumbrances/Interests (including, without limitation, any claims and liens of the

4    Riverside County Tax Collector) not paid prior to or concurrently with the Closing (or otherwise

5    treated in accordance with a written agreement with Purchaser) attaching to the portion of the

6    Debtor's proceeds of the Sale allocable to the property which was subject to the particular

7    Liens/Claims/Encumbrances/Interests in the same scope, order and validity, if any, as such

8    Liens/Claims/Encumbrances/Interests had prior to the Closing.

9        6.    After the Closing, all persons or entities holding

10    Liens/Claims/Encumbrances/Interests against the Debtor or with respect to the Purchased Assets

11    are barred from asserting against Purchaser, and its respective successors or assigns, any claim or

12    right based upon such Liens/Claims/Encumbrances/Interests.

13        7.    The Purchased Assets to be conveyed in accordance herewith, including the

14    assignment to Purchaser of the Assumed Agreements shall be free and clear of all

15    Liens/Claims/Encumbrances/Interests.  On the Closing, all Liens/Claims/Encumbrances/Interests

16    shall be released, terminated and discharged as to the Purchased Assets and Purchaser.

17        8.    Purchaser is and shall be deemed a good faith purchaser of the Purchased Assets

18    for all purposes, including but not limited to the provisions of section 363(m) of the Bankruptcy

19    Code.

20        9.    The terms of the Sale are fair and reasonable and Purchaser is paying reasonably

21    equivalent value for the Purchased Assets.

22        10.    This Order shall be effective immediately upon entry.  No automatic stay of

23    execution, pursuant to Rule 62(a) of the Federal Rules of Civil Procedure, or Bankruptcy Rules

24    6004(h) or 6006(d), applies with respect to this Order.

25        11.    The provisions of the APA relating to the assumption and assignment of the

26    Assumed Agreements are valid and binding, in full force and effect, and enforceable in

27    accordance with their terms and upon the Closing, in accordance with sections 363 and 365 of the

28

1   Bankruptcy Code, Purchaser shall be fully and irrevocably vested with all of the Debtor's right,

2   title and interest of each of the Assumed Agreements.

3       12.     The Debtor is authorized, pursuant to section 365 of the Bankruptcy Code, to

4   assume and assign to Purchaser the Assumed Agreements, which assumption and assignment,

5   without any further order of this Court being required, shall occur upon Closing.  With respect to

6   the Assumed Agreements, the assumption and assignment of the Assumed Agreements shall be

7   such Assumed Agreements to the extent amended and/or supplemented in writing by the

8   Purchaser and the respective counterparties thereto as of the Closing.  Subject to the terms and

9   conditions of the APA, the Debtor shall pay at Closing all Cure Costs required for the Assumed

10  Agreements and except as otherwise agreed in writing between the counterparty to an Assumed

11  Agreement and the Purchaser, the Purchaser shall have no liability to any counterparty to an

12  Assumed Agreement for any claim under an Assumed Agreement arising prior to, or based upon

13  any facts or circumstances arising prior to, the Closing.  The non-debtor parties to the Assumed

14  Agreements are forever bound by the Cure Costs.  In accordance with section 365(k) of the

15  Bankruptcy Code, the assignment by the Debtor to Purchaser of the Assumed Agreements shall

16  relieve the Debtor and its estate from any liability for any breach of such Assumed Agreements, if

17  any, occurring after the Closing.

18      13.     Any provision in any Assumed Agreement that purports to declare a breach,

19  default, or payment right as a result of the assignment or a change of control in respect of the

20  Debtor is unenforceable.  All defaults or other obligations of the Debtor under the Assumed

21  Agreements arising or accruing prior to the Closing (without giving effect to any acceleration

22  clauses or any default provisions of the kind mentioned in section 365(b)(2) of the Bankruptcy

23  Code) shall be deemed cured upon payment of the Cure Costs by the Debtor.

24      14.     To the fullest extent available under applicable law, Purchaser shall be authorized,

25  as of the Closing Date, to operate under any license [including, without limitation the California

26  Department of Alcoholic Beverage Control License, License No. 478985 for the premises located

27  at 10562 Craftsman Way, Ste. 192, San Diego, California (the "ABC License")], permit,

28  registration, and governmental authorization or approval of the Debtor with respect to the

-11-

1    Purchased Assets, and, to the extent transferrable under applicable law, all such licenses

2    (including, without limitation, the ABC License), permits, registrations, and governmental

3    authorizations and approvals are deemed to have been transferred to Purchaser as of the Closing

4    Date.

5          15.    This Order is and shall be binding upon and shall govern acts of all entities

6    including, without limitation, all filing agents, filing officers, title agents, title companies,

7    recorders of mortgages, recorders of fees, registrars of deeds, administrative agencies,

8    governmental departments, secretaries of state, federal, state, and local officials, and all other

9    persons and entities, who may be required by operation of law, the duties of their office, or

10    contract, to accept, file, register or otherwise record or release any documents or instruments that

11    reflect that Purchaser is the assignee of the Purchased Assets free and clear (all such entities being

12    referred to as "Recording Officers").  All Recording Officers are authorized and specifically

13    directed to strike recorded claims, liens and interests against the Purchased Assets recorded prior

14    to the date of this Order that Purchaser is acquiring free and clear.

15          16.    No sections or provisions of any Assumed Agreement that purports to provide for

16    additional payments, penalties, charges, or other financial accommodations in favor of the non-

17    debtor third party to the Assumed Agreements as a result of the Debtor's assumption and

18    assignment to Purchaser of the Assumed Agreements shall have any force and effect with respect

19    to the sale transaction and assignments authorized by this Order, and such provisions constitute

20    unenforceable anti-assignment provisions under section 365(f) and/or are otherwise

21    unenforceable under section 365(e) of the Bankruptcy Code.  No assignment of any Assumed

22    Agreement pursuant to the terms of the APA shall in any respect constitute a default under any

23    Assumed Agreement.  Purchaser shall enjoy the rights and benefits under each such Assumed

24    Agreements as of the applicable date of assumption without the necessity of obtaining such non-

25    debtor party's written consent to the assumption or assignment thereof.

26          17.    After the Closing, all persons or entities holding claims,

27    Liens/Claims/Encumbrances/Interests or interests of any kind or nature are barred from asserting

28    against Purchaser, its respective successors or assigns any claim or right based on any alleged

Case No. 10-bk-00324-PB11

[PROPOSED] ORDER APPROVING SALE MOTION AND ASSET PURCHASE AGREEMENT

LA 128,953,753v6 8-2-10

1  default, breach or unpaid obligation allegedly arising or occurring before the Closing, any

2  pecuniary loss resulting from such default, or any other obligation under the Assumed

3  Agreements arising or incurred prior to the Closing.

4     18.    Debtor is authorized to reject the Rejected Agreements listed on **Exhibit D**,

5  attached hereto.  Those Executory Contracts listed on **Exhibit D** shall be deemed rejected

6  effective as of **JULY 31, 2010,** provided, solely, however, that the Master Distribution

7  Agreement by and between the Debtor and U.S. Foodservice and all ancillary agreements

8  between the Debtor and U.S. Foodservice shall be deemed rejected effective as of the Closing.

9  Those Unexpired Leases listed on **Exhibit D** shall be deemed rejected effective as the earlier of:

10  (1) **AUGUST 6, 2010** or (2) the date upon which the Debtor has surrendered possession of the

11  premises pertaining to the Unexpired Lease.

12     19.    No bulk-sales law or any similar law of any state or other jurisdiction shall apply

13  in any way to the transfer of the Purchased Assets.

14     20.    To the extent requested by Purchaser, all creditors and other persons and

15  entities are authorized and directed as of the Closing to deliver to the Debtor for delivery to

16  Purchaser (or directly to Purchaser if after the Closing), all of the Purchased Assets in their

17  possession, custody or control.

18     21.    The terms and provisions of the APA, together with the terms and provisions of

19  this Order, shall be binding in all respects upon, the Debtor, its estate, successors and assigns;

20     22.    The Debtor and its officers, employees and agents are hereby authorized to execute

21  all such documents and to do all such acts, and certify or attest to such facts and circumstances, as

22  are necessary and appropriate to carry out the Sale as contemplated by the Sale Motion and the

23  APA.

24     23.    All persons and entities that are presently, or on Closing may be, in possession of

25  some or all of the Purchased Assets are hereby directed to surrender possession of the Purchased

26  Assets to Purchaser as of the Closing.

27     24.    All persons and entities are hereby forever prohibited and enjoined from taking

28  any action that would adversely affect or interfere with the ability of the Debtor to sell and

-13-

1    transfer the Purchased Assets to the Purchaser or the ability of the Purchaser to use, possess,

2    enjoy, benefit from, sell, convey, transfer, dispose, or take any action with respect to, the

3    Purchased Assets, except as otherwise specifically provided for in the APA or this Order..

4        25.    Purchaser and its successors and assigns, may from time to time as deemed

5    appropriate institute and prosecute in the Debtor's name, for the benefit of Purchaser, its

6    successors and assigns, matters relating to the collection or reduction to possession of any of the

7    Purchased Assets, and to do all acts and things with respect to the Purchased Assets, and to do all

8    acts and things with respect to the Purchased Assets that Purchaser, its successors and assigns

9    shall deem desirable.  The foregoing powers are coupled with an interest and are irrevocable by

10    the Debtor.

11        26.    The terms and provisions of the APA and this Sale Order shall be binding in all

12    respects upon, and shall inure to the benefit of, the Debtor, Purchaser, and their respective

13    affiliates, successors and assigns, and any affected third parties, notwithstanding any subsequent

14    appointment of any trustee(s) under any chapter of the Bankruptcy Code or conversion of this

15    case to a case under chapter 7, as to which trustee(s) such terms and provisions likewise shall be

16    binding.  The APA, the Sale and this Sale order shall be binding upon, and shall not be subject to

17    rejection or avoidance by, any Chapter 7 or Chapter 11 Trustee appointed in the Debtor's

18    bankruptcy case.  Further, nothing contained in any plan of reorganization (or liquidation) or any

19    other order entered in this bankruptcy case or any order confirming any plan of reorganization (or

20    liquidation) or any other order entered in this bankruptcy case shall conflict with or derogate from

21    the provisions of the APA or the terms of this Order.

22        27.    The Katakalidis Settlement Agreement is approved and the Debtor is authorized to

23    take all actions necessary to consummate the transactions contemplated in such agreement.  The

24    Sale Hearing shall be continued to *Sept. 7*, 2010 at *4:00* p.m. to serve as a holding date to

25    resolve any and all disputes between the Debtor, Purchaser and Mr. Katakalidis respecting the

26    Disputed Trademarks to the extent that Mr. Katakalidis and Purchaser do not execute at Closing

27    the Trademark License Agreement (as defined in the Katakalidis Settlement Agreement).

28

Case No. 10-bk-00324-PB11

[PROPOSED] ORDER APPROVING SALE MOTION AND ASSET PURCHASE AGREEMENT

LA 128,953,753v6 8-2-10

28.    This Court retains jurisdiction to enforce and implement the terms and provisions of this Order and the APA, all amendments thereto, any waivers and consents thereunder, and each of the documents executed in connection therewith in all respects, including retaining jurisdiction to (a) compel delivery of the Purchased Assets to Purchaser, (b) resolve any disputes arising under or related to the APA, (c) protect Purchaser against any Liens/Claims/Encumbrances/Interests asserted against the Purchased Assets, (d) resolve any disputes arising under or related to the Katakalidis Settlement Agreement, and (e) to determine the rights and interests of the Debtor, Mr. Katakalidis and Purchaser respecting the Disputed Trademarks.

29.    The failure to include specifically any particular provision of the APA in this Order shall not diminish or impair the effectiveness of such provisions, it being the intent of the Court that the APA be authorized and approved in its entirety.

30.    To the extent any provisions of this Order conflict with the terms and conditions of the APA, this Order shall govern and control.  Except as specifically provided for in this Order, nothing in this Order shall alter or amend the APA and the obligations of the Debtor and Purchaser under the terms of the APA.

31.    The APA and any related documents or other instruments may be modified, amended or supplemented by the parties thereto, in a writing signed by both parties, and in accordance with the terms thereof, without further order of the Court, provided that any such modification, amendment or supplement does not have a material adverse effect on the Debtor's bankruptcy estate.

32.    With respect to the Purchaser's payment, at Closing, of $185,525 to either the Trust or the Debtor's estate at the direction of the Committee as set forth in Section 3.3(f) of the APA, the Purchaser may pay the $185,525 to the Debtor to be held by the Debtor in trust pending written direction from the Committee and such payment by the Purchaser to the Debtor shall satisfy the Purchaser's obligations under Section 3.3(f) of the APA.

1      33.    The provisions of this Order are non-severable and mutually dependent.

2  Dated:  August **3**, 2010

3  San Diego, California

Peter W. Bowie

4  United States Bankruptcy Judge

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

-16-

[PROPOSED] ORDER APPROVING SALE MOTION AND ASSET PURCHASE AGREEMENT

LA 128,953,753v6 8-2-10

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**EXHIBIT A**

**APA**

Case No. 10-bk-00324-PB11

[PROPOSED] ORDER APPROVING SALE MOTION AND ASSET PURCHASE AGREEMENT

LA 128,953,753v6 8-2-10

**Execution Copy**

**ASSET SALE AND PURCHASE AGREEMENT**

**BY AND AMONG**

**FILI ENTERPRISES, INC. (D/B/A DAPHNE'S GREEK CAFÉ)**

**AS SELLER,**

**AND**

**WREATH EQUITY LLC,**

**AS PURCHASER,**

**August __, 2010**

# TABLE OF CONTENTS

SECTION 1.          DEFINITIONS................................................................1

SECTION 2.          PURCHASE AND SALE OF THE PURCHASED ASSETS...................8
Section 2.1.         Purchased Assets.........................................................8
Section 2.2.         Assumption and Assignment of Leases and Contracts.............11
Section 2.3.         Documents at Closing Date ..........................................11
Section 2.4.         Assumption of Assumed Liabilities; Exclusion of Excluded
                     Liabilities ................................................................11
Section 2.5.         Disclosure Schedule Updates; Cure Costs...........................13

SECTION 3.          PURCHASE PRICE .....................................................14
Section 3.1.         Purchase Price...........................................................14
Section 3.2.         Allocation of Purchase Price..........................................14
Section 3.3.         Adjustment to Assumption of Liabilities and Cash Payment ...........15

SECTION 4.          CLOSING. ...............................................................16
Section 4.1.         Closing ..................................................................16
Section 4.2.         Deliveries at Closing...................................................17

SECTION 5.          REPRESENTATIONS AND WARRANTIES OF SELLER...................17
Section 5.1.         Corporate Organization................................................17
Section 5.2.         Qualification to Do Business ..........................................17
Section 5.3.         Authorization and Validity of Agreement ............................17
Section 5.4.         No Conflict or Violation ...............................................17
Section 5.5.         Consents and Approvals................................................18
Section 5.6.         Good Title; Sufficiency of Assets.....................................18
Section 5.7.         Absence of Certain Changes or Events................................18
Section 5.8.         Real Property. ..........................................................20
Section 5.9.         Intellectual Property...................................................20
Section 5.10.        Permits ..................................................................21
Section 5.11.        Compliance with Law ..................................................21
Section 5.12.        Litigation ...............................................................23
Section 5.13.        Material Contracts.....................................................23
Section 5.14.        Tax Matters .............................................................25
Section 5.15.        Employee Benefit Plans................................................25
Section 5.16.        Employees...............................................................25
Section 5.17.        Labor Matters; Employment Agreements............................25
Section 5.18.        Bank Accounts .........................................................26
Section 5.19.        Environmental Matters and Employee Health and Safety Matters...........26
Section 5.20.        Affiliate Relationships ................................................27
Section 5.21.        Financial Instruments .................................................27
Section 5.22.        Insurance ...............................................................28
Section 5.23.        Brokers/Finders........................................................28

i

| Section 5.24. | Survival.  The representations and warranties of Seller described herein shall not survive Closing and nothing herein shall impose direct liability on Seller's Management Team. | 28 |

| SECTION 6. | REPRESENTATIONS AND WARRANTIES OF PURCHASER. | 28 |
| Section 6.1. | Formation | 28 |
| Section 6.2. | Authorization and Validity of Agreement | 28 |
| Section 6.3. | No Conflict or Violation | 28 |
| Section 6.4. | Consents and Approvals | 29 |

| SECTION 7. | COVENANTS OF SELLER | 29 |
| Section 7.1. | Conduct of Business Before the Closing Date | 29 |
| Section 7.2. | Employment Solicitation | 30 |
| Section 7.3. | Consents and Approvals | 30 |
| Section 7.4. | Access to Properties and Records | 30 |
| Section 7.5. | Notices of Certain Events | 31 |
| Section 7.6. | Transferred Names and Marks | 31 |

| SECTION 8. | COVENANTS OF PURCHASER | 32 |
| Section 8.1. | Actions Before Closing Date | 32 |
| Section 8.2. | Covenant Not to Sue | 32 |
| Section 8.3. | Consents and Approvals | 32 |
| Section 8.4. | Notices of Certain Events | 32 |

| SECTION 9. | COVENANTS OF SELLER AND PURCHASER | 33 |
| Section 9.1. | Execution and Delivery of Ancillary Documents | 33 |
| Section 9.2. | Retained Jurisdiction | 33 |
| Section 9.3. | Assignability of Certain Permits | 33 |
| Section 9.4. | Further Agreements | 33 |
| Section 9.5. | Risk of Loss | 34 |
| Section 9.6. | Liquor License Bridge Agreement | 34 |

| SECTION 10. | EMPLOYEES | 35 |
| Section 10.1. | Offers of Employment | 35 |
| Section 10.2. | Seller Assistance | 35 |
| Section 10.3. | Employee Access | 35 |
| Section 10.4. | Terms of Employment of Transferred Employees | 35 |
| Section 10.5. | Employee Benefits for Transferred Employees | 35 |
| Section 10.6. | WARN Act Liability | 36 |

| SECTION 11. | CONDITIONS PRECEDENT TO PERFORMANCE BY SELLER. | 36 |
| Section 11.1. | Representations and Warranties of Purchaser | 36 |
| Section 11.2. | Performance of the Obligations of Purchaser | 36 |
| Section 11.3. | Consents and Approvals | 36 |
| Section 11.4. | No Violation of Orders | 37 |
| Section 11.5. | Delivery of Ancillary Agreements | 37 |

ii

| SECTION 12. | CONDITIONS PRECEDENT TO PERFORMANCE BY PURCHASER. | 37 |
| Section 12.1. | Representations and Warranties of Seller | 37 |
| Section 12.2. | Performance of the Obligations of Seller | 37 |
| Section 12.3. | Consents and Approvals | 37 |
| Section 12.4. | No Violation of Orders | 38 |
| Section 12.5. | Delivery of Ancillary Agreements | 38 |
| Section 12.6. | No Material Adverse Effect | 38 |
| Section 12.7. | Resolutions; CRO's Certificate | 38 |
| Section 12.8. | Permits | 38 |
| SECTION 13. | CONDITIONS PRECEDENT TO PERFORMANCE BY THE PURCHASER AND THE SELLER. | 38 |
| SECTION 14. | BANKRUPTCY PROCEDURES. | 39 |
| Section 14.1. | Motions and Notices Regarding Sale of Acquired Assets and Assumption and Assignment of Seller Contracts | 39 |
| Section 14.2. | Requests for Information | 40 |
| Section 14.3. | Purchaser's Expense Claim | 40 |
| Section 14.4. | Certain Bankruptcy Undertakings by Seller. | 40 |
| SECTION 15. | TERMINATION. | 41 |
| Section 15.1. | Conditions of Termination | 41 |
| Section 15.2. | Effect of Termination | 41 |
| SECTION 16. | MISCELLANEOUS. | 42 |
| Section 16.1. | Successors and Assigns | 42 |
| Section 16.2. | Governing Law, Jurisdiction | 42 |
| Section 16.3. | Expenses | 42 |
| Section 16.4. | Broker's and Finder's Fees | 42 |
| Section 16.5. | Severability | 42 |
| Section 16.6. | Notices | 42 |
| Section 16.7. | Amendments; Waivers | 43 |
| Section 16.8. | Public Announcements | 43 |
| Section 16.9. | Entire Agreement | 44 |
| Section 16.10. | Parties in Interest | 44 |
| Section 16.11. | Section and Paragraph Headings | 44 |
| Section 16.12. | Construction | 44 |
| Section 16.13. | Counterparts | 44 |
| Section 16.14. | Time is of the Essence | 44 |

iii

## ASSET SALE AND PURCHASE AGREEMENT

This Asset Sale and Purchase Agreement (the "**Agreement**") is dated as of July __, 2010 (the "**Execution Date**"), by and among Fili Enterprises, Inc., a California corporation (d/b/a Daphne's Greek Café) (the "**Seller**"), as debtor and debtor in possession, and Wreath Equity LLC, a Delaware limited liability company ("**Wreath**"), or its designee (the "**Purchaser**").

### PREAMBLE

A.      Seller is a fast-casual restaurant chain, which is headquartered in San Diego, California (the "**Business**").

B.      On the Petition Date, Seller filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of California (the "**Bankruptcy Court**") entitled Case No. 10-BK-00324-PB (the "**Bankruptcy Case**").

C.      Seller currently wishes to sell, transfer, convey, assign and deliver the Purchased Assets to Purchaser, in accordance with Sections 105(a), 363(f) and 365 and other applicable provisions of the Bankruptcy Code (the "**Sale of Assets**").

D.      Seller proposes to complete the Sale of Assets to Purchaser pursuant to this Agreement and in accordance with the Sale Order to be entered by the Bankruptcy Court.

E.      Therefore, the parties, intending to be legally bound, hereby agree as follows:

SECTION 1.   <u>DEFINITIONS</u>.

As used in this Agreement, the following terms have the following meanings:

"**5.9(b) Cure Obligees**" has the meaning set forth in Section 14.1(e).

"**5.9(b) License Agreements**" has the meaning set forth in Section 5.9(b).

"**Abandoned Assets**" has the meaning set forth in Section 2.4(e).

"**Accounts Receivable**" has the meaning set forth in Section 2.1(a)(xiv).

"**Adjusted Cash Payment**" has the meaning set forth in Section 3.3(a).

"**Affiliate**" means any Person that, directly or indirectly, controls, is controlled by, or is under common control with, the subject party.  For purposes of the preceding sentence, "control" (including, with correlative meanings, the terms "controlled by" and "under common control with"), as used with respect to any Person, means the possession, directly or indirectly, of the power (i) to vote more than 20% of the securities having ordinary voting power for the election of directors or managers of the controlled Person, or (ii) to direct or cause the direction of management and policies of the controlled Person, whether through the ownership of voting securities or by Contract or otherwise.

"**Affected Assets**" has the meaning set forth in Section 9.5.

"**Agreement**" means this Asset Sale and Purchase Agreement, as amended and in effect from time to time.

"**Allocation Statement**" has the meaning set forth in Section 3.2.

"**Ancillary Agreements**" means collectively the Bill of Sale, the Trademark Assignments, the Domain Name Assignments, the Contract Assignment, the Lease Assignments, the Title Certificates, the Assignment and Assumption Agreement, Lease Amendments, and the other agreements, documents and instruments to be executed in connection with the Closing.

"**Assignment and Assumption Agreement**" has the meaning set forth in Section 2.4(a)(iii).

"**Assumed and Modified Leases**" has the meaning set forth in Section 2.2(b).

"**Assumed Agreements**" has the meaning set forth in Section 2.2(b).

"**Assumed Agreement Liabilities**" has the meaning set forth in Section 2.4(a)(i).

"**Assumed Agreements and Leases**" has the meaning set forth in Section 2.2(a).

"**Assumed Liabilities**" has the meaning set forth in Section 2.4(a)(ii).

"**Automobiles**" means a 2004 Hyundai Santa Fe owned by Seller bearing Vehicle Identification Number KM8SC13D75U949058 and a 2005 Hyundai Santa Fe owned by Seller bearing Vehicle Identification Number KM8SC13D75U945673.

"**Avoidance Actions**" has the meaning set forth in Section 2.1(a)(xv).

"**Bankruptcy Case**" has the meaning set forth in Paragraph B of the Preamble.

"**Bankruptcy Code**" means the United States Bankruptcy Code 11 U.S.C. Section 101, et seq., as amended, or any successor thereto, and any rules and regulations promulgated thereunder.

"**Bankruptcy Court**" has the meaning set forth in Paragraph B of the Preamble.

"**Bill of Sale**" has the meaning set forth in Section 2.3.

"**Business**" has the meaning set forth in Paragraph A of the Preamble.

"**Business Days**" means days other than Saturdays, Sundays and days on which banks in California are authorized or obligated by law to be closed.

"**Cash**" shall mean all cash and cash equivalents held by or for the benefit of, on deposit with (but excluding any Deposits) or in transit to, the Seller.

2

"**Cash Payment**" has the meaning set forth in Section 3.1(c).

"**CERCLA**" has the meaning set forth in Section 5.19(a).

"**Claim**" has the meaning set forth in section 101(5) of the Bankruptcy Code and shall include, without limitation, any rights under section 365(n) of the Bankruptcy Code.

"**Closing**" has the meaning set forth in Section 4.1.

"**Closing Date**" has the meaning set forth in Section 4.1.

"**Code**" means the Internal Revenue Code of 1986, as amended.

"**Committee**" means the Official Committee of Creditors Holding Unsecured Claims of Fili Enterprises, Inc.

"**Contract**" means any written or oral contract, service order, employment agreement, consulting agreement, Insurance Contract, employee benefit pension plan agreement, purchase order, supply contract, service contract, collective bargaining agreement with any labor union, management agreement, option agreement, indenture, note, bond, lease, license, commitment or instrument or other agreement, arrangement or commitment that is binding upon a Person or its property.

"**Contract Assignment**" means the assignment agreement to be executed and delivered at Closing assigning to Purchaser the Contracts to be assumed by Seller and assigned to Purchaser as listed in Schedule 2.1(a)(iii).

"**Corporate Name**" has the meaning set forth in Section 7.6(a).

"**Credit Bid Transaction Term Sheet**" means the Credit Bid Transaction Term Sheet, executed by Seller, Purchaser, the Committee and certain other parties dated June 28, 2010 (as amended from time to time).

"**CRO**" means Jeff Nerland.

"**CRG**" means CRG Partners Group.

"**Cure Costs**" has the meaning set forth in Section 2.4(b).

"**Cure Costs Benchmark**" has the meaning set forth in Section 3.3(c).

"**Cure Obligees**" has the meaning set forth in Section 14.1(b).

"**Deposits**" mean any sums deposited or payment as security or paid in advance of goods or services or otherwise by the Seller to any person including deposits with landlords, utility companies, insurance companies or vendors.

"**Disclosure Letter**" has the meaning set forth in Section 5.

3

"**Disclosure Schedule**" means any numbered schedule referenced herein or delivered herewith.

"**Dollars**" and "**$**" mean United States dollars.

"**Domain Name Assignments**" has the meaning set forth in Section 2.3.

"**Employees**" has the meaning set forth in Section 5.16.

"**Employee Benefit Plans**" has the meaning set forth in Section 5.15.

"**Environmental Laws**" has the meaning set forth in Section 5.19(a).

"**Environmental Permits**" has the meaning set forth in Section 5.19(a).

"**ERISA**" means the Employee Retirement Income Security Act of 1974, as amended.

"**Excess Cash**" has the meaning set forth in 2.1(a)(xi).

"**Excluded Assets**" has the meaning set forth in Section 2.1(b).

"**Excluded Cash**" has the meaning set forth in Section 2.1(b).

"**Excluded Cash Benchmark Amount**" has the meaning set forth in Section 2.1(b).

"**Excluded Liabilities**" has the meaning set forth in Section 2.4(c).

"**Execution Date**" means the date of execution of this Agreement.

"**Final Cash Collateral Order**" means the final order approving the "Motion by the Debtor for Order (A) Authorizing Interim Use Of Cash Collateral, (B) Granting Adequate Protection For Use Of Prepetition Collateral [ . . . ]" entered on July 13, 2010 as Docket No. 300] attached hereto as Exhibit I.

"**Fixed Assets**" has the meaning set forth in Section 2.1(a)(ii).

"**Hazardous Materials**" means any chemicals, pollutants, contaminants, wastes and toxic substances: (a) the presence of which requires reporting, investigation, removal or remediation under any Environmental Law; (b) that are defined as a "hazardous waste," "hazardous substance," "pollutant" or "contaminant" under any Environmental Law; (c) that are toxic, explosive, corrosive, flammable, ignitable, infectious, radioactive, reactive, carcinogenic, mutagenic or otherwise hazardous and are regulated as such under any Environmental Law; (d) the presence of which poses a hazard to the health or safety of humans; or (e) that contain polychlorinated biphenyls, asbestos and urea formaldehyde.

"**Insurance Contract**" shall mean any pre-petition automobile liability insurance policies, commercial liability, workers compensation insurance policies, insurance policies related to real property (whether leased or owned), cargo insurance policies, general liability policy, key man insurance policy, life insurance policy, or other policies of insurance under

4

which Seller was the insured or, in the case of key man, life, or other similar policies, under which Seller was the beneficiary as of the Petition Date and all rights of any nature with respect thereto including, without limitation, all insurance recoveries thereunder and all rights to assert claims with respect thereto.

"**Intellectual Property**" means registered trademarks or service marks and all trademark and service mark applications, all common law trademarks, trade names, trade dress and logos, all copyrights (including copyrighted content on internet sites to the extent related to the Business), all domain names, websites, and extensions thereof, all know-how, trade secrets and other confidential information, inventions, ideas, discoveries, patent applications and granted patents (including any and all continuations, continuations-in-part, additions and divisions thereof, and any and all patents issuing from the patent applications, and any reissues, reexaminations, renewals, extensions, and substitutions of any of the patents), and all industrial designs, owned by Seller or any Affiliate of Seller, and any registrations and applications therefor, and all databases, design databases, schematics and data collections.

"**Inventory**" means all inventory acquired for sale, and any related merchandise, finished goods, work-in-process, raw materials, and packaging.

"**Knowledge of Seller**" means the actual knowledge of Seller's Management Team, following reasonable and due inquiry.

"**KPMG Allowed Fees**" has the meaning set forth in Section 2.4(a)(ii).

"**Lease Amendments**" has the meaning set forth in Section 2.3.

"**Lease Assignments**" means the assignment agreements to be executed and delivered at Closing assigning to Purchaser the Leases to be assumed by Seller and assigned to Purchaser as listed in Schedule 2.1(a)(iii) and 2.1(a)(iv).

"**Lease**" means any written or oral lease of real property together with all buildings, facilities, structures and improvements located on such real property, all rights and privileges pertaining to such real property or to any of such buildings, facilities, structures and improvements, and all equipment, machinery, fixtures, furniture and other tangible property owned by Seller located at any such location, including, without limitation, all attachments, appliances, lighting fixtures, signs, doors, partitions, plumbing, heating, air conditioning, wiring, telephones, security systems, carpets, floor coverings, wall coverings, office equipment, combinations, codes and keys, and any other furniture, fixtures, equipment and improvements, fixtures, installations, machinery, equipment and other property attached thereto (collectively, the "**Leased Real Property**").

"**Leased Real Property**" has the meaning set forth in Section 2.1(a)(i).

"**Lien**" means any mortgage, pledge, charge, security interest, encumbrance, lien (statutory or other), conditional sale agreement or legally cognizable security interest of any kind.

"**Liquor License**" has the meaning set forth in section 2.1(a)(xx).

5

"**Liquor License Premises**" has the meaning set forth in Section 9.6.

"**Loss**" has the meaning set forth in Section 9.5.

"**Material Adverse Effect**" means a circumstance, state of facts, event, consequence or result that, individually or in the aggregate, materially and adversely affects the Purchased Assets, the Business, Seller's financial condition, results of operations or prospects, or the restaurant industry as a whole, or materially impairs or delays Seller's ability to effect the Closing.

"**Material Contract**" has the meaning set forth in Section 5.13(a).

"**Original Closed Locations**" has the meaning set forth in Section 3.3(e).

"**Other Assets**" has the meaning set forth in Section 2.1(a)(xxi).

"**Payment Period**" has the meaning set forth in Section 3.3(d).

"**Permits**" has the meaning set forth in Section 5.10.

"**Permitted Liens**" has the meaning set forth in Section 5.6(a).

"**Person**" means any individual, corporation, limited liability company, partnership, joint venture, association, joint-stock company, trust or unincorporated organization.

"**Petition Date**" means January 11, 2010.

"**Post-Petition Ordinary Course Benchmark**" has the meaning set forth in Section 2.4(a)(ii).

"**Post-Petition Ordinary Course Liabilities**" has the meaning set forth in Section 2.4(a)(ii).

"**Prior Names**" has the meaning set forth in Section 7.6(a).

"**Proposed Cure Notice**" has the meaning set forth in Section 14.1(b).

"**Purchase Price**" has the meaning set forth in Section 3.1, as the same may be adjusted pursuant to Section 3.3.

"**Purchased Assets**" has the meaning set forth in Section 2.1(a).

"**Purchaser**" has the meaning set forth in the introductory paragraph of this Agreement.

"**Purchaser's Expense Claim**" has the meaning set forth in Section 14.3.

"**RCRA**" has the meaning set forth in Section 5.19(a).

"**Records**" has the meaning set forth in Section 2.1(a)(v).

6

"**Rejected Agreements**" has the meaning set forth in Section 2.1(a).

"**Release**" means any release of any Hazardous Substance into the environment in violation of any Environmental Law.

"**Sale of Assets**" has the meaning set forth in Paragraph C of the Preamble.

"**Sale Motion**" means the motion filed with the Bankruptcy Court on July 2, 2010 seeking entry of the Sale Order, which is intended to give sufficient notice to all persons required in accordance with the requirements of the Bankruptcy Code, the Bankruptcy Rules, the Local Rules for the Bankruptcy Court and the terms and conditions of this Agreement and the provisions of the Sale Order.

"**Sale Order**" means the order of the Bankruptcy Court approving the sale of the Purchased Assets to the Purchaser pursuant to the terms of this Agreement, which order shall, without limitation, (a) be in form and substance acceptable to Purchaser in its sole and absolute discretion and as set forth on Exhibit H; (b) approve and authorize, pursuant to Sections 105, 363 and 365 of the Bankruptcy Code: (i) the execution, delivery and performance by Seller of this Agreement, (ii) the sale of the Purchased Assets to the Purchaser on the terms set forth herein and free and clear of all Liens, Claims and interests, and (iii) the performance by Seller of its obligations under this Agreement, and (iv) Seller's assumption and assignment to the Purchaser of the Assumed Agreements; (c) find that (i) Purchaser is a "good faith" buyer within the meaning of Section 363(m) of the Bankruptcy Code, not a successor to Seller and grant the Purchaser, as purchaser of the Purchased Assets and as assignee of the Assumed Agreements, the protections of Section 363(m) of the Bankruptcy Code, (ii) the Purchase Price paid for the Purchased Assets is fair value and reasonably equivalent value, and (iii) this Agreement was negotiated, proposed and entered into by the Parties without collusion, in good faith and from arm's length bargaining positions; (d) order that (i) the Bankruptcy Court shall retain jurisdiction to resolve any controversy or claim arising out of or relating to this Agreement, or the breach hereof as provided in Section 16.2 hereof, and (ii) this Agreement and the transactions contemplated hereby are not subject to rejection or avoidance by, and shall be binding upon any chapter 7 or chapter 11 trustee of the Seller, and shall continue in full force and effect following dismissal of the Bankruptcy Case; and (e) waive the fourteen (14) day stay of Federal Rule of Bankruptcy Procedure 6004(h) and 6006(d).

"**Schedule**" has the meaning set forth in Section 5.

"**Seller**" has the meaning set forth in the introductory paragraph to this Agreement.

"**Seller's Management Team**" means the CRO, Greg Hernandez, Ricardo Camberos and Thuy Howe.

"**Seller Savings Plans**" has the meaning set forth in Section 10.5(b).

"**Store Cash**" means any and all Cash as of the Closing at all of locations where the Seller conducted its Business on or before the Closing.

"**Stub Rent**" has the meaning set forth in Section 2.4(b).

7

**"Supplemental Assumption Motion"** has the meaning set forth in Section 14.1(e).

**"Taxes"** means all taxes however denominated, including any interest, penalties or additions to tax that may become payable in respect thereof, imposed by any governmental body, which taxes shall include, without limiting the generality of the foregoing, all income taxes, payroll and employee withholding taxes, unemployment insurance, social security, sales and use taxes, excise taxes, franchise taxes, gross receipts taxes, occupation taxes, real and personal property taxes, stamp taxes, transfer taxes, workmen's compensation taxes and other obligations of the same or a similar nature, whether arising before, on or after the Closing; and **"Tax"** shall mean any one of them.

**"Tax Returns"** means any return, report, information return or other document (including any related or supporting information) filed or required to be filed with any governmental body in connection with the determination, assessment, collection or administration of any Taxes.

**"Title Certificates"** means the certificates of title to be executed by Seller and delivered to Purchaser at Closing transferring title to Purchaser of the Automobiles.

**"Trademark Assignments"** has the meaning set forth in Section 2.3.

**"Transferred Employees"** has the meaning set forth in Section 10.1.

**"Trust"** has the meaning set forth in Section 3.3(f).

**"Wreath"** has the meaning set forth in the introductory paragraph of this Agreement.

SECTION 2.    PURCHASE AND SALE OF THE PURCHASED ASSETS.

Section 2.1.    Purchased Assets.

(a)    Subject to the terms and upon the conditions set forth herein, Seller shall sell, convey, transfer, assign and deliver to Purchaser, and Purchaser shall purchase and acquire from Seller, on the Closing Date, all legal and beneficial right, title and interest of Seller in and to any and all assets of every kind and description, whether tangible or intangible, real, personal or mixed, wherever situated, owned, held or used by Seller in the conduct of, or related to, the Business except for the Excluded Assets (as defined below) and provided that Contracts and Leases will only include those that are to be assigned to or assumed by Purchaser as listed on Schedule 2.1(a)(iii) and Schedule 2.1(a)(iv) (and specifically excluding any other Contracts and Leases including, without limitation, those Contracts and Leases listed on Schedule 2.1(a)(1)), the "**Rejected Agreements**") (collectively, the "**Purchased Assets**"). The Purchased Assets shall be sold, transferred, assigned and delivered free and clear of any Liens (except Permitted Liens), Claims and interests and shall specifically include, without limitation, Seller's legal and beneficial right, title and interest in and to the following:

8

(i)      all of the title, rights and interests in and to the Leases and the Leased Real Property identified on Schedule 2.1(a)(iii) and Schedule 2.1(a)(iv) as being assigned to Purchaser;

(ii)     all machinery, furniture, fixtures, tooling, spare parts, supplies, office equipment, computers, telephone and other communications systems and switches, other office assets, maintenance equipment, inventory (whether on hand or on consignment), finished goods, raw materials and work in progress and all other tangible personal property owned by Seller, including the items listed on Schedule 2.1(a)(ii) (collectively, the "**Fixed Assets**");

(iii)    all of Seller's rights under the Contracts and Leases identified by the parties for assumption and assignment to Purchaser on Schedule 2.1(a)(iii) (collectively, the "**Assumed Agreements and Leases**");

(iv)    all of Seller's rights under the Leases identified by the parties for assumption and assignment with certain modifications to Purchaser on Schedule 2.1(a)(iv) (collectively, the "**Assumed and Modified Leases**");

(v)     all financial books, accounting records, files, lists, publications, and other records and data of Seller regardless of the medium on which such information is stored or maintained (the "**Records**");

(vi)    all general intangibles;

(vii)   all instruments, securities and investment property;

(viii)  all goodwill of Seller relating to the Business;

(ix)    all customer lists used by the Business;

(x)     all Store Cash;

(xi)    all Cash (excluding Store Cash) as of Closing in excess of the Excluded Cash (the "**Excess Cash**");

(xii)   all Intellectual Property of Seller including, without limitation, that which is listed on Schedule 2.1(a)(xii);

(xiii)  all Permits and all financial assurance instruments, including letters of credit and surety or other bonds;

(xiv)   all accounts receivable and all notes and other receivables of every kind or character, and any instruments evidencing the foregoing (the "**Accounts Receivable**") and all causes of action specifically pertaining to the collection of the foregoing;

9

(xv)    all claims, rights and causes of action of Seller, including, without limitation, all avoidance actions under Chapter 5 of the Bankruptcy Code ("**Avoidance Actions**");

(xvi)    the telephone and facsimile numbers currently used in connection with the Business;

(xvii)    the depository accounts and lockbox arrangements benefiting the Business, including those listed on Schedule 5.18, but excluding the Cash therein pursuant to Section 2.1(b)(i);

(xviii)    all Deposits and prepaid expenses as of the Closing Date relating to the Business;

(xix)    all Insurance Contracts and claims thereunder of Seller;

(xx)    all of Seller's rights under California Department of Alcoholic Beverage Control License, License No. 478985 for the premises located at 10562 Craftsman Way, Ste. 192, San Diego, California 92127 (the "**Liquor License**"); and

(xxi)    any other assets (whether tangible or intangible, real, personal or mixed) owned, held or used by Seller including Tax attributes (excluding Tax refunds accruing as of the Closing Date, but including any other refunds, loss carryforwards, claims, defenses, credits or similar benefits), and all other assets of any kind or nature whatsoever whether or not used in the Business (the "**Other Assets**").

(b)    The Purchased Assets shall not include any of Seller's right, title or interest in or to any of the following assets (collectively, the "**Excluded Assets**"):

(i)    all of Seller's Cash (excluding Store Cash) on hand as of Closing (the "**Excluded Cash**") in amount up to the benchmark amount of $1,962,548 (the "**Excluded Cash Benchmark Amount**") subject to the reduction of the Excluded Cash Benchmark Amount on a dollar-for-dollar basis to the extent that any of the amounts set forth on Schedule 2.4(a)(ii) are paid by Seller prior to the Closing Date;

(ii)    any Rejected Agreements;

(iii)    any corporate minute books, organizational documents, stock ledgers and other corporate books and records of Seller;

(iv)    the Abandoned Assets;

(v)    all Employee Benefit Plans (except to the extent set forth on Schedule 2.1(a)(iii)); and

10

(vi)    Seller's rights under this Agreement and the Ancillary Agreements.

Section 2.2.    Assumption and Assignment of Leases and Contracts.

(a)    Schedule 2.1(a)(iii) lists all Contracts and Leases of Seller that Purchaser has designated to be assumed and assigned by Seller to Purchaser at Closing (the "**Assumed Agreements and Leases**") and lists the respective Cure Costs for each of the Assumed Agreements and Leases.

(b)    Schedule 2.1(a)(iv) lists all Leases that Purchaser has designated to be assumed, modified and assigned by Seller to Purchaser at Closing (the "**Assumed and Modified Leases**" together with the Assumed Agreements and Leases, the "**Assumed Agreements**") and lists the respective Cure Costs for each of the Assumed and Modified Leases.

(c)    Schedule 2.1(a)(1) lists all Contracts and Leases of Seller that shall be rejected (the "**Rejected Agreements**") with such rejection effective: (x) for Contracts on July 31, 2010; (y) for Leases, the earlier to occur of (i) August 6, 2010, or (ii) the date upon which the Seller has surrendered possession of the premises relating to such Lease.

Section 2.3.    Documents at Closing Date.  The sale, transfer, assignment and delivery by Seller of the Purchased Assets to Purchaser, as herein provided, shall be effected on the Closing Date by the due execution and delivery (notarized where necessary) of the bill of sale ("**Bill of Sale**"), trademark assignments ("**Trademark Assignments**"), domain name assignments ("**Domain Name Assignments**"), Contract Assignment, Lease Assignments, Title Certificates,  and an Assignment and Assumption Agreement, in the forms attached hereto as Exhibits A, B, C, D, E, F, and G, respectively, and, where agreed to by Purchaser and the lessors thereof, amendments of the Leases listed on Schedule 2.1(a)(iv) ("**Lease Amendments**"). Further, on the Closing Date, Seller, on the one hand, and Purchaser, on the other hand, shall each deliver to the other such other documents, estoppels or instruments of sale, assignment or transfer as are customary in transactions such as the transactions contemplated by this Agreement and as the other shall reasonably request.

Section 2.4.    Assumption of Assumed Liabilities; Exclusion of Excluded Liabilities.

(a)    Assumed Liabilities.  On the Closing Date, Purchaser shall assume and agree to pay, perform and discharge when due only:

(i)    the liabilities and obligations of Seller under the Assumed Agreements (excluding any liabilities or obligations arising out of any breach by Seller of the terms thereof, violations of law and further excluding any Cure Costs), but only to the extent such liabilities and obligations first arise and are related to periods subsequent to the Closing Date (the liabilities so assumed, collectively, the "**Assumed Agreement Liabilities**");

(ii)    subject to the provisions of Section 3.3, the liabilities of the Seller incurred after the Petition Date in the ordinary course of business for: (x) the

11

items specified on Schedule 2.4(a)(ii) hereto in an amount not to exceed under any circumstances $1,990,000 (the "**Post-Petition Ordinary Course Benchmark**") with the Post-Petition Ordinary Course Benchmark subject to reduction on a dollar-for-dollar basis if the Seller pays prior to Closing amounts for payroll (including, without limitation, payroll and accrued paid time off for Seller's corporate Employees) that are included in the Post-Petition Ordinary Course Benchmark plus any Excess Assumed Ordinary Course Liabilities (as defined below) and Overage Excess Assumed Ordinary Course Liabilities (as defined below) assumed at Closing by the Purchaser in accordance with this Agreement (collectively, the "**Post-Petition Ordinary Course Liabilities**")[1]; and (y) the allowed fees and expenses of KPMG Corporate Finance LLC pursuant to that certain "Order On Application Of Debtor and Debtor in Possession For Order Authorizing the Employment And Retention of KPMG Corporate Finance LLC As Real Estate Advisor Effective As Of March 5, 2010" [Docket No. 188] (as the same may be amended, supplemented or modified, the "**KPMG Allowed Fees**" together with the Assumed Agreement Liabilities, Post-Petition Ordinary Course Liabilities, and the KPMG Allowed Fees, the "**Assumed Liabilities**");

(iii)    Purchaser expressly assumes no other liabilities of Seller or the Business.  The assumption of the Assumed Liabilities shall be effected on the Closing Date pursuant to an Assignment and Assumption Agreement in the form attached hereto as Exhibit G (the "**Assignment and Assumption Agreement**").

(b)    Amounts Due Under Contracts and Leases; Cure Costs.  Set forth on Schedule 2.4(b) is a list of the costs that pursuant to Bankruptcy Code Section 365(b) shall be required to cure any default on the part of Seller under the Assumed Agreements, or with respect to which adequate assurance of prompt cure by Seller must be provided as a prerequisite to the assumption of such Assumed Agreements under Bankruptcy Code Section 365(a) (the "**Cure Costs**").  Subject to Section 3.3(c) hereof, Seller shall pay all Cure Costs associated with the Assumed Agreements and any Contracts or Leases that subsequently become Assumed Agreements.  For the avoidance of doubt, Cure Costs shall not include any rent allegedly owing from the Petition Date until last day of month in which the Petition Date occurred ("**Stub Rent**").

(c)    Excluded Liabilities.  Except as otherwise expressly assumed by Purchaser pursuant to Section 2.4(a) hereof, Purchaser shall not assume or pay, perform or discharge, nor shall Purchaser be responsible, directly or indirectly, for any debts, liabilities, obligations, accounts or trade payables, Contracts (including liabilities for breach of contract and any Cure Costs), liabilities relating to Taxes, Environmental Laws, Hazard Materials or ERISA, liabilities related to any Employee Benefit Plans, bulk sales liabilities, transfer Taxes, violation of law, torts, and legal proceedings relating to any Excluded Assets, or any other liability of any kind or nature (fixed or contingent, known

---

[1] With respect to Purchaser's payment of the Post-Petition Ordinary Course Liabilities to be assumed at Closing, at Closing, Purchaser and Seller will agree upon a funding mechanism for payment of the same, which mechanism may include for payment of accrued payroll and accrued sales taxes, Purchaser providing the Seller funds, in trust, for Seller to pay the pro-rata pre-closing portion of such Post-Petition Ordinary Course Liabilities.

12

or unknown) of Seller or any of its Affiliates that is not an Assumed Liability (all such debts, obligations, payables, Contracts or liabilities being herein referred to as the "**Excluded Liabilities**").  Without limiting the foregoing and except for the Assumed Liabilities, Purchaser shall not assume or be responsible at any time for any liability, obligation, debt or commitment of Seller, whether absolute or contingent, accrued or unaccrued, asserted or unasserted, or otherwise, including but not limited to any liabilities, obligations, debts or commitments of Seller incident to, arising out of or incurred with respect to, this Agreement and the transactions contemplated hereby.  Without limiting the generality of the foregoing, Seller expressly acknowledges and agrees that Seller shall retain, and that Purchaser shall not assume or otherwise be obligated to pay, perform, defend or discharge, (a) any liability of Seller for Taxes arising out of the ownership or operation of the Business or Purchased Assets prior to the Closing Date, whether measured by income or otherwise, (b) any liability of Seller in connection with any employee benefit plan, including, without limitation, any liability of Seller under ERISA, (c) any liability of Seller under any federal, state or local law, rule, regulation, ordinance, program, permit, or other legal requirement relating to health, safety, hazardous materials and environmental matters applicable to Seller's business and/or the facilities used by Seller (whether or not owned by Seller), (d) any product liability pertaining to products sold or manufactured by Seller, (e) any liability for customer rebates or adjustments with respect to any period prior to the Closing Date, (f) any liability or obligation of Seller relating to any default taking place before the Closing Date under any of the Assumed Liabilities to the extent such default created or increased the liability or obligation, or (g) any obligation of Seller to any shareholder or affiliate of Seller, or any person claiming to have a right to acquire any capital stock or other securities of the Seller.  All such Excluded Liabilities shall remain liabilities of Seller.

(d)    <u>Consent to Assumption</u>.  Seller will request in the Sale Motion  entry of an order from the Bankruptcy Court (which may be the Sale Order) authorizing Seller to assume and assign the Assumed Agreements to Purchaser.

(e)    <u>Treatment of Real Property Where Lease Not Designated as Assumed Agreement</u>.  For any Leased Real Property relating to a Lease that is a Rejected Agreement: (x) the related inventory and furniture, fixtures and equipment shall be, in the sole and absolute discretion of Purchaser: (i) moved to Leased Real Property where the underlying Lease is an Assumed Agreement at the expense of Seller; (ii) abandoned to the landlord at the applicable Leased Real Property (the "**Abandoned Assets**"); or (iii) sold with the proceeds to be included in Cash as of the Closing Date; and (y) the related Contracts assumed and assigned to Purchaser, or rejected.

Section 2.5.    <u>Disclosure Schedule Updates; Cure Costs</u>.  Notwithstanding anything in this Agreement to the contrary, the Purchaser may:

(a)    Revise any schedule setting forth the Purchased Assets and the Excluded Assets to (i) include in the definition of Purchased Assets (pursuant to the applicable schedule) and to exclude from the definition of Excluded Assets any Contract or Lease or asset of Seller not previously included in the Purchased Assets, at any time on or prior to

13

August 3, 2010, provided, however, that if Purchaser wishes to remove any Contract or Lease listed as a Rejected Agreement on Schedule 2.1(a)(1) and add such Contract or Lease to Schedule 2.1(a)(iii) among the Assumed Agreements and Leases, or to Schedule 2.1(a)(iv) among the Assumed and Modified Leases, Purchaser must notify Seller of such designation by no later than July 27, 2010.

(b)     Revise any schedule setting forth the Purchased Assets and the Excluded Assets to exclude from the definition of Purchased Assets (pursuant to the applicable schedule) and to include in the definition of Excluded Assets, and, as applicable, add to the list of Rejected Agreements set forth in Schedule 2.1(a)(1), any Assumed Agreement or other asset of Seller previously included in the Purchased Assets and not otherwise included in the definition of Excluded Assets, at any time on or prior to August 3, 2010.

(c)     If any Contract or Lease is added to (or excluded from) the Purchased Assets and Assumed Agreements as permitted by this Section 2.5, Seller shall promptly take such steps as are reasonably necessary, including, if applicable, payment or adequate assurance of payment of all Cure Costs and prompt delivery of notice to the non-debtor counterparty and obtaining approval of the Bankruptcy Court, to cause such Contracts and/or Leases to be assumed by Seller, and assigned to Purchaser, on the Closing Date (or excluded under the Sale Order and this Agreement).

SECTION 3.   PURCHASE PRICE.

Section 3.1.   Purchase Price. In consideration of the sale and transfer of the Purchased Assets, Purchaser shall, at the Closing, pay, deliver or assume (collectively, the "**Purchase Price**") the following for the benefit of the Seller:

(a)     As elected by Purchaser, either (i) a credit bid in the aggregate amount equal to the secured portion of the outstanding Obligations due and owing under the Credit Agreement as of the Petition Date plus the Adequate Protection Obligations (as defined in the Final Cash Collateral Order)    (collectively, the "**Outstanding Obligations**") in the amount to be determined by Purchaser in its sole and absolute discretion but not to exceed $13,829,683.96 (the "**Credit Bid**"); or (ii) a sale of the Purchased Assets subject to all Outstanding Obligations and Purchaser's Liens, Claims and interests which secure the Outstanding Obligations as same may be amended and restated by Wreath LLC as of the Closing;

(b)     Assumption of the Assumed Liabilities; and

(c)     payment of cash in the amount of $928,927 (the "**Cash Payment**") plus (or minus, as applicable) the adjustments in Section 3.3.

Section 3.2.   Allocation of Purchase Price. Purchaser and Seller agree to allocate the Purchase Price for all Tax purposes in accordance with an allocation statement to be prepared by Purchaser and presented to Seller not less than five (5) days after the Closing Date (the "**Allocation Statement**"), which Allocation Statement shall be prepared in accordance with Section 1060 of the Code, including the regulations promulgated thereunder, and shall be

14

acceptable to Seller in its reasonable discretion. All Tax Returns, including IRS Form 8594, shall be filed consistent with such Allocation Statement. Neither Purchaser nor Seller shall voluntarily take a position on any Tax Return or before any governmental agency charged with the collection of any such Tax that is any manner inconsistent with the terms of such Allocation Statement.

Section 3.3.    Adjustment to Assumption of Liabilities and Cash Payment.

(a)    If the Post-Petition Ordinary Course Liabilities exceed the Post-Petition Ordinary Course Benchmark (the positive differential of these two amounts, the "**Excess Assumed Ordinary Course Liabilities**"), then: (x) if there is Excess Cash, Purchaser shall assume the amount of the Excess Assumed Ordinary Course Liabilities to the extent of the Excess Cash; (y) if there is no Excess Cash, or the Excess Assumed Ordinary Course Liabilities exceed the Excess Cash, then the Purchaser shall assume $100,000 of the Excess Assumed Ordinary Course Liabilities in excess of the Excess Cash; and (z) if the Excess Assumed Ordinary Course Liabilities are in excess of the sum of: (i) Excess Cash; and (ii) $100,000 (collectively, the "**Overage Excess Assumed Ordinary Course Liabilities**"), then Purchaser shall assume the Overage Excess Assumed Ordinary Course Liabilities up to an amount equal to the Cash Payment [as adjusted per Sections 3.3(b), 3.3(c), 3.3(d) and 3.3(e) (the "**Adjusted Cash Payment**")], and the Adjusted Cash Payment shall be reduced on a dollar-for-dollar basis. If the Excess Assumed Ordinary Course Liabilities exceed the sum of: (x) the Excess Cash; (y) $100,000; and (z) the Adjusted Cash Payment, the Seller shall be responsible for the payment of such Excess Assumed Ordinary Course Liabilities and such Excess Assumed Ordinary Course Liabilities shall not be Assumed Liabilities.

(b)    Except with respect to any payroll expenses relating to any of the Original Closed Locations (as defined below), the Cash Payment shall be increased on a dollar-for-dollar basis to the extent of Seller's payment of payroll and accrued paid time off before Closing that are scheduled to be part of the Post-Petition Ordinary Course Liabilities.

(c)    If the aggregate amount necessary to pay Cure Costs for all Assumed Agreements exceeds $400,000 (the "**Cure Costs Benchmark**"), then the Cash Payment shall be increased by such amount that the aggregate Cure Costs exceeds the Cure Costs Benchmark. If the aggregate Cure Costs to be paid for all Assumed Agreements is less than the Cure Costs Benchmark, then the Cash Payment shall be decreased by the difference between the Cure Costs Benchmark and the actual aggregate amount of all Cure Costs.

(d)    Any recurring monthly payment under an Assumed Agreement that is made by the Seller prior to the Closing Date that applies to a period after that the Closing Date shall be apportioned between Seller and Purchaser as of the Closing Date and the Cash Payment shall be adjusted accordingly. Any such apportionment shall be based upon the number of days covered by the relevant payment as provided for in the applicable Contract (the "**Payment Period**") and the payment shall be apportioned to the Seller based on the number of days in the Payment Period which fall before and on the

15

Closing Date and the payment shall be apportioned to the Purchaser based upon the number of days in the Payment Period which fall after the Closing Date.

(e)      To the extent that Purchaser elects to remove from Schedule 2.1(a)(1) as a Rejected Agreement, a Lease for any of the Seller's store locations listed on Schedule 3.3(e) (collectively, the "**Original Closed Locations**"), the Cash Payment shall be reduced for each such Original Closed Locations removed from Schedule 2.1(a)(1) by the amount set forth in the column labeled "Total Cash/Working Capital Impact" on Schedule 3.3(e) corresponding to such store location.  To the extent that Purchaser elects to add any Lease to Schedule 2.1(a)(1) as a Rejected Agreement that is not included in the Original Closed Locations listed on Schedule 3.3(3), the Cash Payment shall be increased by an amount for each such Lease that is added to Schedule 2.1(a)(1) as a Rejected Agreement, which amount shall be the calculated amount of the total cash/working capital impact of adding such a Lease to Schedule 2.1(a)(1), and which amount shall be calculated for each such Lease added to Schedule 2.1(a)(1) using the same methodology and variables as used in Schedule 3.3(e) to calculate the Total Cash/Working Capital Impact for the Original Closed Locations.

(f)      If the Committee affirmatively supports, and does not object to or otherwise impede, and no creditor that is a member of the Committee objects to or otherwise impedes, approval of the Sale Motion and the Closing, then Purchaser will at Closing deposit $185,525 in a trust account (the "**Trust**") to be established and administered by the Committee (or its designee) to be used for the purpose, at the election of the Committee (to be elected in writing three (3) business days prior to the Closing) of either: (i) funding a pro-rata distribution for the benefit of holders as of the Petition Date of allowed general unsecured claims against the Seller; or (ii) increasing the Cash Payment. To the extent that Purchaser has an allowed general unsecured claim against Seller, Purchaser will waive the right to participate in any distribution to general unsecured creditors from the Trust or the Seller's bankruptcy estate.  Administrative costs incurred to establish and administer the Trust will be borne solely by the Trust.

SECTION 4.   CLOSING.

Section 4.1.   Closing.  Subject to the satisfaction of the conditions set forth in Sections 11, 12, and 13 hereof or the waiver thereof by the party entitled to waive the applicable condition, the closing of the sale and purchase of the Purchased Assets and of the other transactions contemplated hereby (the "**Closing**") shall take place within three (3) days after the date on which the Bankruptcy Court enters the Sale Order (which shall be final and non-appealable unless waived by the Purchaser), but in no event shall the Closing occur (subject to the conditions herein) after August 6, 2010, without the written consent of Purchaser.  The Closing shall take place at the offices of Greenberg Traurig, LLP at 2450 Colorado Avenue, Suite 400 East, Santa Monica, CA 90404, or at such other place as may be mutually agreed to by the parties hereto.  The term "**Closing Date**," as used in this Agreement, shall mean the date on which such Closing takes place and the Closing shall be deemed effective as of the end of business on the Closing Date.  The parties acknowledge and agree that time is of the essence with respect to a Closing on or prior to August 6, 2010.

16

Section 4.2.    <u>Deliveries at Closing</u>.  At the Closing, the parties shall deliver to each other the Ancillary Agreements and Purchaser shall deliver to Seller the Purchase Price.

SECTION 5.    <u>REPRESENTATIONS AND WARRANTIES OF SELLER</u>.

Except as set forth on the corresponding numbered sections or otherwise readily apparent on its face in another section (each, a "**Schedule**") of the disclosure letter delivered by Seller to Purchaser immediately prior to the Execution Date (the "**Disclosure Letter**"), Seller hereby represents and warrants as true and correct to Purchaser as follows on and as of the Execution Date and on and as of the Closing Date:

Section 5.1.    <u>Corporate Organization</u>.  Seller is a corporation duly organized, validly existing and in good standing under the laws of California and has all requisite corporate power and authority to own its properties and assets and to conduct the Business as now conducted and, subject to entry of the Sale Order, to perform its obligations hereunder and under any Ancillary Agreement to which it is or will be a party.

Section 5.2.    <u>Qualification to Do Business</u>.  Seller is duly qualified and/or licensed to transact business in all jurisdictions where the conduct of its Business or the ownership of the Purchased Assets make such qualification and/or licensing necessary, which jurisdictions are set forth on <u>Schedule 5.2</u>.

Section 5.3.    <u>Authorization and Validity of Agreement</u>.  (a) Seller has all requisite corporate power and, subject to entry of the Sale Order, authority to enter into this Agreement and each of the Ancillary Agreements to which it is a party and to carry out its obligations hereunder and thereunder, and (b) the execution and delivery of this Agreement and the Ancillary Agreements to which Seller is a party and the performance of its obligations hereunder and thereunder have been duly authorized by all necessary corporate action by the CRO of the Seller, and subject to entry of the Sale Order no other corporate proceeding on the part of Seller will be necessary to authorize such execution, delivery and performance.  This Agreement has been, and as of the Closing Date each Ancillary Agreement to which Seller is a party will be, duly executed by Seller and constitutes, or as of the Closing Date will constitute, the valid and binding obligation of Seller, enforceable against it in accordance with its terms.

Section 5.4.    <u>No Conflict or Violation</u>.  Subject to the approval of the Bankruptcy Court pursuant to the Sale Order, the execution, delivery and performance by Seller of this Agreement and of the Ancillary Agreements to which it is a party and the consummation of the transactions contemplated hereby and thereby: (a) do not and will not violate or conflict with any provision of the Certificate of Incorporation or Bylaws of Seller, (b) do not and will not violate any provision of law or any order, judgment or decree of any court or other governmental or regulatory authority, (c) do not and will not violate or result in a breach of (with due notice or lapse of time or both), conflict with, or result in any violation of or default (with due notice or lapse of time or both) under, or give rise to a right of termination, cancellation or acceleration of any obligation or to loss of a material benefit under, or give rise to any obligation of Seller or Purchaser to make any payment under any provision, in each case under any Assumed Agreement or Permit, (d) will not result in the creation or imposition of any Lien (other than Permitted Liens) upon any of

17

the Purchased Assets, and (e) will not result in the cancellation, modification, revocation or suspension of any material Contract or Permit.

Section 5.5.    Consents and Approvals.    Schedule 5.5 sets forth a true and complete list of each consent, waiver, authorization or approval of (a) any governmental or regulatory authority, domestic or foreign, and each declaration to or filing or registration with any such governmental or regulatory authority, and (b) any Person under any Material Contract or Permit, in each case that is required in connection with the execution and delivery of this Agreement by Seller or the performance by Seller of its obligations hereunder and under any Ancillary Agreement and the consummation of the transactions contemplated hereby and thereby.

Section 5.6.    Good Title; Sufficiency of Assets.

(a)    Except as set forth on Schedule 5.6(a), Seller has good and marketable title in and to the Purchased Assets owned by Seller, and Seller has (and will have and will convey to Purchaser at the Closing) valid and enforceable leasehold interests in the Purchased Assets leased by Seller, in each case free and clear of any Liens other than Permitted Liens. As used in this Agreement, the term "**Permitted Liens**" means (i) Liens for Taxes not yet payable; (ii) easements, rights of way, restrictive covenants, encroachments and similar non-monetary encumbrances or non-monetary impediments against any of the Purchased Assets which do not, individually or in the aggregate, adversely affect the ownership, operation or development of the Purchased Assets and, in the case of Leases that are Assumed Agreements, which do not, individually or in the aggregate, adversely affect the use or occupancy of such Leased Real Property as it relates to the ownership of the Purchased Assets or materially detract from the value of the Leased Real Property and (iii) applicable zoning Laws, building codes, land use restrictions and other similar restrictions imposed by Law.

(b)    To the Knowledge of Seller, the Purchased Assets have been maintained in accordance with Seller's standard practices and manufacturers' recommendations. To the Knowledge of Seller, the Purchased Assets are in good operating condition, reasonable wear and tear excepted, suitable for the purposes for which they have been used by Seller.

(c)    Except for the Excluded Assets, the Purchased Assets will be sufficient in all material respects for the continued conduct of the Business at and after the Closing in substantially the same manner as conducted prior to the Closing by Seller.

Section 5.7.    Absence of Certain Changes or Events.

(a)    Except as set forth on Schedule 5.7, since the Petition Date, to the Knowledge of Seller, Seller has not:

(i)    acquired any material assets, other than acquisitions of Inventory in the ordinary course of business;

(ii)    suffered any material uninsured loss, damage, destruction or other casualty to the Purchased Assets;

18

(iii)    sold, leased, transferred or assigned any material assets, tangible or intangible, other than the disposition of obsolete or immaterial assets not necessary for the conduct of the business by Seller or the sale of Inventory in the ordinary course of business;

(iv)    accelerated, terminated, modified, amended, or cancelled any Assumed Agreement, or waived, released or assigned any material rights or claims thereunder, in each case, in a manner adverse to Seller (and, to the Knowledge of Seller, no other party to any such Assumed Agreement has accelerated, terminated, modified, amended, or cancelled such Assumed Agreement, or waived, released or assigned any rights or claims thereunder);

(v)    imposed or created any Liens (other than Permitted Liens) upon any of the Purchased Assets, tangible or intangible, that would be binding on the Purchaser;

(vi)    incurred or made any capital expenditure;

(vii)    created, incurred, assumed, or guaranteed any indebtedness;

(viii)    granted any bonus opportunity or any increase in any type of compensation or benefits, including severance or termination pay, to any of its current or former directors, Employees or consultants, except for increases in base compensation in the ordinary course of business;

(ix)    paid any bonus, except for bonuses paid or accrued in the ordinary course of business;

(x)    delayed or postponed the payment of undisputed accounts payable or any other undisputed liabilities of Seller in any material respect (except as required by the Bankruptcy Code);

(xi)    adopted, made or agreed to (a) any welfare, pension, retirement, profit-sharing, incentive compensation or similar plan, program, payment or arrangement for any Employee except pursuant to the existing Employee Benefit Plans or (b) any new employment or change of control agreement;

(xii)    made any material addition to or modification of any Employee Benefit Plan, other than (a) contribution to such plans made in the ordinary course of business or (b) the extension of coverage to Employees of the Seller who became eligible after June 28, 2010;

(xiii)    changed any finance or Tax accounting methods, principles or practices, except insofar as may have been required by a change in generally accepted accounting principles or applicable law;

(xiv)    made any Tax election or any settlement or compromise of any material Tax liability; or

19

(xv)    received any written notice of any proposed cancellation or termination of any Assumed Agreement.

Section 5.8.    Real Property.

(a)    Schedule 5.8(a) sets forth the street addresses of each parcel of Leased Real Property, and such other real property leased by Seller that does not constitute Leased Real Property. Except for the locations listed on Schedule 5.8(a), to the Knowledge of Seller, Seller does not lease any real property used in the Business.

(b)    Except as set forth on Schedule 5.8(b):

(i)    To the Knowledge of Seller, there are no leases, subleases, options, rights of first offer, rights of first refusal or other conditional or unconditional rights, options or agreements, written or oral, granting to any Person the right to purchase, use or occupy the Leased Real Property or any portion thereof.

(ii)    There is no pending condemnation, expropriation, eminent domain or similar proceeding affecting all or any portion of the Leased Real Property, and, to the Knowledge of Seller, no such proceeding is threatened. Seller enjoys peaceful and undisturbed possession of the Leased Real Property sufficient for the current operations and uses of such Leased Real Property by Seller in connection with the Business.

(iii)    There are no proceedings pending and brought by, or to the Knowledge of Seller, threatened by, any third party which would result in a change in the allowable uses of the Leased Real Property or which would modify the right of Purchaser to use the Leased Real Property (including access rights) for its current uses after the Closing Date.

(iv)    Seller has delivered to Purchaser true and complete copies of the Leases with respect to all of Seller's Leased Real Property, and the Leases are each in full force and effect. Neither Seller nor, to the Knowledge of Seller, the respective landlords are in breach or default under any Lease that has not been cured or waived, and, to the Knowledge of Seller, no event has occurred or circumstance exists that, with the delivery of notice, the passage of time or both, would constitute such a breach or default, or permit the termination, modification or acceleration of rent under any Lease. Seller's possession and quiet enjoyment of the Leased Real Property under the Leases has not been disturbed or threatened, and there are no currently pending material disputes with respect to any Lease. No security deposit or portion thereof deposited with respect to any Lease has been applied in respect of a breach of or default under a Lease that has not been redeposited in full.

Section 5.9.    Intellectual Property.

(a)    To the Knowledge of Seller, Schedule 2.1(a)(xi) sets forth a complete and correct listing of all (i) registered trademarks and service marks and applications

20

therefore, (ii) patent applications and granted patents, (iii) domain names, and (iv) any other Intellectual Property, in each case that are owned or used by Seller and forming part of the Purchased Assets. Except as described on Schedule 2.1(a)(xi) , all Intellectual Property listed therein is owned by Seller free and clear of all Liens (other than Permitted Liens) and is not the subject of any pending or, to the Knowledge of Seller, threatened challenge. Except as described in Schedule 2.1(a)(xi) , there are no unresolved claims made and there has not been communicated to Seller the threat of any claim that the use of such Intellectual Property is in violation or infringement of any service mark, patent, trademark, trade name, trademark or trade name registration, copyright or copyright registration of any other Person. Except as set forth on Schedule 2.1(a)(xi), Seller has not granted any license to any of such Intellectual Property and Seller has no legal obligation to grant any such license.

(b)    To the Knowledge of Seller, Schedule 5.9(b) lists all licenses to Intellectual Property received by Seller with respect to the Business (collectively, the "**5.9(b) License Agreements**"). Except as set forth in Schedule 5.9(b), Seller is under no obligation to pay any royalties or similar payments in connection with any Intellectual Property license to any of their Affiliates or to any third party.

(c)    To the Knowledge of Seller, Schedule 5.9(c) sets forth a list of (i) all domain names owned or used by the Seller (the "Domain Names"), (ii) whether each such domain name was obtained directly from a domain name registrar, (iii) for any domain name acquired from other than a domain name registrar, the identity of whom obtained from, (iv) the registrar where the domain name is registered and (v) the expiration date of the domain name. To the Knowledge of Seller, Seller has not received any written or oral communications from third parties challenging the use of any domain name and to the Knowledge of the Seller no basis for such challenge exists. To the Knowledge of Seller, no one is using domain names that are similar to the Domain Names. Except as set forth on Schedule 5.9(c) each of the Seller's websites has been developed by Seller and all content and source code thereof is owned by Seller.

Section 5.10.    Permits.  To the Knowledge of Seller, Schedule 5.10 sets forth a true and complete list of all material licenses, permits, franchises, authorizations and approvals issued or granted to Seller with respect to the Business by the federal government, any state or local government, any foreign national or local government, or any department, agency, board, commission, bureau or instrumentality of any of the foregoing and all pending applications therefore (collectively, the "**Permits**"). To the Knowledge of Seller, each Permit has been duly obtained, is valid and in full force and effect, and is not subject to any pending or, to the Knowledge of Seller, threatened administrative or judicial proceeding to revoke, cancel, suspend or declare such Permit invalid in any respect. The Permits are sufficient and adequate to permit the continued lawful conduct of the Business in the manner currently conducted by Seller, and none of the operations of the Business is being conducted in a manner that violates any of the terms or conditions under which any Permit was granted.

Section 5.11.    Compliance with Law.  To the Knowledge of Seller, Seller has owned, leased and used its properties and assets, including the Purchased Assets, and has operated the Business in compliance with all applicable laws, regulations, orders and other requirements of all

21

courts and other governmental or regulatory authorities having jurisdiction over Seller and/or the Purchased Assets. To the Knowledge of Seller, there is no unresolved written notice from any governmental authority that the Purchased Assets or the operations of the Business are not being conducted in accordance with all applicable laws, regulations, orders and other requirements of all courts and other governmental or regulatory authorities having jurisdiction over Seller and/or the Purchased Assets. To the Knowledge of Seller, Seller has not violated, and the employment of the Seller's temporary employees, subcontractors or independent contractors does not violate, any rules or regulations of the U.S. Citizenship and Immigration Service or the Social Security Administration in any manner, whether by failure to keep any Company's 'I-9' compliance files up to date or otherwise. To the Knowledge of Seller, Seller is in compliance with the Labor Condition Application and Immigration Reform and Control Act of 1986 and maintain a current I-9 Employment Eligibility Verification Form in accordance with applicable regulations. Schedule 5.11 lists all workers who are working under any non-immigrant visa (e.g., H-IB, L, etc.), the type and expiration date of the visa, and whether the worker is an employee of the Seller or an independent contractor/subcontractor paid by Seller or any employee or independent contractor/subcontractor paid by any other person to whom the Seller makes payments for that worker's services. To the Knowledge of Seller, the employees, subcontractors, consultants and independent contractors of the Seller are residing and working in the United States (i) free of any restrictions or limitations on their ability to work in the United States (subject to the terms of their visas, if applicable), (ii) in compliance with all applicable laws, rules and regulations relating to immigration and naturalization, (iii) no proceeding has been filed or commenced against any of such employees, independent contractors or consultants alleging any failure so to comply or seeking deportation or other restrictions or limitations on their ability to reside or work in the United States and (iv) to the Knowledge of Seller, there is no reasonable basis for any of the foregoing. To the Knowledge of Seller, all employees, subcontractors, consultants and independent contractors listed (or required to be listed) on Schedule 5.11 will be able to continue to so reside and work in the United States in accordance with all such laws, rules and regulations (subject to the terms of such persons' visas, if applicable). All third parties providing temporary workers, subcontractors or independent contractors to the Seller have been and are in compliance with all applicable Laws including, without limitation, the U.S. Citizenship and Immigration Service and the Social Security Administration. To the Knowledge of Seller, the Seller is not in default with respect to any order, writ, judgment, award, injunction or decree of any governmental entity or arbitrator applicable to them or Seller's personnel or any of the assets of Seller, and Seller has no Knowledge of any factual circumstances that are likely to result in such default. Seller has not received any notice or other communication (whether oral or written) from any governmental entity or any other Person regarding any actual, alleged, possible or potential violation of, or failure to comply with, any term or requirement of any order to which the Seller is or has been subject. Copies of all notices of violation of any of the foregoing which the Seller has received within the past three (3) years are attached to Schedule 5.11. Other than the copy of the employee handbook attached hereto as Schedule 5.11, the Seller does not maintains an employee handbook or similar written policies for its employees. Each of the Seller's employees has completed an employment application substantially in the form attached hereto on Schedule 5.11. Except as set forth on Schedule 5.11, the Seller has not received any correspondence from the Social Security Administration or other governmental entity, including without limitation any "no match" or similar letters. Except as set forth on Schedule 5.11, the Seller has not been subject to or threatened with an audit, investigation or inquiry from the

22

Department of Labor, Department of Homeland Security, United States Citizenship & Immigration Service or other governmental entity.

Section 5.12.  Litigation. Except as set forth on Schedule 5.12, to the Knowledge of Seller, there are no claims, actions, suits, proceedings, labor disputes or investigations pending or, to the Knowledge of Seller, threatened, before any national, state or local court or governmental or regulatory authority, domestic or foreign, or before any arbitrator of any nature, brought by or against Seller or Seller's respective directors, employees, agents or Affiliates, involving, affecting or relating to the Business, the Purchased Assets or the transactions contemplated by this Agreement. Neither the Business nor the Purchased Assets is subject to any order, writ, judgment, award, injunction or decree of any national, state or local court or governmental or regulatory authority or arbitrator, domestic or foreign.

Section 5.13.  Material Contracts.

(a)  Schedule 5.13(a) sets forth a true and correct list and description of each of the following Contracts (each a "**Material Contract**"), and Seller has delivered (or otherwise made available) to Purchaser or its representatives true and correct copies of all such Material Contracts in Seller's possession:

(i)  each pension, profit sharing, stock option, employee stock purchase, bonus or other plan or arrangement providing for deferred or other compensation to Employees, former Employees or consultants, or any other employee benefit plan or arrangement, or any collective bargaining agreement or any other Contract with any labor union, or severance agreements, programs, policies or arrangements;

(ii)  all vendor, broker, distributor, dealer, manufacturer's representative, sales, distribution, vendor rebate, product purchase, sale discount, franchise, agency, sales promotion, market research, marketing consulting and advertising Contracts to which Seller is a party;

(iii)  each Contract for the employment of any officer, individual Employee or other Person on a full-time, part-time, consulting or other basis or relating to loans to officers, directors, managers or Affiliates;

(iv)  all agreements or indentures relating to borrowed money or other indebtedness or the mortgaging, pledging or otherwise placing a Lien on any asset or group of assets of Seller;

(v)  all Contracts under which Seller has advanced or loaned any other Person amounts;

(vi)  all Contracts that limit the ability of Seller to compete in any line of business or with any Person or in any geographic area or during any period of time;

(vii)    any document granting a power of attorney with respect to the conduct of the Business;

(viii)    any option or preferential right to purchase any assets or property rights of the Business;

(ix)    any guaranty, performance bond or similar agreement;

(x)    any Contract under which Seller is lessee of or holds or operates any personal property owned by any other party, except for any lease of personal property under which the aggregate annual rental payments do not exceed One Thousand Dollars ($1,000);

(xi)    any Contract or group of related Contracts with the same party or group of affiliated parties the performance of which involves consideration in the aggregate in excess of Five Thousand Dollars ($5,000);

(xii)    any assignment, license, indemnification or agreement with respect to any intangible property (including any Intellectual Property);

(xiii)    any warranty agreement with respect to Seller's services rendered or its products sold or leased;

(xiv)    any agreement with a term of more than six months which is not terminable by Seller upon less than thirty (30) days' notice without penalty and involves a consideration in excess of Five Thousand Dollars ($5,000) annually; and

(xv)    all other Contracts, whether or not made in the ordinary course of business, which are material to the Purchased Assets, the conduct of the Business, or that involves consideration in excess of Five Thousand Dollars ($5,000) annually.

(b)    To the Knowledge of Seller, each Material Contract is valid, binding and enforceable against Seller in accordance with its terms, and is in full force and effect on the Execution Date. To the Knowledge of Seller, Seller has performed in all material respects the obligations required to be performed by it to date under, and is not in default (except as a result of Seller's bankruptcy filing or any other provision described in Section 365(e) of the Bankruptcy Code) or delinquent in the performance (claimed or actual) in connection with, any Material Contract, and no event has occurred which, with due notice or lapse of time or both, would constitute such a default. No other party to any Material Contract is in default in respect thereof, and no event has occurred which, with due notice or lapse of time or both, would constitute such a default. Seller has not received any written notice that any Person intends or desires to modify, waive, amend, rescind, release, cancel or terminate any Material Contract.

LA 128,943,115v12 7-26-10

Section 5.14.   Tax Matters.

(a)   Transfer Taxes.  Seller shall be responsible for all state and local transfer, excise, value-added or other similar Taxes, and all sales and use Taxes and all recording and filing fees that may be imposed by reason of the sale, transfer, assignment and delivery of the Purchased Assets.

(b)   Allocation of Taxes.  Seller shall be responsible for all real and personal property Taxes or similar ad valorem obligations levied with respect to the Purchased Assets for any taxable period that includes that Closing Date and ends after the Closing Date, whether imposed or assessed on or before the Closing Date.  Purchaser shall be responsible for all real and personal property Taxes or similar ad valorem obligations levied with respect to the Purchased Assets for any taxable period subsequent to the Closing Date.

Section 5.15.   Employee Benefit Plans. Except as set forth on Schedule 5.15, neither Seller nor any Affiliate of Seller maintains, contributes to, or is a party to, (i) any "employee benefit plan," as defined in Section 3(3) of ERISA, or (ii) any other written, unwritten, formal or informal plan or agreement involving direct or indirect compensation other than workers compensation, unemployment compensation and other government programs, under which Seller or any of its respective Affiliates has any present or future obligation or liability with respect to the Transferred Employees (collectively, the "**Employee Benefit Plans**"). A list of Employee Benefit Plans, and related trust documents and summary plan descriptions in the possession of Seller, have been delivered to Purchaser by Seller. To the Knowledge of Seller, Seller has not been a party to or sponsored a multi-employer plan or a defined benefit plan. Seller and all fiduciaries of the Employee Benefit Plans have fully complied with their obligations under the Employee Benefit Plans and all duties under ERISA. To the Knowledge of Seller, there has been no prohibited transaction under Section 4975 of the Code or Section 406 of ERISA or otherwise with respect to any Employee Benefit Plan. To the Knowledge of Seller, each Employee Benefit Plan has been maintained in accordance with applicable laws and in compliance with its terms. To the Knowledge of Seller, Seller has no current or future liabilities with respect to post-employment or post-retirement benefits for former or retired employees.

Section 5.16.   Employees.  Seller has provided an accurate list of (a) all of the employees of the Business as of the Execution Date (collectively with employees of the Business hired by Seller after the Execution Date and prior to the Closing Date, the "**Employees**"), and (b) those Employees on disability, FMLA, military or other leave or absence other than scheduled vacation or jury duty as of the Execution Date.

Section 5.17.   Labor Matters; Employment Agreements.

(a)   Seller is not a party to any union or collective bargaining agreements covering any of the Employees nor, to the Knowledge of Seller, are there currently any union organizing efforts by or with respect to any such Employees. Seller has not experienced any actual or threatened employee strike or employee related work stoppage, slowdown or lockout.

25

(b)     Other than as set forth on Schedule 5.17(b), Seller has no employment agreements with any of the Employees which are not terminable at will and without material cost or expense at the election of Seller. Other than as set forth on Schedule 5.17(b), Seller is not a party to any change of control severance agreements.

(c)     To the Knowledge of Seller, there are no administrative charges or court complaints against Seller concerning alleged employment discrimination or other employment related matters that are pending or, to the Knowledge of Seller, threatened before the U.S. Equal Employment Opportunity Commission, the U.S. Department of Labor or any other governmental authority. To the Knowledge of Seller, Seller is in compliance with all applicable laws relating to employment and employment practices, wages, hours, and terms and conditions of employment, including all immigration laws.

(d)     To the Knowledge of Seller, all independent contractors providing equipment and/or services to Seller have been retained under valid Contracts and qualify for independent contractor status under all applications laws, including existing Internal Revenue Service rules and interpretations.

(e)     To the Knowledge of Seller, Seller has timely paid or adequately accrued all contributions required to be paid by Seller to any unemployment compensation fund or other fund to which Seller is required to contribute under the laws of any applicable state with respect to periods through the Closing.

(f)     To the Knowledge of Seller, Seller has not taken any action in respect of the Employees that would require notice or create any liability under the Worker Adjustment and Retraining Notification Act, and Seller does not have any present plans to take such action.

Section 5.18.  Bank Accounts.  Schedule 5.18 sets forth a list of all banks and other financial institutions with which Seller has an account, a lock box, a safe deposit box or borrowing authority, specifying with respect to each the name and address of the bank or other financial institution, the account number and the names of persons authorized as signatories thereon or to act or deal in connection therewith.

Section 5.19.  Environmental Matters and Employee Health and Safety Matters.

(a)     Except as set forth in Schedule 5.19(a), to the Knowledge of Seller, (i) Seller is in material compliance with all Environmental Laws (as defined below); (ii) Seller has obtained all applicable Environmental Permits (as defined below); (iii) all such permits are in full force and effect; and (iv) Seller is in material compliance with all such Environmental Permits. As used herein, "**Environmental Laws**" shall mean all applicable federal, state, local and foreign laws, ordinances, rules, regulations, judgments, orders, or decrees relating to the protection or regulation of human health, safety, or the environment enacted as of the Execution Date, including to the extent applicable, the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended ("**CERCLA**") (42 U.S.C. §§ 9601 et seq.), the Resource Conservation and Recovery Act ("**RCRA**") (42 U.S.C. §§ 6901 et seq.), the Clean Water Act (33 U.S.C. §§

26

1251 et seq.), the Atomic Energy Act (42 U.S.C. § 2201 et seq.), and similar state and local laws. "**Environmental Permits**" shall mean all applicable licenses and Permits or other approvals required under applicable Environmental Laws in connection with the ownership or operation of the Business. None of the Leased Real Property is listed in the Environmental Protection Agency's National Priorities List of Hazardous Waste Sites under CERCLA or any similar state list under a comparable state statute.

(b)      Except as set forth in Schedule 5.19(b), there is no pending or, to the Knowledge of Seller, threatened claim, litigation, or administrative proceeding, or known prior claim, litigation or administrative proceeding arising under any Environmental Law involving the Purchased Assets, the Business or the Leased Real Property.

(c)      During the period that Seller has conducted the Business on the Leased Real Property, except in material compliance with all Environmental Laws, to the Knowledge of Seller, Seller has never stored, handled, recycled, reclaimed, disposed of, or contracted for the disposal of, Hazardous Materials in connection with the Business, and, to the Knowledge of Seller, no such Hazardous Materials has been disposed of on the Leased Real Property. During the period that Seller has conducted the Business on the Leased Real Property, to the Knowledge of Seller, there have been no Releases of any Hazardous Materials into the environment or onto, under or about the Leased Real Property in connection with the Business, except in compliance with all Environmental Laws.

(d)      Seller has provided or made available to Purchaser true and complete copies of all environmental audits, studies, reports, analyses and monitorings, and all material correspondence on substantial environmental matters, in its possession or control, relating to the Purchased Assets, the Business or the Leased Real Property.

Section 5.20.  Affiliate Relationships.   Except as set forth on Schedule 5.20, no (a) shareholder, officer or director of Seller, (b) entity in which any such shareholder, officer or director owns any beneficial interest (other than a publicly held corporation whose stock is traded on a national securities exchange or in the over-the-counter market and less than two percent (2%) of the stock of which is beneficially owned by such shareholders, officers or directors in the aggregate), or (c) Affiliate of any of the foregoing is a party to: (i) any Contract with, or relating to, Seller, the Business, the Purchased Assets or the Assumed Liabilities; or (ii) any property (real, personal or mixed, tangible or intangible) used by the Seller in the ownership, operation and/ or development of the Purchased Assets or the Business.  Schedule 5.20 also sets forth a true, correct and complete list of all Accounts Receivable, notes receivable and other receivables and accounts payable owed to or due from any such Person described above by or to Seller but solely with respect to the Purchased Assets except for any compensation payable to such officers in their capacity as Employees of Seller in the ordinary course of business, in each case, to the Knowledge of Seller.

Section 5.21.  Financial Instruments.  Schedule 5.21 contains an accurate and complete list of all outstanding financial assurance instruments related to the Permits and the Business, including performance bonds, letters of credit and surety bonds to the Knowledge of Seller.

27

Copies of such financial assurance instruments in the possession of Seller have been provided to Purchaser.

Section 5.22. Insurance. Schedule 5.22 contains an accurate and complete list of all policies or binders of property, general liability, workmen's compensation, automobile liability and legal liability insurance held by or on behalf of Seller in connection with the Business. To the Knowledge of Seller, all such policies are in full force and effect, all premiums with respect thereto covering all periods up to and including the Closing Date have been paid, and Seller has not received notice of cancellation or non-renewal of any policy of insurance, nor been refused any insurance, nor has its coverage been limited by any carrier, in each case in connection with Seller's ownership of the Purchased Assets and operation of the Business.

Section 5.23. Brokers/Finders. Except as set forth in Schedule 5.23, Seller has not employed, and to the Knowledge of Seller, no other Person has made any arrangement by or on behalf of Seller with any financial advisor, investment banker, broker, finder, consultant or intermediary in connection with the transactions contemplated by this Agreement which would be entitled to any investment banking, brokerage, finder's or similar fee or commission in connection with this Agreement or the transactions contemplated hereby.

Section 5.24. Survival. The representations and warranties of Seller described herein shall not survive Closing and nothing herein shall impose direct liability on Seller's Management Team.

SECTION 6. REPRESENTATIONS AND WARRANTIES OF PURCHASER.

Purchaser hereby represents and warrants to Seller as follows on and as of the Execution Date and on and as of the Closing Date:

Section 6.1. Formation. Purchaser is a Delaware limited liability company duly formed, validly existing and in good standing under the laws of Delaware, and Purchaser has all limited liability company power and authority to own its properties and assets and to conduct its businesses as now conducted.

Section 6.2. Authorization and Validity of Agreement. Purchaser has all requisite limited liability company power and authority to enter into this Agreement and each of the Ancillary Agreements to which it is a party and to carry out its obligations hereunder and thereunder. The execution and delivery of this Agreement and each of the Ancillary Agreements to which Purchaser is a party and the performance of its obligations hereunder and thereunder have been duly authorized by all necessary action by its authorized representative, and no other proceedings on the part of Purchaser are necessary to authorize such execution, delivery and performance. This Agreement has been, and as of the Closing Date each Ancillary Agreement to which Purchaser is a party will be, duly executed by Purchaser and constitutes (or as of the Closing Date will constitute) its valid and binding obligation, enforceable against it in accordance with its terms.

Section 6.3. No Conflict or Violation. The execution, delivery and performance by Purchaser of this Agreement and each Ancillary Agreement to which it is a party (a) do not and

28

will not violate or conflict with any provision of its certificate of incorporation or bylaws, (b) do not and will not violate any provision of law, or any order, judgment or decree of any court or other governmental or regulatory authority, and (c) do not and will not violate or result in a breach of or constitute (with due notice or lapse of time or both) a default under any Contract or other material agreement or instrument to which Purchaser is a party or by which it is bound or to which its properties or assets is subject.

Section 6.4.    Consents and Approvals.  The execution, delivery and performance of this Agreement on behalf of Purchaser does not require the consent or approval of, or filing with, any government, governmental body or agency or other Person except: (i) as may be required in connection with the Bankruptcy Code, (ii) as may be required to transfer any Permits; and (iii) as may be required in connection with the assignment and assumption of the Assumed Agreements.

SECTION 7.   COVENANTS OF SELLER.

Section 7.1.    Conduct of Business Before the Closing Date.  During the period from the Execution Date and continuing until the earlier of the termination of this Agreement in accordance with Section 15 or the Closing, except (1) for any limitations on operations imposed by the Final Cash Collateral Order, the Bankruptcy Court or the Bankruptcy Code, (2) as otherwise expressly contemplated by this Agreement or (3) with the prior written consent of the Purchaser, Seller shall not:

(a)    make any material change in the conduct of the Business, or enter into any transaction with respect to the Business other than in the ordinary course of business consistent with past practices;

(b)    subject any of the Purchased Assets, or any part thereof, to any Lien or suffer such to exist other than Permitted Liens or Liens that will be released at or prior to the Closing Date;

(c)    acquire any assets, Inventory or properties related to the Business, or enter into any other transaction related to the Business, other than in the ordinary course of business consistent with past practice and in accordance with the terms of the Final Cash Collateral Order and/or as otherwise directed by Purchaser and approved or permitted by order of the Bankruptcy Court;

(d)    except as consented to by Purchaser, enter into any new (or amend any existing) employee benefit plan, program or arrangement affecting the Employees or any new (or amend any existing) employment, severance or consulting agreement relating to any Employee, or grant any general or specific increase in the compensation (including salary and/or bonus compensation) of any Employees, directors, officers or consultants of Seller other than in accordance with the "Daphne's Greek Café FYE 2009 Monthly Incentive Bonus Plan For General and Restaurant Managers" (including any such increase pursuant to any bonus, pension, profit-sharing or other plan or commitment, and whether payable in cash or personal property) or grant any increase in the compensation payable or to become payable to any Employee or consultants of Seller, outside the ordinary course of business;

29